1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  STEVEN B. SACKS, Cal. Bar No. 98875
   ORI KATZ, Cal. Bar No. 209561
4  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4109
5  Telephone:   415-434-9100
   Facsimile:   415-434-3947
6
   Proposed Attorneys for HUMBOLDT
7  CREAMERY, LLC

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                       SANTA ROSA DIVISION

11

12  In re                                  Case No. 09-11078

13  HUMBOLDT CREAMERY, LLC,                 Chapter 11

14  a Delaware Limited Liability Company,   **DEBTOR'S EMERGENCY MOTION
                                            FOR INTERIM AND FINAL ORDER
15                      Debtor.             (I) AUTHORIZING POST-PETITION
                                            FINANCING AND GRANTING LIENS
16  Tax ID: 87-0736033                      AND SUPERPRIORITY CLAIMS,
                                            (II) AUTHORIZING USE OF CASH
17                                          COLLATERAL, (III) AUTHORIZING
                                            IMMEDIATE PAYMENT OF
18                                          CERTAIN ADMINISTRATIVE
                                            CLAIMS, (IV) AUTHORIZING USE
19                                          OF EXISTING BANK ACCOUNT,
                                            AND (V) PROVIDING RELATED
20                                          RELIEF**

21                                          Date:  April 22, 2009
22                                          Time:  10:00 a.m.
                                            Place: United States Bankruptcy Court
23                                                 99 South "E" Street,
                                                 Santa Rosa, CA 95404
24                                          Judge: Hon. Alan Jaroslovsky

25

26

27

28

EMERGENCY MOTION

# TABLE OF CONTENTS

Page

I. SUMMARY OF RELIEF SOUGHT ................................................................. 2

II. INTRODUCTORY STATEMENT .................................................................. 4

III. BACKGROUND ........................................................................................... 5

    A. Historical Background of the Company. ........................................... 5

    B. Financial Background of the Company. ............................................ 7

        1. The Output Agreement with the Association. ...................... 7

        2. The Debtor's Customers. ...................................................... 7

        3. The Debtor's Product Lines. ................................................. 7

            a. Ice Cream and Frozen Novelties. .......................... 7

            b. Powdered Milk. ...................................................... 8

            c. Fluid Milk. .............................................................. 8

            d. Other Products. ....................................................... 8

    C. The Debtor's Pre-Petition Financing and Capital Structure. ........... 8

    D. Events Leading to the Bankruptcy Filing. ...................................... 9

    E. Plan for the Case. ........................................................................... 11

IV. THE REQUEST FOR DIP FINANCING SHOULD BE GRANTED .................... 12

V. USE OF CASH COLLATERAL IS NECESSARY AND APPROPRIATE ........... 16

VI. IMMEDIATE PAYMENT UNDER 503(b)(9) IS PROPER ................................ 17

VII. THE DEBTOR SHOULD MAINTAIN ITS EXISTING BANK ACCOUNT ........ 20

VIII. NOTICE ...................................................................................................... 21

IX. CONCLUSION ............................................................................................. 21

W02-WEST:5KES1\401946226

EMERGENCY MOTION

Case 09-11078 Doc# 6 Filed: 04/21/09 Entered: 04/21/09 10:02:58 Page 2 of 25

# TABLE OF AUTHORITIES

Federal Cases

In re Ames Department Stores, Inc.,
115 B.R. 34 (S.D.N.Y. 1990)...................................................................... 14

In re Baldwin United Corp.,
79 B.R. 321 (Bankr. S.D. Ohio 1987)........................................................ 20

Bray v. Shenandoah Federal Sav. & Loan Association (In re Snowshoe Co.),
789 F.2d 1085 (4th Cir. 1986)..................................................................... 14

In re Crouse Group, Inc.,
71 B.R. 544, modified on other grounds,
75 B.R. 553 (Bankr. E.D. Pa. 1987)
75 B.R. 553 (Bankr. E.D. Pa. 1987)............................................................ 13

In re Curlew Valley Associate,
14 B.R. 506 (Bankr. D. Utah 1981) ............................................................ 15

In re Garden Ridge Corp.,
323 B.R. 136 (Bankr. D. Del. 2005) ........................................................... 18

In re Global Home Products, LLC,
No. 06-10340(KG), 2006 Bankr. LEXIS 2608
(Bankr. D. Del. Dec. 21, 2006) ................................................................... 18

Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Railway,
318 U.S. 523 (1943)..................................................................................... 14

In re Lifeguard Industrial, Inc.,
37 B.R. 3 (Bankr. S.D. Ohio 1983) ............................................................. 15

In re O'Connor,
808 F.2d 1393 (10th Cir. 1987).................................................................... 16

In re Simasko Prod. Co.,
47 B.R. 444 (D. Colo. 1985) ....................................................................... 14

In re The Charter Co.,
778 F.2d 617 (11th Cir. 1985)..................................................................... 20

Federal Statutes

11 U.S.C. § 105(a) ....................................................................................... 20

11 U.S.C. § 503(b)(9) ...................................................................... 1, 3, 17, 18, 19

Bankruptcy Code § 345 ............................................................................. 4, 14

Bankruptcy Code § 362 .............................................................................. 15

Bankruptcy Code § 363(c)(2) ..................................................................... 16

Case 09-11078    Doc 6    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 3 of 25
W02-WEST:5KES1\401946226
EMERGENCY MOTION

1  Bankruptcy Code § 363(e) ................................................... 16

2  Bankruptcy Code § 364(c) ................................................... 13

3  State Statutes

4  UCC 9-102(44) ................................................................. 17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EMERGENCY MOTION

Humboldt Creamery, LLC (the "Debtor" or "Humboldt") moves this Court on an emergency basis for entry of an order authorizing the Debtor to:

1.    Incur post-petition secured indebtedness (the "DIP Financing") of up to $1.7 million on an interim basis, pursuant to a Debtor in Possession Loan Agreement (the "DIP Credit Agreement") between the Debtor, CoBank, ACB ("CoBank") and the lenders (the "DIP Lenders") specified in the DIP Credit Agreement, pursuant to Sections 105, 361, 362 and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and grant to CoBank a lien and security interest (the "DIP Lien") for the benefit of the DIP Lenders on all real and personal property of the Debtor (the "DIP Collateral"), other than avoidance actions under Bankruptcy Code Sections 544, 545, 547, or 548;

2.    Use the cash collateral (the "Cash Collateral") of CoBank, pursuant to an Agreement for Use of Cash Collateral (the "Agreement") entered into between Debtor and CoBank, pursuant to Sections 361 and 363 of the Bankruptcy Code, and as adequate protection granting to CoBank a replacement lien on (a) post-petition like-kind collateral of the same priority, validity and extent as CoBank's lien on prepetition collateral, and (b) a lien on certain additional collateral that shall be subordinate to any valid and enforceable existing liens on such additional collateral that are not avoidable;

3.    Immediately pay certain administrative expenses of the Humboldt Creamery Association (the "Association"), which is a cooperative that has an exclusive milk supply agreement with the Debtor, and other milk suppliers pursuant to Section 503(b)(9) of the Bankruptcy Code; and

4     Maintain and continue to use its existing bank account, with certain protections in place, as contemplated in Guideline 4.4.6 of the Region 17 United States Trustee Guidelines.

In addition, the Debtor requests that at the conclusion of the interim hearing on this motion (the "Motion"), the Court set a final hearing on the Motion.

W02-WEST:5KES1\401946226

Case 09-11078    Doc 6    Filed 04/21/09    Entered 04/21/09 10:02:58    Page 5 of 25

## I.

## SUMMARY OF RELIEF SOUGHT

The Debtor processes, distributes and markets various dairy products. The Debtor's bankruptcy filing was necessitated by its impaired financial condition, which had been hidden until recently by inaccurate financial statements created by its former Chief Executive Officer. The Debtor now needs up to $3 million in financing and full use of cash collateral in order to operate through the summer months, when sales of its main product line, ice cream, are typically highest. Much of this money ($1.75 million) is needed immediately over the next two weeks in order to pay the dairymen who supply the milk that is the essential raw material for the Debtor's business and to make key inventory purchases that could not be made pre-petition and which are now needed on an emergency basis. Access to the DIP loan is being sought on an interim basis because delaying payments to the dairymen will likely cause them to be unable to stay in business to supply this key ingredient to the Debtor and because inability to make additional materials purchases now will cause irreparable harm to the Debtor's business. The Debtor intends to continue operating as a going concern in this case so that it can either sell its business or reorganize with new investment. Any interruption to the Debtor's business during this key season would have devastating consequences to the Debtor's ability to continue operating, with an equally devastating impact on the dairymen, truckers, customers and others who depend on the Debtor.

The Debtor is seeking four types of emergency relief in this motion (the "Motion"). *First*, the Debtor is seeking entry of an interim order (the "Interim DIP Order") authorizing the Debtor to borrow up to $3 million pursuant to the terms of the DIP Credit Agreement, with such funds to be used pursuant to the budget (the "Budget") attached to the Interim DIP Order. The interim funds requested total approximately $1.75 million, and assume a final hearing on the DIP Financing will be held on or before May 15, 2009. The requested borrowing is absolutely critical because the Debtor does not have sufficient available sources of working capital and liquidity to operate its business without access to the DIP

W02-WEST:5KES1\401946226  EMERGENCY MOTION

Financing. The Debtor has several immediate needs that must be met to: (i) permit the orderly continuation of the operation of its business, (ii) maintain its business relationships with the dairymen and other vendors, (iii) obtain sufficient materials and inventory to meet customer demand, and (iv) satisfy other working capital needs. In the absence of immediate authorization to access the DIP Financing, the Debtor will not be able to effectively operate its business, resulting in a significant loss of going concern value and harm to the estate.

*Second*, the DIP Financing is intended to be used in conjunction with the Cash Collateral of its pre-petition Lenders in order to adequately support the Debtor's working capital and operational needs. Accordingly, the Debtor must have an order (the "Interim CC Order") authorizing the use of its significant Cash Collateral. The Debtor will provide to its existing senior secured lenders adequate protection in the form of a replacement lien on existing collateral, and a subordinate lien on additional collateral.

*Third*, because the Debtor has not made several significant payments to the Association in recent months, the dairymen who comprise the Association are in extreme financial distress. The Association lost one milk producer recently, and neither the Association nor the Debtor can afford further losses. Under Section 503(b)(9) of the Bankruptcy Code, the Association has an administrative expense for the value of the milk received by the Debtor during the 20 days before the commencement of this chapter 11 case (the "20 Day Milk"). Unless the Association's administrative expense is immediately allowed and the Debtor is authorized to being immediately paying the Association on account of the 20 Day Milk, the Association's members will face grim financial consequences, including defaults to their lenders, bankruptcy, and liquidation. Already the financial crisis faced by these farmers and dairymen is the worst the local dairy industry has seen in over three decades, with every single farmer and dairymen in the Association holding out hope that payment for the 20 Day Milk will be allow them to salvage their farms and stay afloat. In addition to milk supplied by the Association's members, the Debtor also seeks to pay certain non-members on account of the value of the milk they

delivered during the same 20 day period.  These non-members are independent farmers and dairymen who will struggle to survive if forced to wait for payment on account of their recently delivered milk.  In this Motion, the request to pay on account of the 20 Day Milk also includes these non-members.  Where, as here, the Debtor's senior secured creditors (with an interest in the Debtor's cash collateral) have studied the Debtor's business and agreed to pay the Milk producers in the manner sought in this Motion and based on the schedule set forth in the Budget, the Court should defer to their defer to them.

*Fourth*, under the Bankruptcy Local Rules and United States Trustee's Guidelines, the Debtor is required to close or freeze all of its bank accounts upon the filing of its chapter 11 petition.  The Debtor only has one bank account, and it would ease some of the burden on the Debtor during this chapter 11 case if it could simply maintain its existing account.[1]  This would avoid confusion and potential delay in connection with significant deposits from long-standing customers that are anticipated during the case.  Assuming entry of an order authorizing the Debtor to maintain its existing bank account, the Debtor will work closely with its bank to ensure that checks on account of pre-petition claims are not honored absent a Court order.  Because the Debtor only recently switched banks, opening a new account with a new account number could disrupt the Debtor's business and confuse its key customers.

II.

<u>INTRODUCTORY STATEMENT</u>

This Court's Guidelines for Cash Collateral & Financing Motions & Stipulations (the "Guidelines") require the Debtor to prepare an introductory statement that summarizes all material provisions of the DIP Financing, the Agreement and the proposed orders sought.  A copy of the Debtor's introductory statement is attached to this Motion as Exhibit

---

[1] The Debtor's bank is not an authorized depository under Bankruptcy Code section 345. The Debtor requests that it nonetheless be authorized to maintain this account as contemplated in the Region 17 United States Trustee Guidelines.  The Debtor will seek the consent of the United States Trustee in this regard.

Case 09-11078    Doc 6    Filed 04/21/09    Entered 04/21/09 10:02:58    Page 8 of 25

W02-WEST:5KES1\401946226

EMERGENCY MOTION

A. Because the introductory statement covers the terms of the Interim DIP Order and the Interim CC Order, a detailed discussion is not repeated here in the body of this Motion, but is instead incorporated by reference to the introductory statement.

The Guidelines also require the Debtor to make disclosures regarding certain provisions included in the Interim DIP Order, Interim CC Order, DIP Credit Agreement and the Agreement. Those disclosures have been included in the introductory statement, which has been certified by Debtor's counsel as required.

In addition to the matters covered in the introductory statement, the Guidelines require the Debtor to include with the Motion a copy of the proposed orders sought and the relevant agreements to be approved. Accordingly, copies of the following documents are attached to this Motion:

Exhibit B       - Interim DIP Order

Exhibit C       - Interim CC Order

Exhibit D       - DIP Credit Agreement

Exhibit E       - Cash Collateral Agreement (defined as the "Agreement")

It should be noted that the Budget attached to the Interim DIP Order contemplates payment to the Association on account of the 20 Day Milk. In addition, the Interim DIP Order includes a provision authorizing the Debtor to maintain its existing bank account.

The Interim DIP Order and the Interim CC Order have not been combined into one order (which is often done) because the secured parties in the two orders are not identical.

III.

BACKGROUND

A.      Historical Background of the Company.

The Debtor processes, distributes and markets a wide array of dairy products, including powdered milk, fluid milk, packaged ice cream and various frozen novelty products. The Debtor's business is a grassroots, homegrown affair that has been an integral part of the dairy business in Northern California since 1929. In January of that year, 153 dairy farmers banded together and formed the Association, a nonprofit

agricultural cooperative whose purpose was to remedy the inequality in bargaining power existing between the individual dairy farmers in the area and their larger, institutional customers. Headquartered in Fernbridge, California, the Debtor has retained these strong ties to the land that bore it – the Debtor receives most of the raw milk necessary for its operations from the approximately 40 farmer-members of the Association, who have an average herd size of 300 milking cows.

Since the beginning of the 1990s and into the 2000s, the Debtor's business has been shifting from the sale of low margin goods like basic milk powders and fluid milk to higher margin goods such as ice cream, frozen novelties, and organic versions of its dairy products. This was done as part of a strategy to remain independent in the midst of market consolidation by growing through acquisitions and internal consolidation and expansion. Significant steps in this journey have included the construction of the business' first ice cream manufacturing facility in Fortuna in 1994, the acquisition of a 40,000 square foot distribution center in Stockton in August of 2004, and the purchase of the ice cream division of WestFarm Foods in November of 2004, which included a license of the Darigold trademark and a second ice cream manufacturing facility in Los Angeles that focuses on frozen novelty products. With this increased capacity and ability to control distribution costs internally, the Debtor is able to produce high quality dairy products at low cost for sale under its customers' private labels and under its own brand. Further, as part of its move towards higher margin products, the Debtor has recently increased its product offerings and marketing efforts for products sold under its own trademarked brand, "Humboldt Creamery," which it rolled out nationally in 2007.

The limited liability company comprising the Debtor was formed on December 3, 2004 as part of a corporate restructuring that enabled the expansion of the business. As part of that restructuring, the Association contributed essentially all of its assets (except for its contracts with its farmer-members) to the Debtor in exchange for a 75% membership interest in the Debtor. The Association's sole function is now to provide the Debtor with raw milk.

B.    <u>Financial Background of the Company.</u>

    1.    <u>The Output Agreement with the Association.</u>

The Debtor and the Association are parties to a Milk Supply Contract dated January 1, 2005 (the "Milk Supply Contract"), which is the key agreement at the heart of the Debtor's business.  The Milk Supply Contract is an output contract pursuant to which the Debtor is obligated to purchase all of the raw milk produced by the approximately 40 members of the Association.  The raw milk purchased under this agreement includes both non-organic and organic milk.  In addition, because the Debtor's raw milk demands exceed the Association's supply, the Debtor also purchases some raw milk from non-Association members.  Currently, approximately 90% of the Debtor's raw milk supply is provided by Association members and approximately 10% is supplied by non-Association milk producers.

    2.    <u>The Debtor's Customers.</u>

The Debtor has contracts with major grocery retailers, big box stores and major food processing companies in the United States and abroad.  The Debtor makes approximately 65% of its sales outside of the State of California, and has been expanding its presence in international markets.  The Debtor has recently become the largest U.S. exporter of ice cream to Mexico.

    3.    <u>The Debtor's Product Lines.</u>

        a.    <u>Ice Cream and Frozen Novelties.</u>

The Debtor's most significant product line is ice cream, and it is the largest private label ice cream manufacturer in the Western United States.  The Debtor's two ice cream manufacturing facilities produce a full range of non-organic and organic ice creams from "regular" to "super premium," as well as over 300 different frozen novelty products of varying flavors, grades, labels and packages.

The Debtor produces these ice cream products under its own trademarked "Humboldt Creamery" brand, and under the private labels of its customers.  In 2008, approximately 55% of the Debtor's ice cream sales were made under its own brand and

approximately 45% under its customers' private labels.  Approximately 45% of the Debtor's gross revenues in 2008 were derived from the sale of ice cream and frozen novelties.

b.     Powdered Milk.

The Debtor's second most significant line of business is the sale of powdered milk, which constituted approximately 35% of its gross revenues in 2008.  The Debtor has the ability to produce approximately 24 million pounds of powdered milk annually, which it sells worldwide to customers in the pharmaceutical, confectionary and other industries. The Debtor has traditionally supplied approximately 30% of the wholemilk powder used in the United States, and is the only American manufacturer to make an "instantized" version for sale internationally.  The Debtor also produces value added non-fat dry milk powder and various niche powders, including organic powder, rBST-free powder and non-fat powder fortified with vitamins.  The Debtor's ability to instantize powders and produce niche powders sets it apart from the average powder manufacturer and enables it to obtain significant premiums over commodity pricing.

c.     Fluid Milk.

After powdered milk, the next most significant line of business for the Debtor is in fluid milk products, of which the Debtor produces approximately 3.9 million gallons annually.  In 2007, approximately 60% of that was organic milk.  The Debtor sells the fluid milk locally under its own "Humboldt Creamery" label, and throughout the West Coast under its customers' private label brands.

d.     Other Products.

In addition to the above, the Debtor sells raw milk and cream to its customers who process it into various items, including fluid milk, cheese and butter.

C.     The Debtor's Pre-Petition Financing and Capital Structure.

The Debtor is 75% owned by Association and 25% owned by another dairy cooperative, Dairy Farmers of America, Inc. ("DFA").  This equity structure derives from the Association's ownership of 13,500 of the 18,000 Common Units of membership

-8-

1   interest in the Debtor, and DFA's ownership of the remaining 4,500 Units.  The Debtor has

2   also sold lesser membership interests in the form of Series A and B Preferred Units.  There

3   are approximately 3,500 Series A Preferred Units and 400 Series B Preferred Units

4   outstanding.

5           The Debtor's secured debt obligations arise from a borrowing arrangement with

6   CoBank, ACB, as administrative and collateral agent, and certain other participating

7   lenders, including two American AgCredit entities (collectively, the "Lenders").  This

8   arrangement is documented in a Loan Agreement dated January 3, 2005, and subsequently

9   amended twenty times (the "Pre-Petition Loan Agreement").  Two primary obligations

10  arise from this borrowing arrangement: the Debtor's obligations under a revolving line of

11  credit extended by the Lenders, and the Debtor's obligations under a term loan extended by

12  the Lenders.  As of the Petition Date, the collective amount outstanding under both the line

13  of credit and the term loan was in excess of $54,000,000.00.[2]  The revolving line of credit

14  matures on February 1, 2010, and the term loan is due on April 30, 2017.

15          The Debtor's obligations under the Pre-Petition Loan Agreement are secured by

16  mortgages encumbering all of its real property in Humboldt, San Joaquin and Los Angeles

17  Counties, as well as security agreements encumbering all of the Debtor's inventory,

18  accounts receivable, equipment and certain other personal property.  In addition, the

19  Association guaranteed all of the Debtor's obligations under the Pre-Petition Loan

20  Agreement.

21  D.      Events Leading to the Bankruptcy Filing.

22          The Debtor's bankruptcy filing was necessitated by the discovery that its financial

23  condition was much different than what had been represented in the financial statements

24  issued by the Debtor under the management of its former Chief Executive Officer, Richard

25  Ghilarducci.  Mr. Ghilarducci had been the President and CEO of the Debtor (and before

26  _____

27  [2] The foregoing numbers are estimates given for informational purposes only, and the
    Debtor reserves all of its rights and arguments regarding the Loan Agreement and any
    amounts owing by the Debtor thereunder.

28

W02-WEST:5RES1\400497622.6                                                    EMERGENCY MOTION

that, the Association) since 1997.  Prior to serving as CEO, Mr. Ghilarducci had also been the Association's Chief Financial Officer since 1985.  On February 20, 2009, Mr. Ghilarducci abruptly resigned, warning the Debtor of potential financial inaccuracies.

Immediately upon Mr. Ghilarducci's resignation, the Debtor suspended the sale of the Series B Preferred Units, which were being sold largely to individuals in Humboldt County, and took active steps to uncover the nature and extent of the potential fraud.  The Debtor has been working closely with the U.S. Department of Justice to investigate its former CEO's misdeeds, and has also commissioned its own investigation into the matter.  The Debtor's investigation showed that the Debtor's financial statements had been manipulated, perhaps going back several years.

In the wake of Mr. Ghilarducci's resignation, the Debtor hired an accounting firm and a workout professional to aid the Debtor in undertaking a thorough review of its balance sheet and other financial data, with the goal of gaining an accurate understanding of its finances.  As that picture has become clearer, so has the need for significant financial restructuring.  To that end, the Debtor has accomplished much in a short time toward the goal of reducing expenses, increasing efficiency, and enhancing its overall financial health.  Among other things, the Debtor has: (i) aggressively marketed the sale of certain of its properties, businesses and facilities, including its manufacturing facility in Los Angeles, its powder milk processing facility in Loleta, its direct store delivery business in Stockton, and certain vacant land in Stockton; (ii) drastically reduced overhead by eliminating approximately one-third of its general and administrative expenses; (iii) conducted strategic workforce reductions at all levels in order to slash payroll expenses, including the elimination of approximately 23% of senior and middle management positions; (iv) obtained concessions from the Association under the Milk Supply Agreement, including the deferral of $2 million dollars in payments past due, a 20% reduction in the supply of raw organic milk, and a significant reduction in the purchase price of all raw milk; (v) commenced discussions regarding strategic partnerships with certain existing equity holders, customers and competitors; and (vi) hired outside consultants from the

-10-

1  dairy industry to review the Debtor's operational structure and provide advice as to how to

2  increase operational efficiency.

3  E.     Plan for the Case.

4      In broad terms, the Debtor's strategy for this chapter 11 case is to obtain a debtor-in-

5  possession loan from its pre-petition Lenders to maintain its operations, while working to

6  reorganize or sell its business with the aid of an investment banking firm.  The Debtor

7  currently contemplates that it will most likely sell the assets of the Debtor as a going

8  concern, but the Debtor remains open to pursuing a partial sale or a reorganization based

9  on new investment capital if, after pursuing all options, any of those prove to be the best

10  course of action for the estate, the creditors and other parties in interest.

11      The need for additional financing became clear to the Debtor after taking the

12  substantial steps toward restructuring described above.  Even after these steps, the Debtor

13  found itself in default under the Pre-Petition Loan Agreement and in need of further

14  financing in order to continue production through the summer months of 2009.  Prior to its

15  bankruptcy filing, the Debtor sought such financing from its pre-petition Lenders, but the

16  Lenders were not willing to make any additional loans without the benefit of a court order

17  in Chapter 11.  In light of the Lenders' security interest in substantially all of the Debtor's

18  assets, the Debtor was unable to secure financing from any other source.  The Debtor needs

19  approximately $3 million in order to operate through the summer months, when sales of its

20  main product line, ice cream, are typically highest.  To fulfill this need, the Debtor and the

21  Lenders have negotiated the terms of a debtor in possession loan agreement ("DIP Loan

22  Agreement") in the form attached to this Motion.  The DIP Loan Agreement has been

23  executed by the Debtor and the Lenders, but is subject to the approval of this Court.

24      As the DIP Loan negotiations developed, so did the plan to sell the Debtor's business.

25  The Lenders conditioned their entry into the DIP Loan Agreement upon the Debtor's

26  consent to a process whereby the Debtor would sell all of its assets on a going concern

27  basis.  The Debtor agreed to do so, using the procedures available in a Chapter 11

28  proceeding to facilitate such a sale.  Toward that end, the Debtor entered into an

-11-

engagement letter with the investment bank Duff & Phelps Securities, LLC and its related entity, Chanin Capital Partners, LLC (collectively, "Duff & Phelps") before it filed this Chapter 11 case. The Debtor is filing an application seeking approval of the employment of that professional concurrently with the filing of this Motion. Duff & Phelps' primary focus is to aggressively market and sell substantially all of the Debtor's assets as a going concern, though Duff & Phelps will explore all available options for a successful reorganization. The Debtor feels that this strategy will be beneficial to all creditors, employees and other parties in interest. The strategy will maximize the return for the creditors, other stakeholders and maintain jobs. Continuing the business of the Debtor provides the milk producers with a continued purchaser and processor of raw milk, benefiting the Association, which is one of the Debtor's major creditors, and other suppliers and vendors. It will also provide an opportunity for creditors to obtain a possible return.

Prior to the filing of this Chapter 11 case, Mr. Len Mayer was the Chief Executive Officer of both the Debtor and the Association. The Association was also the Manager of the Debtor. In order to avoid a situation in which a major creditor controlled the Debtor during its bankruptcy case, Mr. Mayer resigned pre-petition as the CEO of the Association, and has now been nominated as the responsible individual for the Debtor. Also, the Association resigned pre-petition as the Manager of the Debtor, and Mr. Mayer is now the Manager of the Debtor.

IV.

### THE REQUEST FOR DIP FINANCING SHOULD BE GRANTED

The Debtor's successful prosecution of this bankruptcy case depends on the Debtor's ability to demonstrate to existing and prospective customers, suppliers, vendors and other contract counter-parties that the Debtor has adequate means to operate during the administration of its chapter 11 bankruptcy case. Without the ability to gear up for the busy summer season, the Debtor will not be able to capitalize on what is traditionally the most important and highest grossing season of the year. In light of the delays in the Debtor's purchases of inventory to date, unless the $1.7 million in interim financing becomes

W02-WEST:5RES1\400949622.6                                                EMERGENCY MOTION

available immediately as budgeted, the Debtor will suffer irreparable harm and will not be able to recover in time to take advantage of the busy summer season. Such a failure would in turn force the Debtor to cease operations and liquidate immediately. The DIP Financing is further necessary to avoid the perception by third parties that they hold undue leverage over the Debtor in normal business negotiations due to the Debtor's liquidity crisis.

The ability of the Debtor to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the Debtor. The preservation and maintenance of the going concern value of the Debtor is integral to a successful going concern sale or reorganization.

The Debtor was unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. Because the Debtor lacks reliable historical financials and has existing lenders who have security interest in all assets (and are believed to be substantially undersecured), it was clear that the Debtor would be unable to obtain credit from any source (other than the DIP Lenders). As a result, all efforts were focused on obtaining the DIP Financing currently sought. The DIP Financing offered by the DIP Lenders is the Debtor's only realistic alternative to obtain post-petition credit.

The terms of the DIP Facility are contained in the DIP Credit Agreement, and its key provisions (along with the Interim DIP Order's key provisions) are summarized in the introductory statement attached to this Motion as Exhibit A.

The statutory requirement for obtaining post-petition credit under section 364(c)(2) of the Bankruptcy Code is a finding, made after notice and hearing, that the Debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." A Section 364(c) financing facility is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *In re Crouse Group, Inc.*, 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

W02-WEST:5RES1\400997622.6                                                                                  EMERGENCY MOTION

Courts have articulated a three-prong test to determine whether a debtor is entitled to obtain financing under section 364(c) of the Bankruptcy Code, namely that:

a. the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

b. the financing is necessary to preserve the assets of the estate; and

c. the terms of the financing are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

The Debtor was unable to procure adequate post-petition credit in the form of unsecured credit or unsecured debt with an administrative priority. The circumstances of this case, described in detail above, require the Debtor to obtain credit under Bankruptcy Code sections 364(c), and make the DIP Lenders the only logical choice for financing. Therefore, the Debtor believes that this Court should authorize the Debtor to obtain the post-petition DIP Financing to the extent and pursuant to the terms contained herein, in the DIP Credit Agreement, and the proposed Interim DIP Order attached to this Motion as Exhibit B.

After determining that post-petition credit was available only under Bankruptcy Code section 364(c), the Debtor negotiated the DIP Credit Agreement at arm's length and pursuant to its business judgment, which is to be accorded deference so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the credit agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod.*

W02-WEST:5RES1\400996262.6

Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

In general, a bankruptcy court should defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513-14 (footnotes omitted).

The Debtor has exercised sound business judgment in determining that the DIP Financing is appropriate as proposed, and has satisfied the legal prerequisites to borrow and incur the indebtedness requested.

The Debtor additionally requests that the Court order that the security interests and liens granted for the benefit of the DIP Lenders be deemed to constitute enforceable, valid and duly perfected security interests and liens without the filing or recordation of financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or taking of any other action in order to validate or perfect the security interests and liens granted, and that such security interests and liens be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the time and date of entry of the proposed Interim DIP Order.

The Debtor further requests that the automatic stay provisions of Section 362 of the Bankruptcy Code be vacated and modified to the extent necessary so as to permit the DIP Lenders to exercise, upon the occurrence of an event of default (as defined in the DIP Credit Agreement) and the giving of notice, written or otherwise, to the Debtor, all rights and remedies provided for in the DIP Credit Agreement and the proposed Interim DIP Order as entered by the Court, as well as further to evidence and provide notice of the liens granted by the Debtor and approved by the Court.

# V.

## USE OF CASH COLLATERAL IS NECESSARY AND APPROPRIATE

Bankruptcy Code § 363(c)(2) provides that a debtor may not use cash collateral without either the consent of the secured party or an order of the court. Section 363(e) provides that a court may condition a debtor's use of cash collateral by the debtor providing "adequate protection" of the secured party's interest in the collateral being used. One of the examples of adequate protection set forth in Bankruptcy Code § 361(2) is providing the secured party with a replacement lien to the extent that the debtor's use of such property results in a decrease in the value of the property subject to the secured party's security interest. The type of adequate protection that is appropriate in a particular case will depend on the nature of the case. Adequate protection [is] a concept which is to be decided flexibly on the proverbial case-by-case basis. *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987).

In this case, the Debtor will be using cash collateral in which the Debtor's pre-petition senior secured lenders have an interest. Such use is by consent of the secured parties, subject to the terms and conditions of the Agreement and the proposed Interim CC Order (attached to this Motion as Exhibits C and E respectively), as summarized in the introductory statement attached to this Motion as Exhibit A.

The Debtor is providing adequate protection in the form of the Replacement Lien (as that term is defined in the Agreement), which is reasonable under the circumstances because the Replacement Lien will encumber the lenders' pre-existing collateral to the same extent, validity and priority as the lenders' pre-petition lien, and will be subordinate with respect to additional collateral. The Replacement Lien will also be subordinate to the lien granted pursuant to the DIP Lien, and subordinate and subject to the Carveout.

The Cash Collateral will be used to operate the Debtors' business while this bankruptcy case is pending. Without its use, the Debtor will be forced to shut down immediately.

## VI.

### IMMEDIATE PAYMENT UNDER 503(b)(9) IS PROPER

The Debtor is seeking authority pursuant to Section 503(b)(9) of the Bankruptcy Code immediately to begin paying the Association and certain non-members on account of the 20 Day Milk consistent with the Budget.[3]

Section 503(b)(9) of the Bankruptcy Code provides that:

> After notice and a hearing, there shall be allowed administrative expenses ... including - (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9).

Milk deliveries are "goods" for purpose of section 503(b)(9). *See* UCC 9-102(44). The Debtor acknowledges that, during the 20-day period prior to the commencement of this case, it received milk from the Association with a value of approximately $2.1 million, and that the Association has yet to be paid in full on account of that milk. Prior to the Petition Date the Debtor paid approximately $646,000 to the Association on account of the 20 Day Milk. The Debtor only made such payments after the Association agreed that the amounts paid would be applied on account of 20 Day Milk (as opposed to being applied to unpaid amounts from January or March 2009).[4] The budgeted post-petition payments to the Association on account of the 20 Day Milk total approximately $1.5 million.

---

[3] The amounts budgeted for Association and non-member milk are based on estimates of the actual weights and prices of milk fats and solids that were delivered to the Debtor during the 20 day period before the filing. The actual weights and prices will not be known until approximately 25 days after the month in which the milk was delivered. A "true-up" reconciliation will be made at the end of the month following the deliveries, either by making an additional payment for any underpayment, or by subtracting any overpayments from future payment.

[4] The Association's agreement to this treatment is reflected in the minutes of a special meeting of the board of directors of the Association. A copy of those minutes is attached to the statement of Len Mayer in support of his authority to sign and file the voluntary petition in this case.

W02-WEST:5RES1\401497622.6                                                        EMERGENCY MOTION

The 20 Day Milk payments for non-member farmers and dairymen are significantly less than the amounts budgeted for the Association. This is because the non-members provide less milk to the Debtor. Pre-petition payments on account of the 20 Day Milk to the non-members totaled only approximately $15,000. Because the Debtor generally kept current with payments to the non-members, no agreement was obtained pre-petition with the non-members regarding application of post-petition payments to 20 Day Milk. The budgeted post-petition payments to the non-member milk suppliers on account of the 20 Day Milk total approximately $213,000.

In light of the Debtor's need for continued milk supply in order to run its business, the Debtor requests that the Court grant it authority to begin immediately paying the Association and non-members for 20 Day Milk in accordance with the Budget.

In determining when a Section 503(b)(9) administrative expense may be paid, courts generally consider (1) prejudice to the debtor, (2) hardship to the claimant, and (3) potential detriment to other creditors. *See In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005) (noting: "Courts have discretion to determine when an administrative expense will be paid."); *see also In re Global Home Prods., LLC*, No. 06-10340(KG), 2006 Bankr. LEXIS 2608 (Bankr. D. Del. Dec. 21, 2006). Those factors weigh heavily in favor of immediate payment in this case for a number of reasons.

First, the Debtor's lenders have agreed to finance the requested payments and allow for the use of their Cash Collateral to ensure that the milk suppliers are paid. This underscores the importance of the need to immediately make the requested payments.

Second, the Debtor supports the payment of the Association's 503(b)(9) claim in the amounts set forth in the Budget on account of the 20 Day Milk. The Debtor believes that such payment is in the best interest of the estate because it would alleviate the financial burden on the Association's members, who are the primary milk suppliers to the Debtor. Simply put, without the Association's milk, the Debtor has almost no ability to continue making its products. The Debtor is entirely dependent in its operations on the continued supply of the Association's milk, and believes that delaying payment on account of the 20

Day Milk, when coupled with the missed pre-petition payments, will deal a significant blow to Association and its farmers and dairymen.  The Debtor recognizes the importance of the proposed payments.  The same holds true for milk received from non-members.

Third, the hardship on the farmers and dairymen cannot be overstated.  The Debtor was unable to pay the Association about $2 million for milk supplied to the Debtor during January 2009, and approximately $3.7 million for milk supplied in March 2009.  As a result, the Association was unable to pay its members (the farmers and dairymen) for much of the milk its members produced and the Debtor received, processed and sold this calendar year.  The Association's members collectively have foregone approximately $5.7 million since January 1, 2009.  While the amount the Debtor is requesting to pay on the account of the Association's 503(b)(9) claim is relatively small in comparison to the total amount owed to the Association since the beginning of this calendar year, such amount is critical to the members' livelihood and businesses.  Failure to make immediate payment on account of the 20 Day Milk will likely be the proverbial "final straw" for many of the members, who are themselves small business owners with obligations to lenders and trade creditors.  Many of these members rely on the draws they receive from the Association as their only source of income.  To them, the loss of this income for even a few days may result in a financial hardship.  Several of the members have already fallen significantly behind on their obligations to their creditors and suppliers, and many have had their credit either cut-off or sharply reduced.  The Association and its members cannot continue without an immediate payment.  A further delay of even a few days could result in a financial crisis for the Association and its members, with significant ripple effects across Humboldt County.

Fourth, Section 503(b)(9) is a forced codification of what is commonly referred to as a "critical vendor" payment.  The milk suppliers are critical vendors and the Bankruptcy Code recognizes the importance of paying them.  If the milk suppliers are not paid, the Debtor will lose them, and as a result lose the milk that is so critical to the Debtor's business.  Without milk, the Debtor has no supplies.  If the milk suppliers go unpaid, their

Case: 09-11078   Doc# 6   Filed: 04/21/09   Entered: 04/21/09 10:02:58   Page 23 of 25

| | |
|---|---|
| 1 | lenders will foreclose, pick up the cows, slaughter them and there will be no more milk. |
| 2 | There will be no way to recover from that harm. |
| 3 | Accordingly, the Debtor requests that the Court grant it authority to make |
| 4 | immediate payment on account of the 20 Day Milk in the amounts set forth in the Budget. |
| 5 | VII. |
| 6 | <u>THE DEBTOR SHOULD MAINTAIN ITS EXISTING BANK ACCOUNT</u> |
| 7 | A request for authority to continue using existing bank accounts is considered a |
| 8 | "simple matter" and bankruptcy courts routinely grant such requests.  *See In re Baldwin* |
| 9 | *United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); *see also In re The Charter Co.*, |
| 10 | 778 F.2d 617, 621 (11th Cir. 1985) (finding use of pre-petition cash management system |
| 11 | was consistent with Bankruptcy Code).  The relief requested in this Motion is specifically |
| 12 | contemplated under the Region 17 United States Trustee Guidelines, and the Court is |
| 13 | authorized to grant such relief pursuant to Section 105(a) of the Bankruptcy Code, which |
| 14 | provides that the Court "may issue any order, process, or judgment that is necessary or |
| 15 | appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a). |
| 16 | The Debtor maintains a single bank account at Coast Central Credit Union ("Coast |
| 17 | Central"), under account number 160831.[5]  The use of the existing bank account benefits |
| 18 | the Debtor's creditors and estate, primarily because it avoids confusion regarding deposits. |
| 19 | The Debtor switched its account to the current bank several months ago.  It would be |
| 20 | disruptive to now have a third switch in accounts in such a short period of time.  The |
| 21 | Debtor will contact Coast Central immediately upon the filing of this bankruptcy case to |
| 22 | advise the bank not to honor any pre-petition checks or other requests for payment absent a |
| 23 | Court order.  The Debtor has relatively few checks that are still outstanding and will |
| 24 | immediately provide the bank with a list of all checks which cannot be honored.  With this |
| 25 | |
| 26 | [5] Coast Central is not on the United States Trustee's list of authorized depositories. Pursuant to Guideline 4.4.6 of the Region 17 United States Trustee Guidelines, the Debtor |
| 27 | has contacted the United States Trustee to seek consent to the maintenance of the Debtor's account at Coast Central. |
| 28 | |

-20-

bar

protection in place, the Debtor believes it (and the third parties it does business with) would benefit from keeping in place the existing account.

The Debtor has included a provision authorizing it to maintain its existing bank account as part of the Interim DIP Order.

VIII.

<u>NOTICE</u>

Notice of this Motion was provided via email, FedEx or fax (all as indicated on the concurrently filed certificate of service) to the following parties: (i) the DIP Lenders; (ii) the United States Trustee; (iii) the twenty largest unsecured creditors of the Debtor; (iv) other parties with liens or security interests of record; and (v) certain other significant parties in interest and their counsel.  Under the circumstances, the Debtor believes that such notice is sufficient and proper.

IX.

<u>CONCLUSION</u>

For all of the reasons set forth above, the Debtor respectfully requests that the Court: (1) enter the Interim DIP Order, (2) enter the Interim CC Order, (3) authorize payment to the Association and non-members on account of the 20 Day Milk consistent with the Budget, (4) authorize the Debtor to maintain its existing bank account, (5) set a final hearing on the Motion, and (6) grant such other and further relief as the Court deems appropriate.

Dated: April 21, 2009

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____/s/ Michael H. Ahrens_____
MICHAEL H. AHRENS

Proposed Attorneys for Debtor
HUMBOLDT CREAMERY, LLC

-21-