**DEBTOR IN POSSESSION
LOAN AGREEMENT**


**Among**


**HUMBOLDT CREAMERY, LLC,
as Borrower,**


**CoBANK, ACB,
as a Lender,
and as Administrative Agent,**


**AMERICAN AgCREDIT, PCA,
as a Lender,**


**and**


**THE OTHER LENDERS FROM TIME TO TIME PARTY HERETO**

SF:247498.3

# TABLE OF CONTENTS

**PAGE**

ARTICLE I  DEFINITIONS AND ACCOUNTING TERMS ..............................................1

    Section 1.1   Defined Terms .................................................................1
    Section 1.2   Accounting Terms and Calculations .......................................12
    Section 1.3   Computation of Time Periods ...............................................12
    Section 1.4   Other Definitional Terms ..................................................12

ARTICLE II  TERMS OF THE CREDIT FACILITIES ..............................................12

    Section 2.1   Lending Commitments...........................................................12
    Section 2.2   Procedure for Loans..........................................................13
    Section 2.3   Notes .......................................................................14
    Section 2.4   Reserved....................................................................14
    Section 2.5   Interest Rates, Interest Payments and Default Interest ...........................14
    Section 2.6   Final Repayment ..............................................................14
    Section 2.7   Payments....................................................................15
    Section 2.8   Fees. .......................................................................15
    Section 2.9   Computation..................................................................15
    Section 2.10  Payments ....................................................................15
    Section 2.11  Use of Loan Proceeds .........................................................16
    Section 2.12  Interest Rate Not Ascertainable, Etc .........................................16
    Section 2.13  Increased Cost ...............................................................16
    Section 2.14  Illegality ..................................................................17
    Section 2.15  Capital Adequacy ............................................................17
    Section 2.16  Funding Losses ..............................................................17
    Section 2.17  Reserved.....................................................................17
    Section 2.18  Reserved.....................................................................17
    Section 2.19  Replacement of Certain Lenders ..............................................17
    Section 2.20  Taxes. ......................................................................18
    Section 2.21  Capitalization ..............................................................19
    Section 2.22  Lender Equities .............................................................20
    Section 2.23  Security Interest; Carveout. .................................................20
    Section 2.24  Confirmation of Plan of Reorganization.......................................21
    Section 2.25  Release .....................................................................21
    Section 2.26  Waivers .....................................................................22

ARTICLE III  CONDITIONS PRECEDENT ........................................................22

    Section 3.1   Conditions of Initial Loans .................................................22
    Section 3.2   Conditions Precedent to All Loans ...........................................24

ARTICLE IV  REPRESENTATIONS AND WARRANTIES ..............................................24

    Section 4.1   Organization, Standing, Etc .................................................24
    Section 4.2   Authorization and Validity ..................................................25
    Section 4.3   No Conflict..................................................................25
    Section 4.4   Government Consent ..........................................................25

i

SF:247498.3

Section 4.5     Budget .......................................................................................25
Section 4.6     Litigation ...................................................................................25
Section 4.7     Environmental, Health and Safety Laws ................................26
Section 4.8     Reserved.....................................................................................26
Section 4.9     Federal Reserve Regulations....................................................26
Section 4.10    Real Property; Location of Collateral.....................................26
Section 4.11    Taxes ...........................................................................................26
Section 4.12    Trademarks, Patents .................................................................27
Section 4.13    Burdensome Restrictions .........................................................27
Section 4.14    Force Majeure ............................................................................27
Section 4.15    Investment Company Act .........................................................27
Section 4.16    Deposit and Disbursement Accounts ......................................27
Section 4.17    Full Disclosure ..........................................................................27
Section 4.18    Subsidiaries ...............................................................................27
Section 4.19    Labor Matters ............................................................................27
Section 4.20    Chapter 11 Case. .......................................................................28

ARTICLE V  AFFIRMATIVE COVENANTS ...............................................................28

Section 5.1     Financial Statements and Report ............................................28
Section 5.2     Existence .....................................................................................29
Section 5.3     Insurance ....................................................................................29
Section 5.4     Payment of Taxes and Claims...................................................29
Section 5.5     Inspection ...................................................................................29
Section 5.6     Maintenance of Properties .......................................................30
Section 5.7     Books and Records ....................................................................30
Section 5.8     Compliance .................................................................................30
Section 5.9     Reserved......................................................................................30
Section 5.10    Environmental Matters; Reporting .........................................30
Section 5.11    Further Assurance .....................................................................30
Section 5.12    Compliance with Terms of Material Contracts.......................31
Section 5.13    Eligibility ....................................................................................31
Section 5.14    Retention of Advisors ................................................................31
Section 5.15    Landlords' Agreements..............................................................31
Section 5.16    Cash Management Systems .......................................................31

ARTICLE VI  NEGATIVE COVENANTS ......................................................................32

Section 6.1     Merger .........................................................................................32
Section 6.2     Disposition of Assets .................................................................32
Section 6.3     Plans ............................................................................................32
Section 6.4     Change in Nature of Business ..................................................32
Section 6.5     Subsidiaries ...............................................................................32
Section 6.6     Restricted Payments..................................................................32
Section 6.7     Transactions with Affiliates .....................................................32
Section 6.8     Accounting Changes ..................................................................32
Section 6.9     Subordinated Debt ....................................................................32
Section 6.10    Investments ................................................................................33
Section 6.11    Indebtedness...............................................................................33

Case: 09-11078     Doc# 6-4     Filed: 04/21/09     Entered: 04/21/09 10:02:58     Page 3 of
62

Section 6.12    Liens ..................................................................................................33
Section 6.13    Contingent Obligations .....................................................................34
Section 6.14    Payments in Accordance with Budget ...............................................34
Section 6.15    Operating Lease .................................................................................34
Section 6.16    Capital Expenditures ..........................................................................34
Section 6.17    Deposit Accounts ...............................................................................34

ARTICLE VII  EVENTS OF DEFAULT AND REMEDIES .........................................34

Section 7.1     Events of Default ...............................................................................34
Section 7.2     Suspension or Termination of Commitments; Remedies ..................38
Section 7.3     Offset ..................................................................................................38

ARTICLE VIII  THE ADMINISTRATIVE AGENT ....................................................39

Section 8.1     Appointment and Authorization ........................................................39
Section 8.2     Note Holders ......................................................................................39
Section 8.3     Consultation With Counsel ................................................................39
Section 8.4     Loan Documents .................................................................................39
Section 8.5     CoBank and Affiliates ........................................................................39
Section 8.6     Action by Administrative Agent ........................................................39
Section 8.7     Credit Analysis ..................................................................................40
Section 8.8     Notices of Event of Default, Etc .......................................................40
Section 8.9     Indemnification ..................................................................................40
Section 8.10    Payments and Collections ..................................................................40
Section 8.11    Sharing of Payments ..........................................................................41
Section 8.12    Advice to Lenders ..............................................................................41
Section 8.13    Defaulting Lender. .............................................................................41
Section 8.14    Resignation ........................................................................................42

ARTICLE IX  MISCELLANEOUS ...............................................................................43

Section 9.1     Modifications .....................................................................................43
Section 9.2     Expenses .............................................................................................43
Section 9.3     Waivers, etc ........................................................................................44
Section 9.4     Notices ................................................................................................44
Section 9.5     Taxes ..................................................................................................44
Section 9.6     Successors and Assigns; Participations; Purchasing Lenders ...........44
Section 9.7     Reserved .............................................................................................46
Section 9.8     Governing Law and Construction ......................................................46
Section 9.9     Consent to Jurisdiction ......................................................................46
Section 9.10    Waiver of Jury Trial ...........................................................................47
Section 9.11    Survival of Agreement .......................................................................47
Section 9.12    Indemnification ..................................................................................47
Section 9.13    Captions ..............................................................................................48
Section 9.14    Entire Agreement ...............................................................................48
Section 9.15    Counterparts .......................................................................................48
Section 9.16    Interest Rate Limitation .....................................................................48
Section 9.17    Parties, Including Trustees; Bankruptcy Court Proceedings ............49

iii

<u>Appendices</u>

Appendix A          Financial Reporting/Operating Covenants
Appendix B          Real Property; Locations of Collateral; Liens
Appendix C          Deposit Accounts
Appendix D          Budget

SF:247498.3

## DEBTOR IN POSSESSION LOAN AGREEMENT

This DEBTOR IN POSSESSION LOAN AGREEMENT, dated as of April __, 2009, is by and between HUMBOLDT CREAMERY, LLC, a Delaware limited liability company, a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as defined below) ("Borrower"), the banks and other financial institutions or entities which are signatories hereto (individually, a "Lender" and, collectively, the "Lenders"), CoBANK, ACB, a federally charted instrumentality under the Farm Credit Act of 1971, as amended, one of the Lenders, as agent for the Lenders (in such capacity, the "Administrative Agent"), and AMERICAN AgCREDIT, PCA, as a Lender.

## RECITALS

WHEREAS, on April __, 2009 (the "Petition Date"), Borrower filed a voluntary petition for relief (the "Chapter 11 Case") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court");

WHEREAS, from and after the Petition Date, Borrower is continuing to operate its business and manage its properties as a debtor in possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Lenders have agreed to extend to Borrower a revolving credit facility, in an aggregate amount not to exceed $3,000,000 (the "Loans"), the proceeds of which will be used as described herein;

WHEREAS, Borrower has agreed to secure all of its Obligations (as defined herein) by granting to the Administrative Agent, for the benefit of itself and Lenders, a Lien, subject to the priorities set forth herein and in the other Loan Documents, on all of its assets, as specified herein;

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

Section 1.1    Defined Terms.  As used in this Agreement the following terms shall have the following respective meanings (and such meanings shall be equally applicable to both the singular and plural form of the terms defined, as the context may require):

"Administrative Agent":  As defined in the opening paragraph hereof.

"Adverse Actions":  Means (a) any challenge to the validity, priority, perfection, or enforceability of obligations owed to the Administrative Agent or the Lenders or the Prior Agent or the Prior Lenders, or to challenge any liens or security interests held by the Administrative Agent or the Prior Agent or the Prior Lenders, (b) the assertion of any claims, counterclaims, or defenses against the Administrative Agent, the Lenders, the Prior Agent or the Prior Lenders or

their affiliates, including any Avoidance Actions, or (c) any attempt to prevent, hinder or otherwise delay the Administrative Agent's, the Lenders' or the Prior Lenders' or the Prior Agent's exercise of any remedies with respect to their collateral or loan documents.

"Affiliate":  When used with reference to any Person, (a) each Person that, directly or indirectly, controls, is controlled by or is under common control with, the Person referred to, (b) each Person which beneficially owns or holds, directly or indirectly, five percent or more of any class of voting Equity Interests of the Person referred to, (c) each Person, five percent or more of the voting Equity Interests (or if such Person is not a corporation, five percent or more of the equity interest) of which is beneficially owned or held, directly or indirectly, by the Person referred to, and (d) each of such Person's officers, directors, joint venturers and partners.  The term control (including the terms "controlled by" and "under common control with") means the possession, directly, of the power to direct or cause the direction of the management and policies of the Person in question.

"Aggregate Commitment Amounts":  shall mean Three Million Dollars ($3,000,000).

"American AgCredit":  As defined in Section 2.21.

"American AgCredit Equities":  As defined in Section 2.22.

"Assignees":  As defined in Section 9.6(c).

"Assignment Agreement":  As defined in Section 9.6(c).

"Bankruptcy Code": shall mean Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court":  As defined in the Recitals.

"Board":  The Board of Governors of the Federal Reserve System or any successor thereto.

"Borrower":  As defined in the opening paragraph hereof.

"Budget": Means the Budget attached hereto as Appendix D or such replacement Budget as shall be agreed to by Borrower and the Administrative Agent, in the sole discretion of each.

"Business Day":  Any day (other than a Saturday, Sunday or legal holiday in the State of Colorado or the state of New York) on which banks are permitted to be open in Denver, Colorado or New York, New York.

"Capitalization":  The sum of Members' equity and Indebtedness.

"Capitalized Lease":  A lease of (or other agreement conveying the right to use) real or personal property with respect to which at least a portion of the rent or other amounts thereon constitute Capitalized Lease Obligations.

2

SF:247498.3

Case: 09-11078   Doc# 6-4   Filed: 04/21/09   Entered: 04/21/09 10:02:58   Page 7 of 62

"Capitalized Lease Obligations":  As to any Person, the obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real or personal property which obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board), and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP (including such Statement No. 13).

"Carveout":  Means: (a) the compensation and expense reimbursement (other than for professional fees and expenses) allowed to a trustee in any successor Chapter 7 case, (b) unpaid fees payable to the U. S. Trustee pursuant to 28 U.S.C. § 1930, (c) the Debtor's Professionals Carveout Amount, and (d) allowed fees and expenses of professionals for the Committee to the extent such fees and expenses were incurred before the occurrence of an Event of Default and do not exceed (i) $50,000 in the aggregate, and (ii) with respect to any fees incurred in connection with the investigation of the claim of the Prior Lender, such fees shall not exceed $10,000; provided that the foregoing shall be reduced by the amount of any fees paid to such professionals during the Chapter 11 Case.

"Change of Control":  The failure of (a) Members to be the sole members of Borrower, or (b) the failure of the Manager to be the sole manager of Borrower, or (c) the amendment of Borrower's governing documents such that Borrower's affairs are no longer managed by the Manager.

"Chapter 11 Case": As defined in the Recitals.

"Charges":  As defined in Section 9.16.

"Closing Date":  April 22, 2009.

"CoBank":  CoBank, ACB in its capacity as one of the Lenders hereunder.

"CoBank Equities":  As defined in Section 2.22.

"Code":  The Internal Revenue Code of 1986, as amended.

"Collateral":  Means all property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Administrative Agent, on behalf of itself and Lenders, to secure the Obligations or any portion thereof.

"Commitment":  With respect to a Lender, the agreement of such Lender to make Loans to Borrower in an aggregate principal amount outstanding at any time not to exceed such Lender's Commitment Amount upon the terms and subject to the conditions and limitations of this Agreement.

"Commitment Amount":  With respect to a Lender, the amount set opposite such Lender's name on the signature page hereof as its Commitment Amount.

3

"Commitment Termination Date" shall mean the date that is the earliest to occur of the following: (a) September 4, 2009; (b) seven (7) days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date; (c) the date upon which the Interim Order expires, if the Final Order has not been entered prior to the expiration of such period; (d) the closing of all or any portion of the Transaction; (e) the date of indefeasible payment in cash in full by Borrower of all Obligations in accordance with the terms hereof; or (f) the acceleration of the Loans.

"Committee" shall mean the official committee of unsecured creditors formed in the Chapter 11 Case.

"Contingent Obligation": With respect to any Person at the time of any determination, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or otherwise: (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any direct or indirect security therefor, (b) to purchase property, securities, Equity Interests or services for the purpose of assuring the owner of such Indebtedness of the payment of such Indebtedness, (c) to maintain working capital, equity capital or other financial statement condition of the primary obligor so as to enable the primary obligor to pay such Indebtedness or otherwise to protect the owner thereof against loss in respect thereof, or (d) entered into for the purpose of assuring in any manner the owner of such Indebtedness of the payment of such Indebtedness or to protect the owner against loss in respect thereof; provided, that the term "Contingent Obligation" shall not include endorsements for collection or deposit, in each case in the ordinary course of business.

"Control Agreements": As defined in Section 5.16.

"Debtor's Professionals Carveout Amount" means (a) (i) the amount of any allowed fees and expenses of Sheppard Mullin Richter & Hampton, bankruptcy counsel to the Borrower, to the extent such fees and expenses were incurred before delivery of a Default Declaration Notice (but not in excess of the cumulative amounts set forth in the Budget), plus (ii) up to $50,000 of allowed fees and expenses of the Debtor's Professionals incurred after delivery of a Default Declaration Notice, minus (iii) any portion of the foregoing that has been paid by the Borrower or the amount of any prepetition retainer held by Sheppard Mullin Richter & Hampton, and (b) (i) the amount of any allowed fees and expenses of Burr Pilger & Mayer, financial advisor to the Borrower, to the extent such fees and expenses were incurred before delivery of a Default Declaration Notice (but not in excess of the cumulative amounts set forth in the Budget), minus (ii) any portion of the foregoing that has been paid by the Borrower or the amount of any prepetition retainer held by Burr Pilger & Mayer.

"Default": Any event which, with the giving of notice (whether such notice is required under Section 7.1, or under another provision of this Agreement, or otherwise) or lapse of time, or both, would constitute an Event of Default.

SF:247498.3

"Default Declaration Notice": Means a notice from the Administrative Agent to Borrower that an Event of Default has occurred and stating that such notice constitutes a Default Declaration Notice.

"Default Rate": Four percent (4%) per annum in excess of the rate of interest that would otherwise be in effect with respect to any Loan.

"Defaulting Lender": At any time, any Lender that, at such time (a) has failed to make a Loan required pursuant to the terms of this Agreement, including the funding of any participation in accordance with the terms of this Agreement, (b) has failed to pay to the Administrative Agent or any Lender an amount owed by such Lender pursuant to the terms of this Agreement, or (c) has been deemed insolvent or has become subject to a bankruptcy, receivership or insolvency proceeding, or to a receiver, trustee or similar official.

"Disbursement Account": Means the following account of Borrower:

Coast Central Credit Union
2650 Harrison Avenue
Eureka, CA 95501
ABA#: 321172248
Account # 125401371711

"Equity Interests": All shares, interests, participation or other equivalents, however designated, of or in a corporation or limited liability company, whether or not voting, including common stock, member interests, warrants, preferred stock, convertible debentures, and all agreements, instruments and documents convertible, in whole or in part, into any one or more or all of the foregoing.

"ERISA": The Employee Retirement Income Security Act of 1974, as amended.

"Event of Default": As defined in Section 7.1.

"Expenses": As defined in Section 9.2.

"Federal Funds Rate": For any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions, with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Consultant": Means Russell Burbank of Burr, Pilger & Mayer or such other Person as shall have been approved by the Administrative Agent.

"Final Order": means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures

SF:247498.3
Case: 09-11078   Doc# 6-4   Filed: 04/21/09   Entered: 04/21/09 10:02:58   Page 10 of 62

as approved by the Bankruptcy Court which order shall be reasonably satisfactory in form and substance to the Administrative Agent and Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Administrative Agent and Required Lenders waive such requirement), together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent and Required Lenders, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Administrative Agent's and the Lenders' claims.

"Fixed Assets":  As of any date, the fixed assets of Borrower, determined in accordance with GAAP.

"GAAP":  Generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of any date of determination.

"Immediately Available Funds":  Funds with good value on the day and in the city in which payment is received.

"Indebtedness":  With respect to any Person at the time of any determination, without duplication, all obligations, contingent or otherwise, of such Person which in accordance with GAAP should be classified upon the balance sheet of such Person as liabilities, but in any event including:  (a) all obligations of such Person for borrowed money (including non-recourse obligations), (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid or accrued, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services, (f) all obligations of others secured by any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Capitalized Lease Obligations of such Person, (h) all obligations of such Person in respect of interest rate swap agreements, cap or collar agreements, interest rate futures or option contracts, currency swap agreements, currency futures or option agreements and other similar contracts (i) all obligations of such Person, actual or contingent, as an account party in respect of letters of credit or bankers' acceptances, (j) all obligations of any partnership or joint venture as to which such Person is or may become personally liable, and (k) all Contingent Obligations of such Person.

"Indemnitee":  As defined in Section 9.12.

"Interim Order":  Shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law),

6

together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent and the Lenders, which, among other matters (but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Loan Documents.

"Investment":  The acquisition, purchase, making or holding of any Equity Interests or other security, any loan, advance, contribution to capital, extension of credit (except for trade and customer accounts receivable for inventory sold or services rendered in the ordinary course of business and payable in accordance with customary trade terms), any acquisitions of real or personal property (other than real and personal property acquired in the ordinary course of business) and any purchase or commitment or option to purchase Equity Interests, securities or other debt of or any interest in another Person or any integral part of any business or the assets comprising such business or part thereof and the formation of, or entry into, any partnership as a limited or general partner or the entry into any joint venture.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.  For purposes of this Agreement, bank deposit accounts shall not be deemed an Investment.

"Investment Banker": Means Duff & Phelps or such other Person as shall have been approved by the Administrative Agent.

"Lender":  As defined in the opening paragraph hereof.

"LIBOR Rate":  Means a rate (rounded upward to the nearest 1/100th and adjusted for reserves required on "Eurocurrency Liabilities" (as hereinafter defined) for banks subject to "FRB Regulation D" (as hereinafter defined) or required by any other federal law or regulation) per annum equal at all times to the annual rate quoted by the British Bankers Association (the "BBA") at 11:00 a.m. London time for the offering of one (1)-month U.S. dollars deposits, as published by Bloomberg or another major information vender listed on BBA's official website on the first "U.S. Banking Day" (as hereinafter defined) in each week, with such rate to change weekly on such day.  The rate shall be reset automatically, without the necessity of notice being provided to the Borrower or any other party, on the first "U.S. Banking Day" of each succeeding week, and each change in the rate shall be applicable to all balances subject to this option. Information about the then-current rate shall be made available upon telephonic request.  For purposes hereof:  (1) "U.S. Banking Day" shall mean a day on which Administrative Agent is open for business and banks are open for business in New York, New York; (2) "Eurocurrency Liabilities" shall have the meaning as set forth in "FRB Regulation D"; and (3) "FRB Regulation D" shall mean Regulation D as promulgated by the Board of Governors of the Federal Reserve System, 12 CFR Part 204, as amended.

"Lien":  With respect to any Person, any security interest, mortgage, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device (including the interest of each lessor under any Capitalized Lease), in, of or on any assets or properties of such Person, now owned or hereafter acquired, whether arising by agreement or operation of law.

"Loans":  As defined in Section 2.1.

"Loan Date":  The date of the making of any Loan hereunder.

"Loan Documents":  This Agreement, the Notes and the Security Documents.

"Loan Percentage":  With respect to any Lender, the percentage equivalent of a fraction, the numerator of which is the amount of the Loan Commitment of such Lender and the denominator of which is the sum of the Loan Commitments of all the Lenders.

"Manager":  Means Len Mayer or such other Person as may have been approved by the Administrative Agent.

"Material Adverse Occurrence":  Any occurrence of whatsoever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding) which could reasonably be expected to materially and adversely affect (a) the financial condition or operations of Borrower, (b) impair the ability of Borrower to perform its obligations under any Loan Document, or any writing executed pursuant thereto, (c) the validity or enforceability of the material obligations of Borrower under any Loan Document, (d) the rights and remedies of the Lenders or the Administrative Agent against Borrower, (e) the timely payment of the principal of and interest on the Loans or other amounts payable by Borrower hereunder, or (f) the validity of the joint and several nature of the obligations of Borrower with respect to all of the Obligations.

"Maximum Loan Amount":  Means, with respect to any particular week, the negative amount set forth in the Budget under line item "Ending Cash (Book)" plus ten percent (10%). For example, if  "Ending Cash (Book)" for a particular week is shown in the Budget as "($2,000,000)," then the Maximum Loan Amount during such week would be $2,200,000.  If the "Ending Cash (Book)" for a particular week is a positive rather than a negative number, then the Maximum Loan Amount for such week shall be zero.

"Maximum Rate":  As defined in Section 9.16.

"Members":  Means Humboldt Creamery Association and Dairy Farmers of America.

"Mortgages":  Deeds of Trust executed by Borrower in a form satisfactory to the Administrative Agent encumbering the Owned Property.

"Notes":  Promissory notes of Borrower executed by Borrower in a form satisfactory to the Administrative Agent evidencing the obligation of Borrower to repay the Loans.

"Obligations":  Borrower's obligations in respect of the due and punctual payment of principal and interest on the Notes and Total Outstandings when and as due, whether by acceleration or otherwise and all fees (including the Undrawn Facility Fee), expenses, indemnities, reimbursements and other obligations of Borrower under this Agreement or any other Loan Document, in all cases whether now existing or hereafter arising or incurred.

"Operating Lease":  For any Person, a lease of property that would not be classified as a Capitalized Lease, other than a lease under which such Person is the lessor.

"Orders":  Shall mean each of the Interim Order and the Final Order.

8

"Other Taxes": As defined in Section 2.20.

"Owned Property": Means all real property owned by Borrower as reference in Appendix B.

"Participants": As defined in Section 9.6.

"PBGC": The Pension Benefit Guaranty Corporation, established pursuant to Subtitle A of Title IV of ERISA, and any successor thereto or to the functions thereof.

"Person": Any natural person, corporation, partnership, limited partnership, limited liability company, joint venture, firm, association, trust, unincorporated organization, government or governmental agency or political subdivision or any other entity, whether acting in an individual, fiduciary or other capacity.

"Petition Date": As defined in the Recitals.

"Plan": Each employee benefit plan (whether in existence on the Closing Date or thereafter instituted), as such term is defined in section 3.1 of ERISA, maintained for the benefit of employees, officers or directors of Borrower.

"Plan of Reorganization": Means a plan of reorganization in form and substance reasonably satisfactory to the Administrative Agent and Lenders confirmed by an order (in form and substance satisfactory to the Lenders) of the Bankruptcy Court under the Chapter 11 Case (i) containing a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan; (ii) containing a release in favor of the Administrative Agent and the Lenders and their respective affiliates; (iii) containing provisions with respect to the settlement or discharge of all claims and other debts and liabilities; (iv) providing that such plan shall be in full force and effect and shall not have been modified, altered, amended or otherwise changed or supplemented without the prior written consent of the Administrative Agent and Lenders; (v) from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Administrative Agent and the Lenders waive such requirement) and (v) containing such other terms as the Administrative Agent and Lenders may reasonably require.

"Post-Petition": Means the time period beginning immediately upon the filing of the Chapter 11 Case.

"Post-Petition Indebtedness": Means any and all Indebtedness of Borrower incurred after the filing of the Chapter 11 Case.

"Pre-Petition": Means the time period ending immediately prior to the filing of the Chapter 11 Case.

"Pre-Petition Credit Agreement": Means that certain Loan Agreement, dated January 3, 2005, as amended by that certain First Amendment to Loan Agreement, dated as of June 9, 2005, as further amended by that certain Second Amendment to Loan Agreement, dated as of August

9

1, 2005, as further amended by that certain Third Amendment to Loan Agreement, dated as of September 30, 2005, as further amended by that certain Fourth Amendment to Loan Agreement, dated as of November 30, 2005, as further amended by that certain Fifth Amendment to Loan Agreement, dated as of December 1, 2005, as further amended by that certain Sixth Amendment to Loan Agreement, dated as of September 13, 2006, as further amended by that certain Seventh Amendment to Loan Agreement, dated as of December 29, 2006, as further amended by that certain Eighth Amendment to Loan Agreement, dated as of March 1, 2007, as further amended by that certain Ninth Amendment to Loan Agreement, dated as of April 11, 2007, as further amended by that certain Tenth Amendment to Loan Agreement, dated as of May 1, 2007, as further amended by that certain Eleventh Amendment to Loan Agreement, dated as of August 6, 2007, as further amended by that certain Twelfth Amendment to Loan Agreement, dated as of November 2, 2007, as further amended by that certain Thirteenth Amendment to Loan Agreement, dated as of January 1, 2008, as further amended by that certain Fourteenth Amendment to Loan Agreement, dated as of February 1, 2008, as further amended by that certain Fifteenth Amendment to Loan Agreement, dated as of March 1, 2008, as further amended by that certain Sixteenth Amendment to Loan Agreement, dated as of April 1, 2008, as further amended by that certain Seventeenth Amendment to Loan Agreement, dated as of May 1, 2008, as further amended by that certain Eighteenth Amendment to Loan Agreement, dated as of June 1, 2008, as further amended by that certain Nineteenth Amendment to Loan Agreement, dated as of September 1, 2008, as further amended by that certain Twentieth Amendment to Loan Agreement, dated as of December 1, 2008, between Borrower, Prior Agent and Prior Lenders.

"Pre-Petition Indebtedness": Means all Indebtedness of Borrower outstanding immediately prior to the filing of the Chapter 11 Case, other than Indebtedness under the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents": Shall have the meaning assigned to the term "Loan Documents in the Pre-Petition Credit Agreement.

"Prior Agent": Means the administrative agent under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents.

"Prior Lenders": Means the lenders under the Pre-Petition Credit Agreement.

"Prior Lender Obligations": Means the obligations of Borrower to the Prior Lenders pursuant to the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents.

"Regulatory Change": Any change after the Closing Date in federal, state or foreign laws or regulations or the adoption or making after such date of any interpretations, directives or requests applying to a class of banks including any Lender under any federal, state or foreign laws or regulations (whether or not having the force of law) by any court or governmental or monetary authority charged with the interpretation or administration thereof.

"Replaced Lender": As defined in Section 2.19.

"Replacement Lender": As defined in Section 2.19.

SF:247498.3

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 15 of 62

"<u>Reportable Event</u>": A reportable event as defined in Section 4043 of ERISA and the regulations issued under such Section, with respect to a Plan, excluding, however, such events as to which the PBGC by regulation has waived the requirement of Section 4043(a) of ERISA that it be notified within 30 days of the occurrence of such event, <u>provided</u> that a failure to meet the minimum funding standard of Section 412 of the Code and of Section 302 of ERISA shall be a Reportable Event regardless of the issuance of any waiver in accordance with Section 412(d) of the Code.

"<u>Required Lenders</u>": Subject to Section 9.6, at any time, at least two Lenders, other than Defaulting Lenders, holding at least sixty-seven percent (67%) of the aggregate unpaid principal amount of the Notes, excluding Notes held by Defaulting Lenders or, if no Loans are at the time outstanding hereunder, Lenders other than Defaulting Lenders whose Total Percentages aggregate at least sixty-seven percent (67%) (with Total Percentages being computed without reference to the Commitment Amounts of Defaulting Lenders); <u>provided, however</u>, that (i) Required Lenders shall constitute Lenders, other than Defaulting Lenders, holding one hundred percent (100%) of the aggregate unpaid principal of the Notes with respect to the determination of significant matters, including any increase in or extension of the Loans, reduction in the amount or delay of any scheduled payment of principal, interest or fees, or releases of Collateral; (ii) if there are only two Lenders, then Required Lenders shall mean one hundred percent (100%).

"<u>Restricted Payments</u>": With respect to Borrower (a) all dividends or other distributions of any nature (cash, Equity Interests, assets or otherwise), and all payments on any class of Equity Interests (including warrants, options or rights therefor) issued by Borrower, whether such Equity Interests are authorized or outstanding on the Closing Date or at any time thereafter, or (b) any redemption or purchase of, or distribution in respect of, any of the foregoing, whether directly or indirectly.

"<u>Security Agreements</u>": Security Agreements executed by Borrower in a form satisfactory to the Administrative Agent.

"<u>Security Documents</u>": The Security Agreements, the Mortgages, the Control Agreements and each other agreement, document or instrument pursuant to which the Administrative Agent is granted a Lien to secure the Obligations, as the same may be amended, supplemented, extended, restated or otherwise modified from time to time.

"<u>Subordinated Debt</u>": Any Indebtedness of Borrower, now existing or hereafter created, incurred or arising, which is subordinated in right of payment to the payment of the Loans.

"<u>Subsidiary</u>": Any corporation or other entity of which Equity Interests having ordinary voting power for the election of a majority of the board of directors or other Persons performing similar functions are owned by Borrower either directly or through one or more Subsidiaries.

"<u>Taxes</u>": As defined in Section 2.20.

"<u>Total Outstandings</u>": As of any date of determination, the sum of the unpaid principal balance of the Loans outstanding on such date.

11

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 16 of 62

"<u>Transaction</u>":  Means one or more sales covering all substantial components of Borrower's business.

"<u>Undrawn Facility Fee</u>":  As defined in Section 2.8.

"<u>U.S. Taxes</u>":  As defined in Section 2.20.

Section 1.2    <u>Accounting Terms and Calculations</u>.  Except as may be expressly provided to the contrary herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP.  To the extent any change in GAAP affects any computation or determination required to be made pursuant to this Agreement, such computation or determination shall be made as if such change in GAAP had not occurred unless Borrower and Required Lenders agree in writing on an adjustment to such computation or determination to account for such change in GAAP.

Section 1.3    <u>Computation of Time Periods</u>.  In this Agreement, in the computation of a period of time from a specified date to a later specified date, unless otherwise stated the word "from" means "from and including" and the word "to" or "until" each means "to but excluding".

Section 1.4    <u>Other Definitional Terms</u>.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Sections, Exhibits, schedules and like references are to this Agreement unless otherwise expressly provided.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or." All incorporation by reference of covenants, terms, definitions or other provisions from other agreements are incorporated into this Agreement as if such provisions were fully set forth herein, and such incorporation shall include all necessary definitions and related provisions from such other agreements but including only amendments thereto agreed to by the Required Lenders (unless otherwise provided herein or therein), and shall survive any termination of such other agreements until the obligations of Borrower under this Agreement and the Notes are irrevocably paid in full, and the commitments of any Lender to advance funds to Borrower are terminated.

## ARTICLE II
## TERMS OF THE CREDIT FACILITIES

Section 2.1    <u>Lending Commitments</u>.  Subject to the terms and conditions of the Loan Agreement, each Lender severally agrees to make a revolving credit facility available as loans (each, a "<u>Loan</u>" and, collectively, the "<u>Loans</u>") to Borrower.  The Loans shall be advanced to Borrower on a revolving basis, at any time and from time to time (but no more than one time per calendar week unless otherwise agreed by the Administrative Agent in its sole discretion) from the Closing Date to the Commitment Termination Date, during which period Borrower may borrow, repay and reborrow in accordance with the provisions hereof, <u>provided</u>, that (a) no Loans will be advanced in any amount which, after giving effect thereto, would cause the Total Outstandings to exceed the Aggregate Commitment Amounts, and (b) unless otherwise agreed by the Administrative Agent and all Lenders, no Loans will be advanced in any amount which,

12

after giving effect thereto, would cause the Total Outstandings to exceed the then-applicable Maximum Loan Amount. Loans hereunder shall be made by the several Lenders ratably in the proportion of their respective Commitment Amounts.

Section 2.2  Procedure for Loans.

(a)  Subject to the terms hereof, the Loans may be advanced one time per calendar week, and no more than one request for borrowing may be made in any calendar week.

(b)  With respect to any Loan, Borrower shall provide a written or telephonic request to the Administrative Agent to later than 12:00 Noon (Pacific time) on the Business Day prior to the date on which such Loan is proposed to be funded. Each request for Loans hereunder shall be irrevocable and shall be deemed a representation by Borrower that on the requested Loan Date and after giving effect to the requested Loans the applicable conditions specified in Article III have been and will be satisfied. The Administrative Agent may rely on any telephone request by Borrower for Loans hereunder which it believes in good faith to be genuine; and Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of such telephone request.

(c)  Each request for an Loan hereunder shall specify the requested Loan Date and the aggregate amount of the Loans to be advanced on such date, which amount shall be not less than One Hundred Thousand Dollars ($100,000) and shall be in subsequent increments of not less than $10,000.

(d)  The Administrative Agent shall promptly notify each other Lender of the receipt of such request, the matters specified therein, and of such Lender's ratable share of the requested Loans. On the date of the requested Loans, each Lender shall provide its share of the requested Loans to the Administrative Agent in Immediately Available Funds not later than 1:00 P.M (Pacific time). Unless the Administrative Agent determines that any applicable condition specified in Article III has not been satisfied, the Administrative Agent will make available to Borrower at the Administrative Agent's principal office in Greenwood Village, Colorado, in Immediately Available Funds not later than 2:00 P.M. (Pacific time) on the requested Loan Date the amount of the requested Loans.

(e)  If the Administrative Agent has made a Loan to Borrower on behalf of a Lender but has not received the amount of such Loan from such Lender by the time herein required, such Lender shall pay interest to the Administrative Agent on the amount so advanced at the Federal Funds Rate from the Loan Date of such Loan to the date funds are received by the Administrative Agent from such Lender, such interest to be payable with such remittance from such Lender of the principal amount of such Loan (provided, however, that the Administrative Agent shall not make any Loan on behalf of a Lender if the Administrative Agent has received prior notice from such Lender that it will not make such Loan). If the Administrative Agent does not receive payment from such Lender by the next Business Day after the Loan Date of any Loan, the Administrative Agent shall be entitled to recover such Loan, with interest thereon at the rate (or rates) then applicable to

13

such Loan, on demand, from Borrower, without prejudice to the Administrative Agent's and Borrower's rights against such Lender. If such Lender pays the Administrative Agent the amount herein required with interest at the Federal Funds Rate before the Administrative Agent has recovered from Borrower, such Lender shall be entitled to the interest payable by Borrower with respect to the Loan in question accruing from the date the Administrative Agent made such Loan.

(f)     The proceeds of all Loans made to the Borrower pursuant to this Agreement on and subsequent to the Closing Date are to be funded by the Administrative Agent by wire transfer to the Disbursement Account.

Section 2.3     Notes.  The Loans of each Lender shall be evidenced by a Note payable to the order of such Lender in a principal amount equal to such Lender's Commitment Amount originally in effect. Each Lender shall enter in its ledgers and records the amount of each Loan made, converted or continued and the payments made thereon, and each Lender is authorized by Borrower to enter on a schedule attached to its Note a record of such Loans and payments; provided, however that the failure by any Lender to make any such entry or any error in making such entry shall not limit or otherwise affect the obligation of Borrower hereunder and on the Notes, and, in all events, the principal amounts owing by Borrower in respect of the Notes shall be the aggregate amount of all Loans made by the Lenders less all payments of principal thereof made by Borrower.

Section 2.4     Reserved.

Section 2.5     Interest Rates, Interest Payments and Default Interest.  Interest shall accrue and be payable on the Loans as follows:

(a)     Subject to paragraph (b) below, each Loan shall bear interest on the unpaid principal amount thereof at a rate per annum equal to the, sum of (i) the greater of (A) the LIBOR Rate, and (B) two percent (2.00%), plus (ii) four percent (4.00%).

(b)     Upon the occurrence of any Event of Default, each Loan shall bear interest until paid in full at a rate per annum equal to the Default Rate.

(c)     Interest shall be payable, with respect to each Loan, in arrears, on the first Business Day of each calendar month and on the Commitment Termination Date, provided that interest under paragraph (b) of this Section shall be payable on demand.

(d)     The Administrative Agent is authorized to make an advance of the Loans to pay any payment of interest due under this Agreement.

Section 2.6     Final Repayment.  The unpaid principal balance of all Loans, together with all accrued and unpaid interest thereon, shall be due and payable on the Commitment Termination Date.  Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or Final Order, as the case may be, on the Commitment Termination Date, Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, in accordance with provisions of the Interim Order and the Final Order, as applicable.

Section 2.7    Payments.

(a)    Mandatory Payments.   If at any time Total Outstandings exceed the Aggregate Commitment Amounts, Borrower shall immediately repay to the Administrative Agent for the account of the Lenders the amount of such excess.  If at any time the Total Outstandings exceed the Maximum Loan Amount applicable during such week, Borrower shall immediately repay to the Administrative Agent for the account of the Lenders the amount of such excess.

(b)    Optional Payments.   The Loans may be paid at any time, in whole or in part, in minimum amounts of $50,000, and in integral multiples of $10,000 (or the entire outstanding balance, if less) on any Banking Day; provided, however, that Borrower must provide written notice to the Administrative Agent of such payment no later than the Business Day preceding the date of such payment.  Amounts paid (unless following an acceleration or upon termination of the Commitments in whole) under this paragraph (b) may be reborrowed upon the terms and subject to the conditions and limitations of this Agreement.  Amounts paid or prepaid on the Loans under this paragraph (b) shall be for the account of each Lender in proportion to its share of outstanding Loans.

Section 2.8    Fees.

(a)    Loan Origination Fee.   Borrower shall pay to the Administrative Agent for the account of each Lender, a loan origination fee in the amount of Sixty Thousand Dollars ($60,000.00).  Such fee is due and payable on the Closing Date and is non-refundable.

(b)    Undrawn Facility Fee.   As additional compensation for the Commitments, Borrower shall pay to the Administrative Agent, on behalf of each Lender, on the first Business Day of each calendar month prior to the Commitment Termination Date, commencing with the first calendar month following the Closing Date, and on the Commitment Termination Date, a fee (such fee, the "Undrawn Facility Fee") for Borrower's non-use of available funds in an amount equal to one half of one percent (0.50%) per annum multiplied by the positive difference between (x) the Aggregate Commitment Amounts and (y) the average for the period of the daily closing balances of the Loans outstanding during the prior month.

Section 2.9    Computation.   Interest on Loans, including interest at the Default Rate, shall be computed on the basis of actual days elapsed and a year of 360 days.

Section 2.10    Payments.   Payments of principal of, and interest on, the Notes and all fees, expenses and other obligations under this Agreement payable to the Administrative Agent or the Lenders shall be made without setoff or counterclaim in Immediately Available Funds not later than 12:00 Noon (Pacific time) on the dates called for under this Agreement and the Notes to the Administrative Agent at its main office in Greenwood Village, Colorado or at such other location of which the Administrative Agent may notify Borrower in writing from time to time.  Funds received after such time shall be deemed to have been received on the next Business Day. The Administrative Agent will distribute in like funds to each Lender its ratable share of each

15

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 20 of 62

such payment of principal, interest and fees received by the Administrative Agent for the account of the Lenders on the Business Day or deemed Business Day that such funds were received by the Administrative Agent. Whenever any payment to be made hereunder or on the Notes shall be stated to be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time, in the case of a payment of principal, shall be included in the computation of any interest on such principal payment; provided, however, that if such extension would cause payment of interest on or principal of a Loan to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

Section 2.11    Use of Loan Proceeds.  The proceeds of the Loans shall be used solely in accordance with the Budget and in compliance with the provisions set forth in this Agreement.

Section 2.12    Interest Rate Not Ascertainable, Etc.  If at any time the Administrative Agent determines (which determination shall be conclusive and binding, absent manifest error) that:

(a)    deposits in dollars (in the applicable amount) are not being made available at such time to Lenders or the Administrative Agent, or

(b)    the LIBOR Rate will not adequately and fairly reflect the cost to Lenders of funding or maintaining Loans, the Administrative Agent shall forthwith give notice to Borrower and the Lenders of such determination, whereupon the obligation of Lenders to make or continue Loans shall be suspended until the Administrative Agent notifies Borrower and the Lenders that the circumstances giving rise to such suspension no longer exist. While any such suspension continues, the "prime rate" as quoted in the Wall Street Journal shall be used in place of the LIBOR Rate to determine the interest rate hereunder.

Section 2.13    Increased Cost.  If any Regulatory Change:

(a)    shall subject any Lender to any tax, duty or other charge with respect to its Loans, its Note or its obligation to make Loans or shall change the basis of taxation of payment to any Lender of the principal of or interest on its Loans or any other amounts due under this Agreement in respect of its Loans or its obligation to make Loans (except for changes in the rate of tax on the overall net income of such Lender imposed by the jurisdiction in which such Lender's principal office is located; or

(b)    shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including any such requirement imposed by the Board, but excluding any such requirement to the extent included in calculating the applicable LIBOR Rate) against assets of, deposits with or for the account of, or shall impose on any such Lender or on the interbank Eurodollar market any other condition affecting its Loans, its Note or its obligation to make Loans;

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining any Loan, or to reduce the amount of any sum received or receivable by such Lender under this Agreement or under its Note, then, within 30 days after demand by such Lender (with a copy to the Administrative Agent), Borrower shall pay to such Lender such additional amount

16

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 21 of 62

or amounts as will compensate such Lender for such increased cost or reduction. Each Lender will promptly notify Borrower and the Administrative Agent of any event of which it has knowledge, occurring after the date hereof, which will entitle such Lender to compensation pursuant to this Section. A certificate of any Lender claiming compensation under this Section, setting forth the additional amount or amounts to be paid to it hereunder and stating in reasonable detail the basis for the charge and the method of computation, shall be conclusive in the absence of error. In determining such amount, such Lender may use any reasonable averaging and attribution methods.

Section 2.14    Illegality. If any Regulatory Change shall make it unlawful or impossible for any Lender to make, maintain or fund any Loan, such Lender shall notify Borrower and the Administrative Agent, whereupon the obligation of such Lender to make or continue Loans shall be suspended until such Lender notifies Borrower and the Administrative Agent that the circumstances giving rise to such suspension no longer exist. If any Lender determines that it may not lawfully continue to maintain any Loans with reference to the LIBOR Rate, all of the affected Loans shall be automatically bear interest using the "prime rate" as quoted in the Wall Street Journal in lieu of the LIBOR Rate as of the date of such Lender's notice.

Section 2.15    Capital Adequacy. In the event that any Regulatory Change reduces or shall have the effect of reducing the rate of return on any Lender's capital or the capital of its parent corporation (by an amount such Lender deems material) as a consequence of its Commitments and/or its Loans to a level below that which such Lender or its parent corporation could have achieved but for such Regulatory Change (taking into account such Lender's policies and the policies of its parent corporation with respect to capital adequacy), then Borrower shall, within 30 days after written notice and demand from such Lender (with a copy to the Administrative Agent), pay to such Lender additional amounts sufficient to compensate such Lender or its parent corporation for such reduction. Any determination by any Lender under this Section and any certificate as to the amount of such reduction given to Borrower by such Lender shall be final, conclusive and binding for all purposes, absent error.

Section 2.16    Funding Losses. Borrower shall compensate each Lender, upon its written request, for all losses, expenses and liabilities (including any interest paid by such Lender to lenders of funds borrowed by it to make or carry Loans to the extent not recovered by such Lender in connection with the re-employment of such funds and including loss of anticipated profits) which such Lender may sustain if for any reason, other than a default by such Lender, a funding of a Loan does not occur on the date specified therefor in Borrower request or notice as to such Loan under Section 2.2. A Lender's request for compensation shall set forth the basis for the amount requested and shall be final, conclusive and binding, absent error.

Section 2.17    Reserved.

Section 2.18    Reserved.

Section 2.19    Replacement of Certain Lenders. If any Lender shall become affected by any of the changes or events described in Section 2.12, Section 2.13, Section 2.14 or Section 2.15 (any such Lender hereinafter referred to as a "Replaced Lender") and shall give notice to Borrower for any increased cost or amounts thereunder, Borrower may, so long as no Event of

17

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 22 of 62

Default has occurred and is continuing, upon at least five (5) Business Days' notice to the Administrative Agent and such Replaced Lender by Borrower, designate a replacement lender (a "Replacement Lender") reasonably acceptable to the Administrative Agent, to which such Replaced Lender shall, subject to its receipt (unless a later date for the remittance thereof shall be agreed upon by Borrower and the Replaced Lender) of all amounts due and owing to such Replaced Lender under Section 2.12, Section 2.13, Section 2.14 or Section 2.15 assign all (but not less than all) of its rights, obligations, Loans and Loan Commitment pursuant to an Assignment Agreement; provided, that all amounts owed to such Replaced Lender by Borrower (except liabilities which by the terms hereof survive the payment in full of the Loans and termination of this Agreement) shall be paid in full as of the date of such assignment. Upon any assignment by any Lender pursuant to this Section becoming effective, the Replacement Lender shall thereupon be deemed to be a "Lender" for all purposes of this Agreement and such Replaced Lender shall thereupon cease to be a "Lender" for all purposes of this Agreement and shall have no further rights or obligations hereunder (other than pursuant to Section 2.12, Section 2.13, Section 2.14 or Section 2.15 while such Replaced Lender was a Lender).

Section 2.20    Taxes.

(a)    Any and all payments by Borrower hereunder or under the Notes shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges of withholdings, and all liabilities with respect thereto, excluding, in the case of each Lender and the Administrative Agent, taxes imposed on its overall net income and franchise taxes imposed on it in lieu of net income taxes (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under the Notes being hereinafter referred to as "Taxes").

(b)    Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or under the Notes or from the execution, delivery or registration of, performing under, or otherwise with respect to, this Agreement or the Notes (hereinafter referred to as "Other Taxes").

(c)    Borrower shall indemnify each Lender and the Administrative Agent for the full amount of Taxes or Other Taxes imposed on or paid by such Lender or the Administrative Agent and any penalties, interest and expenses with respect thereto. Payments on this indemnification shall be made within 30 days from the date such Lender or the Administrative Agent makes written demand therefor.

(d)    Within 30 days after the date of any payment of Taxes, Borrower shall furnish to the Administrative Agent, at its address referred to on the signature page hereof, a certified copy of a receipt evidencing payment thereof. In the case of any payment hereunder or under the Notes by or on behalf of Borrower through an account or branch outside the United States or by or on behalf of Borrower by a payor that is not a United States person, if Borrower determines that no Taxes are payable in respect thereof, Borrower shall furnish or shall cause such payor to furnish, to the Administrative Agent, at such address, an opinion of counsel reasonably acceptable to the Administrative

18

Agent stating that such payment is exempt from Taxes. For purposes of this subsection (d) and subsection (e), the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)     Each Lender, as of the date it becomes a party hereto, represents to Borrower and the Administrative Agent that it is either (i) a corporation organized under the laws of the United States or any State thereof or (ii) is entitled to complete exemption from United States withholding tax imposed on or with respect to any payments, including fees, to be made pursuant to this Agreement (x) under an applicable provision of a tax convention to which the United States is a party or (y) because it is acting through a branch, agency or office in the United States and any payment to be received by it hereunder is effectively connected with a trade or business in the United States. Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall submit to Borrower and the Administrative Agent, on or before the day on which such Lender becomes a Lender, a duly completed and signed copy of either Form W-8BEN or Form W-8ECI of the United States Internal Revenue Service. Form W-8BEN shall include the foreign Lender's United States taxpayer identification number if required under the current regulations to claim exemption from withholding pursuant to a tax convention. Thereafter and from time to time, each such Lender shall submit to Borrower and the Administrative Agent such additional duly completed and signed copies of one or the other of such forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) as may be (i) reasonably requested by Borrower or the Administrative Agent and (ii) required and permitted under then-current United States law or regulations to avoid United States withholding taxes on payments in respect of all payments to be received by such Lender hereunder. Upon the request of Borrower or the Administrative Agent, each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall submit to Borrower and the Administrative Agent a certificate on Internal Revenue Service Form W-9 or such substitute form as is reasonably satisfactory to Borrower and the Administrative Agent to the effect that it is such a United States person.

(f)     If Borrower shall be required by law or regulation to make any deduction, withholding or backup withholding of any taxes, levies, imposts, duties, fees, liabilities or similar charges of the United States of America, any possession or territory of the United States of America (including the Commonwealth of Puerto Rico) or any area subject to the jurisdiction of the United States of America ("U.S. Taxes") from any payments to a Lender pursuant to any Loan Document in respect of the Obligations payable to such then or thereafter outstanding, Borrower shall make such withholdings or deductions and pay the full amount withheld or deducted to the relevant taxation authority or other authority in accordance with applicable law.

Section 2.21   Capitalization.   Borrower agrees to purchase such equity in CoBank as CoBank may from time to time require in accordance with its Bylaws. Borrower also agrees to purchase such equity in American AgCredit, ACA ("American AgCredit") as may be required from time to time in accordance with its Bylaws. However, the maximum amount of equity which Borrower shall be obligated to purchase in connection with any Loan may not exceed the

19

maximum amount permitted by the Bylaws at the time that Loan is entered into or such Loan is renewed or refinanced by CoBank or American AgCredit, as applicable.

Section 2.22  Lender Equities.  Each party hereto acknowledges that CoBank and American AgCredit has a statutory first Lien on all of Borrower's stock and other equities in CoBank (the "CoBank Equities") and American AgCredit (the "American AgCredit Equities"), respectively, pursuant to 12 U.S.C. § 2131.  Accordingly, and notwithstanding any other provision of this Agreement or any other Loan Document to the contrary:

(a)  CoBank's statutory Lien on the CoBank Equities shall be for CoBank's sole and exclusive benefit and shall not be subject to this Agreement or any other Loan Document nor shall the CoBank Equities (or the proceeds thereof) be subject to pro rata sharing hereunder; American AgCredit's statutory lien on the American AgCredit Equities shall be for American AgCredit's sole and exclusive benefit and shall not be subject to this Agreement or any other Loan Document nor shall the American AgCredit Equities (or the proceeds thereof) be subject to pro rata sharing hereunder;

(b)  CoBank shall have no obligation to retire the CoBank Equities upon Borrower's default or at any other time, either for application to the Obligations or otherwise; American AgCredit shall have no obligation to retire the American AgCredit Equities upon Borrower's default or at any other time, either for application to the Obligations or otherwise; and

(c)  the CoBank Equities or the American AgCredit Equities shall not be offset against the Obligations to CoBank or American AgCredit, respectively, for purposes of determining the Lenders' pro rata shares hereunder.

Borrower agrees that any patronage refunds, dividends, or other proceeds of any of the CoBank Equities or the American AgCredit Equities that may be earned or otherwise available to Borrower shall be applied by the Administrative Agent on account of the Prior Lender Obligations.

Section 2.23  Security Interest; Carveout.

(a)  The payment and performance of the Obligations shall be secured by a lien and security interest on all assets of Borrower pursuant to the Interim Order and the Final Order.  Borrower hereby grants to the Administrative Agent for the benefit of Lenders a lien on and security interest in and to all real and personal property of Borrower, whether now owned or hereafter acquired or arising, including all inventory, farm products, equipment, accounts, general intangibles, investment property, instruments, documents, chattel paper, commercial tort claims, deposit accounts letters of credit, letter of credit rights, and money.  Payment and performance will also be secured by the Security Agreements, the Mortgages, the Control Agreements and the other Security Documents; provided that the taking of any such documents shall be in the sole discretion of the Administrative Agent and the Administrative Agent shall have a lien and security interest covering all assets of Borrower pursuant to the Interim Order and the Final Order without the necessity of taking any Security Documents.  If the Administrative Agent shall require Borrower to deliver Mortgages, Borrower shall also

20

be required to deliver such title insurance policies and endorsements as shall be required by the Administrative Agent, the cost of which shall be borne by Borrowers.

(b)     The priority of Lenders' Liens on the Collateral shall each be set forth in the Interim Order and the Final Order.

(c)     All Obligations shall constitute administrative expenses of Borrower in the Chapter 11 Case, with administrative priority and, with respect to current assets, senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code, as shall be set forth in the Interim Order and the Final Order.  Subject to the Carve Out, and as may be set forth in the Interim Order and the Final Order, such administrative claim shall have priority over all other administrative expenses of the kinds specified in, or ordered pursuant to, Sections 503(b) and 507(b) (except as set forth in the Interim Order or the Final Order, when applicable), as provided under Section 364(c)(1) of the Bankruptcy Code. The Liens granted to Lenders on the Collateral, and the priorities accorded to the Obligations shall have the priority and secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code, all as more fully set forth in the Interim Order and Final Order.

(d)     The payment of any fees or expenses of the Retained Professionals pursuant to the Carve-Out shall not, and shall not be deemed to, (i) reduce Borrower's obligations owed to the Administrative Agent or any Lender or (ii) modify, alter or otherwise affect any of the liens and security interests of such parties in the Collateral (or their respective claims against Borrowers).  Neither the Administrative Agent nor any Lenders shall be responsible for the direct payment or reimbursement of any amounts constituting the Carve Out and nothing herein or otherwise shall be construed to obligate such parties in any way to pay such amounts.

Section 2.24   <u>Confirmation of Plan of Reorganization</u>.  Borrower agrees that (i) the Obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization in the Chapter 11 Case (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the super-priority administrative claim granted to the Administrative Agent and Lenders pursuant to the Interim Order and Final Order and described herein and the Liens granted to the Administrative Agent pursuant to the Interim Order and Final Order and described in herein shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization in any Chapter 11 Case.

Section 2.25   <u>Release</u>.  Borrower hereby acknowledges that, effective upon entry of the Final Order, Borrower has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of Borrower's liability to repay Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Agent or any Lender.  Borrower, in its own right, on behalf of its bankruptcy estates, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "<u>Releasing Parties</u>"), hereby fully, finally and forever releases and discharges Agent and Lenders and all of the Administrative Agent's and Lenders' past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and

21

each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which in each case are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order and the transactions contemplated hereby (other than the Pre-Petition Loan Documents and the financings provided thereunder), and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing. No Released Party shall be entitled to the benefits of the foregoing release for claims directly arising from gross negligence or willful misconduct of such Released Party as subsequently determined by a court of competent jurisdiction in a final non-appealable order. For the avoidance of doubt, the parties agree that nothing in this paragraph in any form or manner releases, compromises or affects any of the rights or obligations with respect to the Pre-Petition Credit Agreement, the Pre-Petition Indebtedness, or the Prior Lender Obligations.

Section 2.26  <u>Waivers</u>.  Upon the Closing Date, and on behalf of itself and its estates, and for so long as any Obligations shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations other than as expressly set forth in the Interim Order (or the Final Order, when applicable).

## ARTICLE III
## CONDITIONS PRECEDENT

Section 3.1  <u>Conditions of Initial Loans</u>.  The making of the initial Loans shall be subject to the prior or simultaneous fulfillment of the following conditions:

(a)  <u>Interim Order and Other Bankruptcy Court Filings</u>.  The Bankruptcy Court shall have entered the Interim Order, which shall be in and substance reasonably satisfactory to the Administrative Agent and the Lenders and shall authorize and approve the credit facilities under this Agreement and the transactions contemplated hereby, including the granting of the super-priority status, security interests and liens, and the payment of all fees referred to herein, which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Lenders. All orders entered by the Bankruptcy Court pertaining to adequate protection shall and all other motions and documents filed or to be

SF:247498.3

filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the Administrative Agent in its sole discretion. The Prior Agent shall have consented, on behalf of itself and the Prior Lenders, to the entry of the Interim Order.

(b) <u>First Day Orders</u>. The "first day" orders in form, scope and substance satisfactory to the Administrative Agent shall have been entered in the Chapter 11 Case.

(c) <u>Documents</u>. The Administrative Agent shall have received the following in sufficient counterparts (except for the Notes) for each Lender:

      (i) A Note drawn to the order of each applicable Lender, executed by a duly authorized officer of Borrower and dated the Closing Date.

      (ii) If required by the Administrative Agent, the Security Documents duly executed by the respective parties thereto.

      (iii) If requested by the Administrative Agent, insurance certificates in form and substance reasonably satisfactory to the Administrative Agent listing the Administrative Agent as loss payee thereof and indicating that Borrower has obtained insurance in compliance with Section 5.3 with respect to each of the businesses and real properties of Borrower in such amounts and with such carriers reasonably acceptable to the Lenders, the prior receipt of which is acknowledged by the Administrative Agent.

(d) <u>Compliance</u>. Borrower shall have performed and complied with all agreements, terms and conditions contained in this Agreement required to be performed or complied with by Borrower prior to or simultaneously with the Closing Date.

(e) <u>Lien Searches</u>. The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions where the assets of Borrower are located, and such search shall be satisfactory to the Administrative Agent.

(f) <u>Budget</u>. The Administrative Agent and the Lenders shall have received and approved the Budget, which approval shall be in their sole discretion.

(g) <u>Other Matters</u>. All corporate and legal proceedings relating to Borrower, and all instruments and agreements in connection with the transactions contemplated by this Agreement shall be satisfactory in scope, form and substance to the Administrative Agent, the Lenders and the Administrative Agent's counsel, and the Administrative Agent shall have received all information and copies of all documents, including records of corporate proceedings, as any Lender or such counsel may reasonably have requested in connection therewith, such documents where appropriate to be certified by proper corporate or governmental authorities.

Any one or more of the conditions set forth above which have not been satisfied by Borrower on or prior to the date of disbursement of the initial Loan under this Agreement shall not be deemed

23

permanently waived by the Administrative Agent or any Lender unless the Administrative Agent or such Lender, as the case may be, shall waive the same in a writing which expressly states that the waiver is permanent, and in all cases in which the waiver is not stated to be permanent the Administrative Agent or any Lender may at any time subsequent thereto insist upon compliance and satisfaction of any such condition as a condition to any subsequent Loan hereunder and failure by Borrower to comply with any such condition within five (5) Business Day's written notice from the Administrative Agent or any Lender to Borrower shall constitute an Event of Default under this Agreement.

Section 3.2    Conditions Precedent to All Loans.  The obligation of the Lenders to make any Loans hereunder shall be subject to the fulfillment of the following conditions:

(a)    Representations and Warranties.    The representations and warranties contained in Article IV shall be true and correct on and as of the Closing Date and on the date of each Loan, with the same force an effect as if made on such date.

(b)    No Default.  No Default or Event of Default shall have occurred and be continuing on the Closing Date and on Loan Date of such Loan or Loans or will exist after giving effect to the Loans made on such date.

(c)    Notices and Requests.    The Administrative Agent shall have received Borrower's request for such Loans in accordance with Section 2.2.

(d)    Interim Order.  The Interim Order shall not have been vacated, stayed, reversed, modified or amended without the consent of the Administrative Agent and the Required Lenders, and each order shall otherwise be in full force and effect; no motion for reconsideration of the Interim Order or the Final Order shall have been timely filed; no appeal of the Interim Order or the Final Order shall have been timely filed and neither the Interim Order nor the Final Order shall in any respect be the subject of a stay pending appeal; the Loan requested would not cause the Total Outstandings to exceed the amount then authorized by the Interim Order or the Final Order, as the case may be; and no order modifying, reversing, staying or vacating either the Interim Order or the Final Order shall have been entered.

(e)    Other Orders.  All orders entered by the Bankruptcy Court on or prior to the entry of the Final Order shall be reasonably satisfactory in form and substance to the Administrative Agent and its counsel.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

To induce the Lenders to enter into this Agreement and to make Loans hereunder, Borrower represents and warrants to the Lenders:

Section 4.1    Organization, Standing, Etc.  Borrower is a limited liability company validly existing and in good standing under the laws of State of Delaware.  Members are the sole members of Borrower.  Subject to the entry of the Orders, Borrower has all requisite power and authority to carry on its business as now conducted, to enter into this Agreement, to issue the

24

Notes and to perform its obligations under the Loan Documents. Borrower (a) holds all certificates of authority, licenses and permits necessary to carry on its business as presently conducted in each jurisdiction in which it is carrying on such business, except where the failure to hold such certificates, licenses or permits would not constitute a Material Adverse Occurrence, and (b) is duly qualified and in good standing as a foreign company or corporation in each jurisdiction in which the character of the properties owned, leased or operated by it or the business conducted by it makes such qualification necessary and the failure so to qualify would permanently preclude Borrower from enforcing its rights with respect to any assets or expose Borrower to any Material Adverse Occurrence.

Section 4.2    Authorization and Validity.    Subject to the entry of the Orders, the execution, delivery and performance by Borrower of the Loan Documents have been duly authorized by all necessary limited liability company action by Borrower, and this Agreement constitutes, and the Notes and other Loan Documents when executed will constitute, the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

Section 4.3    No Conflict.    Subject to the entry of the Orders, the execution, delivery and performance by Borrower of the Loan Documents will not (a) violate any provision of any law, statute, rule or regulation or any order, writ, judgment, injunction, decree, determination or award of any court, governmental agency or arbitrator presently in effect having applicability to Borrower, or (b) violate or contravene any provision of the Certificate of Formation or limited liability company agreement of Borrower. Borrower is not in default under or in violation of any such law, statute, rule or regulation, order, writ, judgment, injunction, decree, determination or award in any case in which the consequences of such default or violation is not stayed by the filing of the Chapter 11 Case.

Section 4.4    Government Consent.    Subject to the entry of the Orders, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any governmental or public body or authority is required on the part of Borrower to authorize, or is required in connection with the execution, delivery and performance of, or the legality, validity, binding effect or enforceability of, the Loan Documents, except for any necessary filing or recordation of or with respect to any of the Security Documents.

Section 4.5    Budget.    The Budget was prepared under the direction of Borrower's independent professional financial consultant and represents Borrower's good faith estimates of the matters set forth therein.

Section 4.6    Litigation.    Except for items that have been stayed due to the filing of the Chapter 11 Case, there are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against or affecting Borrower or any of its properties before any court or arbitrator, or any governmental department, board, agency or other instrumentality which, if determined adversely to Borrower, would constitute a Material Adverse Occurrence. Any actions, suits or proceedings pending against or affecting Borrower have been stayed by Chapter 11 Cases.

SF:247498.3

Section 4.7    Environmental, Health and Safety Laws.    There does not exist any violation by Borrower of any applicable federal, state or local law, rule or regulation or order of any government, governmental department, board, agency or other instrumentality relating to environmental, pollution, health or safety matters which has, will or threatens to impose a material liability on Borrower or which has required or would require a material expenditure by Borrower to cure.  No property of Borrower is used for the production, storage or disposal of hazardous wastes, substances or materials.  Borrower has not received any notice to the effect that any part of its operations or properties is not in material compliance with any such law, rule, regulation or order or notice that it or its property is the subject of any governmental investigation evaluating whether any remedial action is needed to respond to any release of any toxic or hazardous waste or substance into the environment, which non-compliance or remedial action could reasonably be expected to constitute a Material Adverse Occurrence.  Borrower has no knowledge that it or its property will become subject to environmental laws or regulations during the term of this Agreement, compliance with which could reasonably be expected to require capital expenditures that could reasonably be expected to constitute a Material Adverse Occurrence.

Section 4.8    Reserved..

Section 4.9    Federal Reserve Regulations.    Borrower is not engaged principally or as one of its important activities in the business of extending credit for the purpose of purchasing or carrying margin stock (as defined in Regulation U of the Board).  The value of all margin stock owned by Borrower does not constitute more than 25% of the value of the assets of Borrower.

Section 4.10    Real Property; Location of Collateral.

(a)    Appendix B accurately sets forth (i) all real property owned by Borrower, (b) all real property leased by Borrower, and (iii) any other location where any Collateral is located.

(b)    Borrower has good and marketable title to all real property owned by Borrower.  Borrower has a valid, subsisting and enforceable leasehold interest in all real property leased by Borrower.

(c)    If any Collateral is located anywhere other than real property owned or leased by Borrower, such location is identified in Appendix B and Appendix B sets forth the terms under which Borrower has rights with respect to such location.

Section 4.11    Taxes.  Borrower has filed all federal, state and local tax returns required to be filed, or has received an extension for such filings, and has paid or made provision for the payment of all taxes due and payable pursuant to such returns and pursuant to any assessments made against it or any of its property and all other taxes, fees and other charges imposed on it or any of its property by any governmental authority (other than taxes, fees or charges (i) that have been stayed pursuant to the Chapter 11 Case or (ii) the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in accordance with GAAP have been provided on the books of Borrower).  No tax Liens have been filed and no material claims are being asserted with respect to any such taxes, fees or charges.

26

The charges, accruals and reserves on the books of Borrower in respect of taxes and other governmental charges are adequate and Borrower knows of no proposed material tax assessment against it or any basis therefor.

Section 4.12    Trademarks, Patents.  Borrower possesses or has the right to use all of the patents, trademarks, trade names, service marks and copyrights, and applications therefor, and all technology, know-how, processes, methods and designs used in or necessary for the conduct of its business, without known conflict with the rights of others.

Section 4.13    Burdensome Restrictions.  Borrower is not party to or otherwise bound by any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter, corporate or partnership restriction that has not been stayed in connection with the Chapter 11 Case and would foreseeably constitute a Material Adverse Occurrence.

Section 4.14    Force Majeure.  The business, properties and other assets of Borrower have not been materially and adversely affected in any way as the result of any fire or other casualty, strike, lockout, or other labor trouble, embargo, sabotage, confiscation, condemnation, riot, civil disturbance, activity of armed forces or act of God.

Section 4.15    Investment Company Act.  Borrower is not an "investment company" or a company "controlled" by an investment company within the meaning of the Investment Company Act of 1940, as amended.

Section 4.16    Deposit and Disbursement Accounts.  Appendix C lists all banks and other financial institutions at which Borrower maintains deposit or other accounts as of the Closing Date, including the Disbursement Account, and such Appendix correctly identifies the name, address and telephone number of each depository bank, the name in which the account is held and the tax identification number of the holder thereof, a description of the purpose of the account, and the complete account number therefor.

Section 4.17    Full Disclosure.  Subject to the following sentence, no certificate, written statement, exhibit or report furnished by or on behalf of Borrower in connection with or pursuant to this Agreement contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements contained therein not misleading.  Certificates or statements furnished by or on behalf of Borrower to the Lenders consisting of projections or forecasts of future results or events have been prepared in good faith and based on good faith estimates and assumptions of the management of the Borrower, and the Borrower has no reason to believe that such projections or forecasts are not reasonable.

Section 4.18    Subsidiaries.  Borrower has no Subsidiaries.

Section 4.19    Labor Matters.  There are no pending, or to Borrower's knowledge threatened, strikes, lockouts or slowdowns against Borrower.  Borrower have not been or are not in violation in any material respect of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from Borrower on account of wages and employee health and welfare insurance and other benefits (in each case, except for de minimus amounts), have been paid or accrued as a liability on the books of Borrower.  The consummation of the transactions contemplated under the Loan Documents will

SF:247498.3

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 32 of 62

not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Borrower is bound.

Section 4.20    Chapter 11 Case.

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearing for the approval of the interim order, and (z) the hearing for the approval of the Final Order. Borrower shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and as more fully set forth in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Companies now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in Sections 503(b) and 507(b) (except for the Carve Out).

(c)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

# ARTICLE V
# AFFIRMATIVE COVENANTS

Until any obligation of the Lenders hereunder to make the Loans shall have expired or been terminated and the Notes and all of the other Obligations have been paid in full:

Section 5.1    Financial Statements and Report.  Borrower will furnish to the Lenders:

(a)    The financial reports specified in Appendix A.

(b)    Copies of all monthly reports, projections and other materials, as well as all pleadings, motions, applications and judicial information filed by or on behalf of Borrower with the Bankruptcy Court provided by or to the Committee or any trustee or examiner, if any, appointed in the Chapter 11 Case.

(c)    Immediately upon any officer or manager of Borrower becoming aware of any Default or Event of Default, a written notice from Borrower describing the nature thereof and what action Borrower proposes to take with respect thereto.

(d)    Immediately upon any officer or manager of Borrower becoming aware of any matter that has resulted or is reasonably likely to result in a Material Adverse

SF:247498.3

Occurrence, a written notice from Borrower describing the nature thereof and what action Borrower proposes to take with respect thereto.

(e)     Immediately upon any officer or manager of Borrower becoming aware of (i) the commencement of any action, suit, investigation, proceeding or arbitration before any court or arbitrator or any governmental department, board, agency or other instrumentality affecting Borrower or any property of Borrower, or to which Borrower is a party (other than litigation where the insurance insures against the damages claimed and the insurer has assumed defense of the litigation without reservation) and in which an adverse determination or result could reasonably be expected to constitute a Material Adverse Occurrence; or (ii) any adverse development which occurs in any litigation, arbitration or governmental investigation or proceeding previously disclosed by Borrower which, if determined adversely to Borrower, could reasonably be expected to constitute a Material Adverse Occurrence, a written notice from Borrower describing the nature and status thereof and what action Borrower proposes to take with respect thereto.

(f)     From time to time, such other information regarding the business, operation and financial condition of Borrower as any Lender may reasonably request.

Section 5.2    Existence.  Borrower will maintain its existence as a limited liability company in good standing under the laws of its jurisdiction of organization and its qualification to transact business in each jurisdiction where failure to so qualify would permanently preclude Borrower from enforcing its rights with respect to any material asset or would expose Borrower to any material liability.

Section 5.3    Insurance.  Borrower shall maintain with financially sound and reputable insurance companies such insurance as may be required by law and such other insurance in such amounts and against such hazards as is customary in the ease of reputable firms engaged in the same or similar business and similarly situated.

Section 5.4    Payment of Taxes and Claims.  Borrower shall file all tax returns and reports which are required by law to be filed by it and will pay before they become delinquent all taxes, assessments and governmental charges and levies imposed upon it or its property and all claims or demands of any kind (including those of suppliers, mechanics, carriers, warehouses, landlords and other like Persons) which, if unpaid, might result in the creation of a Lien upon its property; provided, however, that the foregoing items need not be paid if (i) they have been stayed pursuant to the Chapter 11 Case or (ii) they are being contested in good faith by appropriate proceedings, and as long as Borrower's title to its property, as applicable, is not materially adversely affected, its use of such property in the ordinary course of its business is not materially interfered with and adequate reserves with respect thereto have been set aside on Borrower's books in accordance with GAAP.

Section 5.5    Inspection.  Borrower shall permit any Person designated by the Administrative Agent or any Lender to visit and inspect any of the properties, books and financial records of Borrower, to examine and to make copies of the books of accounts and other financial records of Borrower, and to discuss the affairs, finances and accounts of Borrower with, and to be advised as to the same by, its officers and managers at such reasonable times and

SF:247498.3

intervals during normal business hours as the Administrative Agent or any Lender may designate.

Section 5.6    Maintenance of Properties.  Borrower will maintain its properties used or useful in the conduct of its business in good condition, repair and working order, and supplied with all necessary equipment, and make all necessary repairs, renewals, replacements, betterments and improvements thereto, all as may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

Section 5.7    Books and Records.  Borrower will keep adequate and proper records and books of account in which full and correct entries will be made of its dealings, business and affairs.

Section 5.8    Compliance.  Borrower will comply in all material respects with all laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject; provided, however, that failure so to comply shall not be a breach of this covenant if such failure cannot reasonably be expected to constitute a Material Adverse Occurrence and Borrower is acting in good faith and with reasonable dispatch to cure such noncompliance.

Section 5.9    Reserved.

Section 5.10    Environmental Matters; Reporting.  Borrower will observe and comply with all laws, rules, regulations and orders of any government or government agency relating to health, safety, pollution, hazardous materials or other environmental matters to the extent non-compliance could result in a material liability or otherwise constitute a Material Adverse Occurrence.  Borrower shall not use its property for the production, storage or disposal of hazardous substances, wastes or materials.  Borrower will give the Administrative Agent written notice within fifteen (15) days of any violation as to any environmental matter by Borrower and of the commencement of any judicial or administrative proceeding relating to health, safety or environmental matters (a) in which an adverse determination or result could result in the revocation of or have a material adverse effect on any operating permits, air emission permits, water discharge permits, hazardous waste permits or other permits held by Borrower that are material to the operations of Borrower, or (b) which will or threatens to impose a material liability on Borrower to any Person or which will require a material expenditure by Borrower to cure any alleged problem or violation.

Section 5.11    Further Assurance.  Borrower shall promptly correct any defect or error that may be discovered in any Loan Document to which it is a party or in the execution, acknowledgment or recordation thereof.  Promptly upon request by the Administrative Agent or the Required Lenders, Borrower also shall do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register, any and all deeds, conveyances, mortgages, deeds of trust, trust deeds, assignments, estoppel certificates, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Administrative Agent or the Required Lenders may reasonable require from time to time in order:  (a) to carry out more effectively the purposes of the Loan Documents; (b) to perfect and maintain the validity, effectiveness and priority of any security interests intended to be created by the Loan Documents including the delivery of a landlord waiver from any landlord required

30

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 35 of 62

by the Administrative Agent or the Required Lenders; and (c) to better assure, convey, grant, assign, transfer, preserve, protect and confirm unto the Lenders the rights granted now or hereafter intended to be granted to the Lenders under any Loan Document or under any other instrument executed in connection with any Loan Document or that Borrower may be or become bound to convey, mortgage or assign to the Administrative Agent for the benefit of the Lenders in order to carry out the intention or facilitate the performance of the provisions of any Loan Document. Borrower shall furnish to the Administrative Agent evidence reasonably satisfactory to the Administrative Agent of every such recording, filing or registration.

Section 5.12   Compliance with Terms of Material Contracts.   Borrower shall make all payments and otherwise perform all obligations in respect of all material contracts to which Borrower is a party, except to the extent that such obligations have been stayed pursuant to the Chapter 11 Case.

Section 5.13   Eligibility.   Borrower shall maintain its status as an entity eligible to borrow from Lenders.

Section 5.14   Retention of Advisors.   Borrower shall continue to retain the Financial Consultant and the Investment Banker on terms and conditions acceptable to the Administrative Agent, together with such other advisors as are reasonably acceptable to the Administrative Agent.

Section 5.15   Landlords' Agreements.   As reasonably requested by the Administrative Agent and to the extent not otherwise addressed to the Administrative Agent's reasonable satisfaction in the Interim Order or the Final Order, as applicable, or in existing contractual arrangements, Borrower shall use reasonable efforts to obtain a landlord's agreement or bailee letter, as applicable, from the lessor of each leased property or bailee with respect to any warehouse facility or other location where Collateral is stored or located, which agreement or letter shall contain a waiver or subordination of all Liens or claims that the landlord or bailee may assert against the Collateral at that location, and shall otherwise be reasonably satisfactory in form and substance to the Administrative Agent.

Section 5.16   Cash Management Systems.   For each account listed on Appendix C hereto, Borrower shall enter into tri-party deposit account control agreements (collectively, the "Control Agreements") with Agent and the bank at which such accounts are located that provide for full cash dominion by the Administrative Agent with respect to each deposit account maintained by Borrower as of or after the Closing Date (other than (a) any payroll account so long as such payroll account either (i) is a zero balance account or (ii) does not contain any amounts in excess of payroll due and payable within four (4) Business Days, and (b) accounts funded solely to pay sales and use tax, and any such funds are so used within two (2) Business Days). Each such Control Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent.

SF:247498.3
Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 36 of 62

# ARTICLE VI
## NEGATIVE COVENANTS

Until any obligation of the Lenders hereunder to make the Loans shall have expired or been terminated and the Notes and all of the other Obligations have been paid in full:

Section 6.1    Merger.    Except as approved by the Administrative Agent and the Required Lenders, Borrower will not merge or consolidate or enter into any analogous reorganization or transaction with any Person or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution).

Section 6.2    Disposition of Assets.    Excluding dispositions of inventory in the ordinary course of business, Borrower will not directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one transaction or a series of transactions) any property (including accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, provided, however, that Borrower may consummate asset sales (i) approved by each of the Bankruptcy Court, the Administrative Agent and the Required Lenders, and (ii) the proceeds of which are used to indefeasibly pay in full the Obligations in Immediately Available Funds.

Section 6.3    Plans.    Borrower will not permit any event to occur or condition to exist which would permit any Plan to terminate under any circumstances which would cause the Lien provided for in Section 4068 of ERISA to attach to any assets of Borrower.

Section 6.4    Change in Nature of Business.    Borrower will not make any material change in the nature of the business of Borrower, as carried on at the date hereof.

Section 6.5    Subsidiaries.    Borrower will not form or acquire any corporation which would thereby become a Subsidiary.

Section 6.6    Restricted Payments.    Borrower will not make any Restricted Payments.

Section 6.7    Transactions with Affiliates.    Borrower will not enter into any transaction with any Affiliate of Borrower, except upon fair and reasonable terms no less favorable than Borrower would obtain in a comparable arm's-length transaction with a Person not an Affiliate.

Section 6.8    Accounting Changes.    Borrower will not make any significant change in accounting treatment or reporting practices, except as required by GAAP, or change its fiscal year.

Section 6.9    Subordinated Debt.    Borrower will not (a) make any scheduled payment of the principal of or interest on any Subordinated Debt; (b) directly or indirectly make any prepayment on or purchase, redeem or defease any Subordinated Debt or offer to do so (whether such prepayment, purchase or redemption, or offer with respect thereto, is voluntary or mandatory); (c) amend or cancel the subordination provisions applicable to any Subordinated Debt; (d) take or omit to take any action if as a result of such action or omission the subordination of such Subordinated Debt, or any part thereof, to the Obligations might be terminated, impaired or adversely affected; or (e) omit to give the Administrative Agent prompt

32

notice of any notice received from any holder of Subordinated Debt, or any trustee therefor, or of any default under any agreement or instrument relating to any Subordinated Debt by reason whereof such Subordinated Debt might become or be declared to be due or payable.

Section 6.10    Investments.  Borrower will not acquire for value, make, have or hold any Investments, except those in existence on the Closing Date.

Section 6.11    Indebtedness.  Borrower will not incur, create, issue, assume or suffer to exist any Indebtedness, except (a) the Obligations, (b) the Pre-Petition Obligations, and (c) current liabilities arising from the day to day operation of Borrower's business (which shall not include borrowed money) and incurred in the ordinary course of business and in accordance with the Budget.

Section 6.12    Liens.  Borrower will not create, incur, assume or suffer to exist any Lien, or enter into, or make any commitment to enter into, any arrangement for the acquisition of any property through conditional sale, lease-purchase or other title retention agreements, with respect to any property now owned or hereafter acquired by Borrower, except for the following, subject to the priorities provided in the Orders:

(a)    Liens granted to the Administrative Agent and the Lenders under the Security Documents to secure the Obligations.

(b)    Liens existing on the date of this Agreement and disclosed on Appendix B.

(c)    Liens in favor of the Prior Agent.

(d)    Deposits or pledges to secure payment of workers' compensation, unemployment insurance, old age pensions or other social security obligations, in the ordinary course of business of Borrower, placed after the Petition Date and in accordance with the Bankruptcy Code.

(e)    Liens for taxes, fees, assessments and governmental charges not delinquent or to the extent that payment therefor shall not at the time be required to be made in accordance with the provisions of Section 5.4.

(f)    Liens of carriers, warehousemen, mechanics and materialmen, and other like Liens arising in the ordinary course of business, for sums not delinquent.

(g)    Liens incurred or deposits or pledges made or given in connection with, or to secure payment of, indemnity, performance or other similar bonds.

(h)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts.

(i)    Encumbrances on real property in the nature of zoning restrictions, easements and rights or restrictions on the use of real property.

33

SF:247498.3

(j)     CoBank's statutory Lien on the CoBank Equities.

(k)     American AgCredit's statutory Lien on the American AgCredit Equities.

The prohibition provided for in this Section 6.12 specifically includes any effort by Borrower, the Committee, or any other party-in-interest in the Chapter 11 Case to prime or create pari passu to any claims, Liens or interests of the Administrative Agent and Lenders any Lien (other than for the Carve Out) or the Pre-Petition Lender Senior Liens irrespective of whether such claims, Liens or interests may be "adequately protected".

Section 6.13   Contingent Obligations.  Borrower will not be or become liable on any Contingent Obligations.

Section 6.14   Payments in Accordance with Budget.  Borrower will not make any expenditure other than in accordance with the Budget to the extent permitted by Appendix A.

Section 6.15   Operating Lease.  Borrower will not enter into any Operating Lease other than short term operating leases replacing existing operating leases that have expired or been terminated.

Section 6.16   Capital Expenditures.  Borrower will not incur capital expenditures.

Section 6.17   Deposit Accounts.  Borrower shall not establish any new deposit accounts, unless the Administrative Agent and the bank at which the account is to be opened have entered into a Control Agreement regarding such deposit account pursuant to which such bank acknowledges the security interest of the Administrative Agent in such deposit account, agrees to comply with instructions originated by the Administrative Agent directing disposition of the funds in the deposit account without further consent from Borrower, and agrees to subordinate and limit any security interest the bank may have in the deposit account and waive all rights of set-off with respect thereto (other than for customary fees and expenses) on terms satisfactory to the Administrative Agent.

## ARTICLE VII
## EVENTS OF DEFAULT AND REMEDIES

Section 7.1   Events of Default.  The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a)     Borrower shall fail to make when due, whether by acceleration or otherwise, any payment of principal of any Note.

(b)     Borrower shall fail to make when due any payment of interest on any Note or of any other Obligation required to be made to the Administrative Agent or any Lender pursuant to this Agreement and such failure to pay shall continue for three (3) days after the date on which such payment was due.

(c)     Any representation or warranty made by or on behalf of Borrower in this Agreement or any other Loan Document or by or on behalf of Borrower in any

34

certificate, statement, report or document herewith or hereafter furnished to any Lender or the Administrative Agent pursuant to this Agreement or any other Loan Document shall prove to have been false or misleading in any material respect on the date as of which the facts set forth are stated or certified.

(d)     Borrower shall fail to comply with Section 2.11, Section 5.1, Section 5.3, Section 5.4, , Section 6.14 or Section 6.17 hereof, any Section of Article IV hereof, or any provision set forth in Appendix A hereof.

(e)     Borrower shall fail to comply with any other agreement, covenant, condition, provision or term contained in this Agreement (other than those hereinabove set forth in this Section 7.1) and such failure, if by its nature is capable of being cured or remedied, shall not have been cured or remedied within five (5) days after the occurrence thereof.

(f)     Any default (however denominated or defined) shall occur under any Security Document or any Security Document shall, at any time, cease to be in full force and effect or shall be judicially declared null and void, or the validity or enforceability thereof shall be contested by Borrower, or the Administrative Agent or the Lenders shall cease to have a valid and perfected security interest having the priority contemplated thereunder in all of the Collateral described therein.

(g)     Any Change of Control shall occur.

(h)     Any of the following occurs in connection with the Chapter 11 Case:

(i)     the bringing of a motion, taking of any action or the filing of any Plan of Reorganization or disclosure statement attendant thereto by Borrower: (A) that would not result in payment in full in cash of the Obligations; (B) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (C) to grant any Lien other than as expressly permitted herein upon or affecting any Collateral on which Agent has a Lien; or (D) any other action or actions adverse to the Administrative Agent and the Lenders or their rights and remedies hereunder or their interest in the Collateral on which Agent has a Lien;

(ii)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order, the Final Order or any order governing cash management arrangements without the written consent of the Administrative Agent and Required Lenders or the filing of a motion for reconsideration with respect to the Interim Order of the Final Order;

(iii)     the payment of any Pre-Petition claim without the Administrative Agent's and Required Lenders' prior written consent unless

35

otherwise permitted under this Agreement or the Orders, or the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral;

(iv)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of Borrower;

(v)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(vi)    other than as expressly set forth in the Interim Order (or the Final Order, when applicable), the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would result in a Material Adverse Occurrence;

(vii)    the commencement of a suit or action against Agent or any Lender and, as to any suit or action brought by any Person other than Borrower, officer or employee of Borrower, the continuation thereof without dismissal for thirty (30) days after service thereof on Administrative Agent or such Lender, that asserts or seeks by or on behalf of Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency, any official committee (including the Committees) in the Chapter 11 Case or any other party in interest in the Chapter 11 Case, any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the Administrative Agent or any Lender under the Loan Documents to any other claim or that would otherwise result in a Material Adverse Occurrence;

(viii)    the challenge by Borrower or Members to the validity, extent, perfection or priority of any liens granted under the Pre-Petition Credit Agreement;

SF:247498.3

(ix)       the remittance, use or application of the proceeds of Collateral other than in accordance with cash management procedures and agreements acceptable to the Administrative Agent;

(x)       the use of the Loans, or any portion thereof, for any purpose other than to pay expenditures set forth in the Budget; or

(xi)       the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xii)       the failure of Borrower to comply with or perform any of the material terms, conditions, covenants, or other obligations under the Interim Order or the Final Order;

(xiii)       the entry of an order in the Chapter 11 Case (A) granting any other super priority administrative claim or Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and Lenders other than as expressly set forth in the Interim Order (or the Final Order, when applicable) or (B) which provides adequate protection, or the granting by Borrower of similar relief in favor of any one or more of Borrower's Pre-Petition creditors, contrary to the terms and conditions of the Interim Order or the Final Order;

(xiv)       the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by Borrower or any other Person to which the Administrative Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims, or the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization (i) that is not acceptable to the Required Lenders in their sole discretion or (ii) that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(xv)       the failure of Borrower to have received a Final Order within thirty (30) days after the Petition Date;

(xvi)       the failure of Borrower (x) to comply with the terms of any of the documents or agreements executed in connection with the Transaction, and the failure of the Transaction to have been consummated strictly in accordance with the terms of such agreements, without any waiver or amendment unless consented to by the Administrative Agent or (y) taking any action to or the occurrence of any event which could reasonably be expected to

37

adversely affect the value of any stalking horse bid; or

(xvii)   the sale without the Administrative Agent and Lenders' written consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed Plan of Reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations and termination of Lenders' Commitment to make Loans.

Section 7.2   <u>Suspension or Termination of Commitments; Remedies</u>.  Upon the occurrence of any Default or Event of Default, Agent may, and, at the request of the Required Lenders, shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, and without any notice or demand, immediately suspend or terminate all or any portion of the Commitments, <u>provided, however</u>, that, in the case of a Default, if the subject condition is waived by the Required Lenders or cured within any applicable grace or cure period, the Commitments shall be reinstated.  In addition, upon the occurrence of any Event of Default, the Administrative Agent may (and upon receipt of a request in writing from the Required Lenders, the Administrative Agent shall) take any of the following actions, subject to and in accordance with the terms of the Interim Order or the Final Order, as applicable: (i) declare all or any portion of the Obligations to be immediately due and payable, whereupon the Obligations, together with all accrued and unpaid interest thereon, shall immediately become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, anything in this Agreement or in the Notes to the contrary notwithstanding; or (ii) exercise any rights and remedies provided to the Administrative Agent under the Loan Documents, the Orders, or at law or in equity.

Section 7.3   <u>Offset</u>.  In addition to the remedies set forth in Section 7.2 and subject to the terms of the Interim Order and the Final Order, as applicable, upon the occurrence of any Event of Default and thereafter while the same be continuing, Borrower hereby irrevocably authorizes each Lender to set off any Obligations owed to such Lender against all deposits and credits of Borrower with, and any and all claims of Borrower against, such Lender.  Such right shall exist whether or not such Lender shall have made any demand hereunder or under any other Loan Document, whether or not the Obligations, or any part thereof, or deposits and credits held for the account of Borrower is or are matured or unmatured, and regardless of the existence or adequacy of any Collateral, guaranty or any other security, right or remedy available to such Lender or the Lenders.  Each Lender agrees that, as promptly as is reasonably possible after the exercise of any such setoff right, it shall notify Borrower of its exercise of such setoff right; <u>provided</u>, <u>however</u>, that the failure of any Lender to provide such notice shall not affect the validity of the exercise of such setoff rights.  Nothing in this Agreement shall be deemed a waiver or prohibition of or restriction on any Lender to all rights of banker's Lien, setoff and counterclaim available pursuant to law.

38

# ARTICLE VIII
## THE ADMINISTRATIVE AGENT

The following provisions shall govern the relationship of the Administrative Agent with the Lenders.

Section 8.1 <u>Appointment and Authorization</u>. Each Lender appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such respective powers under the Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto. Neither the Administrative Agent nor any of its directors, officers or employees shall be liable for any action taken or omitted to be taken by it under or in connection with the Loan Documents, except for its own gross negligence or willful misconduct. The Administrative Agent shall act as an independent contractor in performing its obligations as Administrative Agent hereunder. The duties of the Administrative Agent shall be mechanical and administrative in nature, and nothing herein contained shall be deemed to create any fiduciary relationship among or between the Administrative Agent, Borrower or the Lenders.

Section 8.2 <u>Note Holders</u>. The Administrative Agent may treat the payee of any Note as the holder thereof until written notice of transfer shall have been filed with it, signed by such payee and in form reasonably satisfactory to the Administrative Agent.

Section 8.3 <u>Consultation With Counsel</u>. The Administrative Agent and each Lender may consult with legal counsel selected by it and shall not be liable for any action taken or suffered in good faith by it in accordance with the advice of such counsel.

Section 8.4 <u>Loan Documents</u>. The Administrative Agent shall not be responsible to any Lender for any recitals, statements, representations or warranties in any Loan Document or be under a duty to examine or pass upon the validity, effectiveness, genuineness or value of any of the Loan Documents or any other instrument or document furnished pursuant thereto, and the Administrative Agent shall be entitled to assume that the same are valid, effective and genuine and what they purport to be.

Section 8.5 <u>CoBank and Affiliates</u>. With respect to its Commitments and the Loans made by it, CoBank shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not the Administrative Agent consistent with the terms thereof, and CoBank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Borrower as if it were not the Administrative Agent.

Section 8.6 <u>Action by Administrative Agent</u>. Except as may otherwise be expressly stated in this Agreement, the Administrative Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights which may be vested in it by, or with respect to taking or refraining from taking any action or actions which it may be able to take under or in respect of, the Loan Documents. The Administrative Agent shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all holders

39

SF:247498.3

of Notes; provided, however, that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to the Loan Documents or applicable law. The Administrative Agent shall incur no liability under or in respect of any of the Loan Documents by acting upon any notice, consent, certificate, warranty or other paper or instrument believed by it to be genuine or authentic or to be signed by the proper party or parties and to be consistent with the terms of this Agreement.

Section 8.7    Credit Analysis.  Each Lender has made, and shall continue to make, its own independent investigation or evaluation of the operations, business, property and condition, financial and otherwise, of Borrower in connection with entering into this Agreement and has made its own appraisal of the creditworthiness of Borrower.  Except as explicitly provided herein, the Administrative Agent has no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before the first Event of Default or at any time thereafter.

Section 8.8    Notices of Event of Default, Etc.  In the event that the Administrative Agent shall have acquired actual knowledge of any Event of Default or Default, the Administrative Agent shall promptly give notice thereof to the Lenders.  The Administrative Agent shall not be deemed to have knowledge or notice of any Default or Event of Default, except with respect to actual defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "Notice of Default".

Section 8.9    Indemnification.  Each Lender agrees to indemnify the Administrative Agent, as Administrative Agent (to the extent not reimbursed by Borrower), ratably according to such Lender's share of the Commitment Amounts from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on or incurred by the Administrative Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by the Administrative Agent under the Loan Documents, provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct.  No payment by any Lender under this Section shall relieve Borrower of any of its obligations under this Agreement.

Section 8.10    Payments and Collections.  All funds received by the Administrative Agent in respect of any payments made by Borrower on the Notes or Undrawn Facility Fees shall be distributed forthwith by the Administrative Agent among the Lenders, in like currency and funds as received, ratably according to each such Lender's Loan Percentage.  After any Event of Default has occurred, all funds received by the Administrative Agent, whether as payments by Borrower or as realization on Collateral or on any guaranties, shall (except as may otherwise be required by law) be distributed by the Administrative Agent in the following order: (a) first to the Administrative Agent or any Lender that has incurred unreimbursed costs of collection with respect to any Obligations hereunder, ratably to the Administrative Agent and each Lender in the proportion that the costs incurred by the Administrative Agent or such Lender

40

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 45 of 62

bear to the total of all such costs incurred by the Administrative Agent and all Lenders; (b) next to the Administrative Agent for the account of the Lenders (in accordance with their respective Total Percentages) for application on the Notes; and (c) last to the Administrative Agent for the account of the Lenders (in accordance with their respective Loan Percentages) for any unpaid Undrawn Facility Fees owing by Borrower hereunder.

Section 8.11    Sharing of Payments.  If any Lender shall receive and retain any payment, voluntary or involuntary, whether by setoff, application of deposit balance or security, or otherwise, in respect of Indebtedness under this Agreement or the Notes in excess of such Lender's share thereof as determined under this Agreement, then such Lender shall purchase from the other Lenders for cash and at face value and without recourse, such participation in the Notes held by such other Lenders as shall be necessary to cause such excess payment to be shared ratably as aforesaid with such other Lenders; provided, that if such excess payment or part thereof is thereafter recovered from such purchasing Lender, the related purchases from the other Lenders shall be rescinded ratably and the purchase price restored as to the portion of such excess payment so recovered, but without interest.   Subject to the participation purchase obligation above, each Lender agrees to exercise any and all rights of setoff, counterclaim or banker's lien first fully against any Notes and participations therein held by such Lender, next to any other Indebtedness of Borrower to such Lender arising under or pursuant to this Agreement and to any participations held by such Lender in Indebtedness of Borrower arising under or pursuant to this Agreement, and only then to any other Indebtedness of Borrower to such Lender.

Section 8.12    Advice to Lenders.   The Administrative Agent shall forward to the Lenders copies of all notices, financial reports and other material communications received hereunder from Borrower by it as Administrative Agent, excluding, however, notices, reports and communications which by the terms hereof are to be furnished by Borrower directly to each Lender.

Section 8.13    Defaulting Lender.

(a)     Remedies Against a Defaulting Lender.   In addition to the rights and remedies that may be available to the Administrative Agent or Borrower under this Agreement or applicable law, if at any time a Lender is a Defaulting Lender such Defaulting Lender's right to participate in the administration of the Loans, this Agreement and the other Loan Documents, including any right to vote in respect of, to consent to or to direct any action or inaction of the Administrative Agent or to be taken into account in the calculation of the Required Lenders, shall be suspended while such Lender remains a Defaulting Lender.  If a Lender is a Defaulting Lender because it has failed to make timely payment to the Administrative Agent of any amount required to be paid to the Administrative Agent hereunder (without giving effect to any notice or cure periods), in addition to other rights and remedies which the Administrative Agent or Borrower may have under the immediately preceding provisions or otherwise, the Administrative Agent shall be entitled (i) to collect interest from such Defaulting Lender on such delinquent payment for the period from the date on which the payment was due until the date on which the payment is made at the overnight Federal Funds Rate, (ii) to withhold or setoff.  and to apply in satisfaction of the defaulted payment and any related interest, any amounts otherwise payable to such Defaulting Lender under this Agreement

41

or any other Loan Document until such defaulted payment and related interest has been paid in full and such default no longer exists and (iii) to bring an action or suit against such Defaulting Lender in a court of competent jurisdiction to recover the defaulted amount and any related interest.  Any amounts received by the Administrative Agent in respect of a Defaulting Lender's Loans shall not be paid to such Defaulting Lender and shall be held uninvested by the Administrative Agent and either applied against the purchase price of such Loans under the following subsection (b) or paid to such Defaulting Lender upon the default of such Defaulting Lender being cured.

   (b) <u>Purchase from Defaulting Lender</u>.  Any Lender that is not a Defaulting Lender shall have the right, but not the obligation, in its sole discretion, to acquire all of a Defaulting Lender's Commitments.  If more than one Lender exercises such right, each such Lender shall have the right to acquire such proportion of such Defaulting Lender's Commitments on a pro rata basis.  Upon any such purchase, the Defaulting Lender's interest in its Loans and its rights hereunder (but not its liability in respect thereof or under the Loan Documents or this Agreement to the extent the same relate to the period prior to the effective date of the purchase) shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest to the purchaser thereof subject to and in accordance with the requirements set forth in Section 9.6, including an Assignment in form reasonably acceptable to the Administrative Agent.  The purchase price for the Commitments of a Defaulting Lender shall be equal to the amount of the principal balance of the Loans outstanding and owed by Borrower to the Defaulting Lender.  The purchaser shall pay to the Defaulting Lender in Immediately Available Funds on the date of such purchase the principal of and accrued and unpaid interest and fees on the Loans made by such Defaulting Lender hereunder (it being understood that such accrued and unpaid interest and fees may be paid pro rata to the purchasing Lender and the Defaulting Lender by the Administrative Agent at a subsequent date upon receipt of payment of such amounts from Borrower).  Prior to payment of such purchase price to a Defaulting Lender, the Administrative Agent shall apply against such purchase price any amounts retained by the Administrative Agent pursuant to the last sentence of the immediately preceding subsection (a).  The Defaulting Lender shall be entitled to receive amounts owed to it by Borrower under the Loan Documents which accrued prior to the date of the default by the Defaulting Lender, to the extent the same are received by the Administrative Agent from or on behalf of Borrower.  There shall be no recourse against any Lender or the Administrative Agent for the payment of such sums except to the extent of the receipt of payments from any other party or in respect of the Loans.

Section 8.14 <u>Resignation</u>.  If at any time CoBank shall deem it advisable, in its sole discretion, it may submit to each of the Lenders and Borrower a written notification of its resignation as Administrative Agent under this Agreement, such resignation to be effective upon the appointment of a successor Administrative Agent, but in no event later than 30 days from the date of such notice.  Upon submission of such notice, the Required Lenders may appoint a successor Administrative Agent.

SF:247498.3

# ARTICLE IX
## MISCELLANEOUS

Section 9.1     Modifications.  Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 9.1.  The Required Lenders and Borrower may, or with the written consent of the Required Lenders, the Administrative Agent and Borrower may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of Borrower hereunder or thereunder or (ii) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, no such amendment, modification, waiver or consent shall:

    (a)     Reduce the rate or extend the time of payment of interest thereon, or reduce the amount of the principal thereof, or modify any of the provisions of any Note with respect to the payment or repayment thereof, without the consent of the holder of each Note so affected; or

    (b)     Increase the amount or extend the time of any Commitment of any Lender, without the consent of such Lender; or

    (c)     Reduce the rate or extend the time of payment of any fee payable to a Lender, without the consent of the Lender affected; or

    (d)     Except as may otherwise be expressly provided in any of the other Loan Documents, release any material portion of Collateral securing, or any guaranties for, all or any part of the Obligations without the consent of all the Lenders; or

    (e)     Amend the definition of Required Lenders or otherwise reduce the percentage of the Lenders required to approve or effectuate any such amendment, modification, waiver, or consent, without the consent of all the Lenders; or

    (f)     Amend any of the foregoing Subsections (a) through (e) of this Section or this Subsection (f) without the consent of all the Lenders; or

    (g)     Amend any provision of this Agreement relating to the Administrative Agent in its capacity as Administrative Agent without the consent of the Administrative Agent.

Section 9.2     Expenses.  Borrower agrees to reimburse the Administrative Agent and each Lender upon demand for all reasonable out-of-pocket expenses paid or incurred by the Administrative Agent and each Lender (including the fees and expenses of legal counsel to the Administrative Agent and the Administrative Agent's financial advisor) in connection with the negotiation, preparation, approval, review, execution, delivery, administration, amendment, modification, interpretation, enforcement of or collection under this Agreement, the other Loan

Documents, or with respect to the Loans. The obligations of Borrower under this Section shall survive any termination of this Agreement. The Administrative Agent is authorized to make Loan advances to reimburse the Administrative Agent or any Lender for any expenses of the type referred to in this Section 9.2 or that are otherwise due and owing from Borrower to the Administrative Agent or any Lender.

Section 9.3  Waivers, etc. No failure on the part of the Administrative Agent or the holder of a Note to exercise and no delay in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right. The remedies herein and in the other Loan Documents provided are cumulative and not exclusive of any remedies provided by law.

Section 9.4  Notices. Except when telephonic notice is expressly authorized by this Agreement, any notice or other communication to any party in connection with this Agreement shall be in writing and shall be sent by manual delivery, facsimile transmission, overnight courier or United States mail (postage prepaid) addressed to such party at the address specified on the signature page hereof, or at such other address as such party shall have specified to the other party hereto in writing. All periods of notice shall be measured from the date of delivery thereof if manually delivered, from the date of sending thereof if sent by facsimile transmission, from the first Business Day after the date of sending if sent by overnight courier, or from four days after the date of mailing if mailed; provided, however, that any notice to the Administrative Agent or any Lender under Article II hereof shall be deemed to have been given only when received by the Administrative Agent or such Lender.

Section 9.5  Taxes. Borrower agrees to pay, and save the Administrative Agent and the Lenders harmless from all liability for, any stamp or other taxes which may be payable with respect to the execution or delivery of this Agreement or the issuance of the Notes, which obligation of Borrower shall survive the termination of this Agreement.

Section 9.6  Successors and Assigns; Participations; Purchasing Lenders.

(a)  This Agreement shall be binding upon and inure to the benefit of Borrower, the Administrative Agent, the Lenders, all future holders of the Notes, and their respective successors and assigns, except that Borrower may not assign or transfer any of their rights or obligations under this Agreement without the prior written consent of each Lender.

(b)  Each Lender may, from time to time, in the ordinary course of its commercial banking business and in accordance with applicable law, at any time sell to one or more banks or other financial institutions ("Participants") participating interests in any Loan or other Obligation owing to such Lender, the Note held by such Lender, and any Commitment of such Lender, or any other interest of such Lender hereunder. In the event of any such sale by any Lender of participating interests to a Participant, (i) such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible for the performance thereof, (iii) such Lender shall remain the holder of any such Note for all purposes under

44

this Agreement, (iv) Borrower and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (v) the agreement pursuant to which such Participant acquires its participating interest herein shall provide that such Lender shall retain the sole right and responsibility to enforce the Obligations, including the right to consent or agree to any amendment, modification, consent or waiver with respect to this Agreement or any other Loan Document, provided that such agreement may provide that such Lender will not consent or agree to any such amendment, modification, consent or waiver with respect to the matters set forth in Sections 9.1(a) through (e) without the prior consent of such Participant.  Borrower agrees that if amounts outstanding under this Agreement, the Notes and the Loan Documents are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have, to the extent permitted by applicable law, the right of setoff in respect of its participating interest in amounts owing under this Agreement and any Note or other Loan Document to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement or any Note or other Loan Document; provided, that such right of setoff shall be subject to the obligation of such Participant to share with the Lenders, and the Lenders agree to share with such Participant, as provided in Section 8.11.  Borrower also agrees that each Participant shall be entitled to the benefits of Sections 2.13, 2.14, 2.15, 2.16 and 9.2 with respect to its participation in the Commitments and Loans; provided, that no Participant shall be entitled to receive any greater amount pursuant to such subsections than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

(c)    Each Lender may, from time to time, with the consent of the Administrative Agent and Borrower (neither of which consents shall be unreasonably withheld or delayed; and if an Event of Default shall have occurred and be continuing, then consent of Borrower shall not be required), assign to other lenders ("Assignees") all or part of its rights or obligations hereunder or under any Loan Document evidenced by any Note then held by that Lender, together with equivalent proportions of its Commitment pursuant to written agreements executed by such assigning Lender, such Assignee(s), Borrower and the Administrative Agent in a form to prescribed by the Administrative Agent, which agreements shall specify in each instance the portion of the Obligations evidenced by the Notes which is to be assigned to each Assignee and the portion of the Commitment of such Lender to be assumed by each Assignee (each, an "Assignment Agreement"); provided, however, that the assigning Lender must pay to the Administrative Agent a processing and recordation fee of $3,500.00 per assignment. Upon the execution of each Assignment Agreement by the assigning Lender, the relevant Assignee, Borrower and the Administrative Agent, payment to the assigning Lender by such Assignee of the purchase price for the portion of the Obligations being acquired by it and receipt by Borrower of a copy of the relevant Assignment Agreement, (x) such Assignee lender shall thereupon become a "Lender" for all purposes of this Agreement with a pro rata share of the Commitment in the amount set forth in such Assignment Agreement and with all the rights, powers and obligations afforded a Lender under this Agreement, (y) such assigning Lender shall have no further liability for funding the portion of its Commitment assumed by such Assignee and (z) the address for notices to

such Assignee shall be as specified in the Assignment Agreement executed by it. Concurrently with the execution and delivery of each Assignment Agreement, the assigning Lender shall surrender to the Administrative Agent the Note a portion of which is being assigned, and Borrower shall execute and deliver a Note to the Assignee in the amount of its Commitment, and a new Note to the assigning Lender in the amount of its Commitment, after giving effect to the reduction occasioned by such assignment, all such Notes to constitute "Notes" for all purposes of this Agreement and of the other Loan Documents.

(d) Borrower shall not be liable for any costs incurred by the Lenders in effecting any participation under subparagraph (b) of this subsection or by the Lenders in effecting any assignment under subparagraph (c) of this subsection except with respect to the Administrative Agent as provided in this Section 9.6.

(e) Each Lender may disclose to any Assignee or Participant and to any prospective Assignee or Participant any and all financial information in such Lender's possession concerning Borrower or any of its Subsidiaries (if any) which has been delivered to such Lender by or on behalf of Borrower or any of their Subsidiaries pursuant to this Agreement or which has been delivered to such Lender by or on behalf of Borrower or any of their Subsidiaries in connection with such Lender's credit evaluation of Borrower or any of its Subsidiaries prior to entering into this Agreement.

(f) Notwithstanding any other provision in this Agreement, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement and any note held by it in favor of any federal reserve bank in accordance with Regulation A of the Board or U. S. Treasury Regulation 31 CFR § 203.14, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

Section 9.7    Reserved.

Section 9.8    Governing Law and Construction.  THE VALIDITY, CONSTRUCTION AND ENFORCEABILITY OF THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF COLORADO, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES THEREOF.  Whenever possible, each provision of this Agreement and the other Loan Documents and any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto shall be interpreted in such manner as to be effective and valid under such applicable law, but, if any provision of this Agreement, the other Loan Documents or any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto shall be held to be prohibited or invalid under such applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement, the other Loan Documents or any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto.

Section 9.9    Consent to Jurisdiction.  BORROWER HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT,

SF:247498.3

IRREVOCABLY AGREES THAT, SUBJECT TO THE ADMINISTRATIVE AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURT, AND WAIVES ANY ARGUMENT THAT VENUE IN SUCH FORUM IS NOT CONVENIENT.  BORROWER HEREBY EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURT.  IN THE EVENT BORROWER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS AGREEMENT, THE ADMINISTRATIVE AGENT AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO THE BANKRUPTCY COURT, OR IF SUCH TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.  BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREE THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER, AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

Section 9.10   Waiver of Jury Trial.  BORROWER, THE ADMINISTRATIVE AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11   Survival of Agreement.  All representations, warranties, covenants and agreement made by Borrower herein or in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be deemed to have been relied upon by the Lenders and shall survive the making of the Loans by the Lenders and the execution and delivery to the Lenders by Borrower of the Notes, regardless of any investigation made by or on behalf of the Lenders, and shall continue in full force and effect as long as any Obligation is outstanding and unpaid and so long as the Commitments have not been terminated; provided, however, that the obligations of the under 9.2, 9.5 and 9.12 shall survive payment in full of the Obligations and the termination of the Commitments.

Section 9.12   Indemnification.  Borrower hereby agrees to defend, protect, indemnify and hold harmless the Administrative Agent and the Lenders and their respective Affiliates and the directors, officers, employees, attorneys and agents of the Administrative Agent and the Lenders and their respective Affiliates (each of the foregoing being an "Indemnitee" and all of the foregoing being collectively the "Indemnitees") from and against any and all claims, actions, damages, liabilities, judgments, costs and expenses (including all reasonable fees and disbursements of counsel which may be incurred in the investigation or defense of any matter) imposed upon, incurred by or asserted against any Indemnitee, whether direct, indirect or consequential and whether based on any federal, state, local or foreign laws or regulations (including securities laws, environmental laws, commercial laws and regulations), under common law or on equitable cause, or on contract or otherwise:

47

(a)    by reason of, relating to or in connection with the execution, delivery, performance or enforcement of any Loan Document, any commitments relating thereto, or any transaction contemplated by any Loan Document; or

(b)    by reason of, relating to or in connection with any credit extended or used under the Loan Documents or any act done or omitted by any Person, or the exercise of any rights or remedies thereunder, including the acquisition of any Collateral by the Lenders by way of foreclosure of the Lien thereon, deed or bill of sale in lieu of such foreclosure or otherwise;

provided, however, that Borrower shall not be liable to any Indemnitee for any portion of such claims, damages, liabilities and expenses resulting from such Indemnitee's gross negligence or willful misconduct. In the event this indemnity is unenforceable as a matter of law as to a particular matter or consequence referred to herein, it shall be enforceable to the full extent permitted by law.

This indemnification applies, without limitation, to any act, omission, event or circumstance existing or occurring on or prior to the later of the Commitment Termination Date or the date of payment in full of the Obligations, including specifically Obligations arising under clause (b) of this Section. The indemnification provisions set forth above shall be in addition to any liability Borrower may otherwise have. Without prejudice to the survival of any other obligation of Borrower hereunder the indemnities and obligations of Borrower contained in this Section shall survive the payment in full of the other Obligations.

Section 9.13    Captions.    The captions or headings herein and any table of contents hereto are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Agreement.

Section 9.14    Entire Agreement.    This Agreement and the other Loan Documents embody the entire agreement and understanding between Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof. This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof. Nothing contained in this Agreement or in any other Loan Document, expressed or implied, is intended to confer upon any Persons other than the parties hereto any rights, remedies, obligations or liabilities hereunder or thereunder.

Section 9.15    Counterparts.    This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

Section 9.16    Interest Rate Limitation.    Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and,

48

to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.17 <u>Parties, Including Trustees; Bankruptcy Court Proceedings</u>. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon Borrower, the estate of Borrower, and any trustee or successor in interest of Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Administrative Agent and Lenders and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law. Borrower may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Administrative Agent and Lenders. Any such purported assignment, transfer, hypothecation or other conveyance by Borrower without the prior express written consent of the Administrative Agent and Lenders shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of Borrower, the Administrative Agent and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

[SIGNATURE PAGES FOLLOW]

SF:247498.3

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 54 of 62

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

HUMBOLDT CREAMERY, LLC,
a Delaware limited liability company,
as Borrower


By:_____
Name: Len Mayer
Title:   Manager
Address:

572 Highway 1
Fortuna, CA 95540
Fax: (707) 726-7138

SF:247498.3

Commitment Amount: $1,650,000           CoBANK, ACB,
as a Lender and as the Administrative Agent


By:_____
Name:_____
Title:_____

Address for funding notices:

5500 South Quebec Street
Greenwood Village, CO  80111
Attention:  Agency Syndications
Fax:  (303) 740-4021

Address for all other notices:

5500 South Quebec Street
Greenwood Village, CO  80111
Attention:  Ronald P. Seigley
Fax:  (720) 528-6278

Commitment Amount: $1,350,000           AMERICAN AgCREDIT, PCA,
as a Lender


By:_____
Name:_____
Title:_____

Address for all regular mail notices:

Address:

5560 S. Broadway
Eureka, CA 95503
Fax:  (707) 442-1268

C-2

SF:247498.3

Appendix A

Financial Reporting/Operating Covenants

A.    Financial Reporting.

       Borrower shall deliver the financial information and reports to the Administrative Agent as set forth below.  All such financial information shall be prepared and/or approved by the Financial Consultant.

       1.    On Wednesday of each week, Borrower shall deliver to the Administrative Agent a certificate setting forth, as of the end of the previous week, the following information: (a) the Total Outstandings and the Maximum Amount, (b) the aggregate amount and value of inventory, (c) the aggregate amount of accounts receivable, (d) the total sales for such week, (e) the total cash receipts for such week, and (f) a statement in reasonable detail of all amounts expended during such week and comparing such amounts on a line-item basis with the amount projected to be expended during such week pursuant to the Budget.  All of the foregoing shall include the level of detail specified by the Administrative Agent's financial advisor and shall be accompanied by such backup information as shall be specified by the Administrative Agent's financial advisor.

       2.    If requested by the Administrative Agent, Borrower shall deliver updated budgets to the Administrative Agent containing such detail and covering such time periods as shall be specified by the Administrative Agent.  No such updated budget shall constitute the "Budget" under this Agreement unless specifically agreed in writing by both Borrower and the Administrative Agent.

B.    Operating Covenants.

       Borrower shall comply with and observe each of the following covenants:

       1.    As of the end of each calendar week, the sum of Borrower's accounts receivable and inventory shall be not less than 90% of the amount projected for such date in the Budget. For the purposes of compliance with this covenant, the amount of accounts receivable and inventory shall be determined in the same manner and using the same methodology as are used in the Budget.

       2.    As of the end of each week, Borrower's cumulative sales for the period from the beginning of the period covered by the Budget to the end of such week shall not be less than ninety percent (90%) of the cumulative amount forecast in the Budget.

       3.    As of the end of each week, Borrower's cumulative cash receipts for the period from the beginning of the period covered by the Budget to the end of such week shall not be less than ninety percent (90%) of the cumulative amount forecast in the Budget.

SF:247498.3

4.      Borrower's expenditure during any calendar week for any category of expense set forth in the Budget shall be not more than one hundred ten percent (110%) of the amount forecast for such category for such week in the Budget; provided that (a) if amounts forecasted to be spent in an earlier week are not spent during such earlier week, then such amounts may be carried over to the following weeks or weeks subject to a maximum permitted expenditure in any week of one hundred twenty-five percent (125%) of the amount forecast for such category during such week, and (b) the foregoing covenant shall not apply to (i) the fees and expenses of Agent's counsel and financial advisor, and (ii) payments to the California Dept. of Food and Agriculture.

C.      <u>Covenants Related to a Transaction</u>.

1.      On or before April 27, 2009, Borrower shall have prepared and distributed informational packages soliciting bids from potentially interested parties for the Transaction and shall have caused a virtual data room to be created in which all materials relevant to the Transaction are posted for review by such interested parties; the informational packages shall specify that expressions of interest with respect to the Transaction be delivered by no later than the close of business on May 4, 2009, and that firm bids with respect to the Transaction be delivered by no later than the close of business on May 11, 2009.

2.      On or before the close of business on June 1, 2009, Borrower shall have entered into a stalking horse bid with respect to the Transaction on terms acceptable to the Administrative Agent, which shall be conducted pursuant to bidding procedures in form and substance reasonably acceptable to the Administrative Agent.

3.      On or before May 25, 2009, Borrower shall have filed a motion with the Bankruptcy Court for approval of bidding procedures for a potential sale.   On or before June 8, 2009, Borrower shall have filed a motion with the Bankruptcy Court for approval of the sale to the stalking horse bidder.  Each motion shall be in form and substance acceptable to the Administrative Agent.

4.      On or before July 13, 2009, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Administrative Agent, approving sale to the stalking horse or a higher bidder.

5.      The Transaction shall close on or before July 27, 2009.

6.      Promptly upon any such information becoming available to Borrower, Borrower shall provide the Administrative Agent copies of any informational packages provided to potential bidders, copies of all agreements to be executed in connection with the Transaction and, upon request of the Administrative Agent or any Lender, a status report and updated information relating to the Transaction and copies of any such bids and any updates, modifications or supplements to such information and materials.

SF:247498.3

Case: 09-11078    Doc# 6-4    Filed: 04/21/09    Entered: 04/21/09 10:02:58    Page 58 of 62

Appendix B

Real Property; Location of Collateral


A.      Owned Real Property.

Humboldt Creamery LLC
571 Highway 1
Fortuna, CA 95540

Humboldt Creamery LLC
281 Loleta Drive
Loleta, CA 95551

Humboldt Creamery LLC
1270 Shaw Road
Stockton, CA 95205

Humboldt Creamery LLC
1474 N Indiana Street
Los Angeles, CA 90063


B.      Leased Real Property.

Heritage Foods LLC
13034 Excelsior
Norwalk, CA 90670

Patrick O'Dell- Fortuna leased warehouse
180 South Fortuna Blvd
Fortuna, CA 95540

Seattle Cold Storage
502 10th Avenue
Seattle, WA

Dreisbach Enterprises
P.O. Box 7509
Oakland, CA  94601

Hansen Ranch

F-3

The Borrower shall deliver to the Administrative Agent a copy of each of the above leases (or warehouse agreements if applicable) and all amendments thereto within seven days after the Closing Date.

D.      Liens

None

SF:247498.3

Appendix C

<u>Deposit Accounts</u>

The Borrower shall deliver to the Administrative Agent within seven days after the Closing Date a complete list of all deposit accounts maintained by the Borrower.

SF:247498.3

Appendix D

<u>Budget</u>

SF:247498.3