1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
    MICHAEL H. AHRENS, Cal. Bar No. 44766
3   STEVEN B. SACKS, Cal. Bar No. 98875
    ORI KATZ, Cal. Bar No. 209561
4   Four Embarcadero Center, 17th Floor
    San Francisco, California 94111-4109
5   Telephone:   415-434-9100
    Facsimile:   415-434-3947
6
    Proposed Attorneys for
7   HUMBOLDT CREAMERY, LLC

8

9                   UNITED STATES BANKRUPTCY COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                      SANTA ROSA DIVISION

12

13  In re                              Case No. 09-11078

14  HUMBOLDT CREAMERY, LLC, a          Chapter 11
    Delaware limited liability company,
15                                     **DECLARATION OF LEN MAYER IN**
                 Debtor.               **SUPPORT OF FIRST DAY MOTIONS**
16
    Tax ID: 87-0736033
17                                     Date:    April 22, 2009
                                       Time:    10:00 a.m.
18                                     Place:   99 South E. Street
                                                Santa Rosa, CA 95404
19                                     Judge:   Hon. Alan Jaroslovsky

20

21

22

23

24

25

26

27

28

Case: 09-11078   Doc# 9   Filed: 04/21/09   Entered: 04/21/09 10:09:15   Page 1 of 22

I, Len Mayer, declare as follows:

1.     I am the manager and Chief Executive Officer ("CEO") of Humboldt Creamery, LLC (the "Debtor"), the debtor in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case"). Prior to becoming the manager and CEO, I was the acting CEO of the Debtor from February 22, 2009 to April 17, 2009. During that period I was also Acting Chief Executive Officer of Humboldt Creamery Association ("Association"), the cooperative that was the managing member of the Debtor until April 17, 2009. Prior to February 22, 2009, I was the Chief Operating Officer of the Debtor from 2007, when I joined the Debtor. I am no longer an officer of the Association and am now solely working on behalf of the Debtor.

2.     I also served for four years as Chief Executive Officer of North Coast Cooperative, a consumer food cooperative in Arcata and Eureka, California, and was Administrative Officer at Humboldt Bank. I have a masters degree in Economics from the University of California at Santa Barbara and a B.S. in Economics from Humboldt State University. I make this declaration in my above capacity with the Debtor. Except for those statements made upon information and belief, the following facts are based upon my personal knowledge and if called to testify, I could and would competently testify to such facts. As to those statements made upon information and belief, I believe them to be true.

3.     This declaration is submitted in support of the following motions (collectively, the "First Day Motions"):

    a.     Emergency Application for Order Limiting Service of Notice of Certain Matters Pursuant to Federal Rule of Bankruptcy Procedure 2002(i);

    b.     Emergency Motion for Order Authorizing Debtor to Honor Prepetition Obligations to Employees; and

Case: 09-11078     Doc# 9     Filed: 04/21/09     Entered: 04/21/09 10:09:18     Page 2 of 22

c.    Debtor's Emergency Motion for Interim and Final Order
(I) Authorizing Post-Petition Financing and Granting Liens and
Superpriority Claims, (II) Authorizing Use of Cash Collateral,
(III) Authorizing Immediate Payment of Certain Administrative
Claims, (IV) Authorizing Use of Existing Bank Account, and
(V) Providing Related Relief.

## I.  Disclaimer Regarding Accuracy of Financial and Historical Information.

4.    Among other things, this declaration sets forth the background of the Debtor's business and financial affairs.  For the reasons described below, the Debtor's historical financial records and inventory accounts have recently been found to be unreliable and to contain significant inaccuracies.  The Debtor has been working diligently to resolve these issues, but significant work needs yet to be done.  All financial data and information regarding inventory or production capacity in this declaration must therefore be understood with this in mind.

5.    Furthermore, I have been in the employ of the Debtor since 2007.  Some of the historical knowledge is therefore beyond my first hand experience, but is based on my information and belief after having learned the history and the background of the Debtor during the term of my employment.

## II.  Historical Background of the Company.

6.    The Debtor processes, distributes and markets a wide array of dairy products, including powdered milk, fluid milk, packaged ice cream and various frozen novelty products.  The Debtor's business is a grassroots, homegrown affair that has been an integral part of the dairy business in Northern California since 1929.  In January of that year, 153 dairy farmers banded together and formed Humboldt Creamery Association, a nonprofit agricultural cooperative whose purpose was to remedy the inequality in bargaining power existing between the individual dairy farmers in the area and their larger, institutional customers.  Headquartered in Fernbridge, California, the Debtor has retained these strong

MAXER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:18    Page 3 of 22

ties to the land that bore it – the Debtor receives most of the raw milk necessary for its operations from the approximately 40 farmer-members of the Association, who have an average herd size of 300 milking cows.

7.     Since the beginning of the 1990s and into the 2000s, the Debtor's business has been shifting from the sale of low margin goods like basic milk powders and fluid milk to higher margin goods such as ice cream, frozen novelties, and organic versions of its dairy products. This was done as part of a strategy to remain independent in the midst of market consolidation by growing through acquisitions and internal consolidation and expansion. Significant steps in this journey have included the construction of the business' first ice cream manufacturing facility in Fortuna in 1994, the acquisition of a 40,000 square foot distribution center in Stockton in August of 2004, and the purchase of the ice cream division of WestFarm Foods in November of 2004, which included a license of the Darigold trademark and a second ice cream manufacturing facility in Los Angeles that focuses on frozen novelty products. With this increased capacity and ability to control distribution costs internally, the Debtor is able to produce high quality dairy products at low cost for sale under its customers' private labels and under its own brand. Further, as part of its move towards higher margin products, the Debtor has recently increased its product offerings and marketing efforts for products sold under its own trademarked brand, "Humboldt Creamery," which it rolled out nationally in 2007.

8.     The limited liability company comprising the Debtor was formed on December 3, 2004 as part of a corporate restructuring that enabled the expansion of the Association's business. As part of that restructuring, the Association contributed essentially all of its assets (except for its contracts with its farmer-members) to the Debtor in exchange for a 75% membership interest in the Debtor. The Association's sole function is now to provide the Debtor with raw milk.

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:13    Page 4 of 22

# III. Financial Background of the Company.

## A. The Output Agreement with the Association.

9.     The Debtor and the Association are parties to a Milk Supply Contract dated January 1, 2005 (the "Milk Supply Contract"), which is the key agreement at the heart of the Debtor's business. The Milk Supply Contract is an output contract pursuant to which the Debtor is obligated to purchase all of the raw milk produced by the approximately 40 members of the Association. The raw milk purchased under this agreement includes both non-organic and organic milk. In addition, because the Debtor's raw milk demands exceed the Association's supply, the Debtor also purchases some raw milk from non-Association members. Currently, approximately 90% of the Debtor's raw milk supply is provided by Association members and approximately 10% is supplied by non-Association milk producers.

## B. The Debtor's Customers.

10.     The Debtor has contracts with major grocery retailers, big box stores and major food processing companies in the United States and abroad. The Debtor makes approximately 65% of its sales outside of the State of California, and has been expanding its presence in international markets. The Debtor has recently become the largest U.S. exporter of ice cream to Mexico.

## C. The Debtor's Product Lines.

(i)     Ice Cream and Frozen Novelties.

11.     The Debtor's most significant product line is ice cream, and it is the largest private label ice cream manufacturer in the Western United States. The Debtor's two ice cream manufacturing facilities produce a full range of non-organic and organic ice creams from "regular" to "super premium," as well as over 300 different frozen novelty products of varying flavors, grades, labels and packages.

12.     The Debtor produces these ice cream products under its own trademarked "Humboldt Creamery" brand, and under the private labels of its customers. In 2008,

MAXER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS
Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 5 of 22

1  approximately 55% of the Debtor's ice cream sales were made under its own brand and

2  approximately 45% under its customers' private labels. Approximately 45% of the Debtor's

3  gross revenues in 2008 were derived from the sale of ice cream and frozen novelties.

4      (ii)  <u>Powdered Milk</u>.

5      13.    The Debtor's second most significant line of business is the sale of powdered

6  milk, which constituted approximately 35% of its gross revenues in 2008. The Debtor has

7  the ability to produce approximately 24 million pounds of powdered milk annually, which it

8  sells worldwide to customers in the pharmaceutical, confectionary and other industries.

9  The Debtor has traditionally supplied approximately 30% of the wholemilk powder used in

10 the United States, and is the only American manufacturer to make an "instantized" version

11 for sale internationally. The Debtor also produces value added non-fat dry milk powder and

12 various niche powders, including organic powder, rBST-free powder and non-fat powder

13 fortified with vitamins. The Debtor's ability to instantize powders and produce niche

14 powders sets it apart from the average powder manufacturer and enables it to obtain

15 significant premiums over commodity pricing.

16     (iii)  <u>Fluid Milk</u>.

17     14.    After powdered milk, the next most significant line of business for the Debtor

18 is in fluid milk products, of which the Debtor produces approximately 3.9 million gallons

19 annually. In 2007, approximately 60% of that was organic milk. The Debtor sells the fluid

20 milk locally under its own "Humboldt Creamery" label, and throughout the West Coast

21 under its customers' private label brands.

22     (iv)  <u>Other Products</u>.

23     15.    In addition to the above, the Debtor sells raw milk and cream to its customers

24 who process it into various items, including fluid milk, cheese and butter.

25     **IV.  <u>The Debtor's Pre-Petition Financing and Capital Structure.</u>**

26     16.    The Debtor is 75% owned by Association and 25% owned by another dairy

27 cooperative, Dairy Farmers of America, Inc. ("DFA"). This equity structure derives from

28

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 16 of 22

the Association's ownership of 13,500 of the 18,000 Common Units of membership interest in the Debtor, and DFA's ownership of the remaining 4,500 Units. The Debtor has also sold lesser membership interests in the form of Series A and B Preferred Units. There are approximately 3,500 Series A Preferred Units and 400 Series B Preferred Units outstanding.

17.    The Debtor's secured debt obligations arise from a borrowing arrangement with CoBank, ACB, as administrative and collateral agent, and certain other participating lenders, including two American AgCredit entities (collectively, the "Lenders"). This arrangement is documented in a Loan Agreement dated January 3, 2005, and subsequently amended twenty times (the "Pre-Petition Loan Agreement"). Two primary obligations arise from this borrowing arrangement: the Debtor's obligations under a revolving line of credit extended by the Lenders, and the Debtor's obligations under a term loan extended by the Lenders. As of the Petition Date, the collective amount outstanding under both the line of credit and the term loan was in excess of $54,000,000.00.[1] The revolving line of credit is set to mature on February 1, 2010, and the term loan is set to mature on April 30, 2017.

18.    The Debtor's obligations under the Pre-Petition Loan Agreement are secured by mortgages encumbering all of its real property in Humboldt, San Joaquin and Los Angeles Counties, as well as security agreements encumbering all of the Debtor's inventory, accounts receivable, equipment and certain other personal property. In addition, the Association guaranteed all of the Debtor's obligations under the Pre-Petition Loan Agreement.

### V.  Events Leading to the Bankruptcy Filing.

19.    The Debtor's bankruptcy filing was necessitated by the discovery that its financial condition was much different than what had been represented in the financial

---

[1] The foregoing numbers are estimates given for informational purposes only, and the Debtor reserves all of its rights and arguments regarding the Loan Agreement and any amounts owing by the Debtor thereunder.

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 7 of 22
MAYER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS

statements issued by the Debtor under the management of its former Chief Executive Officer, Richard Ghilarducci. Mr. Ghilarducci had been the President and CEO of the Debtor (and before that, the Association) since 1997. Prior to serving as CEO, Mr. Ghilarducci had also been the Association's Chief Financial Officer since 1985. On February 20, 2009, Mr. Ghilarducci abruptly resigned, warning the Debtor of potential financial inaccuracies.

20.  Immediately upon Mr. Ghilarducci's resignation, the Debtor suspended the sale of the Series B Preferred Units, which were being sold largely to individuals in Humboldt County, and took active steps to uncover the nature and extent of the potential fraud. The Debtor has been working closely with the U.S. Department of Justice to investigate its former CEO's misdeeds, and has also commissioned its own investigation into the matter. The Debtor's investigation showed that the Debtor's financial statements had been manipulated, perhaps going back several years.

21.  In the wake of Mr. Ghilarducci's resignation, the Debtor hired an accounting firm and a workout professional to aid the Debtor in undertaking a thorough review of its balance sheet and other financial data, with the goal of gaining an accurate understanding of its finances. As that picture has become clearer, so has the need for significant financial restructuring. To that end, the Debtor has accomplished much in a short time toward the goal of reducing expenses, increasing efficiency, and enhancing its overall financial health. Among other things, the Debtor has: (i) aggressively marketed the sale of certain of its properties, businesses and facilities, including its manufacturing facility in Los Angeles, its powder milk processing facility in Loleta, its direct store delivery business in Stockton, and certain vacant land in Stockton; (ii) drastically reduced overhead by eliminating approximately one-third of its general and administrative expenses; (iii) conducted strategic workforce reductions at all levels in order to slash payroll expenses, including the elimination of approximately 23% of senior and middle management positions; (iv) obtained concessions from the Association under the Milk Supply Agreement,

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:18    Page 8 of 22

1 including the deferral of $2 million dollars in payments past due, a 20% reduction in the

2 supply of raw organic milk, and a significant reduction in the purchase price of all raw

3 milk; (v) commenced discussions regarding strategic partnerships with certain existing

4 equity holders, customers and competitors; and (vi) hired outside consultants from the dairy

5 industry to review the Debtor's operational structure and provide advice as to how to

6 increase operational efficiency.

## VI. Plan for the Case.

8     22.     In broad terms, the Debtor's strategy for this chapter 11 case is to obtain a

9 debtor-in-possession loan from its pre-petition Lenders to maintain its operations, while

10 working to reorganize or sell its business with the aid of an investment banking firm. The

11 Debtor currently contemplates that it will most likely sell the assets of the Debtor as a going

12 concern, but the Debtor remains open to pursuing a partial sale or a reorganization based on

13 new investment capital if, after pursuing all options, any of those prove to be the best

14 course of action for the estate, the creditors and other parties in interest.

15     23.     The need for additional financing became clear to the Debtor after taking the

16 substantial steps toward restructuring described above. Even after these steps, the Debtor

17 found itself in default under the Pre-Petition Loan Agreement and in need of further

18 financing in order to continue production through the summer months of 2009. As the

19 result of learning its true financial status, the Debtor and its pre-petition lenders determined

20 that the Debtor had far less assets than had previously been represented to the lenders and

21 thus did not have a sufficient capital base to support its existing loans, nor sufficient

22 working capital to operate without additional financing. Prior to its bankruptcy filing, the

23 Debtor sought such financing from its pre-petition Lenders, but the Lenders were not

24 willing to make any additional loans without the benefit of a court order in chapter 11. In

25 light of the Lenders' security interest in substantially all of the Debtor's assets, the Debtor

26 was unable to secure financing from any other source. The Debtor needs approximately $3

27 million in order to operate through the summer months, when sales of its main product line,

28

W02-WEST:5MML1\401498018.3

MAYER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS

ice cream, are typically highest. To fulfill this need, the Debtor and the Lenders have negotiated the terms of a debtor in possession loan agreement ("DIP Loan Agreement") in the form attached to the DIP Financing Motion filed concurrently herewith. The DIP Loan Agreement has been executed by the Debtor and the Lenders, but is subject to the approval of this Court.

24.     As the DIP Loan negotiations developed, so did the plan to sell the Debtor's business. The Lenders conditioned their entry into the DIP Loan Agreement upon the Debtor's consent to a process whereby the Debtor would sell all of its assets on a going concern basis. The Debtor agreed to do so, using the procedures available in a Chapter 11 proceeding to facilitate such a sale. Toward that end, the Debtor entered into an engagement letter with investment bank Duff & Phelps Securities, LLC and its related entity, Chanin Capital Partners, LLC (collectively, "Duff & Phelps") before it filed this Chapter 11 case. The Debtor is filing an application to employ Duff & Phelps concurrently herewith. Duff & Phelps' primary focus is to aggressively market and sell substantially all of the Debtor's assets as a going concern, though Duff & Phelps will explore all available options for a successful reorganization. The Debtor feels that this strategy will be beneficial to all creditors, employees and other parties in interest. The strategy will maximize the return for the creditors, other stakeholders and maintain jobs. Continuing the business of the Debtor provides the milk producers with a continued purchaser and processor of raw milk, benefiting the Association, which is one of the Debtor's major creditors, and other suppliers and vendors. It will also provide an opportunity for creditors to obtain a possible return.

25.     Prior to the filing of this Chapter 11 case, I was the Chief Executive Officer of both the Debtor and the Association. The Association was also the Manager of the Debtor. In order to avoid a situation in which a major creditor controlled the Debtor during its bankruptcy case, I resigned pre-petition as the CEO of the Association, and have now been

MAKER DECLARATION IN SUPPORT OF FIRST DAY MOTIONS

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:19    Page 10 of 22

nominated as the responsible individual for the Debtor. Also, the Association resigned pre-petition as the Manager of the Debtor, and I am now the Manager of the Debtor.

## VII. Prepetition Obligations to Employees.

26. This section of the declaration pertains to the Debtor's Emergency Motion for Order Authorizing Debtor to Honor Prepetition Obligations to Employees (the "Employee Motion") filed concurrently herewith. Terms in initial capital letters not conforming to customary usage and not otherwise defined herein shall have the meanings ascribed to them in the Employee Motion.

27. The Debtor is continuing to operate its business post-petition and believes that any failure to honor certain employee-related obligations in the ordinary course of business would create hardship and discontent among its employees, which would in turn decrease productivity and undermine the Debtor's ability to retain employees, continue normal operations and ultimately, to effectuate a going concern sale or reorganize.

28. If the Debtor cannot assure its employees that it will promptly pay employment-related payments and benefits, employee morale and the Debtor's operations will suffer. The pay and continued benefits are important to the Debtor's employees and their livelihoods. Many, if not most, of the Debtor's employees live check to check. Moreover, the amount requested is relatively small, estimated to be approximately $70,000 for benefits and employee reimbursements, plus approximately $175,000 for the prepetition portion of Debtor's payroll. The Debtor also seeks to honor post-petition (but not pay out), its prepetition vacation obligations to employees.

29. The Debtor maintains and operates an ice cream manufacturing facility in Fernbridge, a second ice cream manufacturing facility in Los Angeles that focuses on frozen novelty products, and a 40,000 square foot distribution center in Stockton. A total of approximately 170 employees work in the Debtor's different facilities.

30. As of the Petition Date various amounts of prepetition employee obligations were owed or had accrued because, among other things:

Case: 09-11078   Doc# 9   Filed: 04/21/09   Entered: 04/21/09 10:09:15   Page 77 of 22

a.     The Debtor filed its chapter 11 petition in the midst of its regular and customary payroll periods (paychecks are normally distributed on the 10th and 25th of each month). As such, various amounts in prepetition payroll liabilities were due and owing as of the Petition Date;

b.     Some payroll and expense reimbursement checks issued to employees prior to the Petition Date have not yet been presented for payment or have not yet cleared the banking systems and, accordingly, were not honored and paid as of the Petition Date; and

c.     Certain other forms of compensation (including sick pay, vacation pay and withholdings for benefit plan contributions) related to prepetition services have not been honored because such benefits, although accrued before the Petition Date, were not payable but rather will become payable in the ordinary course of the Debtor's business.

31.     It is crucial that the Debtor be authorized to pay certain prepetition wages, salaries and benefits to its employees.

**A.     The Debtor's Employees Are Essential To Its Continued Operations And Reorganization.**

32.     The Debtor has approximately 170 employees. The employees fall into four broad categories: management, clerical, sales and creamery workers. Management, clerical and sales staff collectively comprise approximately 50 employees, with the other 120 consisting of creamery workers.

33.     The creamery workers generally operate some form of machinery or equipment at the creamery itself, and their jobs and skill sets vary depending on the type of machinery and equipment they are trained to use. It would be extremely difficult to train replacement workers to perform the specific tasks required in order to keep the creamery running efficiently.

34.     The Debtor's management and clerical employees are also essential to the Debtor's continued operation and viability. Certain of the Debtor's employees will be involved in preparing the schedules and statement of financial affairs in this case, preparing financial analysis, working with third parties who perform due diligence on the Debtor in connection with a going concern sale or formulating a plan of reorganization for the company.

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 12 of 22

35.     The Debtor's sales staff have long-standing relationships with the Debtor's customers, built over the course of many years.  The sales staff is on the front line of the Debtor's business and will be needed in order to maintain key relationships with customers, vendors and other third parties.

36.     The filing of this Bankruptcy Case has disrupted the Debtor's normal operations.  Unless the Debtor can promptly honor its prepetition employee obligations, the Debtor believes that employee morale will suffer, and some employees will be unable to meet their own personal obligations.  If that happens, it will lead to lower productivity and a risk that the employees will find employment elsewhere.

37.     The Debtor's employees (whether management, clerical, sales or creamery workers) are intimately knowledgeable about the Debtor's operations and business affairs, and their retention is necessary to ensure a timely and efficient bankruptcy process.  Without its employees, the Debtor will not be able to continue to operate its business, thereby ending any hopes for reorganization or a sale of the business as a going concern.

**B.     Wages, Salaries and Accrued Vacation**

38.     The Debtor administers its payroll obligations internally, and its employees are paid twice every month (on the 10th and 25th) for the work period ending the prior week.  The total amount of the prepetition wages and salaries owed is collectively approximately $175,000, with no one employee entitled to an amount in excess of $10,950.  Note that the Debtor will *not* pay any employees on account of prepetition accrued vacation.  Rather, employees with prepetition accrued vacation will be authorized to take and use such vacation in the ordinary course of the Debtor's business.

39.     Failure to approve payment for prepetition employee wages and commissions would be a blow to employee morale and could undermine the Debtor's ability to retain its employees at this critical time period.  No employee has received, or will receive, post-petition payment on account of his or her prepetition wages or commissions in excess of $10,950, consistent with the statutory cap in Section 507(a)(4) of the Bankruptcy Code.

MAYER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS

Case: 09-11078     Doc# 9     Filed: 04/21/09     Entered: 04/21/09 10:09:13     Page 13 of 22

**C.  Employee Reimbursements.**

40.  From time to time, the Debtor's employees incur miscellaneous expenses related to their jobs. These expenses were routinely reimbursed by the Debtor before the Petition Date. Employees generally submit expense reports, including receipts or other backup documentation, in order to receive reimbursement for their business expenses. After receiving approvals, the Debtor would remit payment to the employee.

41.  Based on current information, the Debtor estimates that there are few, if any, employees owed expense reimbursements for amounts incurred by employees prepetition. By way of the Employee Motion, the Debtor seeks authority to reimburse employees for such expenses, in order to avoid hardship for the employees who would otherwise be independently obligated to pay such amounts.

**D.  Employee Benefits.**

42.  The Debtor's business practice has been to supplement the wages and salaries of its full-time employees by providing them with certain employee benefit programs. These programs include such standard benefits as vacation and sick time; medical and dental insurance; and workers' compensation. The Debtor is continuing these programs in the ordinary course of its business operations. The relief sought in the Employee Motion relates only to those unpaid, prepetition benefits that were earned in connection with certain of the Debtor's benefit programs as more fully described below.

(i)  Employee Medical And Dental Insurance.

43.  The Debtor provides medical insurance benefits and dental benefits to its employees. As of the Petition Date, the Debtor believes that it is current with respect to amounts owing for such medical insurance and dental benefits. The Debtor, however, seeks authority to continue funding premiums or other charges for such benefits (including on account of prepetition claims as appropriate), solely in its discretion and with the objective of preserving its employees' medical and dental insurance benefits. This relief is precautionary in nature. It is intended to protect the Debtor's employees and business only

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:16    Page 14 of 22

to the extent that some prepetition amounts inadvertently remained unpaid, and to allow the Debtor to maintain continuous coverage for its employees, thereby avoiding any lapses in coverage which may have a serious negative impact on the employees.

(ii)   <u>Vacation Benefits</u>.

44.   The majority of the Debtor's employees are full-time employees who are entitled to vacation benefits. Employees generally accrue between 2 to 3 weeks of vacation time per year, depending on the length of their employment. Accrued vacation may be rolled over from year to year.

45.   Upon termination, the Debtor pays all employees for any accrued but unused vacation leave, pursuant to applicable law. As of the Petition Date, the Debtor estimates that its outstanding liability for accrued vacation time was several hundred thousand dollars. If the Debtor were to pay out such accrued vacation to its employees, the payments would exceed the $10,950 threshold of Section 507(a)(4) with respect to approximately 20 employees. By the Employee Motion, the Debtor seeks authority, in its sole discretion, to continue to honor its vacation policy in the ordinary course, including to allow employees post-petition to take vacation and sick leave earned prepetition. The Debtor is not seeking authority now to compensate employees for accrued and unused vacation leave in the event of a termination. Terminated employees will instead retain a claim for such prepetition accrued and unused vacation.

**E.   Need for Relief.**

46.   The Debtor seeks the relief requested by the Employee Motion because any delay in honoring its prepetition employee obligations will destroy its relationship with its employees, irreparably impair employee morale, and may cause a mass exodus of employees. The Debtor believes that the livelihood of many of its employees depends on the income provided through their work for the Debtor. Many of them rely on their wages as their only source of income. To them, the loss of this income for even a few days may result in a financial hardship. Employee support for the Debtor's continued operations is

Case: 09-11078   Doc# 9   Filed: 04/21/09   Entered: 04/21/09 10:09:16   Page 15 of 22

critical. Without such support, the Debtor faces the imminent risk that its operations will be severely impaired.

### VIII.  **DIP Financing, Cash Collateral and Related Relief.**

47.     This section of this Declaration supports the *Debtor's Emergency Motion for Interim and Final Order (I) Authorizing Post-Petition Financing and Granting Liens and Superpriority Claims, (II) Authorizing Use of Cash Collateral, (III) Authorizing Immediate Payment of Certain Administrative Claims, (IV) Authorizing Use of Existing Bank Account, and (V) Providing Related Relief* (the "DIP Financing Motion").  Terms in initial capital letters in this section not conforming to customary usage and not otherwise defined herein shall have the meanings ascribed to them in the DIP Financing Motion.

### A.     **Introduction.**

48.     As noted above, the Debtor's bankruptcy filing was necessitated by its impaired financial condition, which had been hidden until recently by inaccurate financial statements created by its former Chief Executive Officer.  The Debtor now needs up to $3 million in financing and full use of cash collateral in order to operate through the summer months, when sales of its main product line, ice cream, are typically highest.  Much of this money ($1.75 million) is needed immediately over the next two weeks in order to pay the dairymen who supply the milk that is the essential raw material for the Debtor's business and to make key inventory purchases that could not be made pre-petition and which are now needed on an emergency basis.  Access to the DIP loan is being sought on an interim basis because delaying payments to the dairymen will likely cause them to be unable to stay in business to supply this key ingredient to the Debtor and because inability to make additional materials purchases now will cause irreparable harm to the Debtor's business. The Debtor intends to continue operating as a going concern in this case so that it can either sell its business or reorganize with new investment.  Any interruption to the Debtor's business during this key season would have devastating consequences to the Debtor's ability

MAYER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 16 of 22

1   to continue operating, with an equally devastating impact on the dairymen, truckers,

2   customers and others who depend on the Debtor.

3         49.     The requested borrowing is absolutely critical because the Debtor does not

4   have sufficient available sources of working capital and liquidity to operate its business

5   without access to the DIP Financing. The Debtor has several immediate needs that must be

6   met to: (i) permit the orderly continuation of the operation of its business, (ii) maintain its

7   business relationships with the dairymen and other vendors, (iii) obtain sufficient materials

8   and inventory to meet customer demand, and (iv) satisfy other working capital needs. In

9   the absence of immediate authorization to access the DIP Financing, the Debtor will not be

10   able to effectively operate its business, resulting in a significant loss of going concern value

11   and harm to the estate.

12         50.     Because the Debtor has not made several significant payments to the

13   Association in recent months, the dairymen who comprise the Association are in extreme

14   financial distress. The Association lost one milk producer recently, and neither the

15   Association nor the Debtor can afford further losses. Unless the Association's

16   administrative expense is immediately allowed and the Debtor is authorized to being

17   immediately paying the Association on account of the value of the milk received by the

18   Debtor during the 20 days before the commencement of this chapter 11 case (the "20 Day

19   Milk"), the Association's members will face grim financial consequences, including defaults

20   to their lenders, bankruptcy, and liquidation. Already the financial crisis faced by these

21   farmers and dairymen is the worst the local dairy industry has seen in over three decades,

22   with every single farmer and dairymen in the Association holding out hope that payment for

23   the 20 Day Milk will be allow them to salvage their farms and stay afloat. In addition to

24   milk supplied by the Association's members, the Debtor also seeks to pay certain non-

25   members on account of the value of the milk they delivered during the same 20 day period.

26   These non-members are independent farmers and dairymen who will struggle to survive if

27   forced to wait for payment on account of their recently delivered milk. In the DIP

28

W02-WEST:5MML1\401498018.3

MASER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 17 of 22

Financing Motion, the request to pay on account of the 20 Day Milk also includes these non-members. The Debtor's senior secured creditors (with an interest in the Debtor's cash collateral) have studied the Debtor's business and agreed to pay the Milk producers in the manner sought in the DIP Financing Motion and based on the schedule set forth in the Budget.

51. The Debtor only has one bank account, and it would ease some of the burden on the Debtor during this chapter 11 case if it could simply maintain its existing account. This would avoid confusion and potential delay in connection with significant deposits from long-standing customers that are anticipated during the case. Assuming entry of an order authorizing the Debtor to maintain its existing bank account, the Debtor will work closely with its bank to ensure that checks on account of pre-petition claims are not honored absent a Court order. Because the Debtor only recently switched banks, opening a new account with a new account number could disrupt the Debtor's business and confuse its key customers.

**B.     DIP Financing.**

52. The Debtor's successful prosecution of this bankruptcy case depends on the Debtor's ability to demonstrate to existing and prospective customers, suppliers, vendors and other contract counter-parties that the Debtor has adequate means to operate during the administration of its chapter 11 bankruptcy case. Without the ability to gear up for the busy summer season, the Debtor will not be able to capitalize on what is traditionally the most important and highest grossing season of the year. In light of the delays in the Debtor's purchases of inventory to date, unless the $1.7 million in interim financing becomes available immediately as budgeted, the Debtor will suffer irreparable harm and will not be able to recover in time to take advantage of the busy summer season. Such a failure would in turn force the Debtor to cease operations and liquidate immediately. The DIP Financing is further necessary to avoid the perception by third parties that they hold undue leverage over the Debtor in normal business negotiations due to the Debtor's liquidity crisis.

W02-WEST:5MML1\401498018.3

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 18 of 22

53. The ability of the Debtor to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the Debtor. The preservation and maintenance of the going concern value of the Debtor is integral to a successful going concern sale or reorganization.

54. The Debtor was unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. Because the Debtor lacks reliable historical financials and has existing lenders who have security interest in all assets (and are believed to be substantially undersecured), it was clear that the Debtor would be unable to obtain credit from any source (other than the DIP Lenders). As a result, all efforts were focused on obtaining the DIP Financing currently sought. The DIP Financing offered by the DIP Lenders is the Debtor's only realistic alternative to obtain post-petition credit.

55. The Debtor was unable to procure adequate post-petition credit in the form of unsecured credit or unsecured debt with an administrative priority. The circumstances of this case, described in detail above, require the Debtor to obtain credit under Bankruptcy Code sections 364(c), and make the DIP Lenders the only logical choice for financing.

56. After determining that post-petition credit was available only under Bankruptcy Code section 364(c), the Debtor negotiated the DIP Credit Agreement at arm's length and pursuant to its business judgment.

## C. **Cash Collateral.**

57. In this case, the Debtor will be using cash collateral in which the Debtor's pre-petition senior secured lenders have an interest. Such use is by consent of the secured parties, subject to the terms and conditions of the Agreement and the proposed Interim CC Order.

58. The Debtor is providing adequate protection in the form of the Replacement Lien (as that term is defined in the Agreement), which is reasonable under the circumstances because the Replacement Lien will encumber the lenders' pre-existing collateral to the same extent, validity and priority as the lenders' pre-petition lien, and will

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 19 of 22

be subordinate with respect to additional collateral. The Replacement Lien will also be subordinate to the lien granted pursuant to the DIP Lien, and subordinate and subject to the Carveout.

59.     The Cash Collateral will be used to operate the Debtors' business while this bankruptcy case is pending. Without its use, the Debtor will be forced to shut down immediately.

**D.     Payments Under Bankruptcy Code Section 503(b)(9).**

60.     By the DIP Financing Motion, the Debtor is also seeking authority pursuant to Section 503(b)(9) of the Bankruptcy Code immediately to begin paying the Association and certain non-members on account of the 20 Day Milk consistent with the Budget.

61.     The Debtor acknowledges that, during the 20-day period prior to the commencement of this case, it received milk from the Association with a value of approximately $2.1 million, and that the Association has yet to be paid in full on account of that milk. Prior to the Petition Date the Debtor paid approximately $646,000 to the Association on account of the 20 Day Milk. The Debtor only made such payments after the Association agreed that the amounts paid would be applied on account of 20 Day Milk (as opposed to being applied to unpaid amounts from January or March 2009). The budgeted post-petition payments to the Association on account of the 20 Day Milk total approximately $1.5 million.

62.     The 20 Day Milk payments for non-member farmers and dairymen are significantly less than the amounts budgeted for the Association. This is because the non-members provide less milk to the Debtor. Pre-petition payments on account of the 20 Day Milk to the non-members totaled only approximately $15,000. Because the Debtor generally kept current with payments to the non-members, no agreement was obtained pre-petition with the non-members regarding application of post-petition payments to 20 Day Milk. The budgeted post-petition payments to the non-member milk suppliers on account of the 20 Day Milk total approximately $213,000.

W02-WEST:5MML1\401498018.3

MAYER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS

Case: 09-11078     Doc# 9     Filed: 04/21/09     Entered: 04/21/09 10:09:15     Page 20 of 22

63.     The Debtor's lenders have agreed to finance the requested payments and allow for the use of their Cash Collateral to ensure that the milk suppliers are paid. This underscores the importance of the need to immediately make the requested payments.

64.     The Debtor supports the payment of the Association's 503(b)(9) claim in the amounts set forth in the Budget on account of the 20 Day Milk. The Debtor believes that such payment is in the best interest of the estate because it would alleviate the financial burden on the Association's members, who are the primary milk suppliers to the Debtor. Simply put, without the Association's milk, the Debtor has almost no ability to continue making its products. The Debtor is entirely dependent in its operations on the continued supply of the Association's milk, and believes that delaying payment on account of the 20 Day Milk, when coupled with the missed pre-petition payments, will deal a significant blow to the Association and its farmers and dairymen. The Debtor recognizes the importance of the proposed payments. The same holds true for milk received from non-members.

65.     The hardship on the farmers and dairymen cannot be overstated. The Debtor was unable to pay the Association about $2 million for milk supplied to the Debtor during January 2009, and approximately $3.7 million for milk supplied in March 2009. As a result, the Association was unable to pay its members (the farmers and dairymen) for much of the milk its members produced and the Debtor received, processed and sold this calendar year. The Association's members collectively have foregone approximately $5.7 million since January 1, 2009. While the amount the Debtor is requesting to pay on the account of the Association's 503(b)(9) claim is relatively small in comparison to the total amount owed to the Association since the beginning of this calendar year, such amount is critical to the members' livelihood and businesses. Failure to make immediate payment on account of the 20 Day Milk will likely be the proverbial "final straw" for many of the members, who are themselves small business owners with obligations to lenders and trade creditors. Many of these members rely on the draws they receive from the Association as their only source of income. To them, the loss of this income for even a few days may result in a financial

W02-WEST:5MML1\401498018.3

MAKER DECLARATION IN SUPPORT OF
FIRST DAY MOTIONS

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:16    Page 21 of 22

hardship. Several of the members have already fallen significantly behind on their obligations to their creditors and suppliers, and many have had their credit either cut-off or sharply reduced. The Association and its members cannot continue without an immediate payment. A further delay of even a few days could result in a financial crisis for the Association and its members, with significant ripple effects across Humboldt County.

66.     If the milk suppliers are not paid, the Debtor will lose them, and as a result lose the milk that is so critical to the Debtor's business. Without milk, the Debtor has no supplies. If the milk suppliers go unpaid, their lenders will foreclose, pick up the cows, slaughter them and there will be no more milk. There will be no way to recover from that harm.

## E.     Use of Bank Account.

67.     The Debtor maintains a single bank account at Coast Central Credit Union ("Coast Central"), under account number 160831. The use of the existing bank account benefits the Debtor's creditors and estate, primarily because it avoids confusion regarding deposits. The Debtor switched its account to the current bank several months ago. It would be disruptive to now have a third switch in accounts in such a short period of time. The Debtor will contact Coast Central immediately upon the filing of this bankruptcy case to advise the bank not to honor any pre-petition checks or other requests for payment absent a Court order. The Debtor has relatively few checks that are still outstanding and will immediately provide the bank with a list of all checks which cannot be honored. With this protection in place, the Debtor believes it (and the third parties it does business with) would benefit from keeping in place the existing account.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 21, 2009, at Ferndbridge, California.

/s/ Len Mayer
LEN MAYER

W02-WEST:5MML1\401498018.3

-22-

Case: 09-11078    Doc# 9    Filed: 04/21/09    Entered: 04/21/09 10:09:15    Page 22 of 22