John D. Fiero (CA Bar No. 136557)
Maxim B. Litvak (CA Bar No. 215852)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010
E-mail: jfiero@pszjlaw.com
mlitvak@pszjlaw.com

Attorneys for Official Committee
of Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SANTA ROSA DIVISION

In re:

**HUMBOLDT CREAMERY, LLC,**
a Delaware limited liability company,

Debtor.

Case No.: 09-11078

Chapter 11

**OBJECTION TO ENTRY OF FINAL ORDERS (1) AUTHORIZING POST-PETITION FINANCING AND USE OF CASH COLLATERAL, AND (2) GRANTING LIENS AND SUPERPRIORITY CLAIMS**

Date: June 3, 2009
Time: 9:30 a.m.
Place: United States Bankruptcy Court
Post Office Building
Fifth and H Street, Room 205
Eureka, CA
Judge: Hon. Alan Jaroslavsky

The Official Committee of Unsecured Creditors (the "Committee") of Humboldt Creamery, LLC (the "Debtor") hereby objects to entry of final orders (a) authorizing postpetition financing and granting liens and superpriority claims in favor of CoBank ACB and any other lenders (together, the "Banks") pursuant to the terms of that certain *Final Debtor in Possession Loan Agreement* dated June 3, 2009 (the "DIP Credit Agreement"); and (b) authorizing use of cash collateral and granting liens and superpriority claims on the terms set forth in the *Final Agreement for Use of Cash Collateral* dated June 3, 2009 (the "Cash Collateral Agreement").[1] The DIP Credit Agreement, any documents associated therewith or transactions contemplated thereby, and the proposed form of final order approving the DIP Credit Agreement are referred to collectively herein as the "DIP Financing."[2]

**INTRODUCTION**

The Committee wants the Debtor to remain in business and to preserve jobs. This objection is not designed to impact the Debtor's ordinary course operations. The Committee's concerns focus upon the technical provisions of the DIP Financing and the Cash Collateral Stipulations that unfairly favor the Banks at the expense of unsecured creditors. The Committee also recognizes that the Debtor may not have sufficient cash to maintain operations without additional postpetition funding. But that does not mean the Debtor should be forced to agree to certain over-reaching provisions of the proposed DIP Financing and the Cash Collateral Stipulations that would further extend the influence of the Banks over the Debtor and the course of this case in exchange for a mere $3,000,000 in new money.

The Banks assert prepetition secured claims against the Debtor totaling at least $54,000,000. The Banks allege that these claims are secured by properly perfected senior liens on substantially all of the Debtor's assets. By virtue of their asserted secured position and the amount of debt purportedly owed, the Banks already have a substantial stake in this case. The Committee does not

---

[1] The latest draft versions of the DIP Credit Agreement and the Cash Collateral Agreement dated as of June 3, 2009, have been provided to the Committee, but have not yet been filed with the Court. The Committee anticipates that these documents will be filed of record at or prior to the hearing on this matter.

[2] The Cash Collateral Agreement, any documents associated therewith or transactions contemplated thereby, and the proposed form of final order approving the Cash Collateral Agreement are referred to collectively herein as the "Cash Collateral Stipulations."

believe that the Court should approve additional leverage for the Banks – mostly at the expense of unsecured creditors – in consideration of $3,000,000 of additional funding. This is a very modest sum in light of the Banks' assert prepetition secured claims and the possibility that the unsecured creditor pool could total $30 million.

The DIP Financing (and the Cash Collateral Stipulations) will effectively hand over the reins of the Debtor to the Banks for purposes of determining the "big picture" issues in this case. Under the DIP Financing, the Banks will have veto power over any plan or sale proposed by the Debtor and the Debtor will be prohibited from agreeing to any alternative plan or sale sponsored by the Committee. Moreover, the DIP Financing commits the Debtor to move towards arbitrary sale milestones with the goal of disposing substantially all of the Debtor's assets for the sole benefit of the Banks, after which the Banks could "cut and run" by quickly taking all of the proceeds from the sale, while the estate is converted to chapter 7. This may be the Banks' desired outcome, but it is not a reorganization strategy and it does not maximize value of the estate, or provide any recovery for unsecured creditors.

A sale process engineered by and for the benefit of the Banks simply does not make sense in this case given the level of fraud involving the Debtor and the lack of any thorough investigation into such fraud. The Committee was astonished to learn that more than $50 million in balance sheet adjustments may be required to correct historical overstatements of the Debtor's inventory and accounts receivables, and understatements of the Debtor's payables. Indeed, nearly one-half of the value reflected on the Debtor's prepetition balance sheet appears to have been nothing more than pure fiction.

Yet, little time and money has been spent investigating the fraud involving the Debtor or the parties that were involved with or complicit in it. With the exception of the Debtor's former Chief Executive Officer, Rich Ghilarducci ("Ghilarducci"), who abruptly resigned in February 2009, the Debtor's personnel remain unchanged. Prior management (like current management) was hand-picked by Humboldt Creamery Association (the "Association"), which owns 75% of the equity

interests in the Debtor.[3] Ghilarducci was also the former Chief Executive Officer of the Association, concurrent with his position with the Debtor. The Association is now apparently a potential bidder for the Debtor's assets. Given its controlling role with the Debtor, the Association itself may have responsibility for the past actions.

Aside from the Banks, the Association (an insider) is the principal beneficiary of the contemplated DIP Financing. The Association stands to receive, and indeed has already been paid, the bulk of the funds available under the DIP Financing. The Court will recall reluctantly authorizing, on an emergency basis, the payment of approximately $1.7 million to the Association on account of its prepetition claims for deliveries of milk to the Debtor. That money came from the DIP Financing. Likewise, most of what remains to be drawn on the DIP Financing (not all of which may be needed) will likely end up in the pockets of the Association as well.[4] (Notably, the Association is also liable to the Banks for the Debtor's $55 million debt.

The potential for conflicts of interest in this case is enormous. Indeed, the Committee is informed that the Association received a "patronage dividend" (*i.e.*, a distribution of purported "profits" of the Debtor) last year totaling in excess of $1.7 million. This is particularly troubling in a situation where the Association is a potential bidder for the Debtor's assets, notwithstanding the deep-rooted fraud that has been perpetuated here (which has yet to be thoroughly understood and explained).

Under these circumstances and based upon the additional specific objections set forth below, the proposed DIP Financing should be denied.[5] It should be noted, however, that the Committee has no opposition to permitting the Banks to lend the remaining $1 million contemplated under the DIP Financing with senior liens on the Debtor's personal property, but it should not be under terms that effectively set the stage for the Banks to take control over this case or to direct the swift disposition of the Debtor's assets under suspicious circumstances.

---

[3] The Debtor's current Chief Executive Officer is Len Mayer, who was formerly Chief Operating Officer of both the Debtor and the Association. The Committee is informed that Mr. Mayer has resigned from his position with the Association.
[4] The Debtor has yet to provide the Committee with a final form of proposed budget.
[5] The Committee reserves the right to make additional objections to the DIP Financing and Cash Collateral Stipulations, as appropriate, at the hearing on this matter.

# BACKGROUND

**A.  General Background**

The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 21, 2009 (the "Petition Date").  No trustee has been appointed in this case and, since the Petition Date, the Debtor has operated its business as a debtor in possession.

The Committee is informed that the Debtor is a Delaware limited liability company with its principal place of business located in Humboldt County, California.  The Debtor asserts that its business consists of processing, distributing and marketing a wide array of dairy products, including powdered milk, fluid milk, packaged ice cream and various frozen novelty products.

On April 27, 2009, the United States Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code.  The Committee is comprised of the following seven members: (1) California Dairies; (2) Rumiano Cheese Company; (3) Sweetener Products, Inc.; (4) Mass Marketing Services; (5) Steve Wills Trucking.; (6) Berry Plastics Corp.; and (7) Certified Freight Logistics.  The Chair of the Committee is California Dairies and the co-Chair is Rumiano Cheese Company.  To date, no other committees have been appointed in the case.

**B.  Fraud Involving the Debtor**

On February 23, 2009, either the Debtor and/or the Association (it is not entirely clear which) issued a press release announcing Ghilarducci's abrupt resignation on February 20, 2009, based on a telephone call from Ghilarducci's criminal attorney suggesting that there may be inaccuracies in the "company's financial statements" (presumably, the Debtor's financial statements – and not the Association's) and that the "company" (presumably, the Debtor – and not the Association) should suspend its offering of Series B preferred shares.  The press release went on to state that the Board (it is not clear if this meant the Debtor's Board) would be suspending its offering of Series B preferred stock and would take certain steps to investigate the alleged fraud.

The complete investigation warranted by the foregoing announcements has not been undertaken, and there is no money in the budget to which the Banks would have the Debtor agree to fund such an investigation.

On May 20, 2009, the Debtor provided the Committee with a preliminary summary balance

sheet of the Debtor's assets and liabilities as of December 2008, reflecting the adjustments that appear to be warranted in the wake of Ghilarducci's departure. The level of prior fraud appears to be astronomical. Perhaps most glaring, the Debtor's inventory (which consists of tangible assets such as milk, ice cream and milk powder) required an adjustment from approximately $38,000,000 to $7,500,000. That is a write down of approximately eighty percent (80%). The Debtor's accounts receivable required a 50% write down, and the Debtor's accounts payable required an upward adjustment from approximately $7,000,000 to $23,000,000. These are dramatic changes that could not (or should not) have been missed by the Debtor or the Association. Instead, it appears that responsible parties, at best, turned a blind eye to such rampant fraud, and, at worst, were culpable in the wrongful conduct.

**C.     The Proposed DIP Financing and Cash Collateral Stipulations**

The Debtor has taken the position that it needs access to the DIP Financing in order to finance its operations during this case while it pursues sale or restructuring options. It is clear, however, that under the terms of the DIP Financing and as a practical matter, the Debtor is pursuing only one strategy in this case: the disposition of substantially all of its assets for the benefit of the Banks and perhaps the Association – without regard to the consequences that the sale and the proposed DIP budget will have on the likelihood of a confirmed plan outcome for this case.

By order dated April 23, 2009, the Court authorized the DIP Financing on an interim basis allowing the Debtor to borrow up to $1,750,000 (the "First Interim Order"). On the same day, but by separate order, the Court also authorized the Debtor to use cash collateral on an interim basis (the "Interim Cash Collateral Order"). The vast majority of the funds borrowed under the DIP Financing pursuant to the First Interim Order have been used by the Debtor to pay the prepetition claims of the Association. By memorandum decision dated April 23, 2009, the Court authorized the payment of approximately $1,700,000 to the Association on account of milk deliveries to the Debtor in the 20 days prior to the Petition Date.

By order dated May 8, 2009, the Court extended the DIP Financing through May 22, 2009, and increased the authorized interim borrowings under the DIP Financing to $1,924,166. The Court subsequently extended the previously authorized interim DIP Financing through June 3, 2009, by

order dated May 24, 2009.

Among other things, the proposed DIP Financing imposes a maturity date of September 4, 2009, and milestones in connection with a sale. Specifically, the applicable dates currently contemplated by the DIP Financing are as follows:

- June 22, 2009     Deadline for firm bids for the sale;
- June 29, 2009     Deadline for entry into stalking horse bid and filing of bid procedures motion;
- July 6, 2009     Deadline for filing of sale motion;
- August 11, 2009     Deadline for entry of sale order; and
- August 24, 2009     Deadline for closing of the sale.

*See* DIP Credit Agreement at Appendix A(C).

## **OBJECTION**

The Committee objects to the DIP Financing and the Cash Collateral Stipulations because they unnecessarily and improperly handcuff the estate. Specifically, the limitations imposed on the Debtor in the DIP Financing will allow the Banks to effectuate their chosen exit strategy in this case (a sale), while paying to the Association the bulk of the monies to be provided under the DIP Financing and leaving next to nothing for non-insider unsecured creditors.

The budget contains no funds for a meaningful investigation or forensic analysis of the fraud involving the Debtor and the parties who may have been responsible, and none is ongoing, or even planned. The circumstances here warrant a much more comprehensive, independent review, and perhaps even a full audit.

The approach that the Banks have forced upon the Debtor in this chapter 11 case is not a reorganization strategy at all. It is a "glorified foreclosure" for the benefit of the Banks that will allow the Banks to cut their losses and forget this unfortunate situation while getting at least some of the going concern value of the Debtor's business. *See* DIP Credit Agreement at § 2.6 (requiring repayment of the DIP Financing upon the "Commitment Termination Date," which includes the closing of a sale of the Debtor's assets). The problem with the quick sale option, however, is that it leaves nothing for unsecured creditors, or the chapter 11 bankruptcy process. Indeed, there is no

Case: 09-11078    Doc# 93    Filed: 06/02/09    Entered: 06/02/09 14:08:43    Page 7 of 11

58312-001\DOCS_SF:65174

OBJECTION TO FINAL DIP FINANCING AND CASH COLLATERAL ORDERS

6

mention in the DIP Financing of an exit strategy for the estate and no funding provided for the period from and after the closing of the sale (*i.e.*, no money to confirm a liquidating plan or to pursue litigation against those parties responsible for the fraud or their respective insurers). Presumably, the Banks would be happy to see this case convert to chapter 7 right after the sale.

The other principal beneficiary of the DIP Financing is the Association, who probably would be equally pleased at this point to sweep the Debtor's wrongdoing under the rug. The culpability of the Association and its members is unknown, but the control they exerted over the Debtor's affairs prior to the bankruptcy is undeniable. The Association stands to receive the bulk of the funds available under the DIP Financing. The Association is also a prospective bidder for the Debtor's business. There are inherent conflicts of interest here that need to be addressed sooner rather than later.

As addressed further below, the Committee also notes that certain provisions of the proposed DIP Financing and the Cash Collateral Stipulations are inconsistent with this Court's *Guidelines for Cash Collateral Motions & Financing Motions & Stipulations* (the "Guidelines").

**<u>Waiver of Debtor Discretion to Propose Plan or Sale.</u>** This is the key issue with the DIP Financing. The Guidelines provide that the Court will not ordinarily approve "[p]rovisions that operate, as a practical matter, to divest the debtor in possession or trustee of any discretion in the formulation of a plan or administration of the estate or limit access to the court to seek any relief under other applicable provisions of law." Guideline E.5.

Here, the DIP Credit Agreement makes it an event of default for the Debtor to file any plan of reorganization or disclosure statement, or to propose a sale of all or substantially all assets, without the Banks' consent. *See* DIP Credit Agreement at § 7.1(h)(xiv), (xvii). The DIP Credit Agreement also imposes on the Debtor certain onerous sale milestones set forth above that require the Debtor to effectuate a sale of substantially all assets within the next couple months and by no later than August 24, 2009. *See* DIP Credit Agreement at Appendix A(C).

The Banks should not have veto power over the Debtor's authority to propose a plan or sale. The Committee also objects to the Banks forcing upon the Debtor a ale strategy that serves only the goals of the Banks in achieving an exit from this case and does not address the reorganization needs

of the estate. These concessions in the context of the DIP Financing are unreasonable in light of the minimal new funding that is provided (only $3,000,000) and the fact that the bulk of this money has already been paid to the Association.

**Waiver of Estate's Rights in Avoidance Actions.** The Guidelines provide that the Court will not ordinarily approve"[w]aivers of, or liens on any of the estate's rights arising under Bankruptcy Code §§ 544, 545, 548, 549, 553, 723(a), or 724(a) or the proceeds of any such rights." Guideline E.7.

Here, the DIP Financing proposes to exclude avoidance actions from the scope of the liens granted thereunder, but then picks them right up again by not carving-out avoidance actions from the Banks' superpriority claims. *See* First Interim DIP Order at ¶6. There is no tangible benefit to unsecured creditors to have avoidance actions unencumbered by the Banks' liens if these assets are subject to the Banks' superpriority claims that are senior to prepetition unsecured claims. The practical effect of this structure is a waiver or pledge of the estate's rights in avoidance actions in favor of the Banks and in violation of the Guidelines.

**Improper Cross-Collateralization of Prepetition Debt.** The Guidelines provide that the Court will not ordinarily approve "[c]ross-collateralization clauses, i.e., clauses that secure prepetition debt by postpetition assets in which the party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law." Guideline E.1.

Here, as adequate protection of the Banks' prepetition claims, the Cash Collateral Stipulations grant replacement liens in favor of the Banks on both "Postpetition Like-kind Collateral" and "Additional Collateral." *See* Interim Cash Collateral Order at ¶3. "Postpetition Like-kind Collateral" is defined in the Cash Collateral Agreement as "property acquired by the Debtor after the Petition Date of the same type and description as the Prepetition Collateral." *See* Cash Collateral Agreement at A.9. "Additional Collateral" is defined in the Cash Collateral Agreement as "property of the Debtor that is not Prepetition Collateral, Postpetition Like-kind Collateral, or Avoidance Actions." In other words, the term "Additional Collateral" includes every asset of the Debtor's estate other than Avoidance Actions. *See* Cash Collateral Agreement at A.9. Under the Guidelines, the contemplated replacement lien on Additional Collateral constitutes an

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

improper cross-collateralization of the Bank's prepetition claims with new postpetition assets that extend beyond the Banks' existing prepetition collateral.

**Waiver of Surcharge Rights.** The Guidelines provide that the Court will not ordinarily approve "[w]aivers of, or grants of lien[s] on, rights under Bankruptcy Code § 506(c), unless the waiver or grant is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds." Guideline E.4.

Here, the First Interim DIP Order provides for a waiver of the estate's surcharge rights against the Banks as to any postpetition expenses arising or accruing prior to the delivery of a notice of event of default. *See* First Interim DIP Order at ¶15. However, the First Interim Order does not take into account that there may be material budgeted expenses that have been incurred (but not paid) prior to the delivery of a default notice. There should be no limitation on the estate seeking to surcharge the Banks as to such authorized (but unpaid) obligations.

**Unreasonable Treatment of Committee Professionals.** The Guidelines provide that the Court will not ordinarily approve "[p]rovisions providing unreasonable treatment with respect to fees or professionals retained by a creditors' committee compared to any carve-outs provided for professionals retained by the debtor in possession or trustee." Guideline E.12.

Here, the DIP Financing provides for an aggregate carve-out of merely $100,000 for Committee professionals, of which no more than $10,000 can be used to investigate the Banks' asserted prepetition claims totaling at least $54,000,000. *See* First Interim DIP Order at ¶10.[6] The Debtor's professionals, on the other hand, benefit from a carve-out totaling $785,000 through September 4, 2009, plus an additional $50,000 from and after the occurrence of an event of default.[7]

The DIP Financing and the Debtor's proposed budget must contemplate a reasonable carve-out for Committee professionals because no other party in this case has a vested interest in seeing to it that unsecured creditors are paid something by the parties responsible for the years of fraud here. The budget must include adequate funding for a thorough investigation of the Banks' prepetition claims and also the prepetition conduct which allowed the Debtor's owners to leverage up the

---

[6] The First Interim Order actually references a carve-out of only $50,000 for Committee professionals. The Committee understands that the Banks are now proposing to increase that carve-out to $100,000.
[7] The sum of $785,000 was contained in the original budget filed by the Debtor in this case.

36312-001\DOCS_SF:65174.4                    9                    OBJECTION TO FINAL DIP FINANCING AND CASH COLLATERAL ORDERS

Case: 09-11078    Doc# 93    Filed: 06/02/09    Entered: 06/02/09 14:08:43    Page 10 of 11

estate's assets over a period of years using the Banks' ever-increasing financing. The minimal carve-out proposed for Committee professionals in this case is nothing more than the Banks' attempt to hamstring the Committee in its efforts to maximize returns for unsecured creditors.

**CONCLUSION**

Based on the foregoing, the Court should refuse to approve the DIP Financing and the Cash Collateral Stipulations on the terms currently proposed. The DIP Financing and the contemplated $3,000,000 of new money to be provided thereunder should not be a means by which the Banks are effectively allowed to take control of the outcome in this case or to direct that the estate liquidate substantially all of its valuable assets at an expedited pace to be followed by conversion of this case. Given the extent of the fraud involving this Debtor, the lack of any meaningful investigation into such fraud, and the pervasive involvement of the Association in the Debtor's affairs, a quick sale process is simply inappropriate and unreasonable, particularly if the Association intends to bid.

The Debtor should be permitted to borrow another $1,000,000 from the Banks as contemplated in the DIP Financing and subject to certain senior liens, but without any strings attached in terms of the Banks' leverage over this case or the sale process.

Dated: June 2, 2009          PACHULSKI STANG ZIEHL & JONES LLP

By    *John D. Fiero*
John D. Fiero
Maxim B. Litvak
Attorneys for Official Committee of
Unsecured Creditors