1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
    MICHAEL H. AHRENS, Cal. Bar No. 44766
3   STEVEN SACKS, Cal. Bar No. 98875
    ORI KATZ, Cal. Bar No. 209561
4   Four Embarcadero Center, 17th Floor
    San Francisco, California 94111-4106
5   Telephone:    415-434-9100
    Facsimile:    415-434-3947
6
    Bankruptcy Reorganization Counsel for Debtor and
7   Debtor-in-Possession Humboldt Creamery, LLC

8                       UNITED STATES BANKRUPTCY COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10                           SANTA ROSA DIVISION

11

12

13  In re:                                      Case No. 09-11078

14  HUMBOLDT CREAMERY, LLC, a Delaware          Chapter 11
    limited liability company,
15                                              **FIRST INTERIM APPLICATION OF
                        Debtor.                 SHEPPARD, MULLIN, RICHTER &
16                                              HAMPTON LLP FOR ALLOWANCE OF
                                                COMPENSATION AND
17  Tax ID: 87-0736033                          REIMBURSEMENT OF EXPENSES
                                                INCURRED AS BANKRUPTCY
18                                              REORGANIZATION COUNSEL FOR
                                                THE DEBTOR**

19                                              Date:      August 21, 2009
                                                Time:      10:30 a.m.
20                                              Place:     99 South E. Street
                                                           Santa Rosa, CA 95404
21                                              Judge:     Hon. Alan Jaroslovsky

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY OF SERVICES ............................................................. 1

II. RELIEF REQUESTED AND BASIS FOR RELIEF ............................................................. 4

III. GENERAL BACKGROUND ............................................................................................. 6

    A.    Background of the Debtor ........................................................................................ 6

    B.    Events Leading to Bankruptcy .............................................................................. 8

IV. BANKRUPTCY CASE SUMMARY AND STATUS ........................................................ 9

    A.    The Debtor's Bankruptcy Filing and First-Day Motions ........................................ 9

    B.    The Committee ....................................................................................................... 9

    C.    The Debtor's Operations ....................................................................................... 10

    D.    The Sale Process of the Debtor's Assets............................................................... 10

    E.    Negotiations with Committee and the Bank Regarding "Pot" for Unsecured Creditors ................................................................................................................ 11

V. RETENTION AND PRIOR COMPENSATION ................................................................. 11

VI. EXHIBITS TO APPLICATION ....................................................................................... 12

VII. SUMMARY OF PROFESSIONAL SERVICES RENDERED ......................................... 12

VIII. SUMMARY BY PROJECT BILLING CODES ............................................................. 13

    A.    Maintenance of Records ....................................................................................... 13

    B.    Use of Project Billing Categories ........................................................................ 13

        1.    Corporate Issues ......................................................................................... 13

        2.    Employee Benefits/Pensions ...................................................................... 14

        3.    Employee Matters ....................................................................................... 14

        4.    Freight Issues.............................................................................................. 14

        5.    Insurance Issues .......................................................................................... 14

        6.    Operations ................................................................................................... 15

        7.    Reclamation Issues ..................................................................................... 15

i

8.   UCC Searches/Analysis .................................................... 15

9.   Utilities Issues ............................................................... 15

10.  Mtgs-Communication w/Creditors ................................ 16

11.  Case Administration– General ....................................... 16

12.  Committee Matters/Communications ............................ 16

13.  Creditors Inquiries ......................................................... 17

14.  Early Case Administration .............................................. 17

15.  First Day Motions ........................................................... 17

16.  Initial Case Filing Administration ................................. 18

17.  Operating Reports .......................................................... 18

18.  Schedules/Statement of Financial Affairs .................... 19

19.  Business Operations ....................................................... 19

20.  Service Lists .................................................................... 19

21.  US Trustee Compliance/341 Meeting/Debtor Interview ........... 20

22.  Claims - Lease ................................................................ 20

23.  Claims - Priority ............................................................. 21

24.  Claims - Secured ............................................................ 21

25.  Claims - Unsecured ........................................................ 21

26.  Cash Collateral ............................................................... 21

27.  DIP Financing ................................................................ 21

28.  Bankruptcy Court Litigation .......................................... 22

29.  Discovery ........................................................................ 23

30.  Other Litigation .............................................................. 23

31.  Preference Analysis ........................................................ 23

32.  Relief From Stay Litigation ........................................... 23

33.  Professional Compensation (other than Sheppard) ....... 24

ii

W02-WEST:5KES1\401686822.5                                      FIRST INTERIM FEE APPLICATION

34. Professional's Employment (other than Sheppard) .................................... 24

35. Sheppard Compensation ............................................................................ 25

36. Sheppard Employment .............................................................................. 25

37. Asset Disposition ....................................................................................... 25

38. Executory Contracts - Analysis ................................................................ 26

39. Trial – prepare motions and briefs ........................................................... 27

40. Data Room ................................................................................................. 27

41. ERISA ........................................................................................................ 27

42. NDA ........................................................................................................... 28

IX. COMPENSATION FOR SERVICES OF LEGAL ASSISTANTS ........................................ 28

X. SUMMARY OF SHEPPARD'S EXPENSES ................................................................... 28

XI. COMPLIANCE WITH GUIDELINES ........................................................................... 29

XII. CONCLUSION ............................................................................................................... 31

iii

W02-WEST:5KES1\401686822.5                                                      FIRST INTERIM FEE APPLICATION

# I.

## INTRODUCTION AND SUMMARY OF SERVICES

This is the first interim fee application (the "Application") for allowance of compensation and reimbursement of expenses of Sheppard, Mullin, Richter & Hampton LLP ("Sheppard") as bankruptcy reorganization counsel for Humboldt Creamery, LLC, the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case").

Sheppard seeks interim approval of compensation for professional legal services rendered and reimbursement of expenses incurred from April 21, 2009 through July 17, 2009 (the "Application Period") totaling $640,032.51. This amount consists of professional fees of $621,106.00 and reimbursement of expenses of $18,926.51.

A separate notice (the "Notice") regarding this Application, as well as the interim fee applications filed by certain other professionals in this Bankruptcy Case, is being served upon required parties. The Notice provides details regarding the hearing before this Court with respect to this Application as well as the deadline and procedures for filing and serving any objections to the relief sought in this Application. All parties are encouraged to carefully read the Notice.

Sheppard's request for relief is based on this Application, the Notice, the declaration of Michael H. Ahrens filed in support of the Application, and all related documents and pleadings previously filed, or that may be filed, prior to the hearing on this Application.

Sheppard's efforts on behalf of the Debtor have led to excellent results in a very short period of time. At the time this case was filed there was a real possibility that the Debtor's operations would come a grinding halt and the Debtor would be forced to liquidate. Under such a scenario, the Debtor calculates that unsecured creditors would have received very little, if anything, on account of their claims and the recovery for the secured creditors would have been drastically reduced. Sheppard, in cooperation with the Debtor, has worked very hard to avoid that scenario and has accomplished the following significant results for the estate and creditors in the first 90 days of this case.

When this case was filed, the Debtor needed immediate access to post-petition financing and use of cash collateral in order to facilitate the orderly continuation of its operations,

maintaining its business relationships with the dairymen and other vendors, and obtaining sufficient inventory to meet its customer demand. Sheppard prepared the necessary motions to obtain financing and use of cash collateral and concurrently prepared a motion to approve payment to the dairymen supplying milk to the Debtor for the milk delivered within 20 days prior to the Petition Date which was needed to prevent the destruction of the dairymen's operations on which the Debtor depended. At the "first day" hearing, Sheppard appeared, argued the emergency motions, addressed objections raised to the motions and advocated on behalf of the Debtor and the estate. The Court granted the relief sought in the emergency motions at the "first day" hearing which allowed the Debtor to continue its operations in the critical, early stages of the case. Such relief included authorization to obtain limited financing on an interim basis pending a final hearing. Further briefing followed and the Court later entered its final order (the "<u>Final Order</u>") approving the DIP financing following a final hearing held on June 3, 2009. The amounts borrowed under the DIP financing are described in a final form of the budget (the "<u>Budget</u>"). This financing provided under the Court's orders, the use of cash collateral and the other forms of relief sought on behalf of the estate in the "first day" pleadings have allowed the Debtor to continue to operate as a going concern during its search for a purchaser of its assets.

Thereafter, Sheppard worked with the Debtor and its investment banker, Duff & Phelps Securities, LLC ("<u>Duff & Phelps</u>"), and the Debtor's financial advisor, Burr, Pilger & Mayer, LLP ("<u>Burr Pilger</u>") in connection with the anticipated sale of the Debtor's assets. The sale is contemplated to include the Debtor's assignment of significant contracts and leases to the purchaser, and the purchaser's assumption of liabilities arising after the date of the closing that otherwise would constitute considerable claims against the estate. Sheppard's efforts included setting and maintaining a virtual data room to house the due diligence documents, preparation of a form of asset purchase agreement, and working with the Debtor and its investment banker regarding the timing and process of a sale by auction.

The Debtor determined to move forward with the sale of its assets pursuant to an open auction procedure. Sheppard worked with the Debtor and its investment banker on devising the necessary bidding procedures for the sale of the Debtor's creamery assets and other assets.

Thereafter, Sheppard prepared a motion (the "Bid Procedures Motion") for Court approval of the bid procedures in connection with the auction for the sale of the creamery assets to a stalking horse, subject to overbids, and the sale of the Debtor's other assets.  At a hearing on July 27, 2009, the Court approved these bidding procedures paving the way for the sale of the Debtor's assets.

Sheppard also prepared the motion (the "Sale Motion") for the sale of the Debtor's creamery assets to Foster Dairy Farms ("Foster Farms") and the sale of certain of the Debtor's other assets to a potential winning bidder.  The Sale Motion also includes request for Court authority for the assumption and assignment of certain executory contracts and unexpired leases by the Debtor.  This work involved extensive analysis of the status of claims and preparing the necessary objections to such claims.  In addition, a large part of Sheppard's preparation of the assumption and assignment motion involved reviewing multiple executory contracts, analyzing cure amounts under such contracts, and discussing these amounts with the Debtor and its investment banker.

During the Application Period, Sheppard met and conferred with the official committee of unsecured creditors (the "Committee") on significant matters in this case.  Sheppard kept Committee counsel apprised of significant developments and the status of the case.  This included responding to requests for information by the Committee and coordinating with the Committee in connection with the Debtor's motion for financing, Debtor's stipulations with some of its vendors and insurance providers, the bid procedures motion, the sale process, and due diligence regarding claims and contracts.

Additionally, during the Application Period, Sheppard worked with the Debtor to prepare and file the Debtor's list of equity security holders, the schedules of assets and liabilities (the "Schedules") and the statement of the Debtor's financial affairs (the "Statement").  Sheppard collaborated with the limited number of Debtor's management personnel on preparing the Schedules and Statement which required additional time than the available 15 days after the bankruptcy filing.  Sheppard prepared and obtained Court approval of a motion to extend time to file the Schedules and Statement.  The Schedules and Statement were filed within the additional time provided on May 27, 2009.

FIRST INTERIM FEE APPLICATION

## II.

## RELIEF REQUESTED AND BASIS FOR RELIEF

Sheppard seeks an order from the Court granting interim approval of compensation for professional legal services rendered and reimbursement of expenses incurred as counsel for the Debtor from April 21, 2009 through July 17, 2009 totaling $640,032.51, consisting of $621,106.00 in professional fees and $18,926.51 in expenses.

As previously disclosed in filings with the Court, Sheppard is holding a retainer (the "Retainer") from the Debtor in the amount of $186,956.75. Sheppard seeks authority in this Application to, in its discretion, apply those funds to the amounts sought here.

In addition, the Final Order provides for the Debtor to set aside certain funds (the "Professional Carveout Amounts") as set forth in the Budget on account of the Court-approved professionals (the "Professionals") in this case. Sheppard understands that the Professional Carveout Amounts have been set aside as set forth in the Budget, and that the amounts held on account of Sheppard as a "Carveout" for the Application Period are $395,000.00. Accordingly, when combined with the Retainer, there is approximately $581,957 available for payment of Sheppard's fees and expenses incurred during the Application Period, which is $58,075 less than the requested amount sought in this Application.

The services that Sheppard provided during the Application Period were significantly more than originally anticipated due to the following three reasons.

First, Sheppard Mullin incurred $44,859.00 in preparing the Debtor's Schedules and Statement, which was originally anticipated to be done instead by the Debtor's financial advisor. Because Sheppard and not the financial advisor performed the tasks related to the preparation of the Schedules and Statement, Sheppard's actual fees are more than the budgeted amount whereas the financial advisor's interim request for fees incurred in the Application Period is $108,848.10 less than the amount budgeted for the financial advisor.[1]

---

[1] Burr Pilger holds a retainer of $75,863 and seeks $112,014.90 in its application for fees and expenses incurred during this Application Period. Amounts held as a "Carveout" under the Budget for Burr Pilger on account of the Application Period ending July 17, 2009 are $145,000.

Case: 09-11078   Doc# 183   Filed: 07/31/09   Entered: 07/31/09 14:07:02   Page 8 of 35

Second, of the amounts requested in this Application, approximately $30,428.00 relate to work performed in preparation of an emergency application for a temporary restraining order and preliminary injunction in connection with an unexpected attempt by the Association to replace the Debtor's manager and responsible individual. As a result of Sheppard's work in this category, a major distraction to the sale process was averted.

Third, at least $28,080.00 of the amounts sought in this Application relate to services incurred by Sheppard for creating, maintaining, updating and granting access to a data room housing the Debtor's due diligence materials. These services would otherwise have to be done by a third party at a price that Sheppard understands to be significantly higher than the current cost to the estate, excluding the additional logistical and procedural steps that would be involved with an employment of a third party vendor. During the preparation of this Application, Sheppard sought an estimate from a third party on the costs of maintaining a similar data room based on the size of the due diligence material currently in Sheppard's data room. Sheppard was quoted an amount that is approximately 6 times the fees requested in this Application for this Project Billing Category. Sheppard believes that Sheppard's maintenance of the data room constitutes substantial cost savings to the estate.

The total amount for these services which were not originally anticipated is $103,367.00, which is over one and a half times larger than the $58,075 increase in Sheppard's actual fees over the budgeted amount for Sheppard for the Application Period.

Even though the funds available are less than requested in this Application, Sheppard requests Court approval of the full amount sought in this Application. Further, Sheppard requests that the excess amount available under the Carveout for Burr Pilger (which is $108,848.10) be available for reimbursement for the amounts sought in this Application which are not accounted for in the Budget on account of Sheppard for the Application Period.

A small portion of the fees sought in this Application relate to pre-petition work done the

---

Accordingly when added to its retainer, there is $220,863 available for payment of Burr Pilger's fees and expenses incurred during the Application Period, which is $108,848.10 more than the amount sought in Burr Pilger's application.

Case: 09-11078    Doc# 183    Filed: 07/31/09    Entered: 07/31/09 14:07:02    Page 9 of 35

W02-WEST:5KES1\401686822.5                                                              FIRST INTERIM FEE APPLICATION

day before filing this case, i.e., April 20, 2009, in preparing the first day bankruptcy papers and early case motions. In this Application, the term "Application Period" includes these pre-petition fees.

Sheppard estimates that it will incur approximately $10,000.00 in fees preparing the Application, representing less than 2% of the amount sought in the Application. Because those fees were incurred after the end of the Application Period, no application is made in this interim application for payment of such amounts.

This Application is made pursuant to the provisions of Bankruptcy Rule 2016 and Section 330 of title 11 of the United States Code (the "Bankruptcy Code"). Except as otherwise noted in the pages that follow, the Application conforms with the guidelines (the "Northern District Guidelines") for compensation and expense reimbursement for professional and trustees authorized under Bankruptcy Local Rule 9029-1 and the United States Trustee's guidelines (the "Trustee's Guidelines") for the compensation of professional persons. The Northern District Guidelines and the Trustee's Guidelines are referred to together in this Application as the "Guidelines."

In support of the Application, Sheppard respectfully represents as follows:

## III.

## GENERAL BACKGROUND

A.    Background of the Debtor

A general background discussion regarding the Debtor is contained below. This discussion is based on, but does not reproduce in full, the background discussion contained in the Debtor's previously filed motions in this case.

The Debtor processes, distributes and markets a wide array of dairy products, including powdered milk, fluid milk, packaged ice cream and various frozen novelty products. The Debtor's business is a grassroots, homegrown affair that has been an integral part of the dairy business in Northern California since 1929. In January of that year, 153 dairy farmers banded together and formed the Humboldt Creamery Association (the "Association"), a nonprofit agricultural cooperative whose purpose was to remedy the inequality in bargaining power existing between the

individual dairy farmers in the area and their larger, institutional customers. On December 3, 2004, the limited liability company comprising the Debtor was formed as part of a corporate restructuring that enabled the expansion of the Association's creamery operations. As part of that restructuring, the Association contributed essentially all of its assets (except for its contracts with its farmer-members) to the Debtor in exchange for 75% of the Common Units of membership in the Debtor. The Association's sole function became to supply the Debtor with raw milk. The other 25% of the Common Units of membership in the Debtor are held by Dairy Farmers of America ("<u>DFA</u>").

The Debtor and the Association are parties to a Milk Supply Contract dated January 1, 2005, which is an output contract pursuant to which the Debtor is obligated to purchase all of the raw milk produced by the approximately 40 members of the Association. The raw milk purchased under this agreement includes both non-organic and organic milk. Because the Debtor's raw milk demands exceed the Association's supply, the Debtor also purchases some raw milk from non-Association members. In addition, the Debtor has contracts with major grocery retailers, big box stores and major food processing companies in the United States and abroad.

The Debtor's most significant product line is ice cream, and it is the largest private label ice cream manufacturer in the Western United States. The Debtor's two ice cream manufacturing facilities produce a full range of non-organic and organic ice creams from "regular" to "super premium," as well as over 300 different frozen novelty products of varying flavors, grades, labels and packages.

The Debtor's second most significant line of business is the sale of powdered milk, which constituted approximately 35% of its gross revenues in 2008. The Debtor has the ability to produce approximately 24 million pounds of powdered milk annually, which it sells worldwide to customers in the pharmaceutical, confectionary and other industries.

After powdered milk, the next most significant line of business for the Debtor is in fluid milk products, of which the Debtor produces approximately 3.9 million gallons annually. In 2007, approximately 60% of that was organic milk. The Debtor sells the fluid milk locally under its own "Humboldt Creamery" label, and throughout the West Coast under its customers' private label

1  brands.

2       In addition to the above, the Debtor sells raw milk and cream to its customers who process

3  it into various items, including fluid milk, cheese and butter.

4       The Debtor's pre-petition secured debt obligations arise from a borrowing arrangement

5  with the CoBank, ACB, and certain pre-petition lenders (collectively, the "Bank") under certain

6  loan agreement. The Debtor's obligations under the pre-petition loan agreement are secured by

7  mortgages encumbering all of its real property in Humboldt, San Joaquin and Los Angeles

8  Counties, as well as security agreements encumbering all of the Debtor's inventory, accounts

9  receivable, equipment and certain other personal property. In addition, the Association guaranteed

10 all of the Debtor's obligations under the pre-petition loan agreement.

11 B.   Events Leading to Bankruptcy

12      As set forth in greater detail in the *Declaration of Len Mayer in Support of First Day*

13 *Motions* filed on April 21, 2009 (the "Petition Date") as Docket #9, the Debtor's bankruptcy filing

14 was necessitated by the discovery that its financial condition was much different than what had

15 been represented in the financial statements issued by the Debtor under the management of its

16 former Chief Executive Officer, Richard Ghilarducci. On February 20, 2009, Mr. Ghilarducci

17 abruptly resigned, warning the Debtor of potential financial inaccuracies.

18      Immediately upon Mr. Ghilarducci's resignation, the Debtor suspended the sale of

19 membership units and took active steps to uncover the nature and extent of the potential fraud,

20 working closely with the U.S. Department of Justice and also commissioning its own investigation

21 into the matter. The Debtor also hired an accounting firm to aid the Debtor in undertaking a

22 thorough review of its balance sheet and other financial data. As the Debtor's financial picture

23 cleared, it became evident that significant restructuring was needed. The Debtor took significant

24 steps toward that goal prior to bankruptcy, including a reduction in overhead by one-third and

25 strategic workforce reductions at its various facilities. However, the Debtor concluded that the

26 protections of the Bankruptcy Code would be required to accomplish the further restructuring that

27 was needed.

28

W02-WEST:5KES1\401686822.3                                FIRST INTERIM FEE APPLICATION

# IV.

## BANKRUPTCY CASE SUMMARY AND STATUS

A.     The Debtor's Bankruptcy Filing and First-Day Motions

The Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on Petition Date, commencing the chapter 11 case. The Debtor then filed certain pleadings requesting relief from the Bankruptcy Court on an emergency basis. Among the most important were emergency motions to obtain post-petition financing and to permit the Debtor's use of cash collateral. The Debtor found that it was unable to secure such additional financing outside of bankruptcy, and concluded that it needed the ability to grant a superpriority lien under Bankruptcy Code Section 364 in order to do so. The Debtor sought authority to obtain the debtor-in-possession financing from the Bank and use of Bank's cash collateral. The Court entered orders approving on an interim basis the Debtor's emergency DIP financing and cash collateral motions. Ultimately, the Court granted this relief on a final basis.

The Debtor also filed an emergency motion for an order authorizing the Debtor's continued use of the Debtor's existing bank accounts. Additionally, the Debtor filed an application seeking to appoint Len Mayer as its responsible individual pursuant to Bankruptcy Local Rule 4002-1. The Court issued an order appointing Mr. Mayer as the Debtor's designated responsible individual.

Also, as part of the "first day" motions, the Debtor sought Court approval of payment to the dairymen supplying milk to the Debtor for the milk delivered within 20 days prior to the Petition Date. The Debtor's operations depend on the milk received from the dairymen comprising the Association, and it was critical for the dairymen to receive a payment for the milk provided to the Debtor within the 20 days pre-petition in order to avert the financial demise of their business. The Court granted approval of such payment which the Debtor believes was a significant result for its operations and the dairymen's livelihood.

B.     The Committee

On April 27, 2009, the United States Trustee appointed an official committee of unsecured creditors pursuant to Bankruptcy Code sections 1102(a) and 1102(b)(1). The Committee is

W02-WEST:5KES1\401686822.3                            FIRST INTERIM FEE APPLICATION

comprised of the following members: (1) CA Dairies, attention Ray Gutierrec; (2) Rumiano Cheese, attention Baird Rumiano; (3) Sweetener Productions Inc., attention Jim Boltinghouse; (4) Mass Marketing Services, attention John Carlson; (5) Steve Wills Trucking, attention Steve Wills; (6) Barry Plastics Corp., attention Ronda Hale; and (7) Certified Freight Logistics, attention Scott Cramer.

C.      The Debtor's Operations

The Debtor has continued its business operations following the Petition Date. The Debtor has gone through a large operational restructuring with the goal of reducing expenses, increasing efficiency, and enhancing its overall financial health. Among other things, the Debtor has: (i) drastically reduced overhead by eliminating approximately one-third of its general and administrative expenses; (ii) conducted strategic workforce reductions at all levels in order to reduce payroll expenses; and (iii) aggressively marketed the Sale of its properties, business and facilities.

The Budget provides for the payment of administrative expenses as they accrue. The Debtor has paid quarterly fees to the United States Trustee and the monthly operating reports have been filed.

D.      The Sale Process of the Debtor's Assets

The Debtor pursued a plan to market and sell its assets as a going concern sale under Bankruptcy Code Section 363 free and clear of all liens, claims and other interests. The Debtor believes that the procedures for such a sale provided in chapter 11 of the Bankruptcy Code will maximize the value of its assets and the return to its creditors while also enabling the Debtor's business to continue. The Debtor has been working with its investment banker, Duff & Phelps, in marketing the assets and locating a suitable buyer. After discussions with the Bank and the Committee, the Debtor elected to pursue the sale of its assets pursuant to an open bid auction process and proposed the appropriate bidding procedures for such a sale. Sheppard worked with the Debtor on devising the necessary bidding procedures for the sale of the creamery assets and the other assets. Just recently, on July 27, 2009, the Court held a hearing on the Debtor's motion to approve these bidding procedures, at which hearing Sheppard appeared and addressed

Case: 09-11078    Doc#: 183    Filed: 07/31/09    Entered: 07/31/09 14:07:02    Page 14 of 35
W02-WEST:5KES1\401686822.3                                                      FIRST INTERIM FEE APPLICATION

objections to the motion and advocated for the approval of the procedures. As a result, the Court approved those procedures at the hearing.

After giving access to due diligence material with respect to the Debtor's business to several interested parties and reviewing eleven bids of interest for the purchase of the assets, the Debtor selected Foster Farms to serve as the "stalking horse" bidder for the auction on the Debtor's creamery assets. Pursuant to the bidding procedures, the auction for the sale of the creamery assets is expected to be held on August 11, 2009 with a hearing on the sale scheduled to be held on August 12, 2009. In addition, pursuant to the bidding procedures as approved by the Court, the remainder of the assets are to be auctioned off following separate bidding procedures.

E.    Negotiations with Committee and the Bank Regarding "Pot" for Unsecured Creditors

Sheppard has met with the Bank and the Committee in an attempt to carve out funds for the benefit of unsecured creditors. Negotiations have been held and will continue to be held with these parties in an attempt to set aside funds and assets that will be available to unsecured claimants for the confirmation of a chapter 11 plan.

## V.

## RETENTION AND PRIOR COMPENSATION

On June 5, 2009, the Court entered its order authorizing the Debtor to retain Sheppard as its bankruptcy reorganization counsel (Docket No. 101) (the "Sheppard Employment Order"). A true and correct copy of the Sheppard Employment Order is attached to this Application as Exhibit A. On July 27, 2009, the Court entered an order approving a stipulation among the Debtor, the Committee and the Bank and authorizing the professionals approved in this case to file interim applications less than 120 days after the Petition Date.

This is Sheppard's first interim application for payment of fees and reimbursement of costs in this case. Sheppard has not received payments from the Debtor on account of work performed during the Application Period.

## VI.

## EXHIBITS TO APPLICATION

The exhibits attached to this Application are as follows:

A copy of the Sheppard Employment Order is attached as <u>Exhibit A</u>.

Detailed statements (the "<u>Statements</u>") of the services Sheppard performed and the out-of-pocket expenses Sheppard incurred during the Application Period are set forth on <u>Exhibit B</u>.  The Statements set forth Sheppard's time and expense records as kept in the ordinary course of Sheppard's business, and contains the following information: the names of each attorney or paralegal performing services, the description of the services, and the amount of time incurred for their services.   The Statements are organized in chronological order, separated by billing categories for each task or matter (each a "<u>Project Billing Category</u>") as required by the Guidelines.  A summary of the professional fees incurred by each attorney or paralegal performing services, the hourly rate, the amount of time spent and related fees, is set forth on <u>Exhibit B</u> at page 123.  A summary of Sheppard's expenses is set forth on <u>Exhibit B</u> at pages 124-126.

A summary of the Project Billing Categories used by Sheppard during the Application Period is attached as <u>Exhibit C</u>.  That summary includes the total professional hours spent and the total fees requested under each category.

Copies of the resume of the Pete Stone and Melanie Yuvienco, the paraprofessionals who worked on this Bankruptcy Case during the applicable time period, are attached as <u>Exhibit D</u> and <u>Exhibit E</u>, respectively.

A copy of Sheppard's letter to Len Mayer, the Debtor's designated responsible individual, forwarding him a copy of this Application and inviting discussion, questions, comments, concerns or objections to the Application, is attached as <u>Exhibit F</u>.

## VII.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

Sheppard spent a total of 1,439.10 hours in performing the services described in the Application, at an average hourly billing rate of $431.60.  Cost savings to the estate resulted from the discount in the hourly rate of Michael Ahrens.  The standard hourly rate of Mr. Ahrens is $755

but he discounted it for this case at the request of the client to $725.

<center>VIII.</center>

<center>**SUMMARY BY PROJECT BILLING CODES**</center>

A.        <u>Maintenance of Records</u>

In compliance with the Guidelines, Sheppard maintained its time records on a "Project Billing" basis.        <u>Exhibit C</u> provides a summary of the Project Billing Categories, the total professional hours spent in each category and the total fees requested for each category.

B.        <u>Use of Project Billing Categories</u>

A discussion of the work Sheppard performed in each Project Billing Category is set forth in the paragraphs that follow.   Under the Guidelines, "[t]he maximum amount that should be included in a single category should generally be $20,000.   This cap may be exceeded where further breakdown is impractical."  <u>See</u> Northern District Guidelines, at § I.3.  In some instances the fees for a single category of project in this Application exceeded $20,000.  This is a result of the size and scope of certain of the projects Sheppard performed.   Accordingly, it would be impractical to break down all of the categories in this case to $20,000 or less.

It is inevitable that not all matters fit precisely into one category, or that some items fit appropriately into more than one category.  Additionally, as in the case of telephone conferences or meetings where more than one subject is discussed, a time entry dealing with more than one subject must occasionally be placed in only one category.  Thus, while Sheppard has diligently attempted to segregate its time into the appropriate category, there may be some overlap between and among categories.

In some cases, Sheppard has billed for the services of more than one person in connection with a meeting (either internal or external) or a conference call with a third party.   Sheppard believes that this is justified here by the complexity and scale of this bankruptcy.

A discussion of the work performed in the Project Billing Categories follows below.

1.        **Corporate Issues**

Sheppard spent a total of 1.20 hours and incurred fees totaling $384 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 2.   The work that

<center>-13-</center>

Sheppard performed in this Project Billing Category pertains primarily to reviewing the Debtor's note offerings and its operating agreement for the purpose of liquidation preference analysis.

### 2. Employee Benefits/Pensions

Sheppard spent a total of 8.00 hours and incurred fees totaling $4,512.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 3. During the early stage of the case, Sheppard analyzed the pension claims and other employee benefits and outlined retention plans for the Debtor's key employees.

### 3. Employee Matters

Sheppard spent a total of 30.00 hours and incurred fees totaling $12,912.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 7. Post-bankruptcy, Sheppard's services were needed to address issues related to employee matters such as contribution to salaried and hourly employee pension plans, addressing inquiries by the representatives of the teamsters of the Debtor's employees, and analyzing the implication of the California WARN Act in connection with a sale of the Debtor's assets. In addition, Sheppard reviewed the Debtor's collective bargaining employment agreements and formulated a strategy to negotiate in good faith with the teamsters' representative in anticipation of the sale Debtor's assets.

### 4. Freight Issues

Sheppard spent a total of 4.20 hours and incurred fees totaling $1,383.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 8. These services pertain to preparing stipulations with certain warehousemen and shippers regarding release of the Debtor's inventory.

### 5. Insurance Issues

Sheppard spent a total of 36.50 hours and incurred fees totaling $12,820.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 14. At the Petition Date, the Debtor maintained general liability insurance coverage, real estate and property insurance, and workers compensation coverage. Sheppard worked with the Debtor and the insurance providers to maintain the insurance coverage post-petition. Sheppard negotiated with the insurance providers and prepared stipulations regarding continued coverage and amount of that

coverage. Sheppard also negotiated with the Debtor's unions and union pension funds regarding payment of pre- and post-petition premiums and other amounts, with a view toward maintaining health coverage for the Debtor's employees while at the same time resolving payment issues in a manner favorable to the Debtor.

**6.  Operations**

Sheppard spent a total of 8.40 hours and incurred fees totaling $5,804.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 15.  During the Application Period, Sheppard advised the Debtor regarding various operational issues and addressed inquiries regarding the Debtors' relationship with certain of its vendors and shippers and the claims of set-offs with respect to certain of these parties.

**7.  Reclamation Issues**

Sheppard spent a total of 10.20 hours and incurred fees totaling $4,045.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 18.  After filing the case, the Debtor received reclamation demands by certain of its suppliers.  Sheppard addressed these claims and prepared appropriate responses to the claims.  Sheppard's work included performing research regarding reclamation law, reviewing reclamation letters, and preparing stipulations regarding these claims and obtaining Court approval for the stipulations.

**8.  UCC Searches/Analysis**

Sheppard spent a total of 1.40 hours and incurred fees totaling $650.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 18.  The fees incurred under this Project Billing Category pertains to reviewing a search report of the records of the applicable secretary of state in preparation for the "first day" emergency motions.

**9.  Utilities Issues**

Sheppard spent a total of 32.40 hours and incurred fees totaling $12,102.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 22.  Soon after the case was filed, Sheppard Mullin prepared a motion to determine adequate assurance of payment to the Debtor's utility providers under 11 USC 366.  The purpose of this motion was to prevent utility providers from discontinuing utility service to the Debtor after the time period set

-15-

forth in Section 366 elapsed. In this way, the motion was intended to maintain smooth and uninterrupted operations at the Debtor's processing facilities, thereby maximizing the Debtor's operational efficiency during bankruptcy and so maximizing the return to the Debtor's creditors in an asset sale. Sheppard negotiated with certain of the Debtor's utilities and argued the motion in bankruptcy court, after which time the motion was granted. The Debtor has enjoyed uninterrupted utility service during the crucial summer ice cream production months ever since.

### 10. Mtgs-Communication w/Creditors

Sheppard spent a total of .30 hour and incurred fees totaling $184.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 23. The fees incurred under this Project Billing Category pertains to forwarding a copy of the Debtor's D&O policy insurance to counsel for certain of the Debtor's note-holders.

### 11. Case Administration– General

Sheppard spent a total of 42.10 hours and incurred fees totaling $13,892.00 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 27. Throughout the Application Period, Sheppard performed general case administrative tasks typically required of bankruptcy reorganization counsel, including responding to requests by creditors and other parties in interest for information and documents, monitoring the docket for activity in the case, coordinating the filing and service of pleadings and regularly updating its service lists. In addition, Sheppard worked with the other professionals on setting up and maintaining the data room to house the due diligence documents and monitored the access to the data room.

### 12. Committee Matters/Communications

Sheppard spent a total of 33.60 hours and incurred fees totaling $17,658.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 30. Sheppard worked closely with counsel for the Committee during the Application Period. Sheppard attorneys also had numerous communications with proposed Committee counsel at the inception of the bankruptcy case. Shortly after the Committee was appointed, Sheppard attorneys prepared for and hosted a meeting with counsel for the Committee. In addition, Sheppard communicated

and exchanged information regularly with counsel for the Committee. Sheppard prepared confidentiality agreement in order to facilitate access for the Committee members to documents and information on the Debtor. Subsequently, Sheppard reviewed Committee's requests for information, responded to those requests, and established a procedure for production of documents. Sheppard consulted with Committee counsel continuously throughout the case in order to determine the Committee's position regarding the various motions and relief sought. These communications between Sheppard and Committee counsel resulted in a great benefit to the Debtor and its creditors, because many issues were resolved through cooperation and negotiations.

### 13. Creditors Inquiries

Sheppard spent a total of 34.20 hours and incurred fees totaling $15,046.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 35. Sheppard responded to requests for information and kept interested parties apprised of the progress of the bankruptcy case. Sheppard prepared a press release in connection with the filing of the bankruptcy case and provided information to the Debtor's employees and creditors regarding the status and the Debtor's plans going forward. Sheppard also responded to telephone calls and written inquiries from creditors during the Application Period. These calls typically involved questions regarding the bankruptcy case, the notices, the Schedules and Statements, and claims.

### 14. Early Case Administration

Sheppard spent a total of 15.60 hours and incurred fees totaling $5,258.00 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 38. The services provided by Sheppard under this Project Billing Category pertain mainly to work performed in the early stages of the bankruptcy case. These services included preparation of checklist of tasks and calendaring key deadlines to efficiently proceed with the filing, preparation of the creditors' matrix and other main documents required at the beginning of the case, and coordinating with the Debtor and other professionals regarding the filing.

### 15. First Day Motions

Sheppard spent a total of 86.30 hours and incurred fees totaling $42,405.00 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 42. As more

particularly described below, Sheppard's services in this Project Billing Category pertain to the work performed by Sheppard in connection with the "first day" emergency motions and the hearing on the motions.

On the Petition Date, Sheppard filed emergency motions for relief, including a motion for authority to obtain financing for the case, a motion for authority to use the cash collateral of the Debtor's pre-petition secured lenders, an application to maintain the Debtor's bank account, and a motion for authority to pay Section 503(b)(9) administrative expense claims for milk received by the Debtor during the 20 days before the commencement of this chapter 11 case. The next day the Court held a hearing on the emergency motions and authorized the Debtor to obtain limited financing on an interim basis pending a continued hearing, approved the Debtor's use of the Bank's cash collateral, and approved payment of the 503(b)(9) claims. In addition, Sheppard prepared an application and obtained Court approval to appoint Len Mayer as the Debtor's designated responsible individual pursuant to Bankruptcy Local Rule 4002-1. Sheppard also prepared a motion to limit service of notice in the case which the Court granted. This has allowed for a more efficient administration of the case and kept the service costs under control.

The relief granted on the "first day" has allowed the Debtor to successfully navigate the early stages of the case, dedicate the necessary attention to its operations and prepare for the next step.

### 16. Initial Case Filing Administration

Sheppard spent a total of 8.00 hours and incurred fees totaling $3,018.00 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 43. The fees incurred under this Project Billing Category pertains to preparation of the necessary pleadings and documents required for the filing of the bankruptcy case.

### 17. Operating Reports

Sheppard spent a total of 4.60 hours and incurred fees totaling $2,277.00 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 44. The services provided in this Project Billing Category included communications with the Debtor concerning preparation of the Debtor's monthly operating reports, assisting with the preparation of

the reports, and the review of such reports. Sheppard filed the Debtor's monthly operating reports with this Court as required and served the same on the appropriate parties.

### 18. Schedules/Statement of Financial Affairs

Sheppard spent a total of 115.60 hours and incurred fees totaling $44,859.00 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 48. The services provided in this Project Billing Category pertain to the preparation of the Debtor's list of equity holders, Schedules and Statement.

During the Application Period, Sheppard prepared a motion and related pleadings to extend the deadline for the Debtor to file the Schedules and Statement. Initially, it was anticipated that preparing the Schedules and Statement would be done by the Debtor's financial advisor. However, Sheppard undertook that task and worked closely with the Debtor on preparing these documents. This required undergoing an extensive review of the Debtor's finances, including its outstanding debts, assets and executory contracts and the impact of each on the bankruptcy case, numerous conferences with the Debtor's management, and compiling the necessary information for the Schedules and Statement. As noted above, this has led to an increase in the actual fees of Sheppard as compared to the budgeted amounts, but this is offset by the fact that the actual amount of fees of the Debtor's financial advisor is substantially below the budgeted amount.

### 19. Business Operations

Sheppard spent a total of 33.50 hours and incurred fees totaling $17,182.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 51. After the Petition Date, the Debtor continued to operate its business as a debtor in possession. Sheppard advised the Debtor regarding the impact of filing the case on the Debtor's day-to-day operations. Specifically, Sheppard addressed inquiries regarding the Debtor's business relationship with its suppliers and vendors in connection with the bankruptcy filing, analyzed reclamation claims and offset issues, advised the Debtor on responding to various operational challenges regarding contracts with non-debtor parties, insurance coverage, utilities and employee matters.

### 20. Service Lists

Sheppard spent a total of 39.80 hours and incurred fees totaling $10,996.00 during the

Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 54. These services included the preparation of a motion to limit notice and its related pleadings, as well as preparation, monitoring and maintenance of the required services to the numerous entities involved in this bankruptcy case.

Prior to the Petition Date, the Debtor provided Sheppard with lists of: creditors with pre-petition balances; the Debtor's equity holders; non-debtor parties to contracts and leases; counsel; state, county, city and municipal taxing authorities; employees (full-time and part-time); utility providers; and insurance and benefits providers. Sheppard reviewed these lists and adapted them into a master list, from which Sheppard could develop a mailing list and labels. Sheppard culled the master list for duplicates and reformatted the master list for consistency.

During the Application Period, Sheppard compiled, revised, prepared, circulated and maintained its "Master Mailing List," electronic mail list, and limited notice list. As mail was returned to Sheppard as "undeliverable," Sheppard updated the Master Mailing List as well as the Court-approved limited notice service list. Where the post office provided new addresses for returned mail, Sheppard sent mail to the new address and updated the Master Mailing List with the new "last known address" information.

### 21. <u>US Trustee Compliance/341 Meeting/Debtor Interview</u>

Sheppard spent a total of 17.00 hours and incurred fees totaling $8,691.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 55. Sheppard attended the initial meeting of creditors and the initial Debtor interview conducted by the United States Trustee as is required by Section 341 of the Bankruptcy Code. Sheppard also prepared the Debtor for those meetings, and met with the Debtor regarding the implications of each meeting after it was held. Sheppard also provided services in connection with coordination and providing the U.S. Trustee certain documents pursuant to its requests for certain information.

### 22. <u>Claims - Lease</u>

Sheppard spent a total of 1.10 hours and incurred fees totaling $797.50 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 56. The services provided in this Project Billing Category pertain to review of the Debtor's lease and its

extension.

**23.    Claims - Priority**

Sheppard spent a total of 1.90 hours and incurred fees totaling $1,227.50 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 57.   The services provided in this Project Billing Category pertain to review of the claims register in the case and corresponding with regard to claims under section 503(b)(9) of the Bankruptcy Code.

**24.    Claims - Secured**

Sheppard spent a total of 0.70 hour and incurred fees totaling $507.50 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 57.   The services provided in this Project Billing Category pertain to correspondences regarding claims by secured creditors.

**25.    Claims - Unsecured**

Sheppard spent a total of 3.60 hours and incurred fees totaling $1,012.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 58.   The services provided in this Project Billing Category are related to preparation of list of unsecured creditors with potential claims of at least $50,000 in order to more manageably perform conflicts search in the case.

**26.    Cash Collateral**

Sheppard spent a total of 7.90 hours and incurred fees totaling $2,852.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 59.   The services provided in this Project Billing Category pertain to the cash collateral motion and the cash collateral agreement with the Bank.  Sheppard reviewed the cash collateral agreement, prepared a stipulation regarding the continued use of the Bank's cash collateral pending a final hearing on the motion, and reviewed and revised a form of order approving the motion based on the comments of the related parties.

**27.    DIP Financing**

Sheppard spent a total of 93.60 hours and incurred fees totaling $50,749.50 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 66.  As more

Case: 09-11078   Doc#: 183   Filed: 07/31/09   Entered: 07/31/09 14:07:02   Page: 25 of 35
W02-WEST:5KES1\401686822.3                                                FIRST INTERIM FEE APPLICATION

particularly described below, Sheppard's services in this Project Billing Category pertain to the work performed by Sheppard in connection with obtaining the post-petition financing for the Debtor.

Sheppard worked with the Debtor, its financial advisor and investment banker, counsel for the Bank and counsel for the Committee in connection with negotiations on debtor-in-possession financing. Sheppard reviewed and discussed the terms of such financing with counsel for the Bank and the Committee and communicated with various parties in interest with respect to such financing. Sheppard reviewed and provided comments regarding the proposed budget applicable under the DIP financing. Sheppard's work also included preparing the DIP financing motion and the related pleadings in support of the motion. Sheppard appeared at the interim hearing and the final hearing on the motion. Before and after each hearing Sheppard met and conferred with the major constituencies in the case. Sheppard also negotiated with the Bank the terms of continued financing, prepared a stipulation pending a final hearing for the continued borrowing under the DIP financing approved by the Court at the "first day" hearing, and worked with the Debtor regarding the necessary steps to implement the terms of the financing. Sheppard also worked with the Debtor and its financial advisor regarding the Budget, and worked with the Bank's counsel regarding all of the transactional documents required in connection with a loan transaction secured by the Debtor's assets.

**28.     Bankruptcy Court Litigation**

Sheppard spent a total of 66.80 hours and incurred fees totaling $31,717.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 69. As more particularly described below, the fees incurred in this Project Billing Category pertain to the services performed in response to the unexpected attempt by the Association to replace Len Mayer as the Debtor's manager and responsible individual.

On or about June 4, 2009, the Association passed a resolution purported to replace Mr. Mayer as the manager and the responsible individual for the Debtor. The Debtor opposed this attempt because it feared that the attempt would harm the good relationships that Mr. Mayer had built with the Bank and potential purchasers, and thereby harm the Debtor's sale efforts. Also, the

W02-WEST:5KES1\401686822.3                                                FIRST INTERIM FEE APPLICATION

attempt was supported by one of the potential bidders which the Debtor believed would create a conflict of interest and an attempt to avoid the sale process and obtain control of the company. Sheppard researched legal arguments about why the removal was wrongful, and prepared papers to file in court to block the attempted removal. At the same time, Sheppard negotiated with the parties attempting to remove Mr. Mayer. At the eleventh hour, after having made well-researched legal arguments clear to the Association's counsel, Sheppard was able to convince the parties involved to abandon their effort to remove Mr. Mayer and so preserve the good relationships Mr. Mayer has built in recent months which are crucial to the reorganization effort.

**29.    Discovery**

Sheppard spent a total of 15.70 hours and incurred fees totaling $5,342.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 71. The services rendered in this Project Billing Category relate to responding to a request for information on the Debtor's former CEO, Mr. Ghilarducci, by the investigative authorities, and preparing for and attending the exams of Mr. Ghilarducci and the Debtor's accountant conducted pursuant to Bankruptcy Rule 2004.

**30.    Other Litigation**

Sheppard spent a total of 3.90 hours and incurred fees totaling $2,309.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 72. The services provided in this Project Billing Category related to attending to the forensic investigation stemming from the pre-petition conduct of the Debtor's former CEO.

**31.    Preference Analysis**

Sheppard spent a total of 0.30 hour and incurred fees totaling $217.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 72. The services provided in this Project Billing Category relate to correspondence regarding the analysis of the preference claims.

**32.    Relief From Stay Litigation**

Sheppard spent a total of 45.00 hours and incurred fees totaling $20,879.00 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 76. As more

particularly described below, the fees incurred in this Project Billing Category pertain to the work performed in response to the motion for relief from stay by one of the Debtor's former employees.

Shortly after the Debtor's bankruptcy petition was filed, a former employee of the Debtor filed a motion for relief from stay to continue with a state court trial against the Debtor on May 18, 2009. The trial concerned employment discrimination and related claims. The movant, Richard Homem, indicated through his attorney that he would not limit his requested recovery to claims and damages covered by the Debtor's insurance policy. That unlimited recovery, plus the significant time that many of the Debtor's key employees may have to spend as witnesses in the midst of a reorganization, convinced the Debtor that it needed to work with insurance counsel and oppose the motion. Sheppard promptly filed opposition papers and opposed the motion at the hearing held in the Bankruptcy Court. Sheppard was able to achieve a compromise result, in that while the motion was granted, the order provided that the action could proceed only if the amount of recovery sought was limited to claims and damages covered by the Debtor's insurance policy.

### 33. **Professional Compensation (other than Sheppard)**

Sheppard spent a total of 2.60 hours and incurred fees totaling $1,034.50 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 77. The services provided in this Project Billing Category relate to establishing an interim fee application procedures for the professionals approved in this case and obtaining Court approval to file first application for compensation and reimbursement of expenses.

### 34. **Professional's Employment (other than Sheppard)**

Sheppard spent a total of 33.50 hours and incurred fees totaling $13,894.00 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 81. The Debtor required the employment of an investment banker and financial advisor to assist it in its reorganization process. Sheppard reviewed the engagement terms of the Debtor's other professionals, prepared the employment applications and related pleadings for these professionals, and prepared revised applications when necessary and obtained Court approval of the retention of these professionals.

**35. Sheppard Compensation**

Sheppard spent a total of 0.40 hours and incurred fees totaling $128.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 81. The services provided in this Project Billing Category relate to the preparation of Sheppard's statement pursuant to Bankruptcy Rule 2016(b).

**36. Sheppard Employment**

Sheppard spent a total of 38.80 hours and incurred fees totaling $12,775.50 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 84. Sheppard prepared and filed its application for employment as bankruptcy reorganization counsel to the Debtor. Sheppard supplemented its employment application during the course of the case as it learned of new matters and connections to the Debtor.

**37. Asset Disposition**

Sheppard spent a total of 345.20 hours and incurred fees totaling $176,020.50 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 106. As more particularly described below, Sheppard's services in this Project Billing Category pertain to work performed in connection with the sale of the Debtor's assets.

A significant part of Sheppard's efforts during the Application Period was devoted to the sale of the Debtor's assets. The sale of the Debtor's assets is intended to be completed as a going concern in order to generate maximum returns for the estate. This required a significant amount of work in a short period of time on part of Sheppard. Sheppard set up and maintained a data room intended to house the Debtor's due diligence information, prepared a form of non-disclosure agreement to circulate to the interested buyers, and prepared a form of an asset purchase agreement that could be used by a stalking horse bidder.

In addition, a sale of the magnitude and complexity of the Debtor's business understandably requires expertise in several different areas. The Debtor relied on Sheppard's expertise in bankruptcy, real estate, corporate, labor and environmental law in order to consummate this sale. Sheppard reviewed title reports of the Debtor's real estate, analyzed the liens and other interest in the Debtor's property, and responded to inquiries regarding

environmental matters.  Sheppard analyzed the Debtor's agreements with its union and non-union employees and the implications of the sale in connection with these agreements and addressed employee-related issues in the context of the sale.

The Debtor determined to proceed with the sale pursuant to an open bid auction.  Sheppard worked closely with the Debtor, the Debtor's investment banker and financial advisor and the major constituencies in the case on devising the bidding procedures intended to generate the highest price for the assets.  Soon after the Debtor selected Foster Farms to serve as the "stalking horse" bidder for the sale of the Debtor's creamery assets, Sheppard performed extensive revisions to the agreement with Foster Farms to incorporate the parties comments and guided the Debtor and its investment Banker through the negotiations of the terms of the agreement.

Sheppard prepared the Bid Procedures Motion, addressed objections to the Motion, and recently obtained Court approval for the bidding procedures for an auction for the sale of the Debtor's creamery assets set to be held at Sheppard's San Francisco office on August 11, 2009. Sheppard also prepared the Sale Motion and the supporting documents.  Throughout the process of working with potential purchasers, the Debtor kept the Committee, the Bank and other major constituencies informed.  Sheppard has also spent significant time negotiating with the Bank, the Committee and other parties in interest to obtain their consent to the planned sale which the Debtor hope to be supported by those parties in interest.

**38.**     **Executory Contracts - Analysis**

Sheppard spent a total of 19.80 hours and incurred fees totaling $12,001.0 during the Application Period on this Project Billing Category, as summarized on Exhibit B, p. 109.  These fees were incurred in connection with the work done regarding the analysis of the executory contracts and unexpired leases of the Debtor's in connection with the sale of its assets.  As the anticipated sale involves the assumption and assignment of significant executory contracts and expired leases, Sheppard worked with the Debtor on preparing a list of executory contracts to be assumed and assigned and the estimated amounts to cure any default under those contracts.  This involved reviewing multiple executory contracts, analyzing cure amounts under such contracts, and discussing these amounts with the Debtor and its investment banker.

**39.** **Trial – prepare motions and briefs**

Sheppard spent a total of 5.30 hours and incurred fees totaling $1,563.50 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 110. The services under this Project Billing Category pertain to the preparation of the briefs related to Bid Procedures Motion and the opposition to the Association's attempt to replace Mr. Mayer.

**40.** **Data Room**

Sheppard spent a total of 144.00 hours and incurred fees totaling $28,080.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 116. These fees were incurred in connection with maintaining the data room set up by Sheppard in order to facilitate access to the Debtor's due diligence materials by potential buyers. Sheppard's corporate paralegal took the lead role in setting up the data room, reviewing the due diligence documents and uploading them to the relevant folders. She also reviewed request for access, created account information for interested parties, and provided access to potential buyers and their representatives. Sheppard's corporate paralegal archived additional due diligence documents as they became available and generated reports regarding the activities of the users.

The work and services rendered under this Project Billing Category were necessary to facility access to the Debtor's due diligence material which is critical to the sale process. During the preparation of this Application, Sheppard sought an estimate from a third party on the costs of maintaining a similar data room based on the size of the due diligence material. Sheppard was quoted an amount that is approximately 6 times the fees requested in this Application for this Project Billing Category. As such, Sheppard believes that providing the data room has generated significant savings for the estate.

**41.** **ERISA**

Sheppard spent a total of 18.30 hours and incurred fees totaling $12,169.50 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 119. These fees were incurred in analyzing employee-related matters and the implication of the sale on the Debtor's obligations toward its employees.

42. **NDA**

Sheppard spent a total of 27.80 hours and incurred fees totaling $9,747.00 during the Application Period on this Project Billing Category, as summarized on <u>Exhibit B</u>, p. 122.  In connection with the sales efforts, a process was needed to insure that the Debtor's confidential information is guarded.  As such, Sheppard drafted the necessary non-disclosure agreement which was provided to the potential buyers to execute before they were granted access to the due diligence materials.  Throughout the Application Period, Sheppard responded to inquiries regarding the agreement.  Several parties requested revisions to the agreement and Sheppard addressed those changes and incorporated certain revisions when appropriate.

## IX.

## COMPENSATION FOR SERVICES OF LEGAL ASSISTANTS

Professionals may be compensated for the service of their legal assistants under the Guidelines.  Sheppard seeks to be compensated or the services provided by two of its legal assistants.  The services for which compensation is sought would have had to be done by Sheppard attorneys if not done by Sheppard's legal assistant, and would have been compensable under the Guidelines.  Sheppard did not bill for and wrote off the time of certain of Sheppard's personnel for administrative and secretarial tasks.  The résumés of legal assistant Peter Stone and of Melanie Yuvienco are attached to this Application as <u>Exhibit D</u> and <u>Exhibit E</u>, respectively.  Mr. Stone's résumé will show that Mr. Stone is specially trained, has experience in large chapter 11 bankruptcy cases, and is not primarily a secretary or clerical worker.  Similarly, Ms. Yuvienco's résumé is specially trained, has experience in corporate matters, and is not primarily a secretary or clerical worker.

## X.

## SUMMARY OF SHEPPARD'S EXPENSES

Sheppard seeks expense reimbursement for expenses totaling $18,926.51.  A summary of expenses advanced by Sheppard and a detailed statement of expenses advanced by Sheppard are set forth on the attached <u>Exhibit B</u>, at pages 124-126.  These costs include courier services, overnight mail, postage, photocopying, computerized legal research, facsimile and long distance

W02-WEST:5KES1\401686822.3                                           FIRST INTERIM FEE APPLICATION

telephone calls, filing fees and transportation.  Such expenses are billed to the Debtor's estate at the actual or projected actual cost to Sheppard.

Although Sheppard charges its non-bankruptcy clients for secretarial overtime, word processing costs and incoming faxes, Sheppard has *not* sought recovery of those costs from the Debtor's estate and those items have been deleted from <u>Exhibit B</u>.  Sheppard's internal billing system is designed to bill facsimile charges and long distance charges together for all of its clients. Sheppard is thus unable to separate its facsimile and long distance charges for this matter. Sheppard does not charge for facsimile, other than the actual cost of any long-distance phone charges.  Sheppard is seeking $175.52 for both facsimile and long distance charges – a sum that Sheppard believes is reasonable given the nature of the case and the services rendered on behalf of the Debtor.  Sheppard believes that amount is significantly lower than the amount to be expected in most cases of this size.  Sheppard attributes that savings to Sheppard's policy of scanning the documents in this case into PDF format in order to e-mail those documents to various parties. Sheppard does not charge the Debtor for the scanning of those documents.

Sheppard uses the services of Xerox Corporation ("Xerox") for its in-house photocopy services.  Sheppard has billed the estate at a rate of 25¢ per page for copies, which represents the actual cost that Xerox charges Sheppard.  Sheppard sends photocopying and mailing projects to outside vendors when such vendors are capable of providing service to the Debtor more efficiently and economically than Sheppard's in-house service providers.  Due to the size of this case, Sheppard used the services of such a vendor frequently during the initial stages of this case as well as for services thereafter which needed to be sent to numerous other entities.  Sheppard bills the estate for such projects at the actual cost to Sheppard, a sum that Sheppard believes is reasonable given the nature of the case and the services rendered on behalf of the Debtor.

## XI.

## COMPLIANCE WITH GUIDELINES

Except as noted above with respect to the limit on Project Billing Categories, Sheppard believes that it has prepared the Application in compliance with the Guidelines.

Sheppard has not entered into any agreement, written or oral, express or implied, with any

W02-WEST:5KES1\401686822.3                                                                    FIRST INTERIM FEE APPLICATION

1  other party-in-interest or any attorney for any party-in-interest in the case for the purpose of fixing

2  the amount of any fee or compensation to be paid from the assets of the Debtor's estate.

3       All compensation and expense reimbursements requested by Sheppard have been billed at

4  rates in accordance with practices no less favorable than those customarily employed by Sheppard

5  and generally accepted by Sheppard's clients.

6       Pursuant to the Guidelines, Sheppard is serving a true and correct copy of the Application

7  on the Debtor, along with transmittal correspondence inviting discussion, questions, comments,

8  concerns or objections to the Application. A copy of such correspondence dated today's date and

9  addressed to Mr. Len Mayer, the Debtor's designated responsible individual, is attached as

10  Exhibit F to this Application.

11       //

12       //

13       //

14       //

15       //

16       //

17       //

18       //

19       //

20

21

22

23

24

25

26

27

28

W02-WEST:5KES1\401686822.3          FIRST INTERIM FEE APPLICATION

**XII.**

**CONCLUSION**

WHEREFORE, Sheppard prays that the Court enter an order:

(1) granting interim approval of compensation for professional legal services rendered and reimbursement of expenses incurred as counsel for the Debtor from April 21, 20098 through July 17, 2009 totaling $640,032.51, consisting of $621,106.00 in professional fees and $18,926.51 in expenses;

(2) authorizing and directing the Debtor to make immediate payment to Sheppard of all allowed and outstanding amounts approved in its Application but not yet paid to Sheppard; and

(3) granting such other and further relief as the Court may deem just and proper.


Dated: July 31, 2009

<div style="margin-left:40%">

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By _____
                        */s/ Michael H. Ahrens*
                        MICHAEL H. AHRENS

Attorneys for debtor
Humboldt Creamery, LLC

</div>

W02-WEST:5KES1\401686822.3                                                    FIRST INTERIM FEE APPLICATION