1  John D. Fiero (CA Bar No. 136557)            Michael H. Ahrens (CA Bar No. 44766)
   Maxim B. Litvak (CA Bar No. 215852)          Steven B. Sacks (CA Bar No. 98875)
2  Gail S. Greenwood (CA Bar No. 169939)        Ori Katz (CA Bar No. 209561)
   PACHULSKI STANG ZIEHL & JONES LLP            SHEPPARD, MULLIN, RICHTER &
3  150 California Street, 15th Floor            HAMPTON LLP
   San Francisco, California 94111-4500         Four Embarcadero Center, 17th Floor
4  Telephone: 415/263-7000                      San Francisco, CA 94111-4109
   Facsimile: 415/263-7010                      Telephone: 415/434-9100
5                                               Facsimile: 415/434-3947
   Attorneys for Official Committee
6  of Unsecured Creditors                       Attorneys for Humboldt Creamery, LLC

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        SANTA ROSA DIVISION

11 In re:                                    Case No.: 09-11078

12 **HUMBOLDT CREAMERY, LLC,**               Chapter 11
   a Delaware limited liability company,

13                                           **DISCLOSURE STATEMENT IN**
                           Debtor.           **SUPPORT OF FIRST AMENDED JOINT**
14                                           **PLAN OF LIQUIDATION PROPOSED BY**
                                             **THE DEBTOR AND OFFICIAL**
15                                           **COMMITTEE OF UNSECURED**
                                             **CREDITORS**
16
                                             Plan Confirmation Hearing
17                                           Date:  December 18, 2009
                                             Time:  10:00 a.m.
18                                           Place: 99 South E. Street
                                                    Santa Rosa, CA 95404
19                                           Judge: Hon. Alan Jaroslavsky
20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

    A.    PURPOSE OF THE PLAN.......................................................................... 2

    B.    SUMMARY OF PLAN AND PROJECTED DISTRIBUTIONS TO CREDITORS 4

    C.    VOTING INSTRUCTIONS ......................................................................... 5

        1.    How to Vote ..................................................................................... 5

        2.    Who May Vote ................................................................................. 5

    D.    CONFIRMATION ....................................................................................... 6

II. DEBTOR'S CHAPTER 11 CASE ...................................................................... 7

    A.    EVENTS LEADING UP TO THE FILING OF THE CHAPTER 11 PETITION .... 7

        1.    Historical Background of the Debtor ............................................. 7

        2.    Description of the Debtor's Pre-Bankruptcy Business ................. 8

        3.    Financial Background of the Debtor .............................................. 9

        4.    The Debtor's Bankruptcy Filing ................................................... 9

    B.    SIGNIFICANT POST-PETITION EVENTS ............................................. 11

        1.    Retention of Debtor's Professionals. .......................................... 11

        2.    Appointment of Creditors' Committee. ...................................... 11

        3.    Filing of Schedules and Setting of Claims Bar Date. ................. 12

        4.    Borrowing Under Debtor-in-Possession Financing Facility....... 12

        5.    Investigation of Potential Litigation Claims. .............................. 13

        6.    Sale of Debtor's Assets................................................................ 13

        7.    Compromise with the Banks. ...................................................... 15

        8.    Compromise with California Department of Food & Agriculture.............. 17

III. DESCRIPTION OF PLAN ............................................................................. 18

    A.    CLASSIFICATION OF CLAIMS AND INTERESTS ......................... 18

        1.    Class 1 Claims (Priority Non-Tax Claims)................................. 18

        2.    Class 2 Claims (Miscellaneous Secured Claims)........................ 18

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DISCLOSURE STATEMENT IN SUPPORT OF
FIRST AMENDED JOINT PLAN OF LIQUIDATION

3.    Class 3 Claims (CoBank Claims). .................................................. 18

4.    Class 4 Claims (General Unsecured Claims)................................... 18

5.    Class 5 Interests. ........................................................................... 18

B.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS........................ 18

1.    Class 1 (Priority Non-Tax Claims). ............................................... 18

2.    Class 2 (Miscellaneous Secured Claims). ...................................... 19

a.    Abandonment or Surrender................................................ 19

b.    Cash Payment................................................................... 19

c.    Unimpairment. .................................................................. 19

3.    Class 3 (CoBank Claims). ............................................................. 19

4.    Class 4 (General Unsecured Claims). ............................................. 19

5.    Class 5 (Interests). ........................................................................ 20

C.    TREATMENT OF UNCLASSIFIED CLAIMS ............................................. 20

1.    Administrative Claims. .................................................................. 20

2.    Priority Tax Claims....................................................................... 20

3.    Claims for Professional Fees. ........................................................ 21

IV. IMPLEMENTATION OF THE PLAN ................................................................ 21

A.    ESTABLISHMENT AND FUNDING OF LIQUIDATING TRUST .................... 21

B.    PURPOSE OF LIQUIDATING TRUST ...................................................... 22

C.    LIQUIDATING TRUSTEE....................................................................... 22

1.    Generally....................................................................................... 22

2.    Responsibilities and Authority of Liquidating Trustee.................... 23

3.    Powers of Liquidating Trustee....................................................... 23

4.    Compensation of Liquidating Trustee and Professionals. ............... 24

D.    LIQUIDATING TRUST COMMITTEE ...................................................... 25

1.    Generally....................................................................................... 25

2.    Duties of Liquidating Trust Committee........................................... 25

3.    Reimbursement of Expenses of Liquidating Trust Committee.................... 25

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| E. | VESTING OF ESTATE ASSETS | 25 |
| F. | LIQUIDATING TRUST RETAINED CLAIMS AND/OR DEFENSES | 25 |
| G. | WIND-UP AND DISSOLUTION OF THE DEBTOR | 26 |
| H. | DISSOLUTION OF CREDITORS' COMMITTEE | 27 |
| I. | FINAL DECREE | 27 |

V. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................. 27

| A. | REJECTION OF CONTRACTS AND LEASES | 27 |
| B. | BAR DATE FOR REJECTION DAMAGES | 28 |

VI. EFFECTS OF CONFIRMATION ............................................................................. 28

| A. | BINDING EFFECT | 28 |
| B. | PROPERTY REVESTS FREE AND CLEAR | 28 |
| C. | PERMANENT INJUNCTION | 29 |
| D. | EXONERATION AND RELIANCE | 30 |

VII. KEY PLAN PROVISIONS ................................................................................... 30

| A. | SOURCE OF PLAN FUNDING | 31 |
| B. | LIQUIDATING TRUST RETAINED CLAIMS AND/OR DEFENSES | 31 |
| C. | PRIORITY CLAIMS | 33 |
| D. | ADMINISTRATIVE CLAIMS | 33 |

VIII. FEASIBILITY ................................................................................................. 35

IX. RISK FACTORS ............................................................................................... 35

X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ........................................... 36

| A. | TAX CONSEQUENCES TO THE DEBTOR | 37 |
| B. | TAX CONSEQUENCES TO HOLDERS OF INTERESTS | 39 |
| C. | TAX CONSEQUENCES TO CREDITORS | 39 |
| D. | IMPORTANCE OF OBTAINING PROFESSIONAL TAX ADVICE | 41 |

XI. LIQUIDATION ANALYSIS ................................................................................. 41

XII. CONCLUSION ................................................................................................ 43

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# I.

## **INTRODUCTION**

Humboldt Creamery, LLC (the "Debtor") and the Official Committee of Unsecured Creditors (the "Creditors' Committee") (together, the "Proponents") submit this Disclosure Statement pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims against the Debtor in connection with (i) the solicitation of acceptances of the *First Amended Joint Plan of Liquidation*, dated November 13, 2009, as the same may be amended (the "Plan"), filed by the Proponents in the United States Bankruptcy Court for the Northern District of California, Santa Rosa Division (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan that is scheduled for December 18, 2009 at 10:00 a.m. Unless otherwise defined, capitalized terms contained herein shall have the same meanings set forth in the Plan.

On or about November 13, 2009, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment on whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. Certain of the statements contained in this Disclosure Statement, by nature, are forward-looking and contain estimates and assumptions. There can be no assurance that such statements will reflect actual outcomes. If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.

This Disclosure Statement is for the purpose of enabling you to make an informed judgment about the Plan. You are urged to review both this Disclosure Statement and the Plan in making your decision about whether to accept the Plan. Based on the information contained in this Disclosure Statement and for the reasons set forth below, the Proponents have concluded that the Plan provides the best and most rapid recovery to Creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Note that Exhibit B to the Plan contains a non-exclusive list of potential causes of action that will be retained and may be pursued following confirmation and effectiveness of the Plan. All rights to pursue any such claims are expressly reserved under the Plan.

In addition, a ballot for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement submitted to those holders of Claims that the Proponents believe are entitled to vote to reject or accept the Plan. The Proponents urge you to accept the Plan by completing and returning the enclosed ballot so that it is received by no later than 4:00 p.m., prevailing Pacific Time, on December 11, 2009.

## A.    <u>PURPOSE OF THE PLAN</u>

The Debtor was the subject of a massive fraud perpetrated prepetition that resulted in substantial overstatement of its assets and understatement of its liabilities. As a result of this fraud, the Debtor's liabilities far exceed its assets and the Debtor's principal secured lenders have been rendered undersecured by tens of millions of dollars.

Since the commencement of this case, the Debtor has sought to liquidate its assets for the benefit of creditors and the estate. To date, the Debtor has ceased business operations and sold or otherwise disposed of substantially all of its operating assets. The Debtor, however, was unable to realize sufficient value from these assets to satisfy creditor claims in full. In fact, even though the majority of the sales proceeds realized thus far have been distributed to the Debtor's secured lenders, these creditors have received only a small fraction of the full amount owed to them. Nonetheless, pursuant to a compromise agreement with the Creditors' Committee and the Debtor's lenders, certain pools of cash have been set aside for the benefit of unsecured creditors for purposes of confirming a plan, satisfying priority and administrative claims, and funding certain expenses associated with the estate's litigation assets.

The purpose of the Plan is to effectuate an efficient distribution of available funds in the estate to priority and administrative claimants and to maximize the value of the estate's litigation rights for the benefit of unsecured creditors. The Plan will be implemented through the creation of a Liquidating Trust that will be vested with the Debtor's assets and appointed as estate representative for purposes of pursuing the estate's litigation claims and rights of action.

56812-001\DOCS_SF:67597.20    2

According to the Bankruptcy Court's claims register, there are approximately $27,000,000 million in unsecured claims filed against the estate, of which approximately $3,000,000 are filed as priority claims. The Proponents believe that certain of these claims should be reduced or reclassified. The chart below reflects the Debtor's best estimate of the total amount of Claims that may be allowed against the estate, and summarizes the treatment of, and recoveries that can be anticipated by holders of, Claims and Interests under the Plan. The amounts listed below are estimates only.

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIM | ESTIMATED RECOVERY PERCENTAGE | TREATMENT |
|---|---|---|---|---|
| N/A | Allowed Administrative Claims | $600,000 - $1,200,000 | 100% | Payment in full. *(Not entitled to vote)* |
|  | Allowed Priority Tax Claims | $150,000 - $200,000 | 100% | Payment in full. *(Not entitled to vote)* |
| 1 | Allowed Priority Non-Tax Claims | $350,000 - $375,000 | 100% | Payment in full. *(Not entitled to vote)* |
| 2 | Allowed Miscellaneous Secured Claims | $0 | 100% | Abandonment of collateral, cash payment equal to value of collateral, or retention of rights that existed pre-bankruptcy. *(Not entitled to vote)* |
| 3 | Allowed CoBank Claims | $35,000,000-$40,000,000 (after deducting proceeds of collateral) | Unknown *(Depends on outcome of litigation)* | Entitlement to rights and benefits contemplated under Compromise Agreement. *(Entitled to vote)* |
| 4 | Allowed General Unsecured Claims | $15,000,000-$30,000,000 | Unknown *(Depends on outcome of litigation)* | Distribution of Pro Rata Share of the Liquidating Trust Interests, which primarily represent interests in various litigation assets. *(Entitled to vote)* |
| 5 | Interests | N/A | No recovery. | No recovery. *(Not entitled to vote)* |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**B. SUMMARY OF PLAN AND PROJECTED DISTRIBUTIONS TO CREDITORS**

Under the Bankruptcy Code, holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims are entitled to receive payment on account of their Claims before holders of Allowed General Unsecured Claims. Given the extent of the fraud perpetrated with respect to the Debtor and the lack of funds to satisfy what otherwise would be senior secured claims (*i.e.*, Allowed CoBank Claims), the Plan does not contemplate any immediate distributions to holders of Allowed General Unsecured Claims, other than a Pro Rata Share of the beneficial interests in the Liquidating Trust that will be created under the Plan.

Recoveries by holders of Allowed General Unsecured Claims under the Plan are contingent on the outcome of litigation claims and causes of action that may be pursued by the Liquidating Trust. These claims are summarized in Exhibit B to the Plan, but generally include, without limitation, malpractice claims against the Debtor's former professionals, breach of fiduciary duty claims against the Debtor's insiders, and avoidance actions against any party that received a transfer from the Debtor while it was insolvent or rendered insolvent as a result of such transfer. In addition, the Liquidating Trust will pursue any available insurance coverage associated with the foregoing claims and causes of action.

Because litigation claims are speculative in nature, the Proponents cannot currently predict the amounts that may be recovered on account of such claims or the distributions that ultimately may become available to holders of Allowed General Unsecured Claims. Although the Proponents do not believe that such an outcome is likely, it is possible that there will be no material distributions available to general unsecured creditors in this case.

In addition, holders of Allowed General Unsecured Claims should consider that any distributions on account of such Claims will depend on the size of the overall pool of Allowed General Unsecured Claims, which has yet to be determined and remains uncertain. The Proponents anticipate that the aggregate sum of Allowed General Unsecured Claims will range between $15,000,000 and $30,000,000. The reason for this broad range is that the Creditors' Committee believes that Allowed General Unsecured Claims should exclude Insider Claims, which would have the effect of reducing the claims pool by approximately $14,000,000.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

However, the Proponents can provide no assurance at this time that this reduction will occur. Accordingly, distributions to holders of Allowed General Unsecured Claims may be further diluted depending on the ultimate size of the pool of Allowed General Unsecured Claims.

**C.    VOTING INSTRUCTIONS**

### 1.    How to Vote

A ballot is enclosed herewith for Creditors to use in voting on the Plan. For the reasons described herein, holders of Interests will not receive a ballot. To vote on the Plan, indicate on the enclosed ballot that you accept or reject the Plan, provide the requested information, sign your name and mail the ballot in the envelope provided for this purpose.

In order to be counted, ballots must be completed, signed and returned so that they are actually received no later than 4:00 p.m., prevailing Pacific Time, on December 11, 2009, at the following address:

> Pachulski Stang Ziehl & Jones LLP
> 150 California Street, 15th Floor
> San Francisco, California 94111-4023
> Attn: Patricia J. Jeffries – Humboldt Creamery Ballot Administrator

If your ballot is not properly completed, signed and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to this same address.

### 2.    Who May Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or interests in classes of claims or interests that are impaired and that will receive distributions under a plan are entitled to vote to accept or reject a proposed plan. Holders of Class 3 Claims (CoBank Claims) and Class 4 Claims (General Unsecured Claims) are impaired under the Plan and, to the extent Claims in such Class are Allowed Claims, the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in Class 3 and Class 4 are entitled to vote to accept or reject the Plan. Class 1 and Class 2 of the Plan are unimpaired and conclusively presumed to have accepted the Plan. Class 5, consisting of Interests, will not receive any distributions under the Plan. As a result, holders of Interests are conclusively

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

presumed to have rejected the Plan.  Based on the foregoing, the Proponents are soliciting acceptances only from holders of Allowed Claims in Class 3 and Class 4.

**D.**     **CONFIRMATION**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization.  At the Confirmation Hearing, if the Bankruptcy Court determines that all of the requirements of section 1129 of the Bankruptcy Code have been satisfied, the Bankruptcy Court will enter an order confirming the Plan.  The Proponents believe that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, including that the Plan has been proposed in good faith and not by any means forbidden by law.

Voting is tabulated by Class.  A class of Creditors has accepted the Plan if the Plan has been accepted by at least 2/3 in dollar amount and more than 1/2 in number of Creditors holding Allowed Claims in that class who actually vote to accept or reject such Plan.  Holders of Interests are deemed to have rejected the Plan because their Interests will be extinguished under the Plan.

Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" as to each nonaccepting class.  With respect to Class 5 (Interests), which is deemed to have rejected the Plan, the Proponents intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

The Bankruptcy Court has set December 18, 2009, at 10:00 a.m. for the Confirmation Hearing at which it will determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied.  The Confirmation Hearing may be continued from time to time and day to day without further notice.  Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtor, counsel for the Creditors' Committee and the Office of the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

68312-001\DOCS_SF:67490.9

6

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## II.

### DEBTOR'S CHAPTER 11 CASE

**A.**    **EVENTS LEADING UP TO THE FILING OF THE CHAPTER 11 PETITION**

    **1.**    **Historical Background of the Debtor**

Prior to the filing of this bankruptcy case and up until the sale of the Debtor's business approved by the Bankruptcy Court (referenced below), the Debtor processed, distributed and marketed a wide array of dairy products, including powdered milk, fluid milk, packaged ice cream and various frozen novelty products. The Debtor's business had been a part of the dairy business in Northern California since 1929. In January of that year, 153 dairy farmers banded together and formed the Humboldt Creamery Association (the "Association"), a nonprofit agricultural cooperative. Headquartered in Fernbridge, California, the Debtor received most of the raw milk necessary for its operations from the approximately 40 farmer-members of the Association, who had an average herd size of 300 milking cows.

Since the beginning of the 1990s and into the 2000s, the Debtor's business shifted from the sale of basic milk powders and fluid milk to goods such as ice cream, frozen novelties, and organic versions of its dairy products. Significant steps in this direction included the construction of the business' first ice cream manufacturing facility in Fortuna in 1994, the acquisition of a 40,000 square foot distribution center in Stockton in August 2004, and the purchase of the ice cream division of WestFarm Foods in November 2004, which included a license of the Darigold trademark and a second ice cream manufacturing facility in Los Angeles that focused on frozen novelty products. The Debtor terminated operations at the Los Angeles ice cream facility soon after the commencement of this case.

The limited liability company comprising the Debtor was formed on December 3, 2004. As part of that restructuring, the Association contributed essentially all of its assets (except for its contracts with its farmer-members) to the Debtor in exchange for a 75% membership interest in the Debtor. The Association continued to provide the Debtor with raw milk.

///

///

SF:68316.4\011\DOCS_SF:67996v1    7    DISCLOSURE STATEMENT IN SUPPORT OF FIRST AMENDED JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## 2. Description of the Debtor's Pre-Bankruptcy Business

The Debtor and the Association were parties to a Milk Supply Contract dated January 1, 2005 (the "Milk Supply Contract"). The Milk Supply Contract was an output contract pursuant to which the Debtor was obligated to purchase all of the raw milk produced by the approximately 40 members of the Association. The raw milk purchased under this agreement included both non-organic and organic milk. In addition, because the Debtor's raw milk demands exceeded the Association's supply, the Debtor also purchased some raw milk from non-Association members. Approximately 90% of the Debtor's raw milk supply was provided by Association members and approximately 10% was supplied by non-Association milk producers.

The Debtor's customers included major grocery retailers, big box stores and major food processing companies in the United States and abroad. Approximately 65% of the Debtor's sales occurred outside of the State of California.

The Debtor's most significant product line was ice cream, and it was the largest private label ice cream manufacturer in the Western United States. The Debtor's two ice cream manufacturing facilities produced a range of non-organic and organic ice creams, as well as various frozen novelty products. The Debtor produced these ice cream products under its own brand and under the private labels of its customers.

The Debtor's second most significant line of business was the sale of powdered milk, which constituted approximately 35% of its gross revenues in 2008. The Debtor had the ability to produce approximately 24 million pounds of powdered milk annually, which it sold worldwide to customers in the pharmaceutical, confectionary and other industries.

After powdered milk, the next most significant line of business for the Debtor was fluid milk products, of which the Debtor produced approximately 3.9 million gallons annually. In 2007, approximately 60% of that production was organic milk. The Debtor sold the fluid milk under its own brand and under the private labels of its customers.

In addition, the Debtor sold raw milk and cream to its customers who processed it into various items, including fluid milk, cheese and butter.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### 3. Financial Background of the Debtor

The Debtor is owned 75% by the Association and 25% by another dairy cooperative, Dairy Farmers of America, Inc. ("DFA"). This equity structure derives from the Association's ownership of 13,500 of the 18,000 Common Units of membership interest in the Debtor, and DFA's ownership of the remaining 4,500 Units. The Debtor has also sold lesser membership interests in the form of Series A and B Preferred Units. There are approximately 3,500 Series A Preferred Units and 400 Series B Preferred Units outstanding.

The Debtor's secured debt obligations arise from a borrowing arrangement with CoBank, ACB ("CoBank"), as administrative and collateral agent, and certain other participating lenders, including two American AgCredit entities (collectively, the "Banks"). This arrangement is documented in a *Loan Agreement* dated January 3, 2005, and subsequently amended twenty times (the "Bank Loan Agreement"). Two primary obligations to the Banks arise from this borrowing arrangement: the Debtor's obligations under a revolving line of credit, and the Debtor's obligations under a term loan. As of the Petition Date, the collective amount outstanding under both the line of credit and the term loan was in excess of $54,000,000.00. The revolving line of credit was to mature on February 1, 2010, and the term loan was due on April 30, 2017.

The Debtor's obligations under the Bank Loan Agreement were secured by mortgages encumbering all of its real property in Humboldt, San Joaquin and Los Angeles Counties, as well as security agreements encumbering the Debtor's inventory, accounts receivable, equipment and certain other personal property. In addition, the Association guaranteed all of the Debtor's obligations under the Bank Loan Agreement.

### 4. The Debtor's Bankruptcy Filing

The Debtor's bankruptcy filing was necessitated by the discovery that its financial condition was much different than what had been represented in the financial statements issued by the Debtor under the management of its former Chief Executive Officer, Rich Ghilarducci. Mr. Ghilarducci had been the President and CEO of the Debtor (and before that, the Association) since 1997. Prior to serving as CEO, Mr. Ghilarducci had also been the Association's Chief Financial

Officer since 1985.  On February 20, 2009, Mr. Ghilarducci abruptly resigned, warning the Debtor of potential financial inaccuracies.

Immediately upon Mr. Ghilarducci's resignation, the Debtor suspended the sale of the Series B Preferred Units, which were being sold largely to individuals in Humboldt County, and took active steps to uncover the nature and extent of the potential fraud.  The Debtor has worked closely with the U.S. Department of Justice to investigate its former CEO's misdeeds, and has also commissioned its own investigation into the matter.  The Debtor's investigation showed that the Debtor's financial statements had been manipulated, perhaps going back several years.

In the wake of Mr. Ghilarducci's resignation, the Debtor hired an accounting firm and a workout professional to aid the Debtor in undertaking a review of its balance sheet and other financial data, with the goal of gaining an accurate understanding of its finances.  The Debtor also took steps to effectuate a restructuring outside of bankruptcy, such as: (i) marketing its properties, businesses and facilities, including its manufacturing facility in Los Angeles, its powder milk processing facility in Loleta, its direct store delivery business in Stockton, and certain vacant land in Stockton; (ii) reducing overhead by eliminating approximately one-third of its general and administrative expenses; (iii) conducting workforce reductions at all levels in order to reduce payroll expenses, including the elimination of approximately 23% of senior and middle management positions; (iv) obtaining concessions from the Association under the Milk Supply Agreement, including the deferral of $2 million dollars in payments that were past due, a 20% reduction in the supply of raw organic milk, and a significant reduction in the purchase price of all raw milk; (v) commencing discussions regarding strategic partnerships with certain existing equity holders, customers and competitors; and (vi) hiring outside consultants from the dairy industry to review the Debtor's operational structure and provide advice as to how to increase operational efficiency.

Ultimately, the Debtor was unable to effectuate an out-of-court restructuring and was required to commence a voluntary Chapter 11 case in order to evaluate its options and pursue a strategy that would maximize value for all constituents.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**B.    SIGNIFICANT POST-PETITION EVENTS**

On April 21, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued in the possession of its property and the management of its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtor has been managed during the case primarily by Mr. Len Mayer as Chief Executive Officer, Manager, and designated responsible individual for the Debtor. Prior to the Petition Date, Mr. Mayer was the CEO of both the Debtor and the Association. The Association was also the Manager of the Debtor. In order to avoid a situation in which a potential creditor controlled the Debtor during its bankruptcy case, Mr. Mayer resigned pre-petition as the CEO of the Association and the Association resigned pre-petition as the Manager of the Debtor.

During the Chapter 11 case, significant events have included the following:

**1.    Retention of Debtor's Professionals.**

The Debtor retained Sheppard, Mullin, Richter & Hampton LLP as its bankruptcy counsel prior to the Petition Date. The Debtor also employed the firm of Burr, Pilger & Mayer LLP as its financial advisors and Duff & Phelps Securities, LLC ("Duff & Phelps") as its investment bankers. Duff & Phelps was retained on a monthly fee, plus a contingency basis.

**2.    Appointment of Creditors' Committee.**

On April 27, 2009, the United States Trustee appointed the Creditors' Committee pursuant to Bankruptcy Code sections 1102(a) and 1102(b)(1). The Creditors' Committee was originally comprised of the following members: (1) California Dairies; (2) Rumiano Cheese Company; (3) Sweetener Products Inc.; (4) Mass Marketing Services; (5) Steve Wills Trucking; (6) Berry Plastics Corp.; and (7) Certified Freight Logistics. Mass Marketing Services has since resigned from the Creditors' Committee.

The Creditors' Committee retained Pachulski Stang Ziehl & Jones LLP as its counsel and Deloitte Financial Advisory Services LLP as its financial advisors.

///

///

SF:67290.4 001\DOCS_SF:67290.4

### 3. Filing of Schedules and Setting of Claims Bar Date.

The Debtor initially filed its Schedules with the Bankruptcy Court on May 27, 2009. The Schedules have since been amended or supplemented. The Schedules, as amended or supplemented, list liabilities totaling approximately $86,630,480 as of the Petition Date.

The scheduled liabilities are summarized as follows:

| | |
|---|---|
| Secured Claims: | $55,744,064 |
| Priority Claims: | $1,040,336 |
| General Unsecured Claims: | $29,846,079 |

The Bankruptcy Court established August 31, 2009, as the Bar Date by which non-governmental Creditors were required to file proofs of Claim against the Debtor's estate, and November 2, 2009, as the Bar Date by which governmental Creditors are required to file proofs of Claim against the Debtor's estate. The Debtor has requested that the Bankruptcy Court establish December 9, 2009, as the Bar Date for certain Administrative Claims arising on or before August 27, 2009. A Claim filed after the applicable Bar Date will be considered late and may be disallowed.

### 4. Borrowing Under Debtor-in-Possession Financing Facility.

Early in the case, the Bankruptcy Court authorized the Debtor to enter into a debtor-in-possession loan in a principal amount not exceeding $3,000,000. The loan was provided by the Debtor's pre-petition lenders and was necessary to maintain operations, pending the outcome of a sale process.

In the context of approving the debtor-in-possession loan, the Bankruptcy Court also authorized the Debtor to use of a significant portion of the loan proceeds totaling no more than $1,500,000 to pay the prepetition claims of the Association for milk delivered to the Debtor in the 20 days prior to the Petition Date. An additional $200,000 was used by the Debtor to pay other non-Association suppliers who delivered goods to the Debtor in the 20 days prior to the Petition Date. The Debtor took the position that all such claims were entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

### 5. Investigation of Potential Litigation Claims.

As mentioned above, Richard Ghilarducci, the Debtor's former CEO, resigned unexpectedly in February 2009, advising that there may be inaccuracies in the company's financial statements and that the company should suspend its offering of preferred stock. Based on the Debtor's preliminary estimates, it appears that the Debtor's financials were falsely inflated by extreme amounts. Total assets had to be written down from approximately $85 million to $43 million.

Given the magnitude of the fraud, the Creditors' Committee has been focused on uncovering the wrongdoing. The Creditors' Committee has begun the process of investigating potential claims that the Estate may have against the Debtor's management, Insiders, former professionals, and third parties. To this end, the Creditors' Committee obtained orders from the Bankruptcy Court under Bankruptcy Rule 2004 for Richard Ghilarducci and Frank X. Gloeggler, the Debtor's former accountant and auditor, to appear for examinations and to produce documents. Mr. Ghilarducci appeared at the examination as required, but provided no substantive testimony on the basis of the Fifth Amendment of the United States Constitution. He also produced no documents on the same grounds. Mr. Ghilarducci is currently the subject of a criminal investigation by the United States Attorney and the Federal Bureau of Investigation. Mr. Gloeggler appeared at the examination scheduled by the Creditors' Committee and responded to questions. He has also produced documents. The Creditors' Committee is continuing the investigation of potential claims and the Liquidating Trust will take over the process of investigating and pursuing any viable rights of action held by the Estate against third parties.

### 6. Sale of Debtor's Assets.

Since the Petition Date, the Debtor's principal exit strategy in the case has been to consummate a sale of substantially all of its assets. To this end, the Debtor retained as the Debtor's investment banker, Duff & Phelps, early in the case in order to coordinate the Debtor's marketing and sale process. Duff & Phelps began by exploring the pool of parties potentially interested in the Debtor's business or assets. Duff & Phelps identified and approached national

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

and major international strategic companies and private equity firms who have been active in the dairy industry or have had an interest in entering this market. In addition, Duff & Phelps solicited the interest of various financial firms with experience in the acquisition of distressed assets or transactions in the food industry. This list included more than 150 potential interested parties, both strategic and financial.

Among the tasks that Duff & Phelps undertook in this process was preparing an information memorandum on the Debtor's operations and assembling extensive information on the Debtor's assets for review by potential buyers or investors, including copies of relevant contracts, financial information, and the like. With the assistance of the Debtor's counsel, a data room was set up to house this due diligence information and facilitate access by interested parties to such information. Duff & Phelps provided these parties with confidentiality agreements and then accommodated numerous requests for due diligence information and documents. During late May 2009, and after providing access to the data room and accommodating information requests for over 50 potential purchasers that had executed confidentiality agreements, Duff & Phelps received eleven non-binding indications of interest, written and oral, from potential bidders outlining their proposed bids for the Debtor's assets. Duff & Phelps then coordinated visits by these interested parties to the Debtor's facilities and sites, and circulated a proposed form of asset purchase agreement along with instructions for submitting a letter of intent and mark up of the asset purchase agreement. This process continued through the week of June 15th, 2009, when the bids were due.

Ultimately, the Debtor selected Foster Dairy Farms ("Foster Farms") as the "stalking horse" bidder for the Debtor's creamery assets (which generally include the Debtor's creamery operations in Fernbridge and warehouse facilities in Stockton). Foster Farms' bid contemplated a purchase price of $20,500,000, subject to certain adjustments which had the effect of reducing the price to $19,250,000, plus the assumption of certain designated liabilities. The Debtor filed a motion to approve the sale (and assumption and assignment of certain contracts) to Foster Farms, subject to overbid at auction. The Debtor also filed a separate motion for the Court to approve certain procedures for the sale. The Debtor did not receive acceptable bids for its non-core

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   business assets -- namely, a shuttered ice cream facility in Los Angeles, certain vacant land in

2   Stockton, and an old factory building in Loleta, California.  The Debtor's sale motion

3   nonetheless covered these non-core assets to the extent that an acceptable bid was received prior

4   to the sale hearing.

5        The Bankruptcy Court approved the Debtor's proposed sale procedures, as amended, and

6   set a sale hearing to occur in August 2009.  No satisfactory overbids were received consistent

7   with the sale procedures and therefore no auction was conducted for the Debtor's creamery

8   assets.  The Bankruptcy Court subsequently approved the sale of the creamery assets to Foster

9   Farms, and the sale closed on August 27, 2009.  As to the Debtor's non-core assets, an auction

10  did go forward for the Debtor's Los Angeles facility, but the resulting high bid was not

11  satisfactory to the Debtor or the Banks.  No bids were received for the Debtor's other non-core

12  assets.

13       **7.        Compromise with the Banks.**

14       In conjunction with the Bankruptcy Court's approval of the sale of the Debtor's creamery

15  assets to Foster Farms, the Debtor, the Creditors' Committee and CoBank, in its capacity as

16  agent for the Banks, entered into a compromise agreement dated August 25, 2009 (the

17  "Compromise Agreement") that was approved by the Bankruptcy Court.  Under the Compromise

18  Agreement, (a) CoBank and the Creditors' Committee consented to the sale to Foster Farms, (b)

19  the Debtor agreed to abandon its non-core business assets subject to CoBank's foreclosure rights,

20  and (c) CoBank agreed to set aside certain proceeds from the sale to Foster Farms (a portion of

21  which would be treated as a loan) for the benefit of the Estate.

22       Specifically, the following approximate sums have been set aside:  (i) $450,000 in

23  "Unrestricted Funds" segregated for general chapter 11 purposes; (ii) $222,851 in funds set aside

24  for purposes of satisfying certain claims entitled to administrative expense status under section

25  503(b)(9) of the Bankruptcy Code, (iii) $550,000 in "Plan Date Funds" for payment solely of

26  administrative and priority claims that are required to be paid in order to confirm the Plan; and

27  (iv) $250,000 in "Litigation Funds" available solely for litigation expenses and administrative

28  costs associated with the Liquidating Trust.

The parties also agreed under the Compromise Agreement that on closing of the Sale to Foster Farms an amount would be transferred to the Debtor's existing checking account ("Budgeted Expense Account") to be used for the payment of expenses that were approved as part of the DIP Budget and that were not paid on or before the closing of the Fernbridge sale to Foster Farms (the "Fernbridge Closing"). At the time of the Fernbridge Closing, the estimated accrued but unpaid expenses in the DIP Budget for estate professionals (the "Professionals") was $254,000. However, the Professionals estimated that another $200,000 was needed to cover their accrued expenses through the date of the Fernbridge Closing. CoBank and the other parties to the Compromise Agreement agreed that the accrued amount under the approved DIP budget for Professional Fees through the date of the Fernbridge Closing should be increased by $200,000 to $454,000. On the date of the Fernbridge Closing, a total of $1,866,935 was transferred into the Budgeted Expense Account to cover all of the administrative expenses that were unpaid and accrued, including both trade creditors and the Professionals. When added to the approximately $400,000 that was already in such account on Closing, the Debtor had approximately $2,267,000 in the Budgeted Expense Account as of the Fernbridge Closing. Since the date of the Fernbridge Closing, the Debtor has made payments, with the consent of CoBank, from the Budgeted Expense Account to pay the administrative creditors who were unpaid as of the Fernbridge Closing. The amount of $454,000 for the Professionals will be retained in the Budgeted Expense Account until the Court holds a hearing on allowance of the fee applications of such Professionals. If there are any amounts remaining in the Budgeted Expense Account after payment of the administrative creditors and allowed Professional Fees through the date of the Fernbridge Closing, such amounts will be paid to CoBank on account of the secured portion of its claim

Further, the parties agreed under the Compromise Agreement to allow the CoBank Claims and to implement a methodology for addressing CoBank's deficiency claim against the Estate. Under the Compromise Agreement, net recoveries by the Liquidating Trust are to be allocated 50% to repayment of CoBank's advances of the Plan Date Funds and the Litigation Funds and 50% towards Allowed General Unsecured Claims. Once the Plan Date Funds and the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

18310-001\DOCS_SF:67390.9   16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Litigation Funds (including interest thereon) have been paid in full, the next $500,000 of net recoveries by the Liquidating Trust go directly towards Allowed General Unsecured Claims. Thereafter, any net recoveries by the Liquidating Trust will be shared equally by holders of the CoBank Claims and holders of Allowed General Unsecured Claims, respectively.

**8. <u>Compromise with California Department of Food & Agriculture.</u>**

The California Department of Food & Agriculture (the "CDFA") has filed proofs of claim totaling $1,280,056.13 in the aggregate, of which $1,264,671.27 is for alleged priority tax claims. Both the Debtor and the Committee dispute the CDFA's alleged priority claims, which are based on milk pooling obligations and related fees and assessments. The Debtor, the Committee and the CDFA have met and conferred on multiple occasions and have reached a stipulation for the treatment of the CDFA's priority and nonpriority claims, subject to Court approval. Pursuant to that stipulation, the CDFA's claims will be allowed as follows: a single priority tax claim of $100,000 (the "Allowed CDFA Priority Claim") will be allowed, and a general unsecured claim of $1,180,059.13 (the "Allowed CDFA General Unsecured Claim") will be allowed. With respect to the Allowed CDFA Priority Claim, $60,000 shall be payable upon the effective date of a confirmed chapter 11 plan, and the remaining claim shall be payable only to the extent of available Plan Date Funds (referring to the $550,000 in funds set aside under the Compromise Agreement remaining after payment of other allowed priority and administrative claims. In addition, the Debtor will pay CDFA up to $3,500 in accrued and unpaid administrative expenses owed prior to August 27, 2009, which was the date of the closing of the sale of the Debtor's assets to Foster Dairy Farms. Pursuant to the stipulation, the CDFA also agreed not to object to or oppose a chapter 11 plan submitted by the Debtor or the Committee.

On November 3, 2009, the Committee filed a motion to approve the stipulation with the Court under Fed. R. Bankr. Proc. 9019. The motion was noticed under the notice and opportunity for hearing provisions of Bankruptcy Local Rule 9014-1. No party has yet to object to the motion or request a hearing on the motion.

///

///

# III.

# DESCRIPTION OF PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan that follows constitutes a summary only. You are urged to read the Plan in full in evaluating whether to accept or reject the Plan.

## A.    CLASSIFICATION OF CLAIMS AND INTERESTS

The Plan divides Creditors into Classes. Creditors with similar Claims are placed in the same Class. There are four (4) Classes of Claims and one (1) Class of Interests under the Plan as follows:

**1.    Class 1 Claims (Priority Non-Tax Claims).**

Class 1 consists of Allowed Priority Employee Claims.

**2.    Class 2 Claims (Miscellaneous Secured Claims).**

Class 2 consists of Allowed Miscellaneous Secured Claims.

**3.    Class 3 Claims (CoBank Claims).**

Class 3 consists of Allowed CoBank Claims.

**4.    Class 4 Claims (General Unsecured Claims).**

Class 4 consists of Allowed General Unsecured Claims.

**5.    Class 5 Interests.**

Class 5 consists of all Interests.

## B.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The treatment of Claims and Interests classified under the Plan is as follows:

**1.    Class 1 (Priority Non-Tax Claims).**

Class 1 Claims are unimpaired. Each holder of an Allowed Priority Non-Tax Claim shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, receive from the Liquidating Trust, in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Priority Non-Tax Claim, a Cash payment in an amount equal to the difference between: (a) such Allowed Non-Tax Claim, and (b) the amount of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

any Permitted Payments made to the holder of such Claim, on the latest of: (i) the Effective Date, or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the holder of such Claim and the Liquidating Trust may agree.

**2.**    **Class 2 (Miscellaneous Secured Claims).**

Class 2 Claims are unimpaired.  On or as soon as practicable following the Effective Date, the Liquidating Trust shall select, in its discretion, one of the following alternative treatments for each Allowed Miscellaneous Secured Claim in Class 2, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Miscellaneous Secured Claim:

a.    Abandonment or Surrender.  The Liquidating Trust will abandon or surrender to the holder of such Claim the property securing such Claim, in full satisfaction and release of such Claim.

b.    Cash Payment.  The Liquidating Trust will pay to the holder of such Claim Cash equal to the amount of such Claim, or such lesser amount to which the holder of such Claim and the Liquidating Trust shall agree, in full satisfaction and release of such Claim.

c.    Unimpairment.  The Liquidating Trust will leave the rights of the holder of such Claim unimpaired or provide for such other treatment as necessary to otherwise satisfy the requirements of the Bankruptcy Code.

**3.**    **Class 3 (CoBank Claims).**

Class 3 Claims are impaired.  From and after the Effective Date, each holder of an Allowed CoBank Claim shall be treated in accordance with, and shall be entitled to the rights and benefits provided under, the Compromise Agreement, in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed CoBank Claim.

**4.**    **Class 4 (General Unsecured Claims).**

Class 4 Claims are impaired.  On or as soon as practicable following the Effective Date, each holder of an Allowed General Unsecured Claim shall receive a Pro Rata share of the

Liquidating Trust Interests. Such distribution shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, all Allowed General Unsecured Claims held by such holder.

**5.** **Class 5 (Interests).**

Class 5 Interests are impaired. Upon the Effective Date, all existing Interests shall be deemed extinguished and the holders of such Interests shall not receive or retain any property on account of such Interests under the Plan.

## C. TREATMENT OF UNCLASSIFIED CLAIMS

Certain Claims against the Debtor are not classified for purposes of voting on, or receiving distributions under, the Plan. The treatment of unclassified Claims under the Plan is as follows:

**1.** **Administrative Claims.**

Each Allowed Administrative Claim (except for Professional Fees, which shall be treated as set forth in Section 2.4 of the Plan) shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, be paid in full in Cash by the Liquidating Trust on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; (d) such date as the holder of such Claim and the Liquidating Trust may agree; and (e) the date such Claim is otherwise due according to its terms. All requests for payment of Administrative Claims (except with respect to Professional Fees, which instead shall be subject to the Professional Fees Bar Date) must be filed by the Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the Debtor and/or from sharing in any distribution under the Plan.

**2.** **Priority Tax Claims.**

Each Allowed Priority Tax Claim shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, be paid in full in Cash by the Liquidating Trust on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by

SF:68119.0011/DOCS_SF:67390.5

Case 09-11078   Doc# 310   Filed: 11/13/09   Entered: 11/13/09 17:58:30   Page 24 of 47

the Bankruptcy Court, or as soon thereafter as practicable; (c) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; (d) such date as the holder of such Claim and the Liquidating Trust may agree; and (e) the date such Claim is otherwise due according to its terms.

### 3.    Claims for Professional Fees.

Each Professional seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Professional Fees Bar Date; and (b) if the Bankruptcy Court grants such an award, each such Person will be paid in full in Cash by the Liquidating Trust as to Allowed Professional Fees against the Debtor in such amounts as are allowed by the Bankruptcy Court as soon as practicable following the first day after such order has been entered by the Bankruptcy Court and is not stayed.  All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order.

## IV.

## IMPLEMENTATION OF THE PLAN

The Plan shall be implemented on the Effective Date.  In addition to the provisions set forth elsewhere in the Plan regarding means of execution, the following shall constitute the principal means for the implementation of the Plan.

### A.    ESTABLISHMENT AND FUNDING OF LIQUIDATING TRUST

On the Effective Date, the Debtor shall take any and all actions as may be necessary or appropriate to establish the Liquidating Trust and to transfer the Estate Assets to the Liquidating Trust, which shall thereupon constitute the Liquidating Trust Assets.  The Liquidating Trust's use of, and access to, the Liquidating Trust Cash shall be subject to the limitations on the Debtor set forth in the Compromise Agreement.  The sole beneficiaries of the Liquidating Trust shall be the holders of Allowed General Unsecured Claims in Class 4 under the Plan.  For federal income tax purposes, the beneficiaries of the Liquidating Trust shall be treated as the grantors of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Liquidating Trust and deemed to be the owners of the assets of the Liquidating Trust, and the Debtor shall treat the transfer of the Estate Assets to the Liquidating Trust as a deemed transfer to such beneficiaries followed by a deemed transfer by such beneficiaries to the Liquidating Trust.

**B.      PURPOSE OF LIQUIDATING TRUST**

The Liquidating Trust shall be established for the purpose of: (a) addressing the Claims of holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Miscellaneous Secured Claims, and Allowed CoBank Claims to the extent contemplated by the Plan; and (b) liquidating and distributing the Liquidating Trust Assets for the benefit of holders of Allowed General Unsecured Claims in Class 4 under the Plan, subject to the terms of the Liquidating Trust Agreement and the Compromise Agreement. The Liquidating Trust shall have no objective to continue or engage in the conduct of a trade or business and shall not be deemed a successor-in-interest of the Debtor or the Estate for any purpose other than as specifically set forth in the Plan. For the avoidance of doubt, the Liquidating Trust's obligations to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Miscellaneous Secured Claims, and Allowed CoBank Claims under the Plan shall be contractual in nature and limited to the express requirements set forth in the Plan. The Liquidating Trust shall owe no fiduciary duty to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Miscellaneous Secured Claims, and Allowed CoBank Claims.

**C.      LIQUIDATING TRUSTEE**

        **1.      Generally.**

The retention of the initial Liquidating Trustee and any successor shall be pursuant to the Liquidating Trust Agreement. The Liquidating Trustee shall be deemed to have been appointed as the representative of the Estate by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code for purposes of the Estate Assets, specifically including the Liquidating Trust Retained Claims and/or Defenses. On the Effective Date and subject to the oversight of the Liquidating Trust Committee, the Liquidating Trustee shall be the sole authorized

68310-001\DOCS_SF:67490v1
22
DISCLOSURE STATEMENT IN SUPPORT OF
FIRST AMENDED JOINT PLAN OF LIQUIDATION

representative and signatory of the Liquidating Trust, with authority to render any and all services necessary to effectuate the terms of the Plan. The powers, authority, responsibilities and duties of the Liquidating Trustee shall be governed by the Plan, the Confirmation Order and the Liquidating Trust Agreement. The Liquidating Trustee may execute, deliver, file or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**2.** **Responsibilities and Authority of Liquidating Trustee.**

The responsibilities and authority of the Liquidating Trustee shall include, subject to the oversight of the Liquidating Trust Committee, (a) calculating and implementing all distributions from the Liquidating Trust in accordance with the Plan; (b) investigating or pursuing any lawsuit or other legal or equitable action that constitutes a Liquidating Trust Retained Claim and/or Defense, in any court of competent jurisdiction; (c) filing all required tax returns and paying taxes and all other obligations on behalf of the Liquidating Trust from funds held by the Liquidating Trust; (d) periodic reporting to the beneficiaries of the Liquidating Trust; (e) liquidating the assets of the Liquidating Trust and providing for the distribution of the net proceeds thereof in accordance with the provisions of the Plan; (f) retaining and paying at normal and customary rates, or on a contingency fee basis, professionals in connection with the Liquidating Trustee's duties; (g) paying the reasonable expenses of the members of the Liquidating Trust Committee, in accordance with the provisions of the Plan and the Liquidating Trust Agreement; (h) reconciling and, if appropriate, objecting to Claims that may be asserted against the Debtor; and (i) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement or the Confirmation Order or as may be necessary and proper to carry out the provisions of the Plan.

**3.** **Powers of Liquidating Trustee.**

Subject to the oversight of the Liquidating Trust Committee, the powers of the Liquidating Trustee to administer the Liquidating Trust shall, without any need for approval of the Bankruptcy Court in each of the following instances, include *inter alia*, (a) the power to invest funds in, and withdraw, make distributions and pay taxes and other obligations owed by

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Liquidating Trust from funds held by the Liquidating Trustee in accordance with the Plan, the Compromise Agreement, and the Liquidating Trust Agreement, (b) the power to engage and compensate without prior Bankruptcy Court order or approval employees and professionals to assist the Liquidating Trustee with respect to his or her responsibilities, (c) the power to prosecute, compromise and settle the Liquidating Trust Retained Claims and/or Defenses on behalf of or against the Liquidating Trust, and (d) such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan. Subject to the oversight of the Liquidating Trust Committee, the Liquidating Trustee, on behalf of the Liquidating Trust, shall have absolute discretion to pursue or not to pursue any and all Liquidating Trust Retained Claims and/or Defenses, as he or she determines is in the best interests of the beneficiaries and consistent with the purposes of the Liquidating Trust, and shall have no liability for the outcome of his/her decision, other than those decisions constituting gross negligence or willful misconduct. The Liquidating Trustee may incur any reasonable and necessary expenses in liquidating and converting the assets in the Liquidating Trust to Cash.

**4.**      **Compensation of Liquidating Trustee and Professionals.**

The Liquidating Trustee shall serve on (i) the terms, conditions and rights set forth in the Plan, the Confirmation Order and the Liquidating Trust Agreement, or (ii) such terms, conditions and rights as otherwise agreed to by the Liquidating Trustee and the Liquidating Trust Committee. The compensation for the Liquidating Trustee shall be set forth in the Liquidating Trust Agreement or otherwise disclosed in a filing with the Bankruptcy Court. The Liquidating Trustee shall not be required to file a fee application to receive compensation. The Liquidating Trustee shall have the right to retain the services of attorneys, accountants, and other professionals and agents in the discretion of the Liquidating Trustee to assist and advise the Liquidating Trustee in the performance of his/her duties and compensate such professionals from the assets of the Liquidating Trust, subject to the oversight of the Liquidating Trust Committee and the terms of the Compromise Agreement. Any professionals retained by the Liquidating Trustee shall not be required to file a fee application to receive compensation.

## D. LIQUIDATING TRUST COMMITTEE

### 1. Generally.

The Liquidating Trust Committee shall be created on the Effective Date consistent with the terms of the Liquidating Trust Agreement. The Liquidating Trust Committee shall consist of no more than five (5) Persons initially selected by the Creditors' Committee.

### 2. Duties of Liquidating Trust Committee.

The Liquidating Trust Committee shall monitor the status and progress of the Liquidating Trust. The Liquidating Trust Committee shall meet and/or consult periodically with the Liquidating Trustee and keep itself apprised of the affairs of the Liquidating Trust. The Liquidating Trust Committee shall have the authority to remove the Liquidating Trustee and/or appoint a successor Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement.

### 3. Reimbursement of Expenses of Liquidating Trust Committee.

Members of the Liquidating Trust Committee shall be entitled to reimbursement of reasonable and necessary expenses incurred in carrying out their duties as members of the Liquidating Trust Committee, all of which shall be paid from the Liquidating Trust. Members of the Liquidating Trust Committee shall not be entitled to compensation for time spent on the Liquidating Trust Committee.

## E. VESTING OF ESTATE ASSETS

Upon the Effective Date, the Liquidating Trust shall be vested with all right, title and interest in the Estate Assets of the Debtor, including the Liquidating Trust Cash and Liquidating Trust Retained Claims and/or Defenses, and such property shall become the property of the Liquidating Trust free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as set forth in the Plan.

## F. LIQUIDATING TRUST RETAINED CLAIMS AND/OR DEFENSES

Unless any Liquidating Trust Retained Claim and/or Defense is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtor and the Liquidating Trust expressly reserve such

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

SF:67990.3 48110-001\DOCS_SF:67990.3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  Liquidating Trust Retained Claim and/or Defense for later adjudication by the Liquidating Trust.

2  The reservation set forth in this Section 5.6 shall include, without limitation, a reservation by the

3  Debtor and the Liquidating Trust of any Liquidating Trust Retained Claims and/or Defenses not

4  specifically identified in the Plan or Disclosure Statement, or of which the Debtor or the

5  Liquidating Trust may presently be unaware, or which may arise or exist by reason of additional

6  facts or circumstances unknown to the Debtor and/or the Liquidating Trust at this time or facts or

7  circumstances that may change or be different from those the Debtor and/or the Liquidating

8  Trust now believe to exist and, therefore, no preclusion doctrine, including, without limitation,

9  the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver,

10  estoppel (judicial, equitable or otherwise), or laches will apply to such Liquidating Trust

11  Retained Claims and/or Defenses upon or after the Confirmation of the Plan based on the

12  Disclosure Statement, the Plan or the Confirmation Order, except where such claims and/or

13  defenses have been expressly waived, relinquished, released, compromised, or settled in the Plan

14  or by Final Order.  Following the Effective Date, the Liquidating Trust may assert, compromise

15  or dispose of the Liquidating Trust Retained Claims and/or Defenses without further notice to

16  Creditors or authorization of the Bankruptcy Court.

17  **G.**       **WIND-UP AND DISSOLUTION OF THE DEBTOR**

18          On the Effective Date, the matters under the Plan involving or requiring corporate action

19  of the Debtor, including but not limited to, actions requiring a vote or other approval of the

20  officers, managers, or members of the Debtor or execution of all documentation incident to the

21  Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred

22  and be in effect from and after the Effective Date without any further action by the Bankruptcy

23  Court or the officers, managers, or members of the Debtor.  On the Effective Date, all officers

24  and managers of the Debtor shall be deemed removed from such positions and replaced with the

25  Liquidating Trustee as sole officer and representative of the Debtor.  Also upon the Effective

26  Date, the Debtor's Charter shall be deemed amended to prohibit (1) the issuance of nonvoting

27  equity securities, or (2) the existence of securities possessing an inappropriate distribution of

28  voting power, all as more specifically required and described in section 1123(a)(6) of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Bankruptcy Code.  Upon entry of a final decree or sooner in the discretion of the Liquidating

2    Trustee, the Debtor shall be deemed dissolved and wound up without any further action required

3    by the Debtor or the Debtor's officers, managers, or members.

4    **H.    DISSOLUTION OF CREDITORS' COMMITTEE**

5           On the Effective Date, the Creditors' Committee shall be dissolved and the members of

6    the Creditors' Committee shall be released and discharged from any further authority, duties,

7    responsibilities, liabilities and obligations related to, or arising from, the Chapter 11 Case, except

8    that the Creditors' Committee shall continue in existence and have standing and capacity to

9    prepare and prosecute applications for the payment of fees and reimbursement of expenses

10   incurred by the Creditors' Committee or its Professionals.

11   **I.    FINAL DECREE**

12          At any time following the Effective Date, the Liquidating Trust shall be authorized to file

13   a motion for the entry of a final decree closing the Chapter 11 Case pursuant to Section 350 of

14   the Bankruptcy Code.

15                                      **V.**

16              **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

17   **A.    REJECTION OF CONTRACTS AND LEASES**

18          Except for any executory contracts or unexpired leases of the Debtor:  (i) that previously

19   were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the

20   Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such

21   contract or lease has been filed and served prior to Confirmation; or (iii) that constitute contracts

22   of insurance in favor of, or that benefit, the Debtor or the Estate, each executory contract and

23   unexpired lease entered into by the Debtor prior to the Petition Date that has not previously

24   expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365

25   of the Bankruptcy Code as of the Effective Date.  The Confirmation Order shall constitute an

26   order of the Bankruptcy Court approving such rejection, pursuant to section 365 of the

27   Bankruptcy Code, as of the Effective Date.  For the avoidance of doubt, any insurance policy

28   acquired for the benefit of the Debtor (or any officers and directors of the Debtor) before or after

the Petition Date shall remain in full force and effect after the Effective Date according to its terms.

**B.**     **BAR DATE FOR REJECTION DAMAGES**

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtor, the Estate, or the Liquidating Trust, unless a proof of Claim is filed with the Bankruptcy Court and served on the Liquidating Trust by the Rejection Claim Bar Date.

**VI.**

**EFFECTS OF CONFIRMATION**

**A.**     **BINDING EFFECT**

The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in the Debtor, the Liquidating Trust, and the Estate Assets, including any interest accrued on such Claims from and after the Petition Date or interest which would have accrued but for the commencement of the Chapter 11 Case. The distributions made pursuant to the Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims on account of which such distributions are made. Confirmation of the Plan shall bind and govern the acts of the Debtor, the Liquidating Trust, and all holders of all Claims against, and Interests in the Debtor, whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to Section 502 of the Bankruptcy Code, or (iii) the holder of a Claim or Interest has accepted the Plan.

**B.**     **PROPERTY REVESTS FREE AND CLEAR**

Upon the Effective Date, title to all remaining Estate Assets of the Debtor shall vest in the Liquidating Trust for the purposes contemplated under the Plan and shall no longer constitute property of the Debtor or its Estate. Except as otherwise provided in the Plan or the Compromise Agreement, upon the Effective Date, all Estate Assets shall be free and clear of all Claims and Interests, including Liens, charges or other encumbrances of Creditors of the Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**C.**     **PERMANENT INJUNCTION**

*Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Persons that have held, currently hold or may hold a Claim, Interest or other debt or liability that is stayed, impaired or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions either (x) against the Debtor, the Liquidating Trust or their property on account of all or such portion of any such Claims, Interests, debts or liabilities that are stayed, impaired or terminated, or (y) against any Person with respect to any Liquidating Trust Retained Claim and/or Defense, which is waived, released or exclusively retained under the Plan: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. To avoid any doubt, nothing in the Plan or herein shall be construed or is intended to affect, enjoin, modify, release or waive any claims, rights, and actions that a third party, creditor or noteholder may have against a person other than the Debtor or the Liquidating Trust. Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Case pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date. From and after the Effective Date, except as provided in the Plan or in the Confirmation Order, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, (a) seeking to hold (i) the Debtor or the Liquidating Trust, or (ii) the property of the Debtor or the Liquidating, liable for any Claim, obligation, right, interest, debt or liability that has been addressed or released pursuant the Plan.*

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## D.   **EXONERATION AND RELIANCE**

The Debtor, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Committee, the Creditors' Committee, and each of their respective Agents, shall not be liable, other than for gross negligence or willful misconduct, to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection with the Chapter 11 Case or the negotiation, formulation, development, proposal, disclosure, Confirmation or implementation of the Plan.  The Debtor, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Committee, the Creditors' Committee, and each of their respective Agents may reasonably rely upon the opinions of their respective counsel, accountants, and other experts and professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or willful misconduct; provided however, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or willful misconduct.  For the avoidance of doubt, nothing in this provision shall be construed as an exoneration or release of any claims that relate to conduct or actions taken prior to the Petition Date.

### VII.

### **KEY PLAN PROVISIONS**

Pursuant to the Plan, the Debtor's assets (principally consisting of cash on hand and various rights of action) will be transferred to a liquidating trust for the purpose of maximizing the value of such assets, reconciling claims against the Estate, and making distributions to Creditors in accordance with the Plan.

The Plan sets forth the procedures and guidelines governing the implementation and administration of the Plan, creation of the Liquidating Trust, and the duties and obligations of the Liquidating Trustee from and after the Effective Date.  Generally speaking, the Liquidating Trustee will administer the Liquidating Trust, evaluate and (if appropriate) pursue Liquidating Trust Retained Claims and/or Defenses, review and object to Claims as appropriate, make distributions to Creditors to the extent of available funds as contemplated by the Plan, and

853 12-001\DOCS_SF:67490.9
DISCLOSURE STATEMENT IN SUPPORT OF
FIRST AMENDED JOINT PLAN OF LIQUIDATION

eventually close the Debtor's case by obtaining an order of final decree. The Liquidating Trust Committee will supervise the Liquidating Trustee and the progress of the case. The identity of the initial Liquidating Trustee, the compensation proposed to be paid to the Liquidating Trustee, and names of the members of the Liquidating Trust Committee shall be determined by the Creditors' Committee and will be identified in a filing with the Bankruptcy Court prior to the Confirmation Hearing.

Under the Plan, the Liquidating Trustee and the Liquidating Trust Committee will have considerable discretion, without need for further approval of the Bankruptcy Court or notice to Creditors, to administer the Liquidating Trust and distributions to Creditors consistent with the Plan, to retain and compensate representatives of the Liquidating Trust, and to pursue or resolve litigation claims or objections to Creditor claims.

## A.     SOURCE OF PLAN FUNDING

The Plan will be funded by the Liquidating Trust Cash, which initially will consist of Cash on hand in the Estate as of the Effective Date. The Debtor's existing Cash balance primarily consists of funds set aside under the Compromise Agreement from the proceeds of the sale to Foster Farms. The Debtor has approximately (i) $450,000 in "Unrestricted Funds" segregated for general chapter 11 purposes; (ii) $222,851 in funds set aside for purposes of satisfying certain claims entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code; (iii) $550,000 in "Plan Date Funds" for payment solely of administrative and priority claims that are required to be paid in order to confirm the Plan; and (iv) $250,000" in Litigation Funds" available solely for litigation expenses and administrative costs associated with the Liquidating Trust.

It is anticipated that the Liquidating Trustee may retain professionals on a contingency fee basis from and after the Effective Date for purposes of investigating and pursuing the Liquidating Trust Retained Claims and/or Defenses.

## B.     LIQUIDATING TRUST RETAINED CLAIMS AND/OR DEFENSES

A key component of the assets to be conveyed by the Debtor to the Liquidating Trust under the Plan are the Estate's various litigation claims and causes of action (*i.e.*, the Liquidating

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

SF:67590.2 / 40110/DOCS_SF:67590.7

31

Trust Retained Claims and/or Defenses).  The Liquidating Trust Retained Claims and/or

Defenses include, without limitation, those rights of action identified in Exhibit B to the Plan.  In

addition, the Liquidating Trust retained Claims and/or Defenses include any and all claims,

causes of action, cross-claims, counterclaims, third-party claims, indemnity claims, contribution

claims, defenses, demands, rights, actions, debts, damages, judgments, remedies, Liens,

indemnities, guarantees, suits, obligations, liabilities, accounts, offsets, recoupments, rights of

subordination or subrogation, powers, privileges, licenses, and franchises of any kind or

character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured,

suspected or unsuspected, disputed or undisputed, foreseen or unforeseen, direct or indirect,

choate or inchoate, held by the Debtor or its Estate, whether arising before, on or after the

Petition Date, including through the Effective Date, in contract or in tort, in law or in equity, or

pursuant to any other theory of law.  For the avoidance of doubt, the term "Causes of Action and

Defenses" shall include, but not be limited to: (a) all rights of setoff, counterclaim, or

recoupment and claims on contracts or for breaches of duties imposed by law or in equity; (b) the

right to object to Claims; (c) all claims pursuant to Section 362 of the Bankruptcy Code, (d) all

Avoidance Actions, including claims under Sections 506(c), 506(d), 510, 542, 543, 544, 545,

547, 548, 549, 550 and 553 of the Bankruptcy Code, and any state law fraudulent transfer claims,

whether or not such actions seek an affirmative recovery or are raised as a defense to, or offset

against, the allowance of a Claim; and (e) such claims and defenses as fraud, mistake, duress,

and usury and any other defenses set forth in Section 558 of the Bankruptcy Code.

The Proponents have begun the process of reviewing available information regarding the

Liquidating Trust Retained Claims and/or Defenses against third parties, which review has not

been completed and will be continued by the Liquidating Trustee.  The Debtor, the Creditors'

Committee and the Liquidating Trustee do not intend, and it should not be assumed, that because

any existing or potential Liquidating Trust Retained Claims and/or Defense has not yet been

pursued or may not be described herein or in the Plan, that any such Liquidating Trust Retained

Claim and/or Defense will not be pursued by the Liquidating Trustee or has been waived.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The potential net proceeds from the Liquidating Trust Retained Claims and/or Defenses identified herein or which may subsequently arise or be pursued are speculative and uncertain and therefore no value can be assigned to such recoveries. However, the Proponents believe that the Liquidating Trust Retained Claims and/or Defenses constitute substantial and valuable assets of the Estate and will form the basis for distributions to holders of Allowed General Unsecured Claims.

## C. **PRIORITY CLAIMS**

The Debtor has scheduled approximately $1,040,336 in priority claims. Certain of these claims have been paid pursuant to prior order of the Bankruptcy Court. The Debtor currently estimates that unpaid Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims will total approximately $185,000 and $365,000, respectively.

## D. **ADMINISTRATIVE CLAIMS**

The Debtor believes that all administrative expenses have either been paid or provided for in this case. With respect to the Estate professionals in this case, the following chart lists the fee applications that were previously reviewed by the Bankruptcy Court, approved on an interim basis, and paid:

| **Name** | **Role** | **Amounts Paid Pursuant to First Interim Fee Applications** |
|---|---|---|
| Sheppard Mullin Richter & Hampton LLP | Debtor's Bankruptcy Counsel | $640,032.51 through 7/17/09 (to which $186,956.75 prepetition retainer applied) |
| Burr, Pilger & Mayer LLP | Debtor's Financial Advisors | $112,014.90 through 7/17/09 (to which $75,683.00 prepetition retainer applied) |
| Duff & Phelps | Debtor's Investment Bankers | $184,199.65 in Retainer Fees and costs through 7/17/09, plus a $500,000.00 Transaction Fee paid out of the Fernbridge Closing |
| Pachulski Stang Ziehl & Jones LLP | Creditors' Committee's Bankruptcy Counsel | $115,102.68 through 6/30/09 |
| Deloitte Financial Advisory Services, LLP | Creditors' Committee's Financial Advisors | $26,412.29 through 7/15/09 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   The interim fees and expenses of the Estate professionals set forth in the chart above

2 were paid in full out of the proceeds of the Fernbridge Closing on August 27, 2009.  The

3 Transaction Fee earned by Duff & Phelps and paid on the Fernbridge Closing is anticipated to be

4 the entire amount owing to such professional.  However, further fees accrued with respect to the

5 other Estate professionals for the time period from the end of their interim application through

6 and including the Fernbridge Closing.  It was estimated that the accrued unbilled fees and

7 expenses of the other Estate professionals would be $454,000 as of the Fernbridge Closing.

8 Cash in such amount has been reserved under the Compromise Agreement in an account entitled

9 "Budgeted Expenses Account" and will be retained in that account until further order of the

10 Bankruptcy Court with respect to the fees and expenses of the Estate professionals that have

11 accrued with respect to such period.  With respect to the period from and after the Fernbridge

12 Closing to and including the Effective Date of the Plan, the Estate professionals will have to look

13 to the "Unrestricted Funds" account in the amount of $450,000 for payment of such fees as may

14 be allowed by the Bankruptcy Court.  The Estate professionals jointly expect that such fees will

15 not exceed $150,000 for such period.

16   With respect to the costs of administration other than Professional Fees and claims

17 arising under section 503(b)(9) of the Bankruptcy Code, the Debtor believes that such costs have

18 been paid in the normal course of business, or provided for in the context of the Fernbridge

19 Closing.  When the Fernbridge Closing took place, there were unpaid vendors that had amounts

20 owing to them in connection with the Debtor's operations.  Under the Compromise Agreement,

21 the Debtor was permitted to retain approximately $2,267,000 in the Budgeted Expenses Account

22 as of the Fernbridge Closing to cover such anticipated trade vendor claims.  Since the Fernbridge

23 Closing, the Debtor has been paying such bills, with oversight from CoBank.  The Debtor

24 anticipates all such administrative obligations to vendors will be paid before the Effective Date

25 of the Plan and the Debtor will have no unpaid administrative expenses as of the Effective Date,

26 aside from accrued Professional Fees and unpaid claims arising under section 503(b)(9) of the

27 Bankruptcy Code for goods delivered to the Debtor in the 20 days prior to the Petition Date.  If

28 there are excess funds remaining in the Budgeted Expenses Account after all administrative

claimants and Professionals have been provided for and after final fee applications have been

heard, such excess amounts shall be returned to CoBank and applied to reduce the secured

portion of its claim in the case.

## VIII.

## **FEASIBILITY**

The Bankruptcy Court must determine that the Plan is feasible and is not likely to be

followed by liquidation or further reorganization of the Debtor. To determine whether the Plan

meets this requirement, the Debtor has analyzed the ability of the Estate to meet the obligations

under the Plan.

Because the Plan contemplates the liquidation of the Debtor's assets without the need for

any further financial reorganization and the Proponents believe that sufficient funds will exist as

of the Effective Date to make all payments required to be made on such date, the Proponents

believe that the Plan satisfies the feasibility requirement under the Bankruptcy Code.

## IX.

## **RISK FACTORS**

Although the Proponents believe that the Plan is confirmable, there is a risk that the

Bankruptcy Court will decide not to confirm the Plan. There are also some risks associated with

the performance of the Plan. In particular, distributions to holders of Allowed General

Unsecured Claims are chiefly driven by the success of the Liquidating Trust in realizing value

from the Liquidating Trust Retained Claims and/or Defenses. Litigation is inherently speculative

and uncertain, and may require significant time and expense to pursue. The Proponents cannot

currently estimate the recoveries that will be obtained on account of the Liquidating Trust

Retained Claims and/or Defenses, but expect such recoveries to be materially significant. There

is a risk, however, that the results of pursuing the Liquidating Trust Retained Claims and/or

Defenses will not achieve the levels currently anticipated. Hence, there is a possibility that no

recoveries will be realized by holders of Allowed General Unsecured Claims under the Plan.

Additionally, because uncertainty exists with respect to the allowance of Claims, there

may be significant delay before any distribution is made on account of Allowed Claims and it is

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  possible that the pool of Allowed Claims is ultimately determined to be substantially higher than

2  anticipated herein, which could further dilute recoveries by holders of Allowed General

3  Unsecured Claims.  The Proponents currently anticipate that the aggregate amount of Allowed

4  General Unsecured Claims will total in the range of $15,000,000 to $30,000,000.  The reason for

5  this broad range is that the Creditors' Committee believes that Allowed General Unsecured

6  Claims should exclude Insider Claims, which would have the effect of reducing the claims pool

7  by approximately $14,000,000.

8       However, the Proponents believe each of the foregoing risks are equally present in, and

9  significantly greater to Creditors in, the context of a case under chapter 7 of the Bankruptcy

10  Code.  Accordingly, the Proponents urge Creditors to support the Plan.

11  **X.**

12  **CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

13       The tax consequences of the Plan will vary based on the individual circumstances of each

14  holder of a Claim or Interest.  Accordingly, each Creditor and Interest holder is strongly urged to

15  consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of

16  the Plan.

17       The following discussion is a summary of certain U.S. federal income tax consequences of

18  the Plan to the Debtor and to holders of Claims and Interests.  This discussion is based on the

19  Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial

20  decisions and published administrative rules and pronouncements of the Internal Revenue Service

21  ("IRS") as in effect on the date hereof.  Due to the complexity of certain aspects of the Plan, the

22  lack of applicable legal precedent, the possibility of changes in the law, the differences in the

23  nature of the Claims (including Claims within the same Class) and Interests, the holder's status and

24  method of accounting (including holders within the same Class) and the potential for disputes as to

25  legal and factual matters with the IRS, the tax consequences described herein are subject to

26  significant uncertainties.  No legal opinions have been requested from counsel with respect to any

27  of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with

28  respect to the any of the issues discussed below.  Further, legislative, judicial or administrative

Case: 09-11078   Doc# 310   Filed: 11/13/09   Entered: 11/13/09 17:58:30   Page 40 of
47

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  changes may occur, perhaps with retroactive effect, which could affect the accuracy of the

2  statements and conclusions set forth below as well as the tax consequences to the Debtor and the

3  holders of Claims and Interests.

4       This discussion does not purport to address all aspects of U.S. federal income taxation that

5  may be relevant to the Debtor or the holders of Claims or Interests in light of their personal

6  circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to

7  special treatment under the U.S. federal income tax laws (including, for example, banks,

8  governmental authorities or agencies, pass-through entities, brokers and dealers in securities,

9  insurance companies, financial institutions, tax-exempt organizations, small business investment

10  companies, regulated investment companies and foreign taxpayers).  This discussion does not

11  address the tax consequences to holders of Claims who did not acquire such Claims at the issue

12  price on original issue.  No aspect of foreign, state, local or estate and gift taxation is addressed.

13       THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX

14  PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH

15  HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS

16  URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S.

17  FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE

18  UNDER THE PLAN.

19  **A.**     **TAX CONSEQUENCES TO THE DEBTOR**

20       For U.S. federal income tax law purposes, an entity can be organized as a corporation, a

21  partnership, or a hybrid entity (otherwise known as S corporations and limited liability

22  companies).  The two primary differences between corporations and partnerships are how the

23  entity's earnings are taxed and whether or not the shareholder/owners are shielded from the

24  liabilities of the entity.  Generally, corporations are treated as independent tax-paying entities,

25  unaffected by the personal characteristics of their shareholders or changes in their composition as

26  a result of transfers of stock from old shareholders to new ones, giving rise to the potential for

27  double taxation.  Because corporations are treated independently, corporate income is taxed to a

28  corporation as it is received or accrued, and is taxed at the shareholder level when and if the

37

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  corporation distributes earnings to the shareholders or they sell their stock. Partnerships,

2  however, are not entities subject to income tax. Instead, the partners are taxed directly on

3  partnership income whether or not it is actually distributed to them.

4  Hybrid entities, on the other hand, combine the two primary differences between

5  corporations and partnerships. As to S corporations, shareholders are shielded from entity level

6  liability similar to that of a corporation; however, generally, the earnings of the entity are taxed

7  at the ownership level similar to that of a partnership. As to limited liability companies

8  ("LLCs"), member-owners are shielded from entity level liability similar to that of a corporation;

9  however, unique to the LLC, an option exists to be taxed as a corporation or taxed as a

10  partnership, provided that the LLC has at least two member-owners, as set forth under Treasury

11  Regulations Section 301.7701-3.

12  For U.S. federal income tax purposes, an LLC with multiple member-owners can be

13  treated as either a partnership or a corporation, including an S Corporation. An LLC must have

14  two or more members in order for the entity to be classified as a "partnership". Absent an

15  election to be taxed as a corporation, the Service will generally classify a multi-member LLC as

16  a partnership for federal tax purposes. An LLC wholly-owned by a single member may also

17  elect to be classified and taxed as a corporation.

18  Generally, pass-through entities, partnerships, LLCs (taxed as a partnership), or S

19  corporations are subject to a single layer of tax on their earnings at the ownership level (partner,

20  member, or shareholder depending on entity type). Taxable income of pass-through entities is

21  computed at the entity level (generally each type of entity will file a tax return showing no tax

22  liability at the entity level); however, each owner is taxed separately on his, her, or its

23  distributive share of income, gain, loss, deduction, and/or credit, as applicable. The character of

24  the items included in taxable income is determined at the entity level with no regard to the

25  owners' individual characteristics. With respect to tax attributes, pass-through entities are

26  generally not allowed to maintain certain tax attributes, such as net operating losses, given such

27  entities are not directly taxable. These tax attributes pass-through to the owners, and usage,

28  carryback, or carryforward of these attributes is determined at the ownership level.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Debtor is organized as a pass-through LLC that is subject to a single tax on its earnings at the ownership level. Hence, the Plan should not result in entity level federal income tax liability on the Debtor.

**B.      TAX CONSEQUENCES TO HOLDERS OF INTERESTS**

As noted above, for U.S. federal income tax law purposes, taxable income of pass-through entities is computed at the entity level; however, each owner is taxed separately on his, her, or its distributive share of income, gain, loss, deduction, and/or credit, as applicable. This distributive share is determined in accordance with the LLC operating agreement or other agreements created in setting up such an entity and the governing Treasury Regulations provided for under Section 704(b) of the Internal Revenue Code ("I.R.C.") such that the net earnings of the Debtor are distributed consistently and in accordance therewith.

In general, for U.S. federal income tax purposes, items of income, gain, loss, deductions, and credits are passed through to the owners of certain pass-through entities such as LLCs; in effect, a single layer of tax is assessed and determined at the ownership level. As noted above, the character of the items included in taxable income is determined at the entity level with no regard to the owners' individual characteristics. Therefore, the holder of Interests in the Debtor will need to work closely with their individual tax advisors to determine the appropriate treatment of such partnership items and other partner-to-partnership transactions not considered under the Plan including, but not limited to, the effect of such items to their individual tax liability, reporting on their personal tax returns, and the basis of their interests in the entity.

EACH HOLDER OF AN INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

**C.      TAX CONSEQUENCES TO CREDITORS**

The U.S. federal income tax consequences of the distributions contemplated by the Plan to the holders of Claims that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation or partnership created or organized

58310-001\DOCS_SF:67490.7
DISCLOSURE STATEMENT IN SUPPORT OF
FIRST AMENDED JOINT PLAN OF LIQUIDATION
39

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" shall mean a Holder of a Claim that is a United States Person.

The U.S. federal income tax consequences to Holders and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for U.S. federal income tax purposes. Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary of U.S. federal income tax consequences. There also may be state, local, and/or foreign income or other tax considerations or U.S. federal estate and gift tax considerations applicable to Holders of Claims, which are not addressed herein.

A holder of a Claim that is not a United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the

United States to which income, gain or loss from the exchange is "effective connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

EACH HOLDER OF A CLAIM AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

**D.**     **IMPORTANCE OF OBTAINING PROFESSIONAL TAX ADVICE**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**XI.**

**LIQUIDATION ANALYSIS**

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Proponents must demonstrate, and the Bankruptcy Court must determine that, with respect to such Class, each holder of a Claim or Interest will receive property of a value, that is not less than the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is commonly referred to as the "Best Interests Test."  The Proponents submit that the Plan satisfies the Best Interests Test.

The Plan provides greater recovery to the holders of Allowed Claims than such holders would receive in a liquidation under chapter 7 primarily because the Plan provides additional cash proceeds for the payment of administrative and priority claims that would otherwise come ahead of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

SF:67498.7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

holders of general unsecured claims. Under the Compromise Agreement with CoBank, the sum of $550,000 in "Plan Date Funds" has been set aside specifically for the payment of anticipated administrative and priority claims that must be satisfied in order to confirm a plan. However, if no plan is confirmed and the case is converted to chapter 7 of the Bankruptcy Code, the Compromise Agreement provides that the Plan Date Funds are to be disbursed to CoBank and therefore would provide no direct benefit to the Estate or other Creditor constituents. It is only through the Plan that administrative and priority claims can be paid out of the Plan Date Funds and such payment will allow the holders of Allowed General Unsecured Claims to realize a recovery that much quicker than they otherwise would in the context of a chapter 7 case.

The Plan also avoids a layer of administrative expense and delay associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtor's assets for the benefit of Creditors. In a chapter 7 case, the chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtor has already accumulated certain funds and incurred certain expenses associated with generating such funds. Accordingly, the Proponents believe that there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtor, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including possibly the funds handed over to the chapter 7 trustee by the Debtor.

It is also anticipated that a chapter 7 liquidation would result in delay in distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the chapter 11 case.

In sum, the Plan proposed by the Proponents presents a better alternative to creditors than a chapter 7 liquidation because the Plan will allow Creditors to realize more value from the Debtor's assets and to do so more efficiently than a chapter 7 trustee. **The Plan therefore has the support of all major constituencies in this case, including the Debtor, the Creditors' Committee, and CoBank.**

683142v01\DOCS_SF:67490.9   42   DISCLOSURE STATEMENT IN SUPPORT OF
FIRST AMENDED JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# XII.

## CONCLUSION

The Proponents believe that the Plan is in the best interests of Creditors and urge you to vote to accept the Plan.

Dated:    November 13, 2009                HUMBOLDT CREAMERY, LLC

                                          By:    _/s/ Len Mayer_
                                                 Len Mayer
                                                 Chief Executive Officer

Respectfully submitted by,

SHEPPARD, MULLIN, RICHTER &
    HAMPTON LLP

By:    _/s/ Michael H. Ahrens_
       Michael H. Ahrens
       Attorneys for Debtor and Debtor in Possession

Dated:    November 13, 2009                OFFICIAL COMMITTEE OF UNSECURED
                                          CREDITORS

                                          By:    _/s/ Ray Gutierrez_
                                                 Ray Gutierrez
                                                 Chairman

Respectfully submitted by,

PACHULSKI STANG ZIEHL
    & JONES LLP

By:    _/s/ Maxim B. Litvak_
       John D. Fiero
       Maxim B. Litvak
       Attorneys for Debtor and Debtor in Possession