SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
MICHAEL H. AHRENS, Cal. Bar No. 44766
STEVEN SACKS, Cal. Bar No. 98875
ORI KATZ, Cal. Bar No. 209561
MICHAEL M. LAUTER, Cal. Bar No. 246048
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:     415-434-9100
Facsimile:     415-434-3947

Bankruptcy Reorganization Counsel for Debtor
Humboldt Creamery, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

| | |
|---|---|
| In re: | Case No. 09-11078 |
| HUMBOLDT CREAMERY, LLC, a Delaware limited liability company, | Chapter 11 |
| Debtor. | **SECOND INTERIM AND FINAL APPLICATION OF SHEPPARD, MULLIN, RICHTER & HAMPTON LLP FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED AS BANKRUPTCY REORGANIZATION COUNSEL FOR THE DEBTOR** |
| Tax ID: 87-0736033 | |
| | Date:        February 26, 2010 |
| | Time:        10:30 a.m. |
| | Place:       99 South E. Street |
| |               Santa Rosa, CA 95404 |
| | Judge:      Hon. Alan Jaroslovsky |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF SERVICES ................................................... 1

II.   RELIEF REQUESTED AND BASIS FOR RELIEF ................................................... 5

III.  GENERAL BACKGROUND ................................................................................... 6

    A.    Background of the Debtor ........................................................................ 6

    B.    Events Leading to Bankruptcy ................................................................ 8

IV.   BANKRUPTCY CASE SUMMARY AND STATUS ............................................... 8

    A.    The Debtor's Bankruptcy Filing and First-Day Motions ........................ 8

    B.    The Debtor's Operations ......................................................................... 9

    C.    The Sale of the Debtor's Assets .............................................................. 9

    D.    Compromise Agreement ........................................................................ 10

        (i)    $550,000 in a Plan Date Funding Account to be used for payment of administrative and priority claims; ......................................... 10

        (ii)   $222,851 in a 503(b)(9) Account to be used to pay 503(b)(9) claims; ....... 10

        (iii)  $450,000 in an Unrestricted Funds Checking Account which can be used for any purpose; ............................................................. 10

        (iv)   $250,000 in a Litigation Funding Account to be used to pay litigation expenses and administrative costs associated with the Liquidating Trust; and ......................................................... 10

        (v)    over $2 million in a Budgeted Expenses Account to pay expenses that were approved in the Budget under the DIP Loan Agreement but unpaid as of the closing of the sale to Foster Farms. ............ 10

    E.    Plan Confirmation and Appointment of Liquidating Trustee as Estate Representative .......................................................................................... 11

V.    RETENTION AND PRIOR COMPENSATION ................................................... 11

VI.   EXHIBITS TO APPLICATION ........................................................................... 11

VII.  SUMMARY OF PROFESSIONAL SERVICES RENDERED ........................... 12

| | | | |
|---|---|---|---|
| VIII. | | SUMMARY BY PROJECT BILLING CODES | 13 |
| | A. | Maintenance of Records | 13 |
| | B. | Use of Project Billing Categories | 13 |
| | | 1. Employee Matters | 13 |
| | | 2. Insurance Issues | 14 |
| | | 3. Case Administration. | 14 |
| | | 4. Operations. | 14 |
| | | 5. Utilities Issues. | 15 |
| | | 6. Case Administration – General. | 15 |
| | | 7. Committee Matters/Communications. | 15 |
| | | 8. Creditor Inquiries. | 16 |
| | | 9. Operating Reports. | 16 |
| | | 10. Schedules/Statement of Financial Affairs. | 16 |
| | | 11. Service Lists. | 16 |
| | | 12. US Trustee Compliance/341 Meeting/Debtor Interview | 17 |
| | | 13. US Trustee Fees. | 17 |
| | | 14. Claims - Priority. | 17 |
| | | 15. Claims – Secured. | 18 |
| | | 16. Claims – Unsecured. | 18 |
| | | 17. Claims Administration/Objections. | 19 |
| | | 18. Cash Collateral. | 19 |
| | | 19. DIP Financing. | 19 |
| | | 20. Financing – General. | 19 |
| | | 21. Disclosure Statement. | 19 |
| | | 22. Plan Implementation. | 20 |
| | | 23. Plan of Reorganization. | 20 |
| | | 24. Bankruptcy Court Litigation. | 21 |
| | | 25. Deposition. | 21 |
| | | 26. Federal Court Litigation. | 21 |

| | | | |
|---|---|---|---|
| | 27. | Other Litigation. | 21 |
| | 28. | Preference Analysis. | 22 |
| | 29. | Relief From Stay Litigation | 22 |
| | 30. | State Court Litigation. | 22 |
| | 31. | Professionals' Compensation (Other than Sheppard). | 23 |
| | 32. | Professionals' Employment (Other than Sheppard). | 23 |
| | 33. | Sheppard Compensation. | 23 |
| | 34. | Sheppard Employment. | 23 |
| | 35. | Asset Disposition | 23 |
| | 36. | Executory Contract – Analysis. | 26 |
| IX. | COMPENSATION FOR SERVICES OF LEGAL ASSISTANTS | | 26 |
| X. | SUMMARY OF SHEPPARD'S EXPENSES | | 26 |
| XI. | COMPLIANCE WITH GUIDELINES | | 27 |
| XII. | CONCLUSION | | 28 |

iii

W02-WEST:5MML1\402462627.2

FINAL FEE APPLICATION

# I.

## INTRODUCTION AND SUMMARY OF SERVICES

This is the second interim and final application (the "Application") for allowance of compensation and reimbursement of expenses of Sheppard, Mullin, Richter & Hampton LLP ("Sheppard") as bankruptcy reorganization counsel for Humboldt Creamery, LLC, the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case").

Sheppard seeks interim and final approval of compensation for professional legal services rendered and reimbursement of expenses incurred from July 18, 2009 through December 22, 2009 (the "Second Application Period") totaling $571,821.81. This amount consists of professional fees of $544,150.00[1] and reimbursement of expenses of $27,671.81.

Sheppard previously applied for approval of compensation for professional legal services rendered and reimbursement of expenses incurred in its First Interim Application filed on July 31, 2009 [Dckt #183]. In its order dated August 21, 2009 [Dckt #229] (the "First Application Order"), this Court approved the $640,032.51 in compensation requested in the First Interim Application, covering the period from April 21, 2009 through July 17, 2009 (the "First Application Period"). This amount consisted of professional fees of $621,106.00 and reimbursement of expenses of $18,926.51. A copy of the First Application Order is attached as Exhibit A. All of the above approved fees and expenses have been paid to Sheppard pursuant to orders of this Court. By this Application, Sheppard also seeks final approval of the above amounts approved on an interim basis in the First Application Order.

A separate notice (the "Notice") regarding this Application, as well as the final fee applications filed by certain other professionals in this Bankruptcy Case, is being filed by Committee counsel. The Notice provides details regarding the hearing before this Court with

---

[1] The professional fees sought include an estimated $12,000 to prepare this Application, representing approximately 2.0% of the amount sought in this Application. Also included is an estimated $4,000 to prepare the final fee applications of the Debtor's investment bankers, Duff & Phelps, and the Debtor's financial advisors, Burr Pilger & Mayer, making for an estimated $16,000 total for the preparation of fee applications that has been added to the amounts invoiced on Exhibit C.

respect to this Application as well as the deadline and procedures for filing and serving any objections to the relief sought in this Application. All parties are encouraged to carefully read the Notice.

Sheppard's request for relief is based on this Application, the Notice, the declaration of Michael H. Ahrens filed in support of the Application, and all related documents and pleadings previously filed, or that may be filed, prior to the hearing on this Application.

Sheppard's efforts on behalf of the Debtor have led to excellent results in a very short period of time. At the time this case was filed there was a real possibility that the Debtor's operations would come a grinding halt and the Debtor would be forced to liquidate. Under such a scenario, the Debtor calculates that unsecured creditors would have received very little, if anything, on account of their claims and the recovery for the secured creditors would have been drastically reduced. Sheppard, in cooperation with the Debtor, has worked very hard to avoid that scenario and has accomplished the following significant results for the estate and creditors in the Second Application Period:

Sheppard obtained this Court's approval of the sale of the Debtor's primary assets to Foster Dairy Farms ("Foster Farms") for a purchase price of approximately $19,250,000. This approval, given by an order dated August 14, 2009 [Dckt #211] was achieved in spite of multiple objections to the sale, and was the result of intense and detailed negotiations with CoBank, the secured creditor, the Official Committee of Unsecured Creditors (the "Committee"), objecting noteholders, the California Department of Food and Agriculture, and other parties in interest. Sheppard worked with the Debtor and its investment banker, Duff & Phelps Securities, LLC ("Duff & Phelps"), and the Debtor's financial advisor, Burr, Pilger & Mayer, LLP ("Burr Pilger"), in connection with the sale, which included the assignment of significant contracts and leases to Foster Farms, and Foster Farms' assumption of liabilities arising after the date of the closing that otherwise would have constituted considerable claims against the estate. Sheppard's work in gaining approval of the sale included not only bankruptcy issues, but also real estate, labor and employment, and environmental issues which Sheppard's attorneys in those fields were able to resolve. Sheppard's efforts included, among other things: (i) working with the Debtor and Duff & Phelps to evaluate

overbids and negotiate an amendment to Foster Farms' stalking horse bid when it almost fell through after the departure of a key customer of the Debtor; (ii) negotiating with Foster Farms for the assumption of as many contracts as possible to benefit the estate; (iii) negotiating with CoBank, the Committee and objecting parties to resolve issues related to the sale, including by holding weekly conference calls with said parties; (iv) resolving issues with a key dairy lease by amending the same; (v) preparing and negotiating the asset purchase agreement and other deal documents; (vi) managing the closing of the sale and negotiating with taxing authorities and lienholders regarding the amounts to be paid out of the sale to such entities and the form of order approving the sale; (vii) analyzing and resolving employment-related issues that arose in connection with the sale; (viii) maintaining a virtual due diligence room for interested bidders; and (ix) coordinating and negotiating with the Debtor, CoBank and Foster Farms regarding the working capital adjustment to the purchase price post-closing. It is important to note that Sheppard also worked with the Debtor's professionals to market the Debtor's other assets in Los Angeles and Loleta for sale, including by drafting and negotiating separate asset purchase agreements for those facilities and holding an auction in Sheppard's offices for those facilities. While CoBank did not consent to the sale of the Los Angeles facility to the winning bidder at that auction, CoBank did ultimately sell the property to the bidder produced by Sheppard's auction after having a receiver appointed over the property pursuant to the Compromise discussed below. In the end, by obtaining Court approval of the sale, Sheppard was able to obtain a fair price for the Debtor's assets that would benefit the Debtor's creditors through the Compromise, and also save most of the jobs of the employees at the Debtor's main facility in Fernbridge, which were assumed by Foster Farms.

In connection with obtaining Court approval of the sale to Foster Farms, Sheppard also negotiated and obtained Court approval of a compromise among the Debtor, the Committee and CoBank, as Agent (the "Compromise"). The Compromise was initially memorialized in a term sheet signed by the Debtor, the Committee and CoBank at the hearing on the Sale Motion on August 12, 2009, and was later formalized in an agreement. The Compromise both enabled the Debtor to obtain Court approval of the sale, and also provided for the confirmation of a chapter 11

plan.  CoBank had alleged a secured claim exceeding $54 million (substantially in excess of the purchase price paid by Foster Farms), as well as a security interest in substantially all of the assets of the Debtor, including all of the assets being sold to Foster Farms.  Obtaining CoBank's consent to the sale was thus important, but at the same time, the Debtor and the Committee needed to reserve some proceeds of the sale for the estate so as to provide for the confirmation of a chapter 11 plan.  Delicate and intensive negotiations between CoBank, the Committee and the Debtor, which had been ongoing throughout the progress of the case, intensified as the hearing on the Sale Motion neared.  These negotiations, which included in person meetings at Sheppard's offices, continued at the hearing on the Sale Motion, where the term sheet was finalized and signed by the parties.  The Compromise reflected in the term sheet and later memorialized in a compromise agreement included $550,000 in Plan Date Funds to be used for payment of administrative and priority claims in connection with a plan, $450,000 in Unrestricted Funds to be used by the estate, $222,851 in 503(b)(9) Funds to be used to pay 503(b)(9) claims not cured in the sale to Foster Farms, $250,000 in Litigation Funds to fund litigation on behalf of the estate, and over $2 million set aside in a Remaining Budgeted Expenses Account which would pay expenses approved by CoBank in connection with the DIP Loan Agreement and unpaid at the time of the closing of the sale to Foster Farms.  Sheppard on behalf of the Debtor then sought and obtained Court approval of the Compromise after a hearing held on shortened time.  Approval was obtained despite objections by certain note holders and by the California Department of Food and Agriculture (the "CDFA").  Sheppard negotiated with the objecting parties on certain points, and the objections were overruled.

Sheppard also worked closely with the Debtor and the Committee to formulate a plan of liquidation (the "Plan") and accompanying disclosure statement (the "Disclosure Statement"), which was jointly filed by the Debtor and the Committee.  The Disclosure Statement was approved at a hearing held on November 13, 2009, over the objection of certain note holders and with certain modifications.  Amended versions of the Disclosure Statement and Plan were then filed, and the Plan was confirmed after a hearing held on December 18, 2009.

In connection with the Plan confirmation process, Sheppard expended considerable effort

working with the Debtor to review and analyze priority and administrative claims so that the Plan would be feasible. As noted above, the Compromise set aside a finite amount of funds from the sale to Foster Farms with which to address these claims. As to priority claims, the total aggregate amount of such claims asserted was $4,270,210.62, which greatly exceeded the $550,000 in Plan Date Funds set aside in the Compromise to address such claims. The two largest priority claimants were the Western Conference of Teamsters Pension Trust Fund (the "Teamsters"), which asserted multiple Priority Claims in the aggregate amount of $1,970,449.22, and the CDFA, which asserted multiple Priority Claims in the aggregate amount of $1,213,478.35. Sheppard negotiated stipulations with the Teamsters and the CDFA which reduced the Teamsters' priority claims to $215,550.27 in the aggregate and CDFA's priority claims to $60,000 in the aggregate, with a potential for another $40,000 at a later date if funds were available. Sheppard then sought and obtained Court approval for said stipulations. Sheppard also filed a series of objections to other priority claims, which were granted by the Court. As a result of the foregoing, Sheppard was able to reduce the priority claims from $4,270,210.62 to approximately $470,984.07. Similarly, Sheppard and the Debtor reviewed the administrative claims, including 503(b)(9) claims, and filed objections and reached stipulations where appropriate, such that the Debtor estimated that said administrative claims (excluding fee claims of professionals) were reduced from approximately $688,684.62 to approximately $508,422.37. By drastically reducing the priority and administrative claims by approximately $4 million, Sheppard provided for the confirmation and feasibility of the Plan, which became effective on December 22, 2009.

## II.

## RELIEF REQUESTED AND BASIS FOR RELIEF

Sheppard seeks an order from the Court granting interim and final approval of compensation for professional legal services rendered and reimbursement of expenses incurred during the Second Application Period totaling $571,821.81, consisting of professional fees of $544,150.00 and reimbursement of expenses of $27,671.81.

FINAL FEE APPLICATION

Sheppard also seeks final approval of the $640,032.51 in compensation from the First Application Period previously approved on an interim basis in the First Application Order, which consisted of professional fees of $621,106.00 and reimbursement of expenses of $18,926.51.

As previously disclosed in filings with the Court, at the outset of the case, Sheppard held a retainer (the "Retainer") from the Debtor in the amount of $186,956.75. In the First Application Order, this Court granted Sheppard approval to apply the Retainer to the amounts approved in said Order. Sheppard has thus applied the entire amount of the Retainer and currently holds no Retainer from the Debtor.

Sheppard estimates that it has incurred approximately $12,000.00 in fees preparing the Application (including an estimated three hours of time for Michael Ahrens to attend the hearing on this Application), representing approximately 2.0% of the amount sought in the Application. This amount is included in the fees sought to be approved in this Application, as is an estimated $4,000.00 in fees Sheppard estimates that it has incurred preparing the final fee applications of the Debtor's investment banker, Duff & Phelps, and the Debtor's financial advisor, Burr Pilger & Mayer.

This Application is made pursuant to the provisions of Bankruptcy Rule 2016 and Section 330 of title 11 of the United States Code (the "Bankruptcy Code"). Except as otherwise noted in the pages that follow, the Application conforms with the guidelines (the "Northern District Guidelines") for compensation and expense reimbursement for professional and trustees authorized under Bankruptcy Local Rule 9029-1 and the United States Trustee's guidelines (the "Trustee's Guidelines") for the compensation of professional persons. The Northern District Guidelines and the Trustee's Guidelines are referred to together in this Application as the "Guidelines."

In support of the Application, Sheppard respectfully represents as follows:

**III.**

**GENERAL BACKGROUND**

A.    Background of the Debtor

A general background discussion regarding the Debtor is contained below. This discussion

FINAL FEE APPLICATION

is based on, but does not reproduce in full, the background discussion contained in the Debtor's previously filed motions in this case.

Prior to the sale to Foster Farms, the Debtor processed, distributed and marketed a wide array of dairy products, including powdered milk, fluid milk, packaged ice cream and various frozen novelty products. The Debtor had contracts with major grocery retailers, big box stores and major food processing companies in the United States and abroad. Many of these business functions were sold to and assumed by Foster Farms, such that the Debtor's business has largely survived this bankruptcy case. The Debtor's business was and is a grassroots, homegrown affair that has been an integral part of the dairy business in Northern California since 1929. In January of that year, 153 dairy farmers banded together and formed the Humboldt Creamery Association (the "Association"), a nonprofit agricultural cooperative whose purpose was to remedy the inequality in bargaining power existing between the individual dairy farmers in the area and their larger, institutional customers. On December 3, 2004, the limited liability company comprising the Debtor was formed as part of a corporate restructuring that enabled the expansion of the Association's creamery operations. As part of that restructuring, the Association contributed essentially all of its assets (except for its contracts with its farmer-members) to the Debtor in exchange for 75% of the Common Units of membership in the Debtor. The Association's sole function became to supply the Debtor with raw milk pursuant to an output contract between the Debtor and the Association. The other 25% of the Common Units of membership in the Debtor were held by Dairy Farmers of America ("DFA"). The Debtor's business is described in greater detail in the *Declaration of Len Mayer in Support of First Day Motions* filed on April 21, 2009 (the "Petition Date") as Docket #9 (the "First Day Declaration").

The Debtor's pre-petition secured debt obligations arose from a borrowing arrangement with the CoBank, ACB, and certain pre-petition lenders (collectively, the "Bank") under a Loan Agreement dated January 3, 2005. The Debtor's obligations under the pre-petition loan agreement were secured by mortgages encumbering all of its real property in Humboldt, San Joaquin and Los Angeles Counties, as well as security agreements encumbering all of the Debtor's inventory, accounts receivable, equipment and certain other personal property.

FINAL FEE APPLICATION

B.       Events Leading to Bankruptcy

As set forth in greater detail in the First Day Declaration, the Debtor's bankruptcy filing was necessitated by the discovery that its financial condition was much different than what had been represented in the financial statements issued by the Debtor under the management of its former Chief Executive Officer, Richard Ghilarducci.  On February 20, 2009, Mr. Ghilarducci abruptly resigned, warning the Debtor of potential financial inaccuracies.

Immediately upon Mr. Ghilarducci's resignation, the Debtor suspended the sale of membership units and took active steps to uncover the nature and extent of the potential fraud, working closely with the U.S. Department of Justice and also commissioning its own investigation into the matter.  The Debtor also hired an accounting firm to aid the Debtor in undertaking a thorough review of its balance sheet and other financial data.  As the Debtor's financial picture cleared, it became evident that significant restructuring was needed.  The Debtor took significant steps toward that goal prior to bankruptcy, including a reduction in overhead by one-third and strategic workforce reductions at its various facilities.  However, the Debtor concluded that the protections of the Bankruptcy Code would be required to accomplish the further restructuring that was needed.

**IV.**

**BANKRUPTCY CASE SUMMARY AND STATUS**

A.       The Debtor's Bankruptcy Filing and First-Day Motions

The Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 21, 2009, commencing the chapter 11 case.  The Debtor then filed certain pleadings requesting relief from the Bankruptcy Court on an emergency basis.  Among the most important were emergency motions to obtain post-petition financing and to permit the Debtor's use of cash collateral.  The Debtor found that it was unable to secure such additional financing outside of bankruptcy, and concluded that it needed the ability to grant a superpriority lien under Bankruptcy Code Section 364 in order to do so.  This Court granted interim and then final orders authorizing the Debtor to obtain debtor-in-possession financing from the Bank and use the Bank's cash collateral.  The Debtor also filed an emergency motion for an order authorizing the Debtor's

1 | continued use of the Debtor's existing bank accounts, which was approved.

2 | B.    The Debtor's Operations

3 |   With the financing approved by this Court, the Debtor continued its business operations

4 | following the Petition Date while it marketed its assets for sale under Bankruptcy Code section

5 | 363.  Prior to and during bankruptcy, the Debtor underwent a large operational restructuring with

6 | the goal of reducing expenses, increasing efficiency, and enhancing its overall financial health.

7 | Among other things, the Debtor: (i) drastically reduced overhead by eliminating approximately

8 | one-third of its general and administrative expenses; (ii) conducted strategic workforce reductions

9 | at all levels in order to reduce payroll expenses; and (iii) aggressively marketed the Sale of its

10 | properties, business and facilities.  The budget approved in connection with the DIP Loan

11 | Agreement also provided for the payment of administrative expenses as they accrue.  The Debtor

12 | paid quarterly fees to the United States Trustee and the monthly operating reports have been filed,

13 | with the exception of the operating report covering the period from December 1st through 22nd,

14 | prior to the Plan becoming effective.

15 | C.    The Sale of the Debtor's Assets

16 |   As noted above, the Debtor received Court approval for the sale of the Debtor's primary

17 | assets under Bankruptcy Code section 363 to Foster Farms for approximately $19.25 million after

18 | a two-day sale hearing held on August 12 and 13, 2009.  This sale was the result of months of

19 | aggressive marketing by the Debtor and its professionals, including Sheppard and its investment

20 | banker Duff & Phelps.  The Debtor chose to pursue a 363 sale pursuant to an open bid auction

21 | process after discussions with CoBank and the Committee.  Foster Farms, the eventual winning

22 | bidder, was chosen as the stalking horse bidder after Sheppard worked with the Debtor to give

23 | access to due diligence material regarding the Debtor's business to several interested parties and

24 | reviewed eleven bids of interest for the purchase of the assets.  Then, after obtaining approval of

25 | the bidding procedures formulated by Sheppard and the Debtor despite objections to said

26 | procedures, Foster Farms was selected as the prevailing bidder.  Sheppard's bankruptcy and real

27 | estate attorneys then worked tirelessly with the Debtor and Foster Farms to close the sale of the

28 | Debtor's primary business assets, or creamery assets, to Foster Farms on August 27, 2009.

W02-WEST:5MML1\402402621.2

FINAL FEE APPLICATION

D.    <u>Compromise Agreement</u>

In connection with obtaining Court approval of the sale to Foster Farms, Sheppard also negotiated and obtained Court approval of the Compromise among the Debtor, the Committee and CoBank that paved the way for confirmation of the Plan.  The Compromise both obtained CoBank's consent to the sale to Foster Farms, enabling the sale to be approved by this Court, and also set aside funds from the proceeds of the Sale for use by the estate in connection with plan confirmation.  It was necessary to set such funds aside as CoBank had a security interest in substantially all of the Debtor's assets security an obligation exceeding $54 million, much greater than the $19.25 million purchase price obtained in the sale with Foster Farms.  Specifically, the Compromise Agreement set aside:

> (i)    $550,000 in a Plan Date Funding Account to be used for payment of administrative and priority claims;
>
> (ii)   $222,851 in a 503(b)(9) Account to be used to pay 503(b)(9) claims;
>
> (iii)  $450,000 in an Unrestricted Funds Checking Account which can be used for any purpose;
>
> (iv)   $250,000 in a Litigation Funding Account to be used to pay litigation expenses and administrative costs associated with the Liquidating Trust; and
>
> (v)    over $2 million in a Budgeted Expenses Account to pay expenses that were approved in the Budget under the DIP Loan Agreement but unpaid as of the closing of the sale to Foster Farms.

As noted above, the Compromise was the result of delicate and intensive negotiations between CoBank, the Committee and the Debtor, which had been ongoing throughout the progress of the case, and which intensified as the hearing on the Sale Motion neared.  The Compromise was agreed to at the Sale Hearing on August 12, 2009.  Sheppard then sought and obtained Court approval of the Compromise after a hearing held on shortened time, and over objections by certain note holders and the CDFA.  This Court approved the Compromise by an order entered August 27, 2009.

Case: 09-11078    Doc#: 428    Filed: 01/29/10    Entered: 01/29/10 10:25:39    Page 14 of 33

E.     <u>Plan Confirmation and Appointment of Liquidating Trustee as Estate Representative</u>

The Committee and Sheppard jointly proposed a plan of liquidation and accompanying disclosure statement on October 9, 2009. After a hearing held on November 13, 2009, the disclosure statement was approved over an objection, with certain modifications. A first amended plan and disclosure statement were filed later in the day November 13, 2009. After the voting classes voted in favor of the Plan, and with no objections filed to the Plan, the Plan was approved after a confirmation hearing held on December 18, 2009.

The Effective Date of the Plan occurred shortly after confirmation, on December 22, 2009. On that date, Julianne Viadro, as trustee of the Humboldt Creamery Liquidating Trust, succeeded the Debtor as representative of the Debtor's estate.

## V.

## RETENTION AND PRIOR COMPENSATION

On June 5, 2009, the Court entered its order authorizing the Debtor to retain Sheppard as its bankruptcy reorganization counsel [Dckt #101] (the "<u>Sheppard Employment Order</u>"). A true and correct copy of the Sheppard Employment Order is attached to this Second Application as <u>Exhibit B</u>.

This is Sheppard's second and final interim application for payment of fees and reimbursement of costs in this case. Sheppard has not received payments from the Debtor on account of work performed during the Second Application Period.

## VI.

## EXHIBITS TO APPLICATION

The exhibits attached to this Application are as follows:

A copy of the First Application Order is attached as <u>Exhibit A</u>.

A copy of the Sheppard Employment Order is attached as <u>Exhibit B</u>.

Detailed statements (the "<u>Statements</u>") of the services Sheppard performed and the out-of-pocket expenses Sheppard incurred during the Application Period are set forth on <u>Exhibit C</u>. The Statements set forth Sheppard's time and expense records as kept in the ordinary course of Sheppard's business, and contains the following information: the names of each attorney or

paralegal performing services, the description of the services, and the amount of time incurred for their services. The Statements are organized in chronological order, separated by billing categories for each task or matter (each a "Project Billing Category") as required by the Guidelines. A summary of the professional fees incurred by each attorney or paralegal performing services, the hourly rate, the amount of time spent and related fees, is set forth on Exhibit C at page 112. A summary of Sheppard's expenses is set forth on Exhibit C at pages 113-115.

A summary of the Project Billing Categories used by Sheppard during the Application Period is attached as Exhibit D. That summary includes the total professional hours spent and the total fees requested under each category.

Copies of the resumes of Pete Stone and Melanie Yuvienco, the paraprofessionals who worked on this Bankruptcy Case during the Application Period, are attached as Exhibit E and Exhibit F, respectively.

A copy of Sheppard's letter to Len Mayer, the Debtor's designated responsible individual, forwarding him a copy of this Application and inviting discussion, questions, comments, concerns or objections to the Application, is attached as Exhibit G.

## VII.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

Sheppard spent a total of 1,161.00 hours during the Second Application Period in performing the services described in this Second Application, at an average hourly billing rate of approximately $454.90 (not including the amounts and hours for the estimated $16,000 in preparing this Application and the fee applications for the Debtor's other professionals, described above). Incorporating the summary of professional services in the First Application, Sheppard spent a total of 2,600.10 hours throughout the case, at an average hourly billing rate of approximately $442.00. Cost savings to the estate resulted from the discount in the hourly rate of Michael Ahrens. The standard hourly rate of Mr. Ahrens is $755 but he discounted it for this case at the request of the client to $725.

12

W02-WEST:5MML1\402402621.2

FINAL FEE APPLICATION

# VIII.

## SUMMARY BY PROJECT BILLING CODES

A.     Maintenance of Records

In compliance with the Guidelines, Sheppard maintained its time records on a "Project Billing" basis.  Exhibit D provides a summary of the Project Billing Categories, the total professional hours spent in each category and the total fees requested for each category.

B.     Use of Project Billing Categories

A discussion of the work Sheppard performed in each Project Billing Category is set forth in the paragraphs that follow.  Under the Guidelines, "[t]he maximum amount that should be included in a single category should generally be $20,000.  This cap may be exceeded where further breakdown is impractical."  See Northern District Guidelines, at § I.3.  In some instances the fees for a single category of project in this Application exceeded $20,000.  This is a result of the size and scope of certain of the projects Sheppard performed.  Accordingly, it would be impractical to break down all of the categories in this case to $20,000 or less.

It is inevitable that not all matters fit precisely into one category, or that some items fit appropriately into more than one category.  Additionally, as in the case of telephone conferences or meetings where more than one subject is discussed, a time entry dealing with more than one subject must occasionally be placed in only one category.  Thus, while Sheppard has diligently attempted to segregate its time into the appropriate category, there may be some overlap between and among categories.

In some cases, Sheppard has billed for the services of more than one person in connection with a meeting (either internal or external) or a conference call with a third party.  Sheppard believes that this is justified here by the complexity and scale of this bankruptcy.

A discussion of the work performed in the Project Billing Categories follows below.

**1.     Employee Matters**

As an operating company, the Debtor had approximately 170 employees on the petition date in its different facilities in Fernbridge, Los Angeles and Stockton.  The Debtor's reorganization efforts necessarily meant addressing the situation of its employees, either by

-13-

retaining them, terminating them, or dealing with their pension, severance and other claims. To resolve the many employee issues that arose, especially around the time of the sale to Foster Farms, Sheppard was able to utilize the expertise of its labor and employment labors. Among other things, Sheppard's attorneys reviewed and strategized regarding compliance with the WARN Act, drafted WARN Act notices, resolved issues relating to transitioning employees from the Debtor to Foster Farms, analyzed COBRA issues, analyzed and strategized regarding employee benefits and severance issues, analyzed issues relating to the termination of Debtor's 401(k) plan, strategized with the Debtor on union negotiations, and prepared termination letters for certain employees.

Sheppard spent a total of 52.40 hours and incurred fees totaling $25,177.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 9.

**2.    Insurance Issues.**

Sheppard negotiated with the Debtor's various insurance carriers regarding payments of premiums that were interrupted by cash shortages, coordinated with the carriers, Foster Farms and CoBank regarding the cancellation of policies as of the closing date, analyzed worker's compensation and director and officer insurance issues, and coordinated regarding the payment of insurance refunds.

Sheppard spent a total of 11.20 hours and incurred fees totaling $3,961.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 13.

**3.    Case Administration.**

Sheppard monitored the docket and performed other tasks related to administration of the bankruptcy case.

Sheppard spent a total of 1.50 hours and incurred fees totaling $480.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 14.

**4.    Operations.**

Sheppard coordinated with the Debtor and other parties in interest regarding operational issues such as the maintenance of Debtor's records after the sale, issues related to FBI visits, the terms of employment of the Debtor's CEO and CFO following the sale to Foster Farms, and the

Debtor's obligations following said sale.

Sheppard spent a total of 6.40 hours and incurred fees totaling $4,508.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 15.

**5. Utilities Issues.**

Sheppard analyzed issues relating to utility bonds posted pre- and post-petition, and coordinated with certain utilities regarding refunds on the adequate assurance bonds posted at the outset of the case.

Sheppard spent a total of 1.50 hours and incurred fees totaling $525.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 16.

**6. Case Administration – General.**

Sheppard performed miscellaneous tasks related to the bankruptcy case, including staying in contact with CoBank and Duff & Phelps regarding the progress of the case, preparing status conference statements and related filings, preparing a default request on a stipulation with CROPP (an organic milk supplier), coordinating with the Debtor regarding post-sale issues, and conferring about the case with the U.S. Attorney's office.

Sheppard spent a total of 9.30 hours and incurred fees totaling $3,501.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 17.

**7. Committee Matters/Communications.**

Sheppard remained in constant communication with the Committee throughout the case and in the Second Application Period. Among other things, Sheppard conferred with the Committee's counsel regarding tax refunds, estate claims and their assignment to the Committee, the financial history of the Debtor, information related to the Debtor's directors and officers, claims analyses, the Debtor's schedules, and a variety of other issues. This cooperation proved fruitful as the Debtor and Committee were able to work together on various matters for the benefit of the estate, not least the Plan and Disclosure Statement.

Sheppard spent a total of 6.80 hours and incurred fees totaling $3,059.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 19.

Case: 09-11078   Doc# 428   Filed: 01/29/10   Entered: 01/29/10 10:25:39   Page 19 of 33

**8.    Creditor Inquiries.**

Sheppard has responded to various inquiries throughout the case and continued to do so during the Second Application Period. These inquiries included requests by unsecured creditors for information about the sale process and status of the case, calls from counterparties to contracts inquiring about notices they had received in connection with the sale process, requests for information from suppliers, calls from creditors inquiring about the disclosure statement hearing, and calls from claimants in connection with claim objections, among others.

Sheppard spent a total of 9.30 hours and incurred fees totaling $3,105.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 22.

**9.    Operating Reports.**

Sheppard has worked closely with the Debtor's accountants to stay on track with the filing of monthly operating reports. Sheppard has conferred with the Debtor's accountants regarding various issues related to the operating reports, has reviewed and commented on said reports, and has compiled and filed said reports.

Sheppard spent a total of 5.70 hours and incurred fees totaling $1,995.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 23.

**10.    Schedules/Statement of Financial Affairs.**

Sheppard reviewed material sent by the Debtor and prepared the Debtor's schedules and statement of financial affairs.

Sheppard spent a total of 3.80 hours and incurred fees totaling $1,881.00 on this Project Billing Category, as summarized on Exhibit C, p. 23. These fees were actually incurred during the First Application Period but were not included in Sheppard's first interim fee application due to a clerical error.

**11.    Service Lists.**

Sheppard, mostly through the use of legal assistants, constantly updated and maintained the limited notice service list and the creditor matrix, and also compiled a service of list of counterparties to executory contracts to be noticed.

Sheppard spent a total of 12.00 hours and incurred fees totaling $3,285.00 during the

Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 25.

**12.     US Trustee Compliance/341 Meeting/Debtor Interview.**

Sheppard prepared the Debtor's Responsible Individual for and participated in an interview of the Debtor by the United States Trustee which largely concerned the background of fraud by the Debtor's former CEO.

Sheppard spent a total of 1.30 hours and incurred fees totaling $902.00 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 26.

**13.     US Trustee Fees.**

Sheppard researched and conferred with the Debtor regarding the proper amount of U.S. Trustee fees to be charged in connection with the sale to Foster Farms, which led to a $10,000 reduction such fees.

Sheppard spent a total of 2.70 hours and incurred fees totaling $1,132.50 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 27.

**14.     Claims - Priority.**

One of the key aspects of demonstrating the feasibility of the Debtor's Plan and providing for its successful consummation was establishing that the funds set aside in the Compromise Agreement were sufficient to cover valid priority claims.  To that end, Sheppard worked with the Debtor to analyze the priority claims, conducted related research, and arrived at an estimate of such priority claims.  This estimate was used during the negotiations of the Compromise in determining the amounts to be set aside for payment of priority claims.  Later, after the applicable bar dates passed, Sheppard was able to analyze all of the priority claims filed before the hearing on confirmation of the Plan.  These claims were numerous given that approximately 196 employees worked for the Debtor during the 180 day period prior to the petition date, and many of these filed priority claims in this case.  The claims were also large in number, with approximately $4,270,210.62 in priority claims asserted, of which $1,970,449.22 and $1,213,478.35 were asserted by the Teamsters and the CDFA, respectively.  Sheppard worked with the Debtor to review the filed priority claims, file objections to such priority claims, and work out stipulations resolving certain of the claims.  This included researching and disputing the merits of the

Case: 09-11078   Doc#: 428   Filed: 01/29/10   Entered: 01/29/10 10:25:39   Page 21 of 33

Teamsters and CDFA claims, negotiating with the Teamsters and CDFA, and ultimately arriving at stipulated resolutions that reduced the Teamsters' priority claim to $215,550.27 and the CDFA's priority claim to $60,000 (plus a potential for $40,000 at later date if funds are available). Thus in the end, Sheppard was able to reduce the priority claims from $4,270,210.62 to approximately $470,984.07.

Sheppard moved for and obtained bar dates for administrative claims and 503(b)(9) claims in order to gain an understanding of those claims in advance of plan confirmation. Sheppard also reviewed administrative claims, including 503(b)(9) claims, with a view towards the feasibility of the Plan. Sheppard negotiated with certain administrative claimants to arrive at stipulations regarding their claims, and objected to certain other claims. As a result, Sheppard and the Debtor estimated that the $688,684.62 in administrative and 503(b)(9) claims (excluding fee claims of professionals) would be reduced to approximately $508,422.37.

As a result of the foregoing, Sheppard was able to provide for the successful consummation of the Debtor's Plan, and was able to demonstrate in the Declaration of Len Mayer in Support of Plan Confirmation that the Plan was feasible.

Sheppard spent a total of 245.90 hours and incurred fees totaling $93,534.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 45.

**15.     Claims – Secured.**

Sheppard worked with the Debtor to handle issues relating to the secured claim of CoBank, which had a lien on substantially all of the Debtor's assets.

Sheppard spent a total of 1.30 hours and incurred fees totaling $942.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 46.

**16.     Claims – Unsecured.**

Sheppard reviewed the unsecured claims filed in the case and coordinated with the Debtor and other parties in interest regarding such claims.

Sheppard spent a total of 3.00 hours and incurred fees totaling $1,939.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 47.

**17. Claims Administration/Objections.**

Sheppard also moved for and obtained a bar date for governmental claims which facilitated its analysis of priority claims noted above. Further, Sheppard conferred and negotiated with vendors with potential administrative claims regarding payment of postpetition amounts due. Sheppard also managed the objections filed against administrative and priority claims.

Sheppard spent a total of 23.90 hours and incurred fees totaling $8,519.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 50.

**18. Cash Collateral.**

Sheppard advised and coordinated with the Debtor regarding its use of cash collateral following the sale to Foster Farms.

Sheppard spent a total of 1.00 hours and incurred fees totaling $725.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 50.

**19. DIP Financing.**

Sheppard reviewed the budgets under the DIP Loan Agreement and coordinated with the Debtor and CoBank regarding budgeted expenses and performance against the budget.

Sheppard spent a total of 4.20 hours and incurred fees totaling $2,516.00 on this Project Billing Category, as summarized on Exhibit C, p. 51. Of the foregoing hours, 1.90 occurred during the Second Application Period, and 2.30 occurred during the First Application Period, but were inadvertently left out of Sheppard's first interim fee application due to a clerical error.

**20. Financing – General.**

Sheppard conferred with counsel for CoBank on issues related to the prepetition financing of the Debtor.

Sheppard spent a total of 0.80 hours and incurred fees totaling $580.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 52.

**21. Disclosure Statement.**

Sheppard strategized with Committee counsel on the content of the Disclosure Statement, revised the draft Disclosure Statement sent by the Committee, drafted sections of the Disclosure Statement, and coordinated with the Committee regarding further revisions to the Disclosure

W02-WEST:5MML1\402402621.2                                        FINAL FEE APPLICATION

Statement. Sheppard also reviewed the objections to the Disclosure Statement, strategized with the Committee regarding a response to the same and drafted inserts to address the objections. Finally, Sheppard represented the Debtor at the hearing on the adequacy of the Disclosure Statement, at which hearing the Disclosure Statement was approved.

Sheppard spent a total of 28.50 hours and incurred fees totaling $14,397.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 54.

### 22. Plan Implementation.

Sheppard coordinated with the Debtor, the Liquidating Trustee and the Committee regarding items needed to close the Plan and the manner in which the transition to the Liquidating Trustee would be facilitated. This involved conference calls with the Liquidating Trustee, the Committee and the Debtor, drafting a letter to Foster Farms notifying them of the succession, and the analysis of various issues that arose related to the implementation of the Plan.

Sheppard spent a total of 7.60 hours and incurred fees totaling $3,457.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 55.

### 23. Plan of Reorganization.

As discussed above, in order to provide for the funds necessary to confirm a plan in this case, Sheppard negotiated the Compromise with CoBank, the Committee and certain other parties in interest pursuant to which funds were set aside for use in connection with a plan. These negotiations had been taking place in some form over the course of the case but intensified in the days prior to the sale hearing on August 12, 2009. Sheppard held intensive negotiations over the phone and in person at Sheppard's offices, ultimately resulting in the Compromise, which was first memorialized in a term sheet that was signed by the Debtor, the Committee and CoBank at the sale hearing. Sheppard then filed a motion that was heard on shortened time to approve the Compromise. Sheppard reviewed the objections filed to that motion and advocated approval of the Compromise at the hearing. The compromise was approved, and the moneys necessary for plan conformation were thus set aside from the proceeds of the sale which might otherwise have gone to CoBank as a significantly undersecured creditor with a lien on the all of the assets sold to Foster Farms.

Case: 09-11078    Doc# 428    Filed: 01/29/10    Entered: 01/29/10 10:25:39    Page 24 of 33

After approval of the Compromise, Sheppard worked with the Committee to draft a plan of liquidation and liquidating trust agreement. Sheppard worked with the Committee to address issues that arose in the plan confirmation process and worked with the Committee on the brief in support of plan confirmation. Sheppard also used its review of the priority and administrative claims in this case to draft a Declaration of Len Mayer in support of plan confirmation that primarily went to the feasibility of the Plan. Sheppard also prepared Mr. Mayer to testify at the plan confirmation hearing if need be, and represented the Debtor at said hearing.

Sheppard spent a total of 92.70 hours and incurred fees totaling $45,963.00 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 61.

### 24. **<u>Bankruptcy Court Litigation.</u>**

Sheppard oversaw various litigation matters in Bankruptcy Court throughout the Second Application Period. Among other things, Sheppard prepared status conference statements, prepared demand letters to be sent to parties in connection with delinquent accounts, and performed other litigation-related tasks.

Sheppard spent a total of 9.80 hours and incurred fees totaling $4,188.00 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 63.

### 25. **<u>Deposition.</u>**

Sheppard drafted a summary of the deposition of the Debtor's former outside auditor and conferred with the Debtor regarding said deposition.

Sheppard spent a total of 3.90 hours and incurred fees totaling $1,150.50 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 63.

### 26. **<u>Federal Court Litigation.</u>**

Sheppard analyzed various issues related to potential claims against former officers and directors and coordinated with the Committee regarding a stipulation covering such claims.

Sheppard spent a total of 1.30 hours and incurred fees totaling $942.50 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 64.

### 27. **<u>Other Litigation.</u>**

Sheppard also coordinated with outside parties regarding litigation or potential litigation

W02-WEST:5MML1\402402621.2

FINAL FEE APPLICATION

outside of bankruptcy court, including coordinating with the Department of Justice regarding its investigation and conferring with counsel for Debtor's insurance carrier regarding a state court trial with a former employee.

Sheppard spent a total of 1.10 hours and incurred fees totaling $623.50 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 65.

**28.** **<u>Preference Analysis.</u>**

Sheppard coordinated with the Debtor and the Committee to conduct an analysis of possible preference actions, and reviewed materials regarding one particular preference action against Dairy Farmers of America.

Sheppard spent a total of 4.10 hours and incurred fees totaling $2,972.50 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 66.

**29.** **<u>Relief From Stay Litigation.</u>**

Sheppard represented the Debtor's interests in various relief from stay matters, including a stipulation for stay relief with CROPP, a supplier, and the stay relief granted to CoBank in the Compromise as to assets not sold to Foster Farms. Sheppard also represented the Debtor and strategized with the Committee in connection with a stay relief action filed by certain note holders that concerned their ability to file state court actions against the Debtor's former officers and directors.

Sheppard spent a total of 8.80 hours and incurred fees totaling $4,846.50 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 68.

**30.** **<u>State Court Litigation.</u>**

Sheppard coordinated with CoBank regarding CoBank's application for appointment of a receiver on the properties not sold to Foster Farms, which would as a practical matter relieve the Debtor from having any further operational concern regarding these properties. After the first application for a receiver failed, Sheppard coordinated with CoBank and enlisted the aid of Sheppard's attorneys in Los Angeles to facilitate the appointment of the receiver in Los Angeles Superior Court. After the receiver was appointed, Sheppard's Los Angeles attorneys also attended the hearing on the expansion of the receiver's duties. Finally, Sheppard also coordinated with the

Debtor and with CoBank regarding transitional issues related to the Los Angeles facility.

Sheppard spent a total of 11.00 hours and incurred fees totaling $6,682.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 70.

**31.** **Professionals' Compensation (Other than Sheppard).**

Sheppard coordinated with the Debtor's accountants and its investment bankers regarding first interim fee applications in this case. Sheppard prepared and filed these fee applications in conjunction with these professionals. Sheppard also coordinated with all estate professionals regarding a stipulation for the filing of first interim fee applications prior to the sale motion.

Sheppard spent a total of 29.05 hours and incurred fees totaling $11,686.25 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 74.

**32.** **Professionals' Employment (Other than Sheppard).**

Sheppard drafted employment applications for a real estate broker and also to employ the Debtor's CEO and CFO after the sale to perform the necessary maintenance work required until plan confirmation.

Sheppard spent a total of 15.30 hours and incurred fees totaling $5,530.50 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 76.

**33.** **Sheppard Compensation.**

Sheppard prepared and filed its first interim fee application and attended the fee application hearing.

Sheppard spent a total of 38.15 hours and incurred fees totaling $15,299.75 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 79.

**34.** **Sheppard Employment.**

Upon receiving a letter from Bon Suisse in connection with the Debtor's sale motion, Sheppard conducted a conflicts search and prepared and filed a disclosure.

Sheppard spent a total of 1.10 hours and incurred fees totaling $352.00 during the Second Application Period on this Project Billing Category, as summarized on Exhibit C, p. 79.

**35.** **Asset Disposition.**

This chapter 11 case was centered around a sale of the Debtor's primary business assets

W02-WEST:5MML1\402402627.2                                                    FINAL FEE APPLICATION

under Bankruptcy Code section 363. Broadly stated, the Debtor's reorganization strategy was to obtain the DIP financing and permission to use cash collateral necessary to enable it to operate while it marketed its assets for sale. Among other things, the Debtor's operation in bankruptcy allowed it to generate an accurate financial history that potential buyers could trust, given the background of the Debtor's bankruptcy filing. Sheppard's bankruptcy and real estate lawyers worked together to make the sale process work – negotiating with potential buyers, negotiating and documenting the deal with Foster Farms, obtaining Court approval of the sale, and closing the sale. All of these efforts by Sheppard allowed the sale to be approved and many jobs to be saved, and paved the way for the confirmation of the Plan.

Both the bankruptcy and real estate issues presented were complex, yet Sheppard's attorneys worked diligently to resolve them and ultimately close the sale. On the bankruptcy side, this included first obtaining court approval of the proposed bidding procedures at a hearing held on July 27, 2009. The procedures were approved over objections from certain note holders and the Committee. The bankruptcy work also included obtaining court approval of the sale, which involved researching and drafting a complex and thorough sale motion, responding to objections with a reply brief, negotiating with the objecting parties prior to and at the sale hearing, preparing witnesses prior to the sale hearing, and pursuing the approval of the sale motion at the hearings held on August 12 and 13, 2009. A host of other bankruptcy issues were also tackled by the Sheppard team, including: (i) negotiating with potential bidders; (ii) analyzing assumption and assignment of contract issues and negotiating with CoBank and Foster Farms for the assumption of various contracts, thereby eliminating significant liabilities for the estate; (iii) managing the contract assumption process by reviewing the contracts in question and giving the appropriate notices to counterparties; (iv) reviewing and drafting sections of the form asset purchase agreements; (v) reviewing asset purchase agreements sent in by various parties for both the Debtor's core assets and other assets; (vi) negotiating an amendment to the asset purchase agreement with the Debtor's stalking horse bidder when the deal almost fell through after the departure of one of the Debtor's key customers; (vii) negotiating an asset purchase agreement with a potential overbidder; (viii) holding an auction on the Debtor's Los Angeles and Loleta properties

that produced the eventual purchase of the Los Angeles property; (ix) negotiating with CoBank regarding an acceptable price of the Debtor's Los Angeles and Loleta properties; (x) negotiating with taxing authorities for payment of property taxes out of the sale of the Debtor's assets and the form of the sale order that would address these payments; (xi) working with the Debtor and its professionals to prepare post-closing budgets through plan confirmation; (xii) negotiating with CoBank, the Committee and objecting parties to resolve issues related to the sale, including by holding weekly conference calls with said parties; and (xiii) coordinating with the Bank, the Debtor and Foster Farms regarding the working capital adjustment to the purchase price under the APA post-closing.

On the real estate side, a considerable amount of due diligence, transactional drafting and negotiation and closing management needed to be done in connection with all of the Debtor's properties in order to finalize the sale. As to due diligence, this included permit and entitlement work in Los Angeles, reviewing title reports and negotiating with the title company regarding the removal of items thereon, and coordinating with various taxing authorities regarding property taxes to be paid. The drafting and negotiation work included: (i) drafting an asset purchase agreement for the Debtor's Los Angeles and Loleta properties; (ii) negotiating changes to the asset purchase agreement for the Debtor's core facility in Fernbridge; (iii) negotiating and drafting an amendment to a key dairy lease that resolved issues with the assumption of said lease; (iv) drafting complex escrow instructions providing for the payment of contract cures, taxes and various items out of the proceeds of the sale at closing; (v) resolving mechanics lien issues; and (vi) drafting an escrow agreement for the working capital holdback in connection with the sale. As to closing management, this included: (i) drafting checklists; (ii) conferring with buyer's counsel and with the title company; (iii) coordinating the payment of taxes, contract cures and other items out of the proceeds of the sale at closing; (iv) working with Sheppard's tax lawyers and the Debtor to file the Debtor's final sales tax return due on the sale of a business; and (v) addressing the myriad closing issues that arose.

Finally, Sheppard's paraprofessionals maintained an online data room for potential purchases and coordinated with parties interested in acquiring access to the data room or

FINAL FEE APPLICATION

additional information.

Sheppard spent a total of 492.20 hours and incurred fees totaling $240,394.00 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 108.

**36.**     <u>**Executory Contract – Analysis.**</u>

Sheppard analyzed the Debtor's executory contracts and related cure costs, negotiated with counterparties to executory contracts regarding assumption and assignment issues, and prepared related notices and other documents.

Sheppard spent a total of 12.40 hours and incurred fees totaling $7,394.50 during the Second Application Period on this Project Billing Category, as summarized on <u>Exhibit C</u>, p. 111.

**IX.**

**COMPENSATION FOR SERVICES OF LEGAL ASSISTANTS**

Professionals may be compensated for the service of their legal assistants under the Guidelines.  Sheppard seeks to be compensated or the services provided by two of its legal assistants.  The services for which compensation is sought would have had to be done by Sheppard attorneys if not done by Sheppard's legal assistant, and would have been compensable under the Guidelines.  Sheppard did not bill for and wrote off the time of certain of Sheppard's personnel for administrative and secretarial tasks.  The résumés of legal assistant Peter Stone and of Melanie Yuvienco are attached to this Application as <u>Exhibit E</u> and <u>Exhibit F</u>, respectively.  Mr. Stone's résumé will show that Mr. Stone is specially trained, has experience in large chapter 11 bankruptcy cases, and is not primarily a secretary or clerical worker.  Similarly, Ms. Yuvienco's résumé is specially trained, has experience in corporate matters, and is not primarily a secretary or clerical worker.

**X.**

**SUMMARY OF SHEPPARD'S EXPENSES**

Sheppard seeks expense reimbursement for expenses totaling $27,671.81.  A summary of expenses advanced by Sheppard and a detailed statement of expenses advanced by Sheppard are set forth on the attached <u>Exhibit C</u>, at pages 113 to 115.  These costs include courier services, overnight mail, postage, photocopying, computerized legal research, facsimile and long distance

telephone calls, filing fees and transportation. Such expenses are billed to the Debtor's estate at the actual or projected actual cost to Sheppard, and no surcharge or overhead is or has been added.

Although Sheppard charges its non-bankruptcy clients for secretarial overtime, word processing costs and incoming faxes, Sheppard has *not* sought recovery of those costs from the Debtor's estate and those items have been deleted from <u>Exhibit C</u>. Sheppard's internal billing system is designed to bill facsimile charges and long distance charges together for all of its clients. Sheppard is thus unable to separate its facsimile and long distance charges for this matter. Sheppard does not charge for facsimile, other than the actual cost of any long-distance phone charges. Sheppard is seeking $281.65 for both facsimile and long distance charges – a sum that Sheppard believes is reasonable given the nature of the case and the services rendered on behalf of the Debtor. Sheppard believes that amount is significantly lower than the amount to be expected in most cases of this size. Sheppard attributes that savings to Sheppard's policy of scanning the documents in this case into PDF format in order to e-mail those documents to various parties. Sheppard does not charge the Debtor for the scanning of those documents.

Sheppard uses the services of Xerox Corporation ("Xerox") for its in-house photocopy services. Sheppard has billed the estate at a rate of 25¢ per page for copies, which represents the actual cost that Xerox charges Sheppard. Sheppard sends photocopying and mailing projects to outside vendors when such vendors are capable of providing service to the Debtor more efficiently and economically than Sheppard's in-house service providers. Due to the size of this case, Sheppard used the services of such a vendor frequently during the initial stages of this case as well as for services thereafter which needed to be sent to numerous other entities. Sheppard bills the estate for such projects at the actual cost to Sheppard, a sum that Sheppard believes is reasonable given the nature of the case and the services rendered on behalf of the Debtor.

## XI.

## COMPLIANCE WITH GUIDELINES

Except as noted above with respect to the limit on Project Billing Categories, Sheppard believes that it has prepared the Application in compliance with the Guidelines.

Sheppard has not entered into any agreement, written or oral, express or implied, with any

other party-in-interest or any attorney for any party-in-interest in the case for the purpose of fixing the amount of any fee or compensation to be paid from the assets of the Debtor's estate.

All compensation and expense reimbursements requested by Sheppard have been billed at rates in accordance with practices no less favorable than those customarily employed by Sheppard and generally accepted by Sheppard's clients.

Pursuant to the Guidelines, Sheppard is serving a true and correct copy of the Application on the Debtor's Responsible Individual, along with transmittal correspondence inviting discussion, questions, comments, concerns or objections to the Application. A copy of such correspondence dated January 28, 2010 and addressed to Mr. Len Mayer, the Debtor's designated responsible individual, is attached as Exhibit G to this Application.

**XII.**

**CONCLUSION**

WHEREFORE, Sheppard prays that the Court enter an order:

(1) granting interim and final approval of compensation for professional legal services rendered and reimbursement of expenses incurred as counsel for the Debtor from July 18, 2009 through December 22, 2009 totaling $571,821.81, consisting of professional fees of $544,150.00 and reimbursement of expenses of $27,671.81;

(2) granting final approval of the $640,032.51 in compensation approved in the First Application Order, consisting of $621,106.00 in professional fees and $18,926.51 in expenses;

(3) authorizing and directing the Liquidating Trustee to make immediate payment to Sheppard of all allowed and outstanding amounts approved in its Application but not yet paid to Sheppard; and

(4) granting such other and further relief as the Court may deem just and proper.

Case: 09-11078    Doc# 428    Filed: 01/29/10    Entered: 01/29/10 10:25:39    Page 32 of 33

Dated: January 29, 2010

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By           _/s/ Michael H. Ahrens_
                 MICHAEL H. AHRENS

Attorneys for debtor
Humboldt Creamery, LLC

W02-WEST:5MML1\402402627.2

FINAL FEE APPLICATION